KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Kenneth H. Eckstein
P. Bradley O'Neill
Joshua K. Brody

Proposed Counsel for Debtors and Debtors in Possession


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| BALLY TOTAL FITNESS OF ) | |
| GREATER NEW YORK, INC., <u>et al.</u>, ) | Case No. 08-14818 (BRL) |
| ) | |
| Debtors. ) | |
| ) | Jointly Administered |
| ) | |

**DEBTORS' EMERGENCY MOTION PURSUANT TO**
**SECTIONS 105, 361, 362 AND 363 OF THE BANKRUPTCY CODE,**
**AND RULE 4001(b) OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE FOR (I) ENTRY OF INTERIM AND FINAL ORDERS**
**(A) AUTHORIZING THE USE OF CASH COLLATERAL, (B) GRANTING**
**ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND (C)**
<u>**GRANTING RELATED RELIEF AND (II) SCHEDULING A FINAL HEARING**</u>

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Bally Total Fitness Holding Corporation ("**Bally**") and certain of its direct and

indirect subsidiaries, as debtors and debtors-in-possession (collectively, the "**Debtors**"),

respectfully represent:

<u>**BACKGROUND**</u>

1.      On the date hereof (the "**Petition Date**"), the Debtors commenced cases

(the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**").  The Debtors are continuing to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors and their non-debtor affiliates and subsidiaries (collectively, the "**Company**") are among the largest full-service commercial operators of fitness centers in North America.  As of September 30, 2008, the Company operated 349 fitness centers concentrated in 26 states, collectively serving approximately 3.1 million members (the "**Club Members**").  In addition, the Debtors operate 39 clubs pursuant to franchise and joint venture agreements in the United States, Asia, Mexico, and the Caribbean. The Company maintains its principal executive office in Chicago, Illinois.

3.      Bally is the ultimate corporate parent of each of the Debtors. The Company's corporate structure is comprised of: (i) 29 directly and indirectly wholly-owned subsidiaries, 28 of which have sought chapter 11 protection, and (ii) 18 directly and indirectly partially-owned subsidiaries, 14 of which have sought chapter 11 protection.  As of the Petition Date, the Debtors currently employ approximately 14,572 employees, of whom approximately 6,820 are full-time employees, approximately 7,750 are part-time employees, and approximately 2 are temporary employees.

4.      All of the Company's significant revenues arise from the commercial operation of fitness centers, which are located primarily in major metropolitan markets in the United States.  For the nine months ending September 30, 2008, the Company's consolidated net revenue was approximately $479.5 million.  As of September 30, 2008, the Company had consolidated assets (including non-debtor affiliates) totaling approximately $1,376,000,000 and recorded consolidated liabilities totaling approximately $1,538,000,000.

KL2 2583365.1

5.    Each of the Debtors previously filed a bankruptcy case on July 31, 2007 (the "**Prior Bankruptcy Cases**") in this Court.  On September 17, 2007, this Court confirmed a chapter 11 plan of reorganization (the "**Prior Plan**") and on October 1, 2007, the Debtors emerged from chapter 11.  Under the Prior Plan, Harbinger Capital Partners acquired 100% of the common stock of the reorganized Bally.

## JURISDICTION

6.    The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. sections 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. section 157(b)(2).  Venue is proper before the Court pursuant to 28 U.S.C. sections 1408 and 1409.

## RELIEF REQUESTED

7.    The Debtors hereby move the Court (the "**Motion**") for (i) entry of an interim order in the form attached hereto as Exhibit A (the "**Interim Order**") (a) authorizing the Debtors' use of cash collateral, (b) granting the Prepetition Secured Creditors (as defined below) adequate protection with respect to any diminution in the value of the Senior Secured Lenders' interests in the Prepetition Collateral (as defined below), and (c) scheduling a final hearing on the Motion (the "**Final Hearing**"); and (ii) entry of an order (the "**Final Order**") granting such relief on a final basis.

## THE DEBTORS' CAPITAL STRUCTURE

8.    As of September 30, 2008, the Debtors' total consolidated debt (excluding trade debt) was approximately $755 million. The Debtors' debt structure is comprised of the following: (i) the Credit Agreement (as defined below); (ii) the 13% Senior Secured Notes Due 2011 (the "**Senior Secured Notes**"); (iii) the 15-5/8%/14% Senior Subordinated Toggle Notes

due 2013 (the "**Subordinated Toggle Notes**"); and (iv) various capital leases and other secured debt.

A. **The Credit Agreement**

9.    Bally is party to that certain Credit Agreement (the "**Credit Agreement**"), dated October 1, 2007, with Morgan Stanley Senior Funding, Inc. (the "**Agent**"), as Administrative Agent and Collateral Agent, Wells Fargo Foothill, LLC, as Revolving Credit Agent, and the CIT Group/Business Credit, Inc., as Revolving Syndication Agent and certain other lenders party thereto (collectively, the "**Senior Secured Lenders**").  The Credit Agreement provides for financing of up to $292 million, consisting of $50 million in a senior secured revolving credit facility with a $40 million sublimit for letters of credit (the "**Revolver Facility**") and a six-year $242 million senior secured term loan facility (the "**Term Loan**").  The proceeds from the Term Loan and the Revolver Facility were used to refinance the amounts outstanding under the Company's debtor-in-possession credit agreement from the Prior Bankruptcy Cases and to provide additional working capital.  Bally's obligations under the Credit Agreement are guaranteed by most of Bally's domestic subsidiaries.

10.    Principal amounts outstanding under the Term Loan became payable in quarterly installments of $605,000 beginning on June 30, 2008, with a final installment of the balance at the Term Loan Maturity Date (as defined in the Credit Agreement).  Currently, the rate of interest on borrowings under the Revolving Facility is, at the Company's option, either (i) the Reference Rate (as defined in the Credit Agreement) plus an applicable margin of 4.50% or (ii) the Eurodollar rate (as defined in the Credit Agreement) plus an applicable margin of 5.50%.  The interest rate on borrowings under the Term Loan is, at the Company's option, either (i) the Reference Rate plus an applicable margin of 8.50% or (ii) the Eurodollar Rate plus an applicable margin of 9.50%.  In addition, the fees payable in respect of issued and outstanding letters of

KL2 2583365.1

credit are 5.50% per annum.  In May 2008, the Company entered into an interest expense hedging agreement with Morgan Stanley Capital Services to hedge the Company's interest expense under the Term Loan until October 1, 2010.

11.     Pursuant to that certain Guarantee and Collateral Agreement, dated as of October 1, 2007, between Bally and the Agent, obligations under the Credit Agreement are secured by (subject to certain exceptions) first priority liens and security interests on certain assets and property of the Debtors, including without limitation, accounts, deposit accounts, chattel paper, commercial tort claims, contracts, documents, equipment, general intangibles, instruments, intellectual property, inventory, investment property, all pledged securities, receivables, goods, and books and records and the proceeds thereof (collectively the "**Prepetition Collateral**").  The Prepetition Collateral includes cash collateral of the Agent and the Senior Secured Lenders within the meaning of Section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").[1]

12.     Approximately two months ago, the Debtors, the Agent and certain of the Senior Secured Lenders entered into that certain Temporary Waiver No. 2 and Agreement (the "**Second Waiver**"), dated as of September 23, 2008, to obtain a waiver of certain defaults under the Credit Agreement.  In connection with the Second Waiver, among other things, the Debtors granted the Senior Secured Lenders liens and security interests in approximately 53 leasehold interests and fee-owned properties (the "**Encumbered Leases**").  In return, the Senior Secured Lenders allowed the Company to draw down on the full amount of the Revolver Facility.  In

---

[1] The Company's obligations under the interest expense hedging agreement also constitute secured obligations under the Credit Agreement.

KL2 2583365.1

addition to the Encumbered Leases, as of the Petition Date, the Debtors have approximately 350 leases that are currently unencumbered (the "**Unencumbered Leases**").

13.    As of October 31, 2008, approximately $240.8 million was outstanding under the Term Loan, $44.3 million was outstanding under the Revolver Facility, and $5.7 million of letters of credit were issued.  Under the Credit Agreement, the claims arising from the Term Loan recover after the payment in full of the Revolver Facility from collateral proceeds. The Debtors believe that the value of the Prepetition Collateral is presently sufficient to satisfy the amount of the claims under the Revolver Facility, but less than the amount of the claims under the Term Loan.  As a result, the Debtors believe that the Term Loans are undersecured.

B.    **The Senior Secured Notes**

14.    Pursuant to that certain Indenture, dated as of October 1, 2007 (the "**Senior Secured Notes Indenture**") between Bally and U.S. Bank National Association ("**U.S. Bank**") as Trustee, Bally issued $247,337,500 in aggregate principal amount of the Senior Secured Notes.  The Senior Secured Notes mature on July 15, 2011, and interest thereon is payable semi-annually on January 15 and July 15 of each year.  Bally's obligations under the Senior Secured Notes Indenture are guaranteed by most of Bally's domestic subsidiaries.

15.    The Debtors have granted U.S. Bank, on behalf and for the benefit of the holders of the Senior Secured Notes, a second priority lien on the Prepetition Collateral.  The Debtors believe, however, that the value of the Prepetition Collateral is presently materially less than the amount of the claims under the Credit Agreement.  As a result, the Debtors believe that the second priority liens of the Senior Secured Notes are completely undersecured.

C.    **The Subordinated Toggle Notes**

16.    Pursuant to that certain Indenture, dated as of October 1, 2007 (the "**Subordinated Toggle Notes Indenture**"), between Bally and HSBC Bank USA, National

KL2 2583365.1

Association as Trustee, Bally issued $200,000,000 in aggregate principal amount of the Subordinated Toggle Notes. The Subordinated Toggle Notes will mature on October 1, 2013. Under the terms of the Subordinated Toggle Notes Indenture, prior to the Petition Date, the Debtors were accruing interest expense at a rate of 15-5/8%, Payable in Kind.[2] As of September 30, 2008, approximately $221 million was outstanding under the Subordinated Toggle Notes.

17.    Bally's obligations under the Subordinated Toggle Notes Indenture are unsecured obligations and are not guaranteed by any of the other Debtors. The claims arising from the Subordinated Toggle Notes are subordinated in right of payment to the payment in full of all senior indebtedness of the Company, which includes, among other things, the obligations arising under the Credit Agreement and the Senior Secured Notes Indenture.

### D. **Capital Leases and Other Secured Debt**

18.    The Debtors lease certain equipment under capital leases expiring in periods ranging from one to five years. As of September 30, 2008, approximately $6,674,000 in debt was due on equipment and other property subject to capital leases with various third parties. The Debtors also have additional secured debt in the approximate amount of $1,337,000 as of September 30, 2008. The capital leases and other secured debt are not secured by Cash Collateral.

### EVENTS LEADING TO THE CHAPTER 11 FILING AND THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

19.    As more fully described in the Affidavit of Michael W. Sheehan, Chief Executive Officer of Bally, in Support of First Day Motions (the "**Sheehan Affidavit**"), the Debtors generated negative cash flows and incurred substantial losses from operations after their

---

[2] The Subordinated Toggle Notes Indenture provides that the Subordinated Toggle Notes could accrue interest at a lower rate of 14% if the Debtors meet certain prescribed conditions.

emergence from the Prior Bankruptcy Cases.  One of the primary causes for the Company's poor financial performance was its lack of a suitable, permanent management team.  Specifically, the Company did not have a permanent CEO with experience in the fitness industry.

20.     Effective July 1, 2008, Mr. Sheehan was appointed as Chief Executive Officer of the Company.   Soon thereafter, Mr. Sheehan prepared a comprehensive plan to implement an operational restructuring of the Company, with the goal of improving the Company's financial position for 2009 and beyond.  The comprehensive plan contemplates an operational restructuring of the Company's field organization as well as significant reductions in certain corporate costs (the "**Operational Restructuring and Cost Reduction Plan**").   The Operational Restructuring and Cost Reduction Plan was launched in October 2008.   In connection with the plan, the Company has also begun introducing new initiatives to enhance revenue and cash flow.

21.     Unfortunately, before the Company was able to implement the Operational Restructuring and Cost Reduction Plan, the Company encountered a liquidity crisis in the summer of 2008.  This crisis resulted from, among other things, a long term decline in payment of fees and dues (resulting primarily from a drop off of new Club Member sign-ups during the years 2005-2007) and increased operating expenses and capital expenditures.

22.     On July 24, 2008, the Company delivered notice to the Senior Secured Lenders that it had breached the Credit Agreement's Maximum Senior Secured Leverage Ratio (as defined under the Credit Agreement) and thus was in default under the Credit Agreement. The Company subsequently engaged in negotiations regarding a proposed amendment to the Credit Agreement to provide the Company with the liquidity and covenant relief necessary to continue the Company's operational restructuring through 2009 and beyond.  Specifically, the

Company sought an "over-advance" from the Revolving Lenders, which, when coupled with certain real property sales, would have been sufficient to bridge the Company until the first half of 2009 when it projected it would begin to enjoy positive cash flows. However, due to, among other things, the turmoil in the credit markets, the Company and the Senior Secured Lenders were unable to agree upon a full amendment to the Credit Agreement before the Company was projected to run out of cash necessary to fund its operations on a day-to-day basis. In the interim, the Company and the Senior Secured Lenders entered into two temporary limited waivers (including the Second Waiver) with respect to the Credit Agreement on August 4, 2008, and September 23, 2008.

23. Since beginning implementation of the Operational Restructuring and Cost Reduction Plan, it has been the Company's view that an out-of-court solution to the Company's troubles will provide the maximum benefit for all parties-in-interest. This view is based on the significant benefit that full implementation of the Operational Restructuring and Cost Reduction Plan is projected to have on the Company's EBITDA for 2009. By way of example, although the Company's EBITDA for 2008 is projected to be approximately $17 million, the Company is currently projecting, assuming full implementation of the Operational Restructuring and Cost Reduction Plan and current revenue projections, EBITDA for 2009 of between $50 and $60 million. Indeed, for September 2008 the Company's EBITDA was approximately $1.7 million and for October 2008 – where only a portion of the plan was in place - the Company's EBITDA was approximately $3.5 million. This shows the significant positive impact the Operational Restructuring and Cost Reduction Plan is having on the Company's operations, and demonstrates that the Company's projections for 2009 are achievable.

KL2 2583365.1

24.     In October 2008, the Company took steps to increase its liquidity by drawing approximately $19.3 million against the Revolver Facility, as permitted under the Second Waiver, and selling real property for aggregate net cash proceeds of approximately $3.8 million.  In addition, the Company, with the assistance of their financial advisor and investment banker Houlihan Lokey Howard Zukin Capital, Inc., explored opportunities to obtain additional financing, in both out-of-court and chapter 11 scenarios, from a variety of sources, including certain of their existing Senior Secured Lenders and Senior Secured Noteholders.

25.     In connection therewith, the Company entered extensive discussions with certain of its Term Loan holders regarding a potential sale of the Debtors' assets.  The Debtors, however, were unable to complete the negotiation and documentation of an agreement with such Term Loan lenders before it became necessary to seek chapter 11 protection.  Nevertheless, the Company expects to continue active negotiations with such Term Loan lenders after commencement of these cases in an attempt to complete an asset purchase agreement and debtor-in-possession financing on terms that are satisfactory and in the best interests of the Debtors and their constituencies.

26.     As more fully described in the Sheehan Affidavit, while the Debtors continue their negotiations with the Term Loan lenders regarding a possible sale, they will also prepare for a possible stand-alone restructuring.   Given the Debtors' liquidity crisis, it is necessary for the Debtors to be prepared for both eventualities. The Debtors believe that they have a strong business plan and that a stand-alone reorganization is achievable if they are unable to negotiate a sale of their assets on favorable terms and they are able to obtain sufficient liquidity to bridge the next 90 days.  Under both scenarios, however, if the Debtors are unable to access adequate liquidity immediately, it is highly likely that the Debtors will be unable to

sustain their businesses and, as a result, will be forced to cease operations and liquidate their assets to the detriment of their estates and creditors.

## USE OF CASH COLLATERAL

27.    The Debtors have an immediate need for the use of cash collateral in light of the immediate and irreparable harm that will be suffered by the Debtors' estates if they do not have access to the cash necessary to sustain their businesses as a going concern.  The Debtors have an urgent need to use cash for, among other things, continuing the operation of their businesses in an orderly manner, maintaining business relationships with vendors, suppliers and customers, paying employees and satisfying other working capital and operational needs — all of which are vital to preserving and maintaining the Debtors' going-concern value and, ultimately, effectuating a successful reorganization for the benefit of all parties in interest.

28.    The Debtors use funds deposited in their bank accounts to fund their day-to-day operations.  As of the Petition Date, the Debtors had approximately $17 million of cash on hand which comprises Cash Collateral.  In addition, the Debtors currently forecast receipt of $3.5 million of additional cash over the next 45 days, which is proceeds of the Senior Secured Lenders' collateral.

29.    The interim use of Cash Collateral proposed herein is intended to provide sufficient working capital while the Debtors operate in chapter 11.  As a result, the Debtors seek the use of the Cash Collateral, including cash on hand, as well as proceeds from the postpetition sale of Prepetition Collateral.  The Debtors' use of Cash Collateral will be governed (subject to permitted expenditure variances) by a cash collateral budget (in the form attached as Annex 1 to the Interim Order, the "**Budget**") and will be used mainly to preserve and maintain the value of the Debtors' assets for the benefit of the Debtors' estates and creditors.  The Budget shows the Debtors' cash flow forecasts for the next 13 weeks.

KL2 2583365.1

30.     To successfully navigate through the next 13 weeks of these Chapter 11 Cases, it is extremely important that the Debtors maintain sufficient liquidity to support the continued ordinary course operation of the Debtors' businesses notwithstanding the challenges posed by market conditions and the filing of these Chapter 11 Cases.  Immediate access to Cash Collateral will enable the Debtors to demonstrate to their vendors, suppliers, customers and employees that they have sufficient capital to ensure ongoing operations.  Absent authorization to use the Cash Collateral, the Debtors all but certainly will be unable to sustain their businesses and, as a result, will have to terminate their operations and liquidate their assets, all to the material detriment of all parties in interest.

## PROPOSED ADEQUATE PROTECTION

31.     Prior to filing this Motion, the Debtors shared the proposed Interim Order with the Agent, certain of the Senior Secured Lenders, and certain holders of the Senior Secured Notes (together with the Agent and the Senior Secured Lenders, the "**Prepetition Secured Creditors**").  The Debtors incorporated the comments on the Interim Order that they received from the Prepetition Secured Creditors prior to the filing of this Motion.  Thus, as of the filing of this Motion, the Debtors believe that the Prepetition Secured Creditors are agreeable to the Debtors' use of the Cash Collateral pursuant to terms and conditions outlined in the proposed Interim Order.  As such, the Debtors request that the Court approve use of Cash Collateral on the terms as set forth in the Interim Order and as described below.  The Interim Order imposes certain conditions and restrictions on the Debtors' use of Cash Collateral and grants certain relief

KL2 2583365.1

and adequate protection for the benefit of the Prepetition Secured Creditors, including without

limitation, the following:[3]

    a.    Use of Cash Collateral will be governed by the Budget and will be used to preserve and maintain the value of the Debtors's assets for the benefit of the Debtors' estate and creditors.  In addition, Cash Collateral may be used solely up to the amounts (not to exceed 115% of the amounts set forth in the Budget on a cumulative, aggregate rolling basis measured weekly as of the close of business on Friday of each week), at the times, and for the purposes identified in the Budget reasonably approved by the Agent.  In addition, the Debtors will deliver weekly Budget reconciliation statements to the Prepetition Secured Creditors.

    b.    Use of the Cash Collateral is conditioned on the granting of adequate protection as set forth below.

    c.    Use of the Cash Collateral will be subject to the rights of the Prepetition Secured Creditors to seek further adequate protection as set forth in the Interim Order.

    32.    As adequate protection for, and to the extent of, any diminution in the

value of the Prepetition Secured Creditors' interest in the Prepetition Collateral resulting from

the Debtors' use of the Cash Collateral or the Prepetition Collateral other than the Cash

Collateral (the amount of any such diminution being referred to hereinafter as the "**Adequate**

**Protection Obligations**"), the Debtors propose to provide the following:

    a.    *Interest Payments*. The Debtors will make monthly interest payments to the Agent, for the benefit of the lenders under the Revolver Facility, in the amount of approximately $300,000.

    b.    *Expense Reimbursement*.  The Debtors will pay the Agent's reasonable and documented expenses, not to exceed $100,000 monthly, for professional fees in connection with monitoring the Debtors' use of Cash Collateral and the Chapter 11 Cases.

    c.    *Senior Secured Lenders' Replacement Liens*.  The Senior Secured Lenders shall receive (effective as of the Petition Date), first priority perfected replacement liens (the "**First Priority Replacement Liens**") on all of the

---

[3] The descriptions of the terms of the Interim Order set forth in this Motion are summaries only.  To the extent of any inconsistency between the summaries set forth in this Motion and the terms of the Interim Order, the terms of the Interim Order shall govern.

KL2 2583365.1

Debtors' rights in property acquired postpetition of the same type as the Prepetition Collateral (collectively, with the proceeds and products of any and all of the foregoing, the "**Postpetition Collateral**") and the Encumbered Leases in the same relative priority as the Prepetition Liens

d.    *Senior Secured Notes Replacement Liens*.    The Senior Secured Noteholders shall receive (effective as of the Petition Date) second priority perfected replacement liens (the "**Second Priority Replacement Liens**," and together with the First Priority Replacement Liens, the "**Replacement Liens**") on all of the Debtors' rights in the Postpetition Collateral.

e.    *Senior Secured Lenders' Real Estate Liens*.    The Senior Secured Lenders shall receive (effective as of the Petition Date) first priority perfected liens (the "**First Priority Real Estate Liens**") on all of the Debtors' rights in the Unencumbered Leases in the same relative priority as the Prepetition Liens.

f.    *Senior Secured Notes Real Estate Liens*.    The Senior Secured Noteholders shall receive (effective as of the Petition Date) second priority perfected liens on the Unencumbered Leases (the "**Second Priority Real Estate Liens**," and together with the First Priority Real Estate Liens, the "**Real Estate Liens**").

33.    Notwithstanding the granting of the Real Estate Liens to the Senior Secured Lenders and the Senior Secured Notes, the Debtors preserve their rights, subject to Court approval, to pledge the Unencumbered Assets to a lender who provides debtor-in-possession financing, with liens superior to the First Priority Real Estate Liens and the Second Priority Real Estate Liens.

34.    The approval of the Interim Order shall be without prejudice to the rights and remedies of any party in interest, including the Debtors and any statutory committee, to: (a) review, object to, challenge or contest the validity, perfection or priority of the Prepetition Secured Creditors' liens and security interests on the Prepetition Collateral; or (b) otherwise assert any claims or causes of action against the Prepetition Secured Creditors related thereto.

## BASIS FOR RELIEF REQUESTED

35.    A Debtors' use of estate property is governed by section 363 of the Bankruptcy Code.   Section 363(c)(1) provides that a debtor may use estate property in the ordinary course of business without notice or a hearing.   11 U.S.C. § 363(c)(1).   Section 363(c)(2), however, permits a debtor to use, sell or lease cash collateral only if the entity with an interest in such cash collateral consents or the Court authorizes such use.   11 U.S.C. § 363(c)(1)-(2).

36.    The Debtors propose to provide the Prepetition Secured Creditors with adequate protection to the extent of any diminution in the value of the Cash Collateral.   The Bankruptcy Code does not explicitly define "adequate protection" but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. See 11 U.S.C. § 361.   What constitutes adequate protection must be evaluated on a case-by-case basis.   See Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group Inc.), 16 F.3d 552, 564 (3d Cir. 1994) (citing MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987)); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

37.    Adequate protection is meant to ensure that the secured lender receives the value for which it originally bargained.   See Mosello, 195 B.R. at 288 (citing Swedeland, 16 F.3d at 564) ("The purpose of 'adequate protection' for a creditor 'is to insure that the creditor receives the value for which he bargained prebankruptcy.'").   Courts have noted that "[t]he essence of adequate protection is the assurance of the maintenance and continued recoverability

of the lien value during the interim between the filing … and the confirmation." In re Arriens, 25 B.R. 79, 81 (Bankr. D. Or. 1982); In re O.P. Held, Inc., 74 B.R. 777, 782 (Bankr. N.D.N.Y. 1987). The focus of the requirement is to protect a secured creditor from diminution in value of its collateral during the period the collateral is used. See In re 495Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); Beker Indus., 58 B.R. at 736; In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990); In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

38.    The Debtors believe that use of Cash Collateral pursuant to the terms and conditions set forth above is fair and reasonable and that the interests of the Prepetition Secured Creditors will be adequately protected by the measures proposed. As noted above, on the Petition Date, the Debtors had approximately $17 million in Cash Collateral. The Debtors currently forecast no decrease in the Cash Collateral over the next 45 days. Moreover, the combination of (i) the Debtors' ability to preserve the going concern value of the businesses with the use of Cash Collateral, (ii) the Replacement Liens and Real Estate Liens, (iii) the interest payments to the lenders under the Revolver Facility, and (iv) the Debtors' budgetary constraints adequately protects the Prepetition Secured Creditors' secured position under section 361(2) and (3).

i.    **Use of Cash Collateral Will Preserve the Debtors' Going Concern Value to the Benefit of the Prepetition Secured Creditors**

39.    The continued operation of the Debtors' businesses will preserve the Debtors' going-concern value, enable the Debtors to capitalize on that value through a reorganization, and ultimately enable the Debtors to confirm a chapter 11 plan. However, if the Debtors are not allowed to use Cash Collateral, the Debtors will lose the customers, their

KL2 2583365.1

revenues will decline and their Debtors' businesses will deteriorate in value to the detriment of

the Prepetition Secured Creditors (as well as all of their other constituents).

40.    It is well established that a bankruptcy court, where possible, should

resolve issues in favor of preserving the business of the debtor as a going concern.  As stated by

the Eleventh Circuit:

> A debtor, attempting to reorganize a business under Chapter 11,
> clearly has a compelling need to use "cash collateral" in its effort
> to rebuild.  Without the availability of cash to meet daily operating
> expenses such as rent, payroll, utilities, etc., the congressional
> policy favoring rehabilitation over economic failure would be
> frustrated.

Chrysler Creditor Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d

1017, 1019 (11th Cir. 1984); see also Northwest Airlines Corp. v. Ass'n of Flight Attendants-

CWA (In re Northwest Airlines Corp.), 349 B.R. 338, 380 (S.D.N.Y. 2006) ("The Bankruptcy

Code embodies a strong policy in favor of reorganization").

41.    This policy is particularly compelling in the current credit crises, where

traditional corporate lending has effectively evaporated.  As stated in a recent Wall Street Journal

article: "Banks continue to tighten lending terms for the nation's consumers and businesses,

hamstringing the economy and raising the risk of a protracted recession. The Federal Reserve's

latest survey of banks' senior loan officers showed that a large majority of the 76 U.S. and

foreign-based respondents clamped down on lending in the past three months amid mounting

losses and concern about the nation's economy."  Kelly Evans, Bank Clampdown Dogs Economy

--- Lending Standards Keep Tightening, Increasing the Risk of a Prolonged Recession, Wall St.

J, Nov. 4, 2008, at A3.

42.    Accordingly, courts regularly authorize the use of cash collateral to

enhance or preserve the debtor's going concern value.  For example, in Stein v. United States

17

Farmers Home Administration (In re Stein), the court allowed a debtor to use cash collateral where the secured party was undersecured, finding that the use of cash collateral was necessary to the debtor's continued operations, and that the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]." 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982).

43.    As set forth above, the Debtors' ability to maintain business relationships with their customers and vendors, and to meet payroll and other critical operating expenses, is essential to the continuation of the Debtor's businesses as a going concern. Indeed, absent use of the Cash Collateral, the Debtors' business will be brought to an immediate halt, with disastrous consequences for the Debtors and their estates and the creditors – including the Prepetition Secured Creditors. Far from being diminished, the Prepetition Secured Creditors' position, therefore, can only be enhanced by the Debtors' use of Cash Collateral and the concomitant continued operation of the Debtors' businesses. See In re Constable Plaza Assoc., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor's reinvestment of rents to maintain and operate office building "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"); In re Pine Lake Village Apartment Co., 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's collateral . . . clearly ensures that the plaintiff-mortgagee's investment is adequately protected"); Federal Nat. Mort. v. Dacon Bolingbrook Assoc., 153 B.R. 204, 214 (N.D. Ill. 1993) (security interest protected to extent debtor reinvested rents in operation and maintenance of the property); In re Dynaco Corp., 162 B.R. 389, 395–96 (Bankr. D.N.H. 1983) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors).

ii.   **The Replacement Liens and Real Estate Liens Adequately
Protect the Prepetition Secured Creditors**

44.    The Bankruptcy Code expressly provides that granting additional or replacement liens is a means of adequate protection.  11 U.S.C. § 361(2).  The Debtors will adequately protect the Prepetition Secured Creditors' interests in Cash Collateral by, among other things, providing Replacement Liens on the Postpetition Collateral of the same type each held prepetition to the extent the Debtors' use of Cash Collateral results in a postpetition decrease in the value of the collateral securing the Prepetition Secured Creditors' claims. Furthermore, in addition to retaining a lien on the proceeds of their Prepetition Collateral, the Prepetition Secured Creditors are also being provided additional adequate protection in the form of the Real Estate Liens on the Debtors' Unencumbered Leases.  See, e.g., In re Musicland Holding Corp., 362 B.R. 644, 648 (Bankr. S.D.N.Y. 2007) (finding that a replacement lien on the estate's post-petition assets would qualify as adequate protection and thus permit the debtor to use the cash collateral); In re Connor, 808 F.2d at 1396-98 (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); In re Center Wholesale, Inc., 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor).

45.    In granting the Prepetition Secured Creditors the Real Estate Liens on the Unencumbered Leases, the Debtors will be providing the Prepetition Secured Creditors with substantial additional collateral to secure their obligations.  Such adequate protection should be more than sufficient to maintain the Prepetition Secured Creditors' lien value during the time between the Petition Date and the Debtors' emergence from chapter 11.

KL2 2583365.1

     iii.  **Payment of Current Interest to the Holders of the Revolver**
          **Facility Adequately Protects the Holders of the Revolver Facility**

       46.    The Budget provides for payment to lenders under the Revolver Facility of current interest at the applicable non-default rate and on the non-default interest payment dates set forth in the Credit Agreement.  In providing interest payments to the lenders under the Revolver Facility, the Debtors will be providing the Revolver Facility lenders with adequate protection to the extent their liens are oversecured and they are entitled to postpetition interest. Such adequate protection should be sufficient to maintain the Revolver Facility's lenders oversecured status during the interim between the Petition Date and the Debtors' emergence from chapter 11.  *See* 11 U.S.C. § 361(1) (providing that "periodic cash payments" is a form of adequate protection).

       47.    As noted above, the claims arising from the Term Loan recover from collateral proceeds after application thereof to the payment in full of the Revolver Facility under the Credit Agreement.  Although the Debtors believe that the value of their Prepetition Collateral is sufficient to satisfy the claims under the Revolver Facility, it is not sufficient to satisfy the claims under the Term Loan.  As a result, the Debtors believe that the Revolver Facility liens are oversecured and the Term Loan liens are undersecured.  Thus, the Debtors propose to make interest payments to the holders of the Revolver Facility, but not to holders of the Term Loan.  In the cash collateral context, it is well established that replacement liens can be used to counter-balance any diminution in value of the security interest. 11 U.S.C. §361(2); see also United Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs. Ltd (In re Timbers of Inwood Forest Assocs., Ltd.) 484 U.S. 365, 372-73 (1988)(holding that since §506 of the Bankruptcy code "permits post-petition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing post-

petition interest."). Moreover, to the extent there is any value in the liens of the Senior Secured Noteholders, the granting of the Second Priority Replacement Liens and the Second Priority Real Estate Liens should be more than sufficient to protect the Senior Secured Noteholders' lien value during the period between the Petition Date and the Debtors' emergence from chapter 11.

      iv.  **The Budgetary Constraints on the Use of Cash
Collateral Adequately Protect the Prepetition Secured Creditors**

        48.     In addition, the Debtors' use of Cash Collateral in accordance with the proposed Budget provides adequate protection to the Prepetition Secured Creditors. The Budget provides for expenditures to fund the Debtors' reduced, but necessary and essential, day-to-day operations, which for the foreseeable future are primarily geared to reorganizing the Debtors. Courts have routinely held that adequate protection may be demonstrated by a showing that the value of the debtors, or the value of the lender's collateral, is preserved by the debtor's use of cash collateral. See, e.g., In re JKJ Chevrolet, Inc., 117 F.3d 1413, 1413 (4th Cir. 1997); In re Snowshoe Co., Inc., 789 F.2d 1085, 1087 (4th Cir. 1986); In re 499 W. Warren St. Assocs., Ltd. P'ship, 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991).

        49.     Here, the proposed cash expenditures under the Budget are necessary to preserve and maintain the value of the Prepetition Collateral and the interests of the Prepetition Secured Creditors. Moreover, Cash Collateral may be used solely up to the amounts (not to exceed 120% of the amounts set forth in the Budget on a cumulative, aggregate rolling basis measured weekly as of the close of business on Friday of each week), at the times, and for the purposes identified in the Budget reasonably approved by the Agent. Use of the Cash Collateral in the manner and for the purposes proposed will maintain the overall value of the Debtors' estate and help to maximize creditor recoveries. If the Debtors are precluded from making

expenditures necessary to maintain their assets and sustain their operations, the Prepetition Secured Creditors and indeed all creditors — secured and unsecured — will be harmed. See, e.g., In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized") (citing In re Grant Broad. of Philadelphia, Inc., 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1987).

### THE NEED FOR IMMEDIATE RELIEF PENDING A FINAL HEARING

50.    Pursuant to Bankruptcy Rule 4001(b), a final hearing on a motion to use Cash Collateral may not be commenced earlier than 15 days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 15-day period and to authorize the use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estate.  Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court (i) schedule interim and final hearings to consider approval of the Debtors' use of Cash Collateral and (ii) authorize the Debtors, pursuant to the terms of the Interim Order, to use Cash Collateral in accordance with the Budget.  If the Debtors are unable to obtain the immediate use of Cash Collateral, they will be unable to continue their operations in an orderly and efficient manner, causing immediate and irreparable harm to the value of its business and estate.

### NOTICE

51.    No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases.   The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York, (b) counsel to the agent for the Senior Secured Lenders, (c) counsel to the indenture trustees for the Senior Secured Notes and Subordinated Toggle Notes, (d) counsel to certain prepetition creditors, (e) the holders of the

fifty largest unsecured claims (on a consolidated basis) and (f) counsel to the Debtors' equity holders.

52.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested and such other or further relief as is just.

Dated: New York, New York
       December 3, 2008

                                    **KRAMER LEVIN NAFTALIS & FRANKEL LLP**

                                    /s/ _Kenneth H. Eckstein_____
                                    Kenneth H. Eckstein
                                    P. Bradley O'Neill
                                    Joshua K. Brody
                                    1177 Avenue of the Americas
                                    New York, New York 10036
                                    Telephone: (212) 715-9100

                                    Proposed Counsel for Debtors and
                                    Debtors in Possession

KL2 2583365.1

**<u>EXHIBIT A TO MOTION</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

In re:                                           )        Chapter 11
                                                 )
    BALLY TOTAL FITNESS OF                      )
    GREATER NEW YORK, INC., <u>et al.</u>,       )        Case No. 08-14818 (BRL)
                                                 )
           Debtors.                          )
                                                 )        Jointly Administered
_____        )

**INTERIM ORDER (A) AUTHORIZING USE**
**OF CASH COLLATERAL, (B) PROVIDING ADEQUATE**
**PROTECTION, AND (C) SCHEDULING A FINAL HEARING**

Upon the Motion, dated December 3, 2008 (the "**Motion**"),[1] of Bally Total Fitness

Holding Corporation and certain of its direct and indirect subsidiaries, as debtors and debtors in

possession (collectively, the "**Debtors**") for entry of (i) an interim order (the "**Interim Order**"):

(a) authorizing the Debtors' use of cash collateral, (b) granting adequate protection with respect

to any diminution in the value of the interests in the Prepetition Collateral, and (c) scheduling a

final hearing on the Motion (the "**Final Hearing**"); and (ii) entry of a final order (the "**Final**

**Order**") (a) authorizing the Debtors' use of cash collateral, and (b) granting the Prepetition

Secured Creditors adequate protection with respect to any diminution in the value of the

Prepetition Secured Creditors' interests in the Prepetition Collateral, all as more fully set forth in

the Motion; and the Court having subject matter jurisdiction to consider the Motion and the relief

request therein pursuant to 28 U.S.C. section 1334 and the Standing Order of Referral of Cases

to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated

July 19, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested

therein being a core proceeding pursuant to 28 U.S.C. section 157(b); and venue being proper

---

[1] Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

before the Court pursuant to 28 U.S.C. sections 1408 and 1409; and due and proper notice of the

Motion having been provided to (i) the Office of the United States Trustee for the Southern

District of New York, (ii) counsel to the agent for the Senior Secured Lenders, (iii) counsel to the

indenture trustees for the Senior Secured Notes and Subordinated Toggle Notes, (iv) counsel to

certain prepetition creditors, (v) the holders of the fifty largest unsecured claims (on a

consolidated basis) and (vi) counsel to the Debtors' equity holders, and no other or further notice

need be provided; and the relief requested in the Motion being in the best interests of the Debtors

and their estates and creditors; and the Court having reviewed the Motion and having heard the

statements in support of the relief requested therein at a hearing before the Court (the

"**Preliminary Hearing**"); and the Court having determined that the legal and factual bases set

forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon

all of the proceedings had before the Court; and after due deliberation and sufficient cause

appearing therefore:

**IT IS HEREBY FOUND THAT**:

A.      On December 3, 2008 (the "**Petition Date**"), the Debtors each filed a

voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101

et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District

of New York.   The Debtors are continuing to operate their businesses and manage their

properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy

Code.   No request has been made for the appointment of a trustee or examiner and no official

committee has yet been established in the Debtors' Chapter 11 cases.

B.      This Court has jurisdiction over these Chapter 11 cases and the Motion

pursuant to 28 U.S.C. § 157(b) and 1334.   Consideration of this Motion constitutes a core

proceeding as defined in 28 U.S.C. § 157(b)(2). The statutory predicates for the relief sought herein are sections 105, 361 and 363 of the Bankruptcy Code and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). Venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    Without prejudice to the rights of any other party, the Debtors acknowledge and agree that pursuant to the Credit Agreement among Bally, Morgan Stanley Senior Funding, Inc., as Administrative Agent and Collateral Agent, Wells Fargo Foothill, LLC, as Revolving Credit Agent, and the CIT Group/Business Credit, Inc., as Revolving Syndication Agent and the Senior Secured Lenders, the Senior Secured Lenders provided pre-petition financing of up to $292 million, consisting of $50 million in a senior secured revolving credit facility with a $40 million sublimit for letters of credit (the "**Revolver Facility**") and a six-year $242 million senior secured term loan facility (the "**Term Loan**"). The proceeds from the Term Loan and the Revolver Facility were used to refinance the amounts outstanding under the Company's debtor-in-possession financing agreement and to provide additional working capital.

D.    Without prejudice to the rights of any other party, the Debtors acknowledge and agree that pursuant to the Guarantee and Collateral Agreement, dated October 1, 2007, made by Bally and the other Debtors in favor of the Agent, obligations under the Credit Agreement are secured by (subject to certain exceptions) first priority liens and security interests on certain assets and property of the Debtors, including without limitation, accounts, deposit accounts, chattel paper, commercial tort claims, contracts, documents, equipment, general intangibles, instruments, intellectual property, inventory, investment property, all pledged securities, receivables, goods, and books and records and the proceeds thereof (collectively the "**Prepetition Collateral**").

KL2 2583365.1

E.      Without prejudice to the rights of any other party, the Debtors acknowledge and agree that in connection with the second waiver, dated September 23, 2008 (the "**Second Waiver**"), the Senior Secured Lenders were granted security interests in approximately 53 leasehold and fee-owned property interests (the "**Encumbered Leases**"). Notwithstanding the Second Waiver, as of the Petition Date, the Debtors have 350 leases that had not been pledged to the Senior Secured Lenders (the "**Unencumbered Leases**").

F.      Without prejudice to the rights of any party, the Debtors further acknowledge and agree that certain cash on hand of the Debtors and amounts generated by the collection of accounts receivable, sale of inventory or other dispositions of the Prepetition Collateral constitute proceeds of the Prepetition Collateral and, therefore, is cash collateral of the Senior Secured Lenders within the meaning of Section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

G.      Without prejudice to the rights of any other party, the Debtors acknowledge and agree that as of the Petition Date, the Agent and the Senior Secured Lenders had made loans and financial accommodations such that (i) Bally was liable to the Agent and the Senior Secured Lenders in respect of loans made by the Agent and the Senior Secured Lenders to Bally pursuant to the Credit Agreement in the aggregate principal amount of not less than $285.1 million, (ii) Bally was contingently liable to the Agent and the Senior Secured Lenders in the aggregate face amount of approximately $5.7 million on account of Bally's reimbursement obligations with respect to letters of credit issued pursuant to the Credit Agreement which remained outstanding as of the Petition Date, (iii) Bally was liable to the Agent and the Senior Secured Lenders for fees and expenses incurred in connection with such loans and letters of credit as provided in the Credit Agreement, and (iv) each Debtor party to a guarantee executed

4

and delivered in respect of the Prepetition Obligations was contingently liable to the Agent and the Senior Secured Lenders pursuant to such guarantee (collectively, the "**Prepetition Obligations**").

H.    Without prejudice to the rights of any other party, the Debtors acknowledge and agree that on October 1, 2008, Bally issued $247,337,500 of the Senior Secured Notes under that certain Indenture, dated as of October 1, 2007 (the "**Senior Secured Notes Indenture**") between Bally and U.S. Bank National Association ("**U.S. Bank**") as Trustee. The Debtors have granted U.S. Bank, on behalf and for the benefit of the holders of the Senior Secured Notes, a second priority lien on the Prepetition Collateral.

I.    Without prejudice to the rights of any other party, the Debtors acknowledge and agree that the Senior Secured Lenders and the Senior Secured Noteholders (together, the "**Prepetition Secured Creditors**") are entitled, pursuant to Sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral to the extent of the diminution in value, including for the use of the Cash Collateral, the use, sale, lease, depreciation, or other diminution in value of the Prepetition Collateral other than the Cash Collateral, and the imposition of the automatic stay.

J.    Good cause has been shown for the entry of this Order. The ability of the Debtors to finance their operations requires the use of Cash Collateral, absent which immediate and irreparable harm will result to the Debtors, their estates and creditors, and the possibility for a successful chapter 11 case. In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors, their estates and their creditors would occur. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary

KL2 2583365.1

course of business or to maintain their property without the use of Cash Collateral.  The relief requested in the Motion is therefore necessary, essential, and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their property.  The use of the Cash Collateral is therefore of the utmost significance and importance to the preservation and maintenance of the going concern value of the Debtors and their estates, and the preservation of prospects for a successful reorganization of the Debtors under Chapter 11 of the Bankruptcy Code.

K.    The Prepetition Secured Creditors have not objected to the Debtors use their Cash Collateral. In addition, based on the record presented to the Court at the Preliminary Hearing, the terms of the Debtors' use of the Prepetition Secured Creditors' Cash Collateral appear to be fair and reasonable, and to reflect the Debtors' and their respective directors' exercise of prudent business judgment consistent with their fiduciary duties.

L.    The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2).  The use of the Preparation Secured Creditors' Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Order is in the best interest of the Debtors' estate and creditors.

M.    Notice of the Preliminary Hearing and the relief requested in the Motion has been given to:  (a) the United States Trustee; (b) counsel to the Agent; (c) the creditors listed on the Debtors' consolidated list of fifty largest unsecured creditors, as filed with the chapter 11 petitions; (d) counsel to the indenture trustee for the Senior Secured Notes; (e) counsel to the indenture trustee for the Subordinated Toggle Notes; and (f) counsel to Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund L.P.  Under the circumstances, such notice of the Preliminary Hearing was given in accordance with

6

Sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), and the local rules of this District.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.      The Motion is granted as set forth herein.  The Debtors are hereby authorized to use the Cash Collateral (including, without limitation, Cash Collateral consisting of proceeds from any disposition of Prepetition Collateral prior to the Petition Date) on an interim basis for general corporate purposes and costs and expenses related to these Chapter 11 cases in accordance with the Budget attached as Annex A hereto and the terms and conditions of this Order.

2.      Subject to the terms and conditions of this Interim Order, and in accordance with the Budget (as defined below), the Debtors are authorized to use Cash Collateral for the period (the "**Specified Period**") from the Petition Date through the earliest to occur of (a) the date an order is entered granting or denying the Motion on a final basis, and such order is no longer subject to appeal, certiorari or other review, or (b) 11:59 p.m. (Eastern time) on [____], 2009.  Except as otherwise expressly provided herein, Cash Collateral may be used during the Specified Period solely up to the amounts (not to exceed 115% of the amounts set forth in the Budget on a cumulative, aggregate rolling basis measured weekly as of the close of business on Friday of each week), at the times, and for the purposes identified in the cash collateral budget reasonably approved by the Agent (the "**Budget**"), a copy of which is attached hereto as Annex A.  The authorization for the Debtors to use Cash Collateral shall terminate at the expiration of the Specified Period.

KL2 2583365.1

3.    Notwithstanding anything to the contrary in the Credit Agreement, the Revolving Agent, in its capacity as Issuing Lender (or such other Issuing Lender acceptable to the Revolving Agent), is hereby authorized (but not directed) to amend, replace, renew or reissue any Letter of Credit outstanding under the Credit Agreement as of the Petition Date, so long as (i) the aggregate face amount of the sum of Letters of Credit outstanding after any such amendment, replacement, renewal or reissuance, does not exceed the aggregate face amount of the Letters of Credit outstanding as of the Petition Date and (ii) any such amendment, replacement, renewal or reissuance is on the same terms and conditions as any Letters of Credit outstanding under the Credit Agreement as of the Petition Date.

4.    As adequate protection for, and to the extent of, any diminution in the value of the Preparation Secured Creditors' interest in the Prepetition Collateral resulting from (x) the use of the Cash Collateral pursuant to Section 363(c) of the Bankruptcy Code, (y) the use, sale, lease, depreciation, or other diminution in value of the Prepetition Collateral (other than the Cash Collateral) pursuant to Section 363(c) of the Bankruptcy Code and (z) the imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as the "**Adequate Protection Obligations**"), the Preparation Secured Creditors are granted:

a.    *Interest Payments*. The Debtors will make monthly interest payments to the Agent, for the benefit of the lenders under the Revolver Facility, in the amount of approximately $300,000.

b.    *Expense Reimbursement*.  The Debtors will pay the Agent's reasonable and documented expenses, not to exceed $100,000 monthly, for professional fees in connection with monitoring the Debtors' use of Cash Collateral and the Chapter 11 Cases.

c.    *Senior Secured Lenders' Replacement Liens*.  The Senior Secured Lenders shall receive (effective as of the Petition Date), first priority perfected replacement liens (the "**First Priority Replacement Liens**") on all of the Debtors' rights in property acquired postpetition of the same type as the

Prepetition Collateral (collectively, with the proceeds and products of any and all of the foregoing, the "**Postpetition Collateral**") and the Encumbered Leases in the same relative priority as the Prepetition Liens

d.    *Senior Secured Notes Replacement Liens.*    The Senior Secured Noteholders shall receive (effective as of the Petition Date) second priority perfected replacement liens (the "**Second Priority Replacement Liens,**" and together with the First Priority Replacement Liens, the "**Replacement Liens**") on all of the Debtors' rights in the Postpetition Collateral.

e.    *Senior Secured Lenders' Real Estate Liens.*    The Senior Secured Lenders shall receive (effective as of the Petition Date) first priority perfected liens (the "**First Priority Real Estate Liens**") on all of the Debtors' rights in the Unencumbered Leases in the same relative priority as the Prepetition Liens.

f.    *Senior Secured Notes Real Estate Liens.*    The Senior Secured Noteholders shall receive (effective as of the Petition Date) second priority perfected liens on the Unencumbered Leases (the "**Second Priority Real Estate Liens,**" and together with the First Priority Real Estate Liens, the "**Real Estate Liens**").

5.    Notwithstanding the granting of the Real Estate Liens to the Senior Secured Lenders and the Senior Secured Notes, the Debtors preserve their rights, subject to Court approval, to pledge the Unencumbered Leases to a lender who provides debtor-in-possession financing, with liens superior to the First Priority Real Estate Liens and the Second Priority Real Estate Liens.

6.    The Replacement Liens shall be senior to all liens and encumbrances of all other secured creditors in and to such Postpetition Collateral granted, or arising, after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor).  The Replacement Liens and the Real Estate Liens granted pursuant to this Order shall constitute valid and duly perfected security interests and liens, and the Prepetition Secured Creditors shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or

9

take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Replacement Liens and the Real Estate Liens shall in no way affect the validity, perfection or priority of such Replacement Liens and Real Estate Liens.  If, however, the Agent, in its sole discretion, shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Replacement Liens and the Real Estate Liens, the Debtors are directed to cooperate with and assist in such process, the stay imposed by Section 362(a) of the Bankruptcy Code is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

7.     The approval of the Interim Order shall be without prejudice to the rights and remedies of any party in interest, including the Debtors and any statutory committee, to: (a) review, object to, challenge or contest the validity, perfection or priority of the Prepetition Secured Creditors' liens and security interests on the Prepetition Collateral or the allowable amount of the Prepetition Obligations; or (b) otherwise assert any claims or causes of action against the Prepetition Secured Creditors related thereto.

8.     The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in these Chapter 11 cases; (b) converting any of these Chapter 11 cases to a Chapter 7 case; or (c) dismissing any of these Chapter 11 cases.  If an order dismissing these Chapter 11 cases under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the

KL2 2583365.1

Replacement Liens and Real Estate Liens granted pursuant to this Order to the Prepetition Secured Creditors shall continue in full force and effect, shall remain binding on all parties in interest notwithstanding such dismissal until the obligations secured thereby shall have been paid and satisfied in full and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the limited purposes of enforcing such Replacement Liens and Real Estate Liens.

9.       Notwithstanding any provision in other "first day" orders entered by this Court authorizing the Debtors to make payments in respect of Prepetition Obligations, the provisions in this Order conditioning the payment of such amounts or limiting the amount of such payments are controlling.

10.       Upon satisfaction of the Prepetition Obligations, the Prepetition Secured Creditors shall release all liens and security interests upon the Prepetition Collateral, Real Estate Liens and all Replacement Liens.

11.       The Final Hearing to consider entry of the Final Order is scheduled for _____, 2008 at ___:___ __.m. (Eastern time) before Honorable _____, United States Bankruptcy Judge, Courtroom ___ at the United States Bankruptcy Court for the Southern District of New York.  The Debtors shall, on or before [_____ ___], 2008, mail copies of a notice of the entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order and the Motion, to the parties having been given notice of the Preliminary Hearing, to any party which has filed prior to such date a request for notices with this Court and to counsel for any statutory committee of unsecured creditors appointed pursuant to Section 1102 of the Bankruptcy Code.  The notice of entry of this Order shall state that any party in interest objecting to the use of the Cash Collateral shall file written objections with the United States Bankruptcy Court Clerk for the Southern District of New York no later than 4:00 p.m. on

KL2 2583365.1

[_____  ___], 2008 and objections shall be served so that the same are received on or before such date by: (a) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attention:  Kenneth H. Eckstein, Esq., Attorneys for the Debtors, (b)  Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606, Attention: Tim Pohl, Esq., Attorneys for the Agent for the Senior Secured Lenders, and (c) the Office of the United States Trustee.

Dated: New York, New York
December __, 2008


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Annex A to Interim Order</u>**

**Budget**

KL2 2583365.1

Bally Total Fitness
13 Week Forecast- Consolidated
(in 000's)

Bally No DIP Scenario Dec 1, 2008

| | Act | Fcst 12/1-12/2 | Fcst 12/3-12/5 | Fcst Week 2 | Fcst Week 3 | Fcst Week 4 | Fcst Week 5 | Fcst Week 6 | Fcst Week 7 | Fcst Week 8 | Fcst Week 9 | Fcst Week 10 | Fcst Week 11 | Fcst Week 12 | Fcst Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 1/7/00 | 12/2 | 12/5 | 12/12/08 | 12/19/08 | 12/26/08 | 1/2/09 | 1/9/09 | 1/16/09 | 1/23/09 | 1/30/09 | 2/6/09 | 2/13/09 | 2/20/09 | 2/27/09 |
| **Cash Receipts:** | | | | | | | | | | | | | | | |
| Total Membership Receipts | $11,247 | $11,365 | $6,819 | $11,239 | $11,426 | $10,967 | $15,528 | $11,378 | $17,613 | $12,828 | $17,827 | $10,556 | $13,266 | $12,271 | $12,250 |
| Other Non-operating Receipts | 34 | 1,540 | 85 | 790 | 125 | 125 | 150 | 125 | 125 | 125 | 225 | 125 | 125 | 125 | 225 |
| **Total Cash Receipts** | **$11,281** | **$12,905** | **$6,904** | **$12,029** | **$11,551** | **$11,092** | **$15,678** | **$11,503** | **$17,738** | **$12,953** | **$18,052** | **$10,681** | **$13,391** | **$12,396** | **$12,475** |
| **Cash Disbursements:** | | | | | | | | | | | | | | | |
| Media | $454 | $0 | $1,058 | $1,450 | $650 | $900 | $575 | $0 | $1,200 | $0 | $1,200 | $0 | $1,438 | $0 | $1,438 |
| Payroll, Payroll Taxes & Other Employee Costs | 11,076 | 515 | 5 | 8,275 | 4,115 | 8,275 | 440 | 8,180 | 510 | 8,355 | 510 | 12,280 | 590 | 8,355 | 510 |
| Rent & Other Operating Expenses | 3,902 | 8,942 | 4,831 | 4,400 | 7,815 | 4,300 | 10,300 | 3,985 | 5,000 | 4,100 | 4,090 | 23,375 | 11,195 | 5,350 | 4,875 |
| Capital Expenditures | 200 | 0 | 700 | 400 | 400 | 400 | 800 | 200 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Revolving Credit Facility Interest Payments | 38 | 0 | 0 | 0 | 0 | 0 | 322 | 0 | 0 | 0 | 0 | 322 | 0 | 0 | 0 |
| Capital Lease Payments | 30 | 0 | 30 | 30 | 30 | 30 | 30 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Professional Fees | 100 | 3,350 | 0 | 0 | 0 | 0 | 2,725 | 0 | 0 | 0 | 3,175 | 0 | 0 | 0 | 500 |
| **Total Cash Disbursements** | **$15,800** | **$12,807** | **$6,625** | **$14,555** | **$13,010** | **$13,905** | **$15,192** | **$12,390** | **$7,135** | **$12,880** | **$9,400** | **$36,402** | **$13,648** | **$14,130** | **$7,748** |
| **Net Adjusted Receipts and (Disbursements)** | **($4,519)** | **$98** | **$279** | **($2,526)** | **($1,459)** | **($2,813)** | **$486** | **($887)** | **$10,603** | **$73** | **$8,652** | **($25,721)** | **($257)** | **($1,734)** | **$4,728** |
| **Cash** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | $21,017 | $16,498 | $16,596 | $16,875 | $14,350 | $12,890 | $10,077 | $10,563 | $9,676 | $20,280 | $20,353 | $29,005 | $3,283 | $3,027 | $1,293 |
| Net Adjusted Receipts and (Disbursements) | (4,519) | 98 | 279 | (2,526) | (1,459) | (2,813) | 486 | (887) | 10,603 | 73 | 8,652 | (25,721) | (257) | (1,734) | 4,728 |
| **Ending Cash Balance** | **$16,498** | **$16,596** | **$16,875** | **$14,350** | **$12,890** | **$10,077** | **$10,563** | **$9,676** | **$20,280** | **$20,353** | **$29,005** | **$3,283** | **$3,027** | **$1,293** | **$6,021** |