> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| BALLY TOTAL FITNESS OF ) | |
| GREATER NEW YORK, INC., <u>et al</u>., ) | Case No. 08-14818 (BRL) |
| ) | |
| Debtors. ) | |
| ) | Jointly Administered |
| ) | |

**AMENDED DISCLOSURE STATEMENT FOR THE**

**AMENDED JOINT PLAN OF REORGANIZATION OF THE DEBTORS UNDER**

**CHAPTER 11 OF THE BANKRUPTCY CODE**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Kenneth H. Eckstein
P. Bradley O'Neill
Stephen D. Zide
Counsel for the Debtors and the
Debtors in Possession

Dated: New York, New York
        July 7, 2009

# TABLE OF CONTENTS

Page

I.  INTRODUCTION .................................................................................................1
    A.  Overview of Chapter 11 ...........................................................................3
    B.  Classification and Voting on the Plan.......................................................3
    C.  Ballots and Voting Deadline.....................................................................5
    D.  Voting .......................................................................................................7
    E.  Beneficial Owners of the Notes ...............................................................8
    F.  Brokerage Firms, Banks and Other Nominees .........................................9
    G.  The Confirmation Hearing........................................................................9

II. SUMMARY OF TREATMENT OF CLAIMS  AND EQUITY INTEREST
    UNDER THE PLAN.............................................................................................12

III. COMPANY BACKGROUND ............................................................................15
    A.  The Debtors.............................................................................................15
    B.  The Debtors' Businesses.........................................................................16
    C.  Debtors' Prepetition Capital Structure....................................................17
        1.  The Credit Agreement.................................................................17
        2.  The Senior Notes........................................................................17
        3.  The Subordinated Notes..............................................................18
        4.  Capital Leases and Other Secured Debt......................................19
    D.  Debtors' Equity Holders .........................................................................19

IV. EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11
    CASES .................................................................................................................19
    A.  The Previous Bankruptcy Cases .............................................................19
    B.  Emergence from the Previous Bankruptcy Cases....................................19
    C.  Operational Restructuring and Cost Reduction Plan ...............................19
    D.  Liquidity Crisis and Waivers Under the Credit Agreement.....................20
    E.  Continued Liquidity Crisis and Decision to File the Chapter 11 Cases .................21

V.  THE CHAPTER 11 CASES .................................................................................21
    A.  Significant First Day Motions and Retention of Professionals...............22
    B.  Cash Collateral........................................................................................22
    C.  Landlord Issues.......................................................................................23
        1.  Footprint Optimization...............................................................23
        2.  Deferral of Postpetition Rent Obligations..................................23
        3.  December 2008 Rent....................................................................23
        4.  Closing of Certain Locations and Rejection of Related Leases.................24
        5.  Assumption of Unexpired Leases................................................24
    D.  Official Committee of Unsecured Creditors ...........................................24
    E.  Exclusivity ..............................................................................................25
    F.  Claims Process ........................................................................................25
        1.  Bar Date to File Proofs of Claim ...............................................25

|  |  | 2. | Claims Reconciliation and Review | 25 |
|  | G. | Legal Proceedings | | 26 |
|  |  | 1. | 24 Hour Fitness USA, Inc. | 26 |
|  |  | 2. | Great American Insurance Company | 27 |
|  |  | 3. | Carrera | 28 |
|  | H. | Assumption/Rejection of Executory Contracts | | 29 |
|  | I. | Post-Petition Insurance Policies | | 30 |
|  | J. | Plan Support Agreement | | 31 |
|  | K. | Exit Financing | | 32 |

| VI. | SUMMARY OF THE PLAN | | | 33 |
|  | A. | Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan | | 33 |
|  |  | 1. | Description and Treatment of Unclassified Claims | 33 |
|  |  | 2. | Description and Treatment of Classified Claims and Equity Interests | 34 |
|  | B. | Consolidation of Debtors for Distribution Purposes | | 38 |
|  | C. | Means for Implementation of the Plan | | 40 |
|  |  | 1. | Exit Facilities | 40 |
|  |  | 2. | Voting of Claims | 40 |
|  |  | 3. | Nonconsensual Confirmation | 40 |
|  |  | 4. | Issuance of New Bally Common Stock, New Bally Warrants, and New Subsidiary Equity Interests | 40 |
|  |  | 5. | The New Bally Common Stock | 41 |
|  |  | 6. | The New Bally Warrants | 42 |
|  |  | 7. | Claims Monitor | 44 |
|  |  | 8. | Restructuring Transactions | 44 |
|  | D. | Provisions Regarding Corporate Governance of the Reorganized Debtors | | 45 |
|  |  | 1. | Amendments to Certificates of Incorporation | 45 |
|  |  | 2. | Appointment of Officers and Directors. | 46 |
|  |  | 3. | Powers of Officers. | 46 |
|  |  | 4. | Management of Reorganized Debtors. | 46 |
|  |  | 5. | Reorganized Debtors' Management Incentive Plan. | 47 |
|  |  | 6. | Reorganized Debtors' Corporate Personnel Incentive Plan | 47 |
|  |  | 7. | Indemnification of Directors, Officers and Employees. | 47 |
|  | E. | Effect of Confirmation of the Plan | | 47 |
|  |  | 1. | Continued Corporate Existence | 47 |
|  |  | 2. | Dissolution of Unsecured Creditors' Committee | 48 |
|  |  | 3. | Benefit Plans | 48 |
|  |  | 4. | Vesting of Property | 48 |
|  |  | 5. | Discharge of the Debtors | 48 |
|  |  | 6. | Injunction | 49 |
|  |  | 7. | Preservation of Causes of Action | 49 |
|  |  | 8. | Votes Solicited in Good Faith | 50 |
|  |  | 9. | Administrative Claims Incurred After the Effective Date | 50 |
|  |  | 10. | Releases by the Debtors | 50 |
|  |  | 11. | Releases by Holders of Claims and Equity Interests | 51 |
|  |  | 12. | Exculpation and Injunction with Respect of Released Parties | 52 |

KL2 2608436.2

|  | 13. | Injunction with Respect of Released Parties | 52 |
|  | 14. | Term of Bankruptcy Injunction or Stays | 53 |
|  | 15. | Preservation of Insurance | 53 |
|  | 16. | Indemnification Obligations Owed by the Debtors | 53 |
| F. | Distributions under the Plan | | 53 |
|  | 1. | Allowed Claims | 53 |
|  | 2. | Disputed Claims | 55 |
|  | 3. | Insured Claims | 56 |
|  | 4. | Tort Claims | 57 |
|  | 5. | Reserve for Disputed General Unsecured Claims | 58 |
|  | 6. | Allocation of Consideration | 60 |
|  | 7. | Cancellation and Surrender of Existing Securities and Agreements | 60 |
|  | 8. | Estimation | 60 |
| G. | Retention of Jurisdiction | | 61 |
| H. | Executory Contracts and Unexpired Leases | | 62 |
|  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 62 |
|  | 2. | Cure | 62 |
|  | 3. | Assumption | 63 |
|  | 4. | Limited Extension of Time to Assume or Reject | 64 |
|  | 5. | Rejection Damage Claims | 64 |
|  | 6. | Assignment | 64 |
|  | 7. | No Change in Control | 64 |
|  | 8. | Obligations to Indemnify Directors, Officers and Employees | 65 |
| I. | Miscellaneous Provisions | | 65 |
|  | 1. | Payment of Statutory Fees | 65 |
|  | 2. | Payment of Indenture Trustee Fees | 65 |
|  | 3. | Governing Law | 66 |
|  | 4. | Filing or Execution of Additional Documents | 66 |
|  | 5. | Information | 66 |
|  | 6. | Withholding and Reporting Requirements | 67 |
|  | 7. | Exemption from Transfer Taxes | 67 |
|  | 8. | Waiver of Federal Rule of Civil Procedure 62(a) | 67 |

| VII. | CONFIRMATION AND EFFECTIVENESS OF THE PLAN | | 67 |
| A. | Conditions Precedent to Confirmation | | 67 |
| B. | Waiver of Conditions Precedent to Confirmation | | 68 |
| C. | Confirmation of the Plan | | 68 |
|  | 1. | Acceptance | 68 |
|  | 2. | Standards for Confirmation | 69 |
|  | 3. | Feasibility | 72 |
|  | 4. | Best Interests Test | 72 |
| D. | Conditions Precedent to Effectiveness | | 74 |
|  | 1. | Conditions Precedent to Effectiveness | 74 |
|  | 2. | Waiver of Conditions Precedent to Effectiveness | 74 |
|  | 3. | Effect of Failure of Conditions | 75 |
|  | 4. | Vacatur of Confirmation Order | 75 |
|  | 5. | Modification of the Plan | 75 |

KL2 2608436.2

|   |   | 6. | Revocation, Withdrawal, or Non-Consummation | 75 |

| VIII. | | PROJECTIONS AND VALUATION | 76 |
|---|---|---|---|
| | A. | Financial Projections | 76 |
| | | 1. Scope of Financial Projections | 77 |
| | | 2. Summary of Significant Assumptions | 78 |
| | B. | Valuation of the Reorganized Debtors as of June 8, 2009 | 79 |
| | C. | Valuation Methodology | 81 |
| | | 1. Comparable Public Company Analysis | 82 |
| | | 2. Precedent Transactions Analysis | 83 |
| | | 3. Discounted Cash Flow Approach | 83 |

| IX. | | CERTAIN RISK FACTORS TO BE CONSIDERED | 84 |
|---|---|---|---|
| | A. | Risks Related to the Debtors' Business and Operations | 84 |
| | | 1. Ability to Maintain Sufficient Liquidity | 84 |
| | | 2. Restrictive Covenants in the Exit Facilities | 85 |
| | | 3. Ability to Attract New Members and Expand Operations | 85 |
| | | 4. Ability to Remain Competitive | 85 |
| | | 5. Ability to Attract and/or Retain Quality Employees | 86 |
| | | 6. Misappropriation and Infringement of Intellectual Property | 86 |
| | | 7. Debtors' Compliance with Payment Card Industry Data Standards | 86 |
| | | 8. Changes to Regulation of the Debtors' Business | 86 |
| | | 9. Protracted Chapter 11 Cases | 87 |
| | | 10. Impact of the Chapter 11 Cases on the Reorganized Debtors | 87 |
| | | 11. Discharge of Prepetition Claims | 88 |
| | | 12. Litigation Risks | 88 |
| | | 13. Prolonged Global Recession | 88 |
| | B. | Certain Bankruptcy Law Considerations | 89 |
| | | 1. Risk of Non-Confirmation of the Plan | 89 |
| | | 2. Risk of Non-Occurrence of the Effective Date | 89 |
| | C. | Certain Risks Relating to the Equity Securities under the Plan | 89 |
| | | 1. Significant Holders | 89 |
| | | 2. Lack of Established Market for New Bally Common Stock | 89 |
| | | 3. Lack of Publicly Available Information about the Debtors | 90 |

| X. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 90 |
|---|---|---|---|
| | A. | Alternative Plan of Reorganization or Plan of Liquidation | 90 |
| | B. | Liquidation Under Chapter 7 | 90 |

| XI. | | SECURITIES LAW MATTERS | 91 |
|---|---|---|---|
| | A. | Bankruptcy Code Exemptions from Registration Requirements | 91 |
| | | 1. Initial Offer and Sale of Plan Securities | 91 |
| | | 2. Subsequent Transfers of Plan Securities | 92 |

| XII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 94 |
|---|---|---|---|
| | A. | Introduction | 94 |

iv

B.    Certain Material Federal Income Tax Consequences to the Debtors. ....................95
    1.    Cancellation of Indebtedness .....................................................................95
    2.    Net Operating Losses.................................................................................95
    3.    Alternative Minimum Tax ..........................................................................96
C.    Federal Income Tax Consequences to Holders of Claims .....................................97
    1.    In General...................................................................................................97
    2.    Claims that are Tax Securities ..................................................................98
    3.    Sale, Exchange, or Exercise of Reorganized Bally Common Stock,
Warrants, or Interests in the Exit Revolver Facility .............................................99
    4.    Treatment of Holders of Interests in the Exit Revolver Facility................99
    5.    Unsecured Claims Reserve ......................................................................100
D.    Information Reporting and Backup Withholding ................................................100

XIII.    RECOMMENDATION AND CONCLUSION..............................................................101

KL2 2608436.2

# TABLE OF EXHIBITS

**Exhibit A:**    Plan

**Exhibit B:**    Disclosure Statement Approval Order

**Exhibit C:**    Financial Projections

**Exhibit D:**    Liquidation Analysis

**Exhibit E:**    Consolidated Financial Statements for the Debtors for the Year December 31, 2008 and for the Period October 2, 2007 through December 31, 2007 (Successor Company) and for the Period January 1, 2007 through October 1, 2007 (Predecessor Company) and Independent Auditors' Report Thereon

**Exhibit F:**    The Debtors' Prepetition Corporate and Capital Structure

# INDEX OF DEFINED TERMS

24 Hour Fitness ...................................................27
24 Hour Fitness Action .......................................27
AFCO .................................................................31
AFCO PFA .........................................................31
AIG ....................................................................31
AIG Order ..........................................................31
AMT ..................................................................96
AMTI .................................................................96
Assumption Motions ..........................................24
Ballots .................................................................6
Bally ....................................................................1
Bankruptcy Code .................................................1
Bankruptcy Court ................................................1
Bar Date Order ..................................................25
Bar Dates ...........................................................25
Beneficial Holder Ballot ......................................8
Beneficial Owners of the Notes ...........................6
Cash Collateral ..................................................22
Cash Collateral Budget ......................................22
Chapter 11 Cases .................................................1
Claims Objection and Settlement Procedures ......26
Claims Objection and Settlement Procedures Motion ...26
Club Members ...................................................16
COD ..................................................................95
Commitment Letter Motion ...............................33
Commitment Letters ..........................................33
Company ...........................................................15
Confirmation Hearing ..........................................2
Confirmation Order ..............................................2
Consumer Protection Surety Bonds ....................30
Convenience Claims Consideration ....................37
Creditors' Committee .........................................24
Critical Vendor Motion ......................................22
DCF ...................................................................83
Debtors ................................................................1
December Rent ...................................................24
December Rent Issue ..........................................24
December Rent Motion .......................................24
Disclosure Statement ............................................1
Disclosure Statement Approval Order ...................1
DOF ..................................................................59
DTC ...................................................................41
EBITDA .............................................................82
Excess Insurers ..................................................28
Exclusive Periods ...............................................25
Exclusive Plan Period ........................................25
Exclusive Solicitation Period ..............................25
Exclusivity Motion .............................................25
Exit Facilities .....................................................40
Exit Lenders .......................................................31
Exit Revolver Commitment Letter ......................32
Exit Term Loan Commitment Letter ...................32
Financial Projections ..........................................76
Fireman's ...........................................................28
First Interim Cash Collateral Order .....................22
First Omnibus Executory Contract Rejection Motion ...30
First Waiver .......................................................20
Great American ..................................................27
Great American Action .......................................27
Great American Fee Reimbursement ...................28
Harbinger ...........................................................19
Hilco ..................................................................23
Houlihan Lokey ..................................................22

Impaired Classes ..................................................5
Insurance Financing Motion ...............................30
Insurance Policies ..............................................30
Insurance Renewal Motion .................................30
KCC .....................................................................6
Lease .................................................................23
Lease Rejection Motions ....................................24
Leases ................................................................23
LTM ..................................................................82
Management Options .........................................47
Master Ballot .......................................................9
Master Ballot Agent .............................................8
Motion to Enforce the Stay ................................28
NOL ..................................................................95
Non-Voting Classes .............................................5
Notes ...................................................................8
Operational Restructuring and Cost Reduction Plan ...20
Pending Claims ..................................................26
Petition Date ........................................................1
PFA ...................................................................30
Plan .....................................................................1
Plan Securities ...................................................91
Plan Support Agreement .....................................31
Prepetition Credit Agreement .............................17
Prepetition Secured Creditors .............................22
Previous Bankruptcy Cases ................................19
Previous Plan .....................................................19
Principal Stockholders ........................................93
Released Parties .................................................51
Released Party ...................................................51
Renewal Insurance Program ...............................30
Rent Deferral Motion .........................................23
Revolving Facility ..............................................17
Revolving Lenders .............................................20
RLI ....................................................................28
RLI Stay Motion ................................................28
Schedules ...........................................................26
SEC .....................................................................2
Second Omnibus Executory Contract Rejection Motion ...30
Second Waiver ...................................................21
Securities Act ....................................................91
Senior Notes Indenture ......................................17
Senior Secured Lenders ......................................17
Service ...............................................................94
SFC ...................................................................30
Subordinated Notes Indenture ............................18
Surety Bonds .....................................................30
Tax Code ...........................................................94
Tax Security .......................................................98
Term Loan .........................................................17
Term Sheets .......................................................33
TIN ..................................................................101
Travelers ............................................................28
U.S. Bank ..........................................................17
UCD Claims ......................................................26
Unimpaired Claims ..............................................5
United States Trustee .........................................24
Unsecured Claims Reserve .................................59
Utility Surety Bonds ..........................................30
Voting Classes .....................................................5
Voting Deadline ...................................................6
Voting Record Date ..............................................7

# I. INTRODUCTION

On December 3, 2008 (the "Petition Date"), Bally Total Fitness Holding Corporation ("Bally") and certain of its direct and indirect subsidiaries (collectively, the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").    All of the Debtors' bankruptcy cases are being jointly administered for procedural purposes only under Case No. 08-14818 (BRL) (the "Chapter 11 Cases").

On June 10, 2009, the Debtors filed their proposed joint plan of reorganization (as subsequently amended on July 7, 2009, the "Plan") which sets forth the manner in which Claims against and Equity Interests in the Debtors will be treated.  The Debtors believe implementation of the Plan will enable them to reorganize successfully, accomplish the objectives of chapter 11, and is in the best interests of the Debtors and their creditors.  A copy of the Plan is attached as Exhibit A hereto.

This Disclosure Statement, including the exhibits attached hereto (the "Disclosure Statement"), describes the Debtors' prepetition operating and financial history, the events leading up to the commencement of the Chapter 11 Cases, significant events that occurred during the Chapter 11 Cases and the anticipated organization, operations and financing of Reorganized Bally if the Plan is confirmed and becomes effective.  This Disclosure Statement also describes the Plan, including distributions under the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, certain alternatives to the Plan and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement describes the confirmation process and the voting procedures under the Plan.  All Exhibits to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein.  **Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  The terms of the Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in this Disclosure Statement.**

On [_____], 2009, the Bankruptcy Court entered an order (the "Disclosure Statement Approval Order") approving this Disclosure Statement as containing "adequate information," i.e., information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of Claims or Equity Interests to make an informed judgment about the Plan.    THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Equity Interests in the Debtors in connection with (i) the solicitation of acceptances of the Debtors' Plan and (ii) the hearing for [DATE], 2009, at [TIME] p.m. (prevailing Eastern Time) (the "Confirmation Hearing") to consider an order confirming the Plan (the "Confirmation Order").

The Disclosure Statement Approval Order sets forth the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. A Ballot for acceptance or rejection of the Plan is enclosed with this Disclosure Statement submitted to the holders of Claims that are entitled to vote on the Plan. Detailed voting instructions accompany each Ballot.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD READ IN THEIR ENTIRETY THIS DISCLOSURE STATEMENT, THE PLAN, THE DISCLOSURE STATEMENT ORDER AND THE INSTRUCTIONS ACCOMPANYING THE BALLOTS BEFORE VOTING ON THE PLAN. THESE DOCUMENTS CONTAIN, AMONG OTHER THINGS, IMPORTANT INFORMATION CONCERNING THE CLASSIFICATION OF CLAIMS FOR VOTING PURPOSES AND THE TABULATION OF VOTES. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. **ALL CREDITORS SHOULD CAREFULLY READ THE "RISK FACTORS" SECTION OF THIS DISCLOSURE STATEMENT LOCATED IN SECTION IX BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE. AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS STATEMENTS MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN SHALL BE ADMISSIBLE IN ANY

KL2 2608436.2

NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL EITHER BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

## A.  Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders.  Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to confirmation of the plan and substitutes the debt with the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor are generally permitted to vote on the plan.  Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

## B.  Classification and Voting on the Plan

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  An "allowed" administrative expense, claim or equity interest means that the Debtors agree, or in the event of a dispute, that the Bankruptcy Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of or equity interest in, the Debtors.  Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically "allowed" unless the debtor or another party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed.  These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable

3

value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the Debtors into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (i.e., altered by the plan) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7.

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.

Only holders of allowed claims or equity interests in classes of claims or equity interests that are Impaired and will receive or retain property under on a proposed chapter 11 plan are entitled to vote on a such a plan. Classes of claims or equity interests in which such holders are unimpaired under a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote on the plan. Classes of claims or equity interests in which such holders are not entitled to receive or retain any property on account of such claims or equity interests are deemed to reject the plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote on the plan.

Consistent with these requirements, the Plan divides the Claims against, and Equity Interests in, the Debtors into the following Classes and affords the treatments described:

| Class | Designation | Impairment |
| --- | --- | --- |
| Unclassified | Administrative Claims | Paid in Full/Unimpaired |
| Unclassified | Fee Claims | Paid in Full/Unimpaired |

4

| Class | Designation | Impairment |
|-------|-------------|------------|
| Unclassified | Priority Tax Claims | Paid in Full/Unimpaired |
| 1 | Other Priority Claims | Paid in Full/Unimpaired |
| 2 | Other Secured Claims | Paid in Full/Unimpaired |
| 3 | Prepetition Revolver Facility Claims | Impaired |
| 4 | Prepetition Swap Claims | Impaired |
| 5 | Prepetition Term Loan Secured Claims | Impaired |
| 6 | Prepetition Term Loan Deficiency Claims | Impaired |
| 7 | Senior Note Claims | Impaired |
| 8 | General Unsecured Claims | Impaired |
| 9 | Convenience Claims | Impaired |
| 10 | Subordinated Note Claims | Impaired |
| 11 | Intercompany Claims | Impaired |
| 12 | Equity Interests | Impaired |

The Debtors are not seeking votes from the holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) because the Debtors believe those Claims are not Impaired by the Plan. These holders will be deemed to have voted to accept the Plan. In addition, the Debtors are not seeking votes from the holders of Allowed Administrative Claims, Fee Claims and Priority Tax Claims, which are also unimpaired and not classified under the Plan (collectively with the Claims in Classes 1 and 2, the "Unimpaired Claims").

The Debtors are seeking votes from the holders of Allowed Claims in Class 3 (Prepetition Revolver Facility Claims), Class 4 (Prepetition Swap Claims), Class 5 (Prepetition Term Loan Secured Claims), Class 6 (Prepetition Term Loan Deficiency Claims), Class 7 (Senior Note Claims), Class 8 (General Unsecured Claims), Class 9 (Convenience Claims), and Class 10 (Subordinated Note Claims) because those Claims are Impaired under the Plan, and the holders of Allowed Claims in such Classes (collectively, the "Voting Classes") are receiving a distribution under the Plan on account of such Allowed Claims.

In addition to the Unimpaired Classes, the Debtors are not seeking votes from the holders of Claims in Class 11 (Intercompany Claims) or Equity Interests in Class 12 (Equity Interests). Under section 1126(g) of the Bankruptcy Code, the holders of Equity Interests in Class 12 are deemed to reject the Plan because such Equity Interests are Impaired under the Plan and will not receive any distributions under the Plan. Furthermore, pursuant to the Plan, holders of Intercompany Claims in Class 11 are deemed to accept the Plan. Accordingly, holders of Class 11 Claims and Class 12 Equity Interests (together with the Unimpaired Classes, the "Non-Voting Classes,") will not have the right to vote on the Plan. Classes 11 and 12, along with the Voting Classes, shall constitute the "Impaired Classes."

## C. Ballots and Voting Deadline

Separate forms of ballots (collectively, the "Ballots") are provided for voting the various Classes of Claims. A SEPARATE BALLOT MUST BE USED FOR EACH CLAIM. Any Person who holds Claims in more than one Class is required to vote separately with respect to each Claim. HOWEVER, HOLDERS OF CLAIMS ARE REQUIRED TO VOTE ALL OF THEIR CLAIMS WITHIN A CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND

5

MAY NOT SPLIT THEIR VOTES. ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL BE DEEMED TO BE A VOTE TO ACCEPT THE PLAN IN THE FULL AMOUNT OF THE RELEVANT CLAIM.

ANY BALLOT RECEIVED THAT IS NOT SIGNED OR THAT CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

The Disclosure Statement Approval Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

In accordance with Bankruptcy Rule 3018(c), the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these cases. In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a Contested Claim, this amount may not be the amount ultimately allowed for purposes of distribution) and the Class into which the Claim has been placed under the Plan.

If you are entitled to vote on the Plan, a Ballot is enclosed. If you hold Claims in more than one Class and you are entitled to vote such Claims, you will receive separate Ballots that must be used for each Class. Please sign and complete a separate Ballot with respect to each Claim, and return your Ballot(s) directly to the Debtors' voting tabulation agent, Kurtzman Carson Consultants ("KCC") at the following address (If you are the beneficial owner of a Senior Note Claim or Subordinated Note Claim, please follow the directions listed on your Ballot and read Section E, "Beneficial Owners of the Notes") :

> Bally Total Fitness Corporation Ballot Processing
> c/o Kurtzman Carson Consultants
> 2335 Alaska Avenue
> El Segundo, CA 90245

**TO BE COUNTED, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY KCC NO LATER THAN [DATE & TIME] (the "Voting Deadline").**

**ONLY BALLOTS WITH ORIGINAL SIGNATURES WILL BE COUNTED. BALLOTS WITH COPIED SIGNATURES WILL NOT BE ACCEPTED OR COUNTED. YOU MAY NOT SUBMIT A BALLOT ELECTRONICALLY, INCLUDING VIA EMAIL OR FACSIMILE. ONLY ORIGINAL BALLOTS (INCLUDING BALLOTS FORWARDED BY MASTER BALLOTING AGENTS) RECEIVED BY KCC BY THE VOTING DEADLINE WILL BE COUNTED.**

**IF DELIVERY OF A BALLOT IS BY MAIL, IT IS RECOMMENDED THAT VOTERS USE AN AIR COURIER WITH A GUARANTEED NEXT DAY**

KL2 2608436.2

**DELIVERY OR REGISTERED MAIL, PROPERLY INSURED, WITH RETURN RECEIPT REQUESTED.    IN ALL CASES, SUFFICIENT TIME SHOULD BE ALLOWED TO ENSURE TIMELY DELIVERY.  THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.**

Pursuant to the Disclosure Statement Approval Order, the Bankruptcy Court set [DATE], as the record date for voting on the Plan (the "Voting Record Date").  Accordingly, only holders of record as of [DATE] will receive a Ballot and be allowed to vote on the Plan.

If you (a) did not receive a Ballot and believe you are entitled to one; (b) received a damaged Ballot; (c) lost your Ballot; (d) have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, or the solicitation packet of materials you received; or (e) if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, please contact KCC by (i) regular mail, delivery, or courier at Bally Total Fitness Corporation Ballot Processing, c/o Kurtzman Carson Consultants, 2335 Alaska Avenue, El Segundo, CA 90245; or (ii) toll-free telephone for U.S. callers at 888-830-4664 and for international callers at 310-751-2647 from 9 a.m. to 6 p.m. (prevailing Pacific Time), Monday through Friday.

## D.  Voting

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and represent more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

Any Claim in a Voting Class to which an objection or request for estimation is pending, or which is scheduled by the Debtors as unliquidated, disputed or contingent and for which no proof of claim has been filed, is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan prior to the Voting Record Date.  **As set forth in the Disclosure Statement Approval Order, motions for claims to be temporarily allowed for voting purposes must be filed by [DATE & TIME] or ten days after the date of service of an objection to a claim.**

Ballots cast by alleged creditors who have timely filed Claims in unliquidated or unknown amounts that are not the subject of an objection filed by the Debtors but whose Claims are (a) not listed on the Debtors' Schedules or (b) listed as disputed, contingent and/or unliquidated on the Debtors' Schedules, will have their Ballots counted towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, but will not have their Ballots counted toward satisfying the aggregate Claim amount requirement.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

A Ballot may be withdrawn by delivering a written notice of withdrawal to KCC, so that KCC receives the notice prior to the Voting Deadline.  After the Voting Deadline, withdrawal may be effected only with the approval of the Bankruptcy Court.  In order to be

valid, a notice of withdrawal must (a) specify the name of the creditor who submitted the Ballot to be withdrawn, (b) contain a description of the Claim(s) to which it relates and (c) be signed by the creditor in the same manner as on the Ballot.  The Debtors expressly reserve the right to contest the validity of any withdrawals of votes on the Plan.

Any creditor who has timely submitted a properly-completed Ballot to KCC or a Master Ballot Agent, as applicable, may change its vote only with the approval of the Bankruptcy Court.  In the case where more than one timely, properly-completed Ballot is received with respect to the same Claim and no order of the Bankruptcy Court allowing the creditor to change its vote has been entered prior to the Voting Deadline (or, with respect to beneficial owners of the Notes in street name, the Mailing Deadline), the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly-completed Ballot that KCC determines was the first to be received.

The transferee of a transferred Claim is entitled to cast a Ballot on account of such transferred Claim only if (a) all actions necessary to effect the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed or (b) the transferee files by [DATE]: (i) documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer.  Where a portion of a single Claim has been transferred to a transferee, all holders of any portion of such single Claim will be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth in the Disclosure Statement Approval Order) and (b) required to vote every portion of such Claim collectively to either accept or reject the Plan.  In the event that a group of Ballots received from the various holders of multiple portions of a single Claim partially rejects and partially accepts the Plan, such Ballots will NOT be counted.

## E.  **Beneficial Owners of the Notes**

**If you are the beneficial owner of the Senior Notes or the Subordinated Notes (collectively, the "Notes") and you received a Ballot for beneficial holders of a security (a "Beneficial Holder Ballot") from a brokerage firm, commercial bank, trust company or other nominee (each a "Master Ballot Agent") with a return envelope addressed to the Master Ballot Agent, return the completed Ballot(s) to the appropriate Master Ballot Agent so that the Master Ballot will have sufficient time to complete a Ballot summarizing votes cast by beneficial owners holding securities (each a "Master Ballot") so that it can be forwarded to KCC by the Voting Deadline.  If your Beneficial Holder Ballot is not received by your Master Ballot Agent with sufficient time for the Master Ballot Agent to submit its Master Ballot by the Voting Deadline, your vote will not count.**

**If you received a return envelope addressed to KCC your Master Ballot Agent has pre-validated your Beneficial Holder Ballot.  Therefore, you must return your pre-validated Beneficial Holder Ballot directly to KCC so it is actually received by KCC on or before the Voting Deadline.**

KL2 2608436.2

**If you are the beneficial owner of the Notes and hold them in your own name, you can vote by completing either a beneficial holder Ballot or a completing and signing the enclosed Ballot and returning it directly to KCC using the enclosed preaddressed, postage prepaid envelope.**

DO NOT RETURN YOUR NOTES OR ANY OTHER INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE WITH YOUR BALLOT(S).

You may receive multiple mailings of this Disclosure Statement, especially if you own the Notes through more than one brokerage firm, commercial bank, trust company or other nominee. If you submit more than one Ballot for a Class because you beneficially own the securities in that Class through more than one broker or bank, you must indicate in the appropriate item of the Ballot(s) the names of ALL broker dealers or other intermediaries who hold securities for you in the same Class.

Authorized signatories voting on behalf of more than one beneficial owner must complete a separate Ballot for each such beneficial owner. Any Ballot submitted to a brokerage firm or proxy intermediary will not be counted until the brokerage firm or proxy intermediary (a) properly executes the Ballot(s) and delivers them to KCC, or (b) properly completes and delivers a corresponding Master Ballot to KCC.

By voting on the Plan, you are certifying that you are the beneficial owner of the Notes being voted or an authorized signatory for the beneficial owner. Your submission of a Ballot will also constitute a request that you (or in the case of an authorized signatory, the beneficial owner) be treated as the record holder of those securities for purposes of voting on the Plan.

## F.  <u>Brokerage Firms, Banks and Other Nominees</u>

A brokerage firm, commercial bank, trust company or other nominee that is the registered holder of a Note for a beneficial owner, or that is a participant in a securities clearing agency and is authorized to vote in the name of the securities clearing agency pursuant to an omnibus proxy and is acting for a beneficial owner, can vote on behalf of such beneficial owner by: (i) distributing a copy of this Disclosure Statement and all appropriate Ballots to the beneficial owner; (ii) collecting all such Ballots; (iii) completing a Master Ballot compiling the votes and other information from the Ballots collected; and (iv) transmitting the completed Master Ballot to KCC.

A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of the beneficial owner. If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact KCC in the manner set forth above.

## G.  <u>The Confirmation Hearing</u>

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for [DATE & TIME], before the Honorable Burton R. Lifland, United States Bankruptcy Judge,

9

Courtroom 623, One Bowling Green New York, NY 10004-1408.  With the consent of the Exit Term Lenders (whose consent will not be unreasonably withheld), the Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim(s) or other Interest(s) held by the objector.  Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the following parties and the other parties requesting notice in these cases on or before [DATE & TIME]:

- To the Debtors:  Bally Total Fitness Corporation, 8700 W Bryn Mawr Ave., Third Floor, Chicago, IL 60631-3507, attention: General Counsel, Tel (773) 399-7626, Fax: (773) 399-0126, with a copy to (i) Kramer Levin Naftalis & Frankel, 1177 Avenue of the Americas, New York, NY 10036, attention: Kenneth Eckstein, Esq., Tel: (212) 715-9100, Fax: (212) 715-8000; and (ii) Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178- 0061, attention: Steven J. Reisman, Esq., Tel: (212) 696-6000, Fax: (212) 697-1559.

- To the Unsecured Creditors' Committee: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, attention: David Botter, Esq., Tel: (212) 872-1000, Fax: (212) 872-1000.

- To the Prepetition Administrative Agent: Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, California 90071, attention: Gregory Robins, Esq., Tel: (213) 687-5270, Fax: (213) 621-5270.

- To the Exit Revolver Lenders:  Buchalter Nemer, A Professional Corporation, 1000 Wilshire Blvd., Suite 1500, Los Angeles, California 90017, attention: Pamela Kohlman Webster, Esq., Tel: (213) 891-0700, Fax (213) 896-0400; Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10022, attention: Rosanne Thomas Matzat, Esq., Tel: (212) 478-7410, Fax: (212) 478-7400.

- To the Exit Term Loan Lenders:  Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, attention:  Irena Goldstein, Esq., Tel:  (212) 259-8000, Fax: (212) 259-6333.

- The Office of the United States Trustee: 33 Whitehall Street, 21st Floor, New York, New York 10004, attention: Paul K. Schwartzberg, Esq., Tel.: (212) 510-0500, Fax: (212) 668-2255.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

KL2 2608436.2

## II.  SUMMARY OF TREATMENT OF CLAIMS
## AND EQUITY INTEREST UNDER THE PLAN

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Equity Interests thereunder.

| Class of Claims | Treatment of Allowed Claims |
|---|---|
| **Class 1 — Other Priority Claims** | Unimpaired.  Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to different treatment, in full satisfaction of and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will receive payment in an amount equal to such Allowed Other Priority Claim in full in Cash as soon as practicable after the later of (a) the Effective Date and thirty days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim.  Holders of Allowed Other Priority Claims are deemed to accept the Plan and are not entitled to vote. |
| Estimated Aggregate Allowed Amount: $1,000,000 | Estimated Percentage Recovery: 100% |
| **Class 2 — Other Secured Claims** | Unimpaired.  Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to different treatment, at the sole option of the Debtors, after consultation with the Exit Term Loan Lenders, in full satisfaction of and in exchange for each Allowed Other Secured Claim, (i) each Allowed Other Secured Claim will be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim will receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) each holder of an Allowed Other Secured Claim will receive the Collateral securing its Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim as soon as practicable, after the later of (a) the Effective Date and (b) thirty days after the date such Other Secured Claim becomes an Allowed Other Secured Claim.  Notwithstanding the foregoing, to the extent an Allowed Other Secured Claim arises on account of property taxes, such Allowed Other Secured Claim will be treated as Priority Tax Claims, and any applicable liens will remain unimpaired until such Allowed Other Secured Claim is paid in full.  Any applicable interest will be calculated in a manner consistent with Section 511 of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are deemed to accept the Plan and are not entitled to vote. |
| Estimated Aggregate Allowed Amount: $2,522, 716 - $24,369,160.11 | Estimated Percentage Recovery: 100% |

KL2 2608436.2

| Class of Claims | Treatment of Allowed Claims |
| --- | --- |
| **Class 3 — Prepetition Revolver Facility Claims**<br><br><br><br><br><br>Estimated Aggregate Allowed Amount: $50,000,000 | Impaired.  In full satisfaction of and in exchange for each Allowed Prepetition Revolver Facility Claim, each holder of an Allowed Prepetition Revolver Facility Claim will receive a Pro Rata share of the Exit Revolver Facility.  Any Letter of Credit Claim shall be satisfied with the issuance of one or more replacement letter of credit facilities as part of the Exit Revolver Facility unless cash collateralized at the sole election of the Debtors.  Holders of Allowed Prepetition Revolver Facility Claims are entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 4 — Prepetition Swap Claims**<br><br><br>Estimated Aggregate Allowed Amount: $7,415,000 | Impaired.  In full satisfaction of and in exchange for the Allowed Prepetition Swap Claims, the holders of Allowed Prepetition Swap Claims shall receive the Swap Note.  Holders of Allowed Prepetition Swap Claims are entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 5 — Prepetition Term Loan Secured Claims**<br><br><br><br>Estimated Aggregate Allowed Amount: $162,000,000 | Impaired.  In full satisfaction of and in exchange for each Allowed Prepetition Term Loan Secured Claim, each holder of a Prepetition Term Loan Secured Claim will receive a Pro Rata share of the Prepetition Term Loan Distribution.  Holders of Allowed Prepetition Term Loan Secured Claims are entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 6 — Prepetition Term Loan Deficiency Claims**<br><br><br><br><br><br><br><br><br><br><br><br>Estimated Aggregate Allowed Amount: $0.00 - $80,000,000 | Impaired.  In full satisfaction of and in exchange for each Allowed Prepetition Term Loan Deficiency Claim, each holder of a Prepetition Term Loan Deficiency Claim will receive a Pro Rata share of the Unsecured Claims' Distribution, provided, however, that in no event shall the holders of Prepetition Term Loan Deficiency Claims recover any value in excess of the Allowed amount of such Claims, provided however, that so long as the Unsecured Creditors Committee supports, and does not object, to the Plan, the Allowed Prepetition Term Loan Deficiency Claim shall be capped at $40 million, provided further, that if Classes 7 and 8 vote in favor of the Plan, the Prepetition Term Loan Holders shall be deemed to waive the Prepetition Term Loan Deficiency Claim.  Holders of Allowed Prepetition Term Loan Deficiency Claims are entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0.00% – 1.34% |

KL2 2608436.2

| Class of Claims | Treatment of Allowed Claims |
|---|---|
| **Class 7 — Senior Note Claims** | Impaired.  In full satisfaction of and in exchange for each Allowed Senior Note Claim, each holder of an Allowed Senior Note Claim will receive a Pro Rata distribution of the Unsecured Claims Distribution; provided, however, that in no event will the holders of Senior Note Claims recover value in excess of the Allowed amount of such claims;  provided,  further,  however,  that if a Subordination Dispute is not timely commenced, the Subordinated Notes Plan Distribution shall be distributed to the Senior Secured Notes Indenture Trustee for the benefit of holders of Allowed Class 7 Claims, and there shall be no distributions to Class 10.  If a Subordination Dispute is timely commenced, then the Debtors shall retain the Subordinated Notes Plan Distribution until the Subordination Dispute is resolved by Final Order, and shall distribute the Subordinated Notes Plan Distribution to holders of Class 7 Claims only to the extent provided for in a Final Order entered in the Subordination Dispute.  The Subordinated Notes Indenture Trustee's rights under the Subordinated Notes Indenture shall not be reduced or impaired by reason of the Debtors' retention of the Subordinated Notes Plan Distribution.  Holders of the Senior Note Claims are entitled to vote on the Plan |
| Estimated Aggregate Allowed Amount: $259,663,152.08 | Estimated Percentage Recovery: 0.80% – 2.94% |
| **Class 8 — General Unsecured Claims** | Impaired.   In full satisfaction of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive a Pro Rata distribution of the Unsecured Claims Distribution, provided, however, that in no event shall the holders of General Unsecured Claims recover value in excess of the Allowed amount of such Claims.  Holders of Allowed General Unsecured Claims are entitled to vote on the Plan. |
| Estimated Aggregate Allowed Amount: $75,000,000 – $475,000,000 | Estimated Percentage Recovery: 0.80% – 1.54% |
| **Class  9 — Convenience Claims** | Impaired.  In full satisfaction of and in exchange for each Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive a distribution in Cash equal to 1.17% of such holder's Allowed Convenience Claim within the later of (i) 30 days after the Effective Date, or (ii) 30 days after the date on which such holder's claim becomes an Allowed Convenience Claim.  Holders of Allowed Convenience Claims are entitled to vote on the Plan. |
| Estimated Aggregate Allowed Amount: $27,000,000 - $41,000,000 | Estimated Percentage Recovery: 1.17% |

14

| Class of Claims | Treatment of Allowed Claims |
|---|---|
| **Class 10 — Subordinated Note Claims** | Impaired. In full satisfaction of and in exchange for each Allowed Subordinated Note Claim, each holder of an Allowed Subordinated Note Claim will receive a Pro Rata distribution of the Unsecured Claims Distribution, <u>provided</u>, <u>however</u>, that in no event will the holders of Subordinated Note Claims recover value in excess of the Allowed amount of such claims, <u>provided</u> <u>further</u>, <u>however</u>, that the treatment and distributions to be paid to the holders of the Allowed Subordinated Note Claims and Senior Note Claims will give effect to the subordination provisions of the Subordinated Notes Indenture to the extent and in the manner set forth therein and section 501(a) of the Bankruptcy Code; <u>provided</u> <u>further</u>, <u>however</u>, if a Subordination Dispute is not timely commenced, the Subordinated Notes Plan Distribution shall be distributed to the Senior Secured Notes Indenture Trustee for the benefit of holders of Allowed Class 7 Claims, and there shall be no distributions to holders of Class 10 Claims. If a Subordination Dispute is timely commenced, then the Debtors shall retain the Subordinated Notes Plan Distribution until the Subordination Dispute is resolved by Final Order, and shall distribute the Subordinated Notes Plan Distribution to holders of Class 10 Claims only to the extent provided for in a Final Order entered in the Subordination Dispute. Nothing in the Plan shall affect, limit or impair the rights that the Senior Secured Indenture Trustee and the holders of Class 7 Claims may have as holders of Senior Indebtedness (as defined in the Subordinated Notes Indenture) with respect to the Subordinated Notes Plan Distribution. Nothing in this Plan shall affect, limit or impair the respective rights of the Senior Secured Notes Indenture Trustee and holders of Allowed Senior Notes Claims, or the Subordinated Notes Indenture Trustee and holders of Allowed Subordinated Notes Claims, in respect of the Subordinated Notes Indenture, including provisions pertaining to subordination. Each holder of a Subordinated Note Claim is entitled to vote on the Plan. |
| Estimated Aggregate Allowed Amount: $237,472,873 | Estimated Percentage Recovery: 0.00% – 1.54% |
| **Class 11 — Intercompany Claims** | Impaired. On the Effective Date, Intercompany Claims that are not specifically reinstated by the Debtors will be deemed eliminated in full through contribution or distribution of the Intercompany Claim, depending on the relationship of the parties, to the Debtor liable for the Claim, or as otherwise provided by the Debtors. Holders of Intercompany Claims are deemed to accept the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |
| **Class 12 — Equity Interests** | Impaired. The holders of Equity Interests in the Debtors will neither receive distributions nor retain any property under the Plan on account of such Equity Interests. Holders of Equity Interests are deemed to reject the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |

## III. COMPANY BACKGROUND

## A. <u>The Debtors</u>

The Debtors and their non-debtor affiliates and subsidiaries (collectively, the "<u>Company</u>") are among the largest full-service commercial operators of fitness centers in North

KL2 2608436.2

America in terms of members, facility revenues and square footage. As of December 31, 2008, the Company operated 328 fitness centers concentrated in 25 states, collectively serving approximately 2.9 million members (the "Club Members"). In addition, the Debtors operate a number of clubs pursuant to franchise and joint venture agreements in the United States, Asia, Mexico, and the Caribbean.

As of the Petition Date, the Debtors employed approximately 14,572 employees, of whom approximately 6,820 were full-time employees and approximately 7,750 were part-time employees.

The Company's corporate structure is comprised of: (i) 5 directly wholly-owned subsidiaries, 4 of which have sought chapter 11 protection, and (ii) 42 indirectly wholly and partially-owned subsidiaries, 38 of which have sought chapter 11 protection. A chart describing the prepetition corporate and capital structure of the Company is attached hereto as Exhibit F.

## B. The Debtors' Businesses

The great majority of the Company's revenues derive from the commercial operation of fitness centers, which are located primarily in major metropolitan markets in the United States. As of December 31, 2008, the Company operated fitness centers in 43 major metropolitan areas, which contain approximately 60% of the United States population. Club Members electing multiple club access are required to make larger monthly payments than those who select a single club membership. As of December 31, 2008, approximately 87% of the Debtors' Club Members had multiple club access memberships.

As of December 31, 2008, the Company (including non-debtor affiliates) had consolidated assets totaling approximately $1.164 billion and recorded consolidated liabilities totaling approximately $1.577 billion.

For the year ended December 31, 2008, the Company's consolidated net revenue was approximately $634.4 million. The Company has three principal sources of revenue:

❖ Membership Services Revenue. The Company's primary source of revenue is payments for membership services provided at its various fitness centers. Membership services revenue includes amounts paid by Club Members in the form of membership fees and dues payments, as well as revenue generated from personal training services. Membership services revenue comprised 92% of the Company's revenue for the year ended December 31, 2008. Total membership revenue for the year ended December 31, 2008, was approximately $580.8 million, a 26% decline from approximately $786.1 million for the year ended December 31, 2007.

❖ Sale of Products. The Company also generates revenue through the sale of products at its fitness center retail stores, including Bally-branded and third-party nutrition products, juice bar nutrition drinks and fitness-related convenience products (such as clothing). Revenue from product sales represented approximately 5% of total revenue for the year ended December 31, 2008. Total revenue from product sales for the year ended

December 31, 2008, was approximately $33.0 million, a 5% decline from approximately $34.7 million for the year ended December 31, 2007.

❖ <u>Other Revenue Sources</u>. The balance of the Company's revenue primarily consists of franchising revenue, guest fees and fees from specialty fitness programs. Revenue from these sources represented 3% of total revenue for the year ended December 31, 2008. Total revenue from these sources for the year ended December 31, 2008, was approximately $20.6 million, a 7% increase from approximately $19.2 million for the year ended December 31, 2007.

## C. **Debtors' Prepetition Capital Structure**

As of December 31, 2008, the Debtors' total consolidated debt (excluding trade debt) was approximately $779.6 million. The Debtors' debt structure is comprised of the following: (i) the Credit Agreement; (ii) the Senior Notes; (iii) the Subordinated Notes; and (iv) various capital leases and other secured debt.

### 1. **The Credit Agreement**

On October 1, 2007, Bally entered into the Credit Agreement (the "<u>Prepetition Credit Agreement</u>") arranged by Morgan Stanley Senior Funding, Inc., as Administrative Agent and Collateral Agent, Wells Fargo Foothill, LLC, as Revolving Credit Agent, and CIT Group/Business Credit, Inc., as Revolving Syndication Agent and certain other lenders party thereto (collectively, the "<u>Senior Secured Lenders</u>"). The Credit Agreement provided financing of up to $292 million, consisting of $50 million in a senior secured revolving credit facility, with a $40 million sublimit for letters of credit (the "<u>Revolving Facility</u>"), and a six-year $242 million senior secured term loan facility (the "<u>Term Loan</u>"). The proceeds from the Term Loan and the Revolving Facility were used to refinance the amounts outstanding under the Company's prior financing agreement and to provide additional working capital. In May 2008, the Company entered into an interest expense hedging agreement with Morgan Stanley Capital Services to hedge the Company's interest expense under the Term Loan until October 1, 2010.

The Credit Agreement is secured by substantially all the Company's real and personal property, including Club Member obligations under installment contracts, but (initially) excluding a pledge of the Company's real property leases. The Debtors' obligations under the Credit Agreement are also guaranteed by most of the Debtors' domestic subsidiaries. As of December 31, 2008, approximately $242 million was outstanding under the Term Loan, $44.3 million was outstanding under the Revolving Facility, and $5.6 million of letters of credit were issued.

### 2. **The Senior Notes**

On October 1, 2007, Bally issued $247,337,500 of the Senior Notes under that certain Indenture, dated as of October 1, 2007 (the "<u>Senior Notes Indenture</u>"), between Bally and U.S. Bank National Association ("<u>U.S. Bank</u>") as Trustee. By their terms, the Senior Notes mature on July 15, 2011, and the interest on the Senior Notes is payable semi-annually on January 15 and July 15 of each year. The Debtors granted a second priority lien on certain of

17

their assets to U.S. Bank on behalf and for the benefit of the holders of the Senior Notes. Obligations under the Senior Notes Indenture are also guaranteed by most of the Bally's subsidiaries.

### 3.   <u>The Subordinated Notes</u>

On October 1, 2007, Bally issued $200,000,000 of the Subordinated Notes under that certain Indenture, dated as of October 1, 2007 (the "<u>Subordinated Notes Indenture</u>"), between Bally and HSBC Bank USA, National Association, as Trustee.  By their terms, the Subordinated Notes mature on October 1, 2013, and the interest on the Subordinated Notes is payable semi-annually on January 15 and July 15 of each year.   Under the terms of the Subordinated Notes Indenture, the Debtors were accruing interest expense at a rate of 15-5/8%, Payable in Kind.  As of December 31, 2008, approximately $237.5 million was outstanding under the Subordinated Notes.  The Subordinated Notes are unsecured obligations and are not guaranteed by any of the other Debtors.  As more fully described in the Subordinated Notes Indenture, the claims arising from the Subordinated Notes are subordinated in right of payment to the payment in full of all senior indebtedness of the Company, which includes, among other things, the obligations arising under the Credit Agreement and the Senior Notes Indenture.

The Senior Secured Notes Indenture Trustee asserts that the subordination provisions require the Debtors to deliver the Subordinated Notes Plan Distribution to it for distribution to holders of Allowed Senior Secured Note Claims in accordance with the Senior Secured Notes Indenture.  The Subordinated Notes Indenture Trustee asserts that pursuant to the terms of the subordination provisions in the Subordinated Notes Indenture, distribution of securities, including the New Bally Warrants and New Bally Common Stock, shall be distributed, pro rata, between the Senior Secured Notes and the Subordinated Notes.  The Senior Secured Notes Indenture Trustee and/or holders of Senior Secured Notes holding at least 25% of said Senior Secured Notes, and/or the Subordinated Notes Indenture Trustee, and/or holders of Subordinated Notes holding at least 25% of said Subordinated Notes, may bring an action  in the Bankruptcy Court seeking a determination as to the application of the subordination provisions in the Subordinated Notes Indenture on any basis on or before the Subordination Dispute Deadline, and the Court may, at any time after the Subordination Dispute Deadline, determine the disposition of the Subordinated Notes Plan Distribution.   The Debtors shall retain the Subordinated Notes Plan Distribution in the Unsecured Claims Reserve until any such Subordination Dispute is resolved by a Final Order.  The Plan thus preserves the rights of the Senior Secured Notes Indenture Trustee as well as the Subordinated Notes Indenture Trustee. The Debtors do not believe that the resolution of any Subordination Dispute needs to occur prior to the confirmation of the Plan.  The Debtors will not pay any fees and expenses in excess of $125,000 for each indenture trustee.  To the extent that the Senior Secured Notes Indenture Trustee or the Subordinated Notes Indenture Trustee incurs fees and expenses in excess of the amount paid to them by the Debtors, they may invoke lien rights and other provisions of the respective indentures that could reduce the amount of distributions to Class 7, Class 10 or both, or seek allowance of administrative claims.   Neither the Senior Secured Notes nor the Subordinated Notes will be tradable after the Effective Date.  The Senior Secured Notes and the Subordinated Notes are both currently held of record by Cede & Co. on behalf of DTC for the benefit of beneficial holders.

18

### 4. **Capital Leases and Other Secured Debt**

The Debtors lease certain equipment under capital leases expiring in periods ranging from one to five years. As of December 31, 2008, approximately $6.5 million in debt was due on equipment and other property subject to capital leases with various third parties. The Debtors also have additional secured debt in the approximate amount of $400,000 as of December 31, 2008.

## D. **Debtors' Equity Holders**

As of December 31, 2008, the authorized common stock of Bally consisted of 450,000 shares of common stock, $0.01 par value per share, 9,000 of which were issued and outstanding. As of the Petition Date, Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, L.P. (collectively, "Harbinger") were the sole owners of the outstanding common stock.

## IV. **EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

## A. **The Previous Bankruptcy Cases**

Each of the Debtors previously filed a bankruptcy case in the Bankruptcy Court on July 31, 2007 (the "Previous Bankruptcy Cases"). As part of the Previous Bankruptcy Cases, the Debtors filed a prepackaged plan of reorganization, which contemplated a deleveraging of the Debtors. After filing the plan, the Debtors negotiated an investment agreement with Harbinger, which reflected a Harbinger-led restructuring and recapitalization. Under the investment agreement, Harbinger acquired 100% of the common stock of reorganized Bally in exchange for approximately $233.6 million in cash. On September 17, 2007, the Bankruptcy Court confirmed an amended plan reflecting the Harbinger recapitalization (the "Previous Plan") and on October 1, 2007, the Previous Plan went effective.

## B. **Emergence from the Previous Bankruptcy Cases**

Following the effective date of the Previous Plan, the Company incurred substantial losses from operations and generated negative cash flow. In order to address these issues, the Company took steps to (i) hire a CEO to lead the Company, (ii) improve membership sales and retention, and (iii) reduce costs. Among those efforts were a program to improve the clubs' appearance to attract new Club Members, significant purchases of new equipment for the clubs, and incentives to improve Club Member retention. As a cost-cutting measure, the Company reduced corporate headcount and began outsourcing certain functions. Nevertheless, in the first half of 2008, the Company continued to incur a substantial loss from operations and generate negative cash flow, resulting in EBITDA that was dramatically below the projections prepared in connection with the Previous Plan.

## C. **Operational Restructuring and Cost Reduction Plan**

Effective July 1, 2008, Michael Sheehan was appointed as Chief Executive Officer of the Company and a member of the Company's Board of Directors. Soon after Mr.

Sheehan's appointment, he prepared a comprehensive plan to implement a restructuring of the Company, with the goal of improving the Company's financial position for 2009 and beyond. The comprehensive plan contemplates an operational restructuring of the Company's field organization as well as significant reductions in certain corporate costs (the "Operational Restructuring and Cost Reduction Plan"). The Company has also begun introducing new initiatives to enhance revenues and cash flow. Since its introduction and continued implementation, the Operational Restructuring and Cost Reduction Plan has been tremendously successful, allowing the Debtors to operate successfully during the pendency of these Chapter 11 Cases without the need for postpetition financing.

**D. Liquidity Crisis and Waivers Under the Credit Agreement**

Before the Company was able to implement the Operational Restructuring and Cost Reduction Plan, and notwithstanding a significant increase in new Club Member sign-ups for the second quarter of 2008, the Company encountered a liquidity crisis in the summer of 2008. This crisis resulted from, among other things, a long term decline in payment of fees and dues (resulting primarily from a drop off of new Club Member sign-ups during the years 2005-2007).

On July 24, 2008, the Company delivered notice to the Senior Secured Lenders that the Company had failed to comply with the Maximum Senior Secured Leverage Ratio (as defined under the Credit Agreement) for the quarter ended June 30, 2008, resulting in a default under the Credit Agreement.

Effective as of August 4, 2008, the Company and the Senior Secured Lenders entered into a temporary limited waiver with respect to the Credit Agreement (the "First Waiver"). The First Waiver provided, among other things, that the majority lenders under the Credit Agreement agreed to temporarily waive certain events of default under the Credit Agreement, namely, those arising as a result of the Company's failure to comply with the Maximum Senior Secured Leverage Ratio and as a result of the Company's failure to comply with the Minimum Liquidity Covenant (as defined under the Credit Agreement) with respect to the fiscal month ended July 31, 2008.

Following the execution of the First Waiver, the Company engaged in extensive negotiations with the Senior Secured Lenders regarding a proposed amendment to the Credit Agreement that would have provided the Company with the liquidity and covenant relief necessary to continue the Company's operational restructuring through 2009 and beyond. Specifically, the Company sought an "over-advance" from the lenders under the Revolving Facility (collectively, the "Revolving Lenders"), which, when coupled with certain real property sales, would have been sufficient to bridge the gap until the Company began to enjoy positive cash flows in the first half of 2009. Detailed and arduous negotiations continued through late September 2008. However, due to, among other things, the turmoil in the credit markets, the Company and the Senior Secured Lenders were unable to agree upon a full amendment to the Credit Agreement before the Company ran out of cash necessary to fund its operations on a day-to-day basis.

On September 23, 2008, the Company and the Senior Secured Lenders executed a second waiver (the "Second Waiver"), which, among other things, waived the existing defaults through December 31, 2008 and also provided for the grant of additional collateral to the Senior Secured Lenders (in the form of security interests in certain unencumbered real property and leasehold interests). In return, the Senior Secured Lenders agreed to provide the Company with up to $20 million of additional revolving loans based upon the amount of collateral provided to the Senior Secured Lenders. The Senior Secured Lenders further agreed to permit the Company to incur an additional $10 million in term loans senior to the existing Term Loans, to the extent the Majority Lenders (as that term is defined under the Credit Agreement) had the right to do so under the Credit Agreement, subject to the Senior Secured Lenders' approval of the terms and conditions of such additional loans. As part of the Second Waiver, the Company agreed to provide the Senior Secured Lenders with an alternative strategic operating and financing plan no later than October 7, 2008.

## E.  Continued Liquidity Crisis and Decision to File the Chapter 11 Cases

In September and October 2008, the Company took steps to increase its liquidity by drawing approximately $19.3 million against the Revolving Facility as permitted under the Second Waiver and selling real property for aggregate net cash proceeds of approximately $3.8 million. In addition, the Company exhaustively explored opportunities to obtain additional out-of-court financing from a variety of sources, including the Senior Secured Lenders and certain of the holders of the Senior Notes.

As the prospects for an out-of-court financing dwindled, the Company tried to raise financing in connection with a bankruptcy filing. Unfortunately, the unstable credit markets made it particularly difficult for the Company to secure sufficient financing both out-of-court and in bankruptcy. Furthermore, because the Company lacked sufficient unencumbered assets and obtaining debtor-in-possession financing from a third party on a priming basis would have been difficult and uncertain, the Debtors attempted to negotiate debtor-in-possession financing with certain of the Senior Secured Lenders, the Senior Secured Noteholders, the Subordinated Noteholders and holders of the Debtors' Equity Interests. In connection with the negotiations for debtor-in-possession financing, certain of the Term Loan lenders expressed an interest in purchasing substantially all of the Debtors' assets pursuant to a sale under section 363 of the Bankruptcy Code. Accordingly, in the weeks before the bankruptcy the Debtors had extensive discussions with such Term Loan lenders regarding a potential sale of the Debtors' businesses as a going concern. The Debtors, however, were unable to complete their negotiations and documentation of an agreement with certain of the Term Loan lenders before it became necessary to seek chapter 11 protection.

## V.  THE CHAPTER 11 CASES

On December 3, 2008, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Debtors have continued to manage their properties as debtors-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code. An immediate effect of the filing of the Chapter 11 Cases was the imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined the commencement or continuation of: (1) all

collection efforts by creditors; (2) enforcement of Liens against any Assets of the Debtors; and (3) litigation against the Debtors. On the Petition Date, or shortly thereafter, the Bankruptcy Court approved certain orders to minimize the disruption caused by the chapter 11 filing of the Debtors' business operations and to facilitate their reorganization.

## A. Significant First Day Motions and Retention of Professionals

On the Petition Date and during the first few weeks of the Chapter 11 Cases, the Bankruptcy Court entered several orders authorizing the Debtors to pay various prepetition claims. These orders were designed to ease the strain on the Debtors' relationships with customers, employees and vendors as a consequence of the filings. The Bankruptcy Court entered orders authorizing the Debtors, among other things, to (i) pay prepetition compensation, benefits and employee expense reimbursements to employees, as well as continue certain workers' compensation programs and insurance policies; (ii) pay certain taxes that the Debtors are required to collect from third parties and remit to the appropriate taxing authorities; (iii) continue certain customer practices and programs; (iv) pay prepetition claims of critical vendors and pay certain vendors entitled to administrative priority under Bankruptcy Code sections 503(b)(9) and 507(a)(2) (the "Critical Vendor Motion"). The Debtors also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code and to establish procedures to resolve adequate assurance requests for their approximately 1,750 utility accounts.

In addition, the Debtors filed several applications seeking orders authorizing the retention of certain professionals. Specifically, the Debtors filed applications, which have been approved by the Bankruptcy Court, to retain (i) Kramer Levin Naftalis & Frankel LLP, as lead bankruptcy counsel, (ii) Curtis, Mallet-Prevost, Colt & Mosle LLP, as conflicts counsel, (iii) Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), as financial advisor, (iv) AP Services, LLC as crisis managers, (v) Hilco Real Estate, LLC, as real estate consultants, (vi) Deloitte Tax LLP, as tax services providers, (vii) BDO Seidman, LLP, as independent auditors, and (viii) certain ordinary course professionals.

## B. Cash Collateral

On the Petition Date, the Debtors had approximately $16.6 million cash on hand comprised of cash collateral (the "Cash Collateral") of the Debtors' prepetition secured creditors (the "Prepetition Secured Creditors"). To provide the Debtors with the cash and liquidity necessary to continue operating and to maintain normal vendor relations postpetition, the Debtors sought Bankruptcy Court approval on the Petition Date for the use of the Cash Collateral. On December 5, 2008, the Bankruptcy Court entered an order (the "First Interim Cash Collateral Order") approving the use of the Cash Collateral in accordance with a budget agreed to by the Prepetition Secured Creditors (the "Cash Collateral Budget"). Pursuant to the First Interim Cash Collateral Order, the Debtors granted adequate protection to the Prepetition Secured Creditors consisting of, among other things, (i) replacement liens on property acquired by the Debtors after the petition date, (ii) liens on unencumbered real estate assets of the Debtors, (iii) payment of certain expenses incurred by the Prepetition Secured Creditors in connection with the Chapter 11 Cases, and (iv) payment of current interest to the Revolver lenders of approximately $300,000. The Bankruptcy Court extended the relief granted in the First Interim Cash Collateral Order in a series of subsequent interim orders. Due to the introduction of the

22

Operational Restructuring and Cost Reduction Plan and the support of many of the Debtors' vendors in maintaining customary business terms, as of May 29, 2009, the Debtors had a cash balance of $47.8 million. Hence, the Debtors have not required postpetition financing to successfully operate in these Chapter 11 Cases.

## C. <u>Landlord Issues</u>

### 1. <u>Footprint Optimization</u>

The Debtors are party to approximately 400 leases of nonresidential real property (each such lease a "<u>Lease</u>" and collectively the "<u>Leases</u>"). The Debtors use the space obtained under the Leases to operate the vast majority of their health clubs and other facilities relating to their businesses. The Debtors' average monthly rent obligations under the Leases total approximately $14 million.

An important part of the Debtors' bankruptcy proceedings is the Debtors' evaluation of which leased locations are part of the Debtors' core business. This evaluation includes an examination of each location's performance in terms of cost, profit margin, and member retention, not on an individual basis, but in terms of the location's geographic location. In addition, this evaluation includes active discussions between the Debtors and their landlords regarding assumption or rejection of the Leases and the terms of assumed Leases. To facilitate this process, the Debtors retained Hilco Real Estate, LLC ("<u>Hilco</u>") on January 14, 2009 as real estate restructuring advisors. With Hilco's assistance, the Debtors have engaged the landlords in an effort to achieve consensual modifications to the Leases.

### 2. <u>Deferral of Postpetition Rent Obligations</u>

On December 19, 2008, the Debtors filed a motion (the "<u>Rent Deferral Motion</u>") seeking a 60-day deferral of their obligation to pay postpetition rent under section 365(d)(3) of the Bankruptcy Code. The months of November and December are routinely among the lowest cash generating months of the Debtors' business because, among other things, collections from value memberships and renewal memberships tend to drop due to the holiday season. Thus, the Debtors sought a short-term deferral of their postpetition rent obligations until early February to enable Bally to conserve cash during the lowest cash flow period of its annual business cycle and provide a bridge to the higher cash flow months of February and March.

In response to the motion, a number of the Debtors' landlords filed objections. Upon considering those objections, the Debtors reviewed their cash flows for December and January and determined that there was sufficient cash on hand to satisfy the postpetition rent obligations by January 16, 2009. Thus, the Debtors modified the relief sought in the Rent Deferral Motion to seek a deferral of the postpetition rent obligations to January 16, 2009. On January 7, 2009, the Bankruptcy Court entered an order granting the Rent Deferral Motion as modified.

### 3. <u>December 2008 Rent</u>

Under section 365(d)(3) of the Bankruptcy Code, a debtor is required to timely perform its postpetition obligations under its unexpired leases of nonresidential real property. It

is the Debtors' position that their December 2008 rent obligations under their unexpired leases (the "December Rent") that was payable prior to the Petition Date are prepetition claims and are not payable under section 365(d)(3).  Certain of the Debtors' landlords, however, sought immediate payment of the December Rent.  In order to facilitate the orderly resolution of this issue (the "December Rent Issue"), the Debtors filed a motion (the "December Rent Motion") on December 19, 2008 seeking to establish procedures to litigate the December Rent Issue.  On March 24, 2009, at a hearing on the December Rent Motion, the Debtors offered to grant their landlords an Administrative Claim, payable pursuant to the Plan's treatment of such claims, for the December Rent in settlement of the December Rent Issue.

### 4.  Closing of Certain Locations and Rejection of Related Leases

On December 12, 2008, January 14, 2009, February 25, 2009, April 29, 2009, May 20, 2009, and June 15, 2009, the Debtors filed motions (the "Lease Rejection Motions") seeking permission from the Bankruptcy Court to (a) reject various leases relating to approximately 70 locations that the Debtors identified as underperforming and burdensome to the Debtors' estates, and (b) abandon certain de minimis assets located at the closed locations.  On December 22, 2008, January 28, 2009, March 11, 2009, May 14, 2009, June 3, 2009, and June 25, 2009, the Bankruptcy Court entered orders granting the Lease Rejection Motions, respectively.

### 5.  Assumption of Unexpired Leases

On June 15, 2009, the Debtors filed several omnibus motions (the "Assumption Motions") seeking to assume approximately 330 unexpired leases.  These unexpired leases constituted the bulk of the Debtors' operating locations.  The Court granted the Assumption Motions on June 29, 2009 and June 30, 2009.

## D.  Official Committee of Unsecured Creditors

On December 12, 2008, the United States Trustee for the Southern District of New York (the "United States Trustee") appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "Creditors' Committee").  The current members of the Creditors' Committee are:

**U.S. Bank National Association**, as Indenture Trustee
Corporate Trust Services
60 Livingston Avenue
Third Floor
St. Paul, MN 55107-2292
Attn: Patricia J. Kapsch, Vice President

**HSBC Bank USA, National Association**, as Indenture Trustee
452 Fifth Avenue
New York, NY 10018-2706
Attn: Robert A. Conrad, Vice President

**Leo Burnett Company, Inc.**
35 W. Wacker Dr.
Chicago, IL 60601
Attn: Carla Michelotti, Executive Vice President and General Counsel

**Convergys Corporation**
201 East Fourth Street
Loc 14-0201

**Mattone Group Jamaica Co., LLC**
134-01 20th Avenue

KL2 2608436.2

Cincinnati, OH 45202          College Point, NY 11356
Attn: Jennifer L. McGrath     Attn: Michael X. Mattone,
In-House Counsel              Member


On February 10, 2009, the Bankruptcy Court entered an order approving the retention of the following Creditors' Committee professionals: (i) Akin Gump Strauss Hauer & Feld LLP, as counsel, (ii) FTI Consulting, Inc., as financial advisors to the Creditors' Committee, and (iii) Butler Rubin Saltarelli & Boyd LLP, as conflicts counsel.

## E.  **Exclusivity**

Pursuant to section 1121 of the Bankruptcy Code, a debtor has the exclusive right to (1) file a plan of reorganization during the first 120 days of its chapter 11 case (the "Exclusive Plan Period") and (2) solicit acceptances of the plan during the first 180 days of the case (the "Exclusive Solicitation Period," and together with the Exclusive Plan Period, the "Exclusive Periods").  On March 9, 2009, the Debtors filed a motion (the "Exclusivity Motion") seeking to extend the Exclusive Plan Period from April 2, 2009 to July 31, 2009, and the Exclusive Solicitation Period from June 1, 2009, to September 9, 2009.  On March 24, 2009, the Bankruptcy Court granted the Exclusivity Motion.

## F.  **Claims Process**

### 1.  **Bar Date to File Proofs of Claim**

On January 23, 2009, the Bankruptcy Court entered an order (the "Bar Date Order") requiring any person or entity holding or asserting a prepetition Claim against the Debtors to file a written proof of claim with KCC on or before March 9, 2009, and solely as to governmental units, June 1, 2009 (collectively, the "Bar Dates").  The Bar Date Order further provides that any person or entity (other than, among specified others, professionals retained in the Chapter 11 Cases, any Debtor asserting a claim against another Debtor, and any direct or indirect non-debtor subsidiary of a Debtor asserting a claim against a Debtor) that fails to timely file a proof of claim will be forever barred, estopped and enjoined from voting on, or receiving a distribution under, the Plan and will be forever barred, estopped and enjoined from asserting a Claim against the Debtors, their estates, the Reorganized Debtors, and any of their successors or assigns.

### 2.  **Claims Reconciliation and Review**

On January 20, 2009, the Debtors filed their respective schedules of assets and liabilities, and on March 4, 2009 filed certain amendments thereto  (collectively, the "Schedules").  The Schedules identified approximately 4,000 potential Claims against the Debtors' estates.  On March 4, 2009, the Debtors amended their Schedules and identified approximately 35,000 additional potential creditors of their estates.  In addition, shortly after the entry of the Bar Date Order, the Debtors served notice of the Bar Dates on approximately 140,000 parties and received approximately 3,174 proofs of claims in response.  As a result, approximately 4,075 filed and scheduled claims are currently pending against the Debtors (the

"Pending Claims"), for an aggregate amount of $20.5 billion.  Among the Pending Claims are approximately 611 claims that are currently unliquidated, contingent, or disputed (the "UCD Claims").  The Debtors believe that after removing duplicate filed and scheduled claims, as well as claims that were filed after the Bar Dates, there will be approximately 3,424 pending general unsecured claims in the aggregate amount of $1,043,936,050.10.

On April 15, 2009, the Debtors filed a motion (the "Claims Objection and Settlement Procedures Motion") seeking an order from the Bankruptcy Court establishing claims objection and settlement procedures (the "Claims Objection and Settlement Procedures").  On April 29, 2009, the Bankruptcy Court approved the Claims Objection and Settlement Procedures Motion.  Pursuant to the Claims Objection and Settlement Procedures, the Debtors are authorized to (i) file omnibus objections to certain types of asserted claims that are without merit, such as duplicate claims, and claims filed against the wrong Debtor, and (ii) settle disputed claims in accordance with certain procedures.

## G.  Legal Proceedings

The Debtors are involved in various claims and lawsuits incidental to their business, including (i) claims arising from accidents at their fitness centers, and (ii) customer complaints that are subject to investigation by various governmental bodies.  In addition, the Debtors are, and have been in the past, named as defendants in a number of purported class action lawsuits based on alleged violations of state and local consumer protection laws and regulations governing the sale, financing and collection of membership fees, and alleged violations of state and federal employment laws and regulations.  Prior to the Petition Date, the Debtors successfully defended or settled such lawsuits without a material adverse effect on their financial condition or results of operations.

While the Debtors are operating under chapter 11 bankruptcy protection, most legal proceedings that were or could have been commenced against them prior to the Petition Date are stayed by operation of the Bankruptcy Code.  The following describes the legal proceedings that were commenced against the Debtors after the Petition Date and their related pre-bankruptcy proceedings.

### 1.  24 Hour Fitness USA, Inc.

The Debtors and Michael Sheehan, Bally's CEO, have been named as defendants in an action commenced by 24 Hour Fitness USA, Inc. (collectively with its affiliates, "24 Hour Fitness") in the United States District Court for the Northern District of Illinois captioned *24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp., et al.*, Index No. 08-cv-6096, in the United States District Court for the Northern District of Illinois, alleging violation of the Computer Fraud and Abuse Act due to Mr. Sheehan's alleged removal of a disk drive containing trade secrets, violation of an Illinois computer fraud statute on similar grounds, and a breach of fiduciary duty related to the removal of the documents (the "24 Hour Fitness Action").  24 Hour Fitness is a commercial operator of fitness centers in the United States and a competitor of the Debtors.

26

In early 2000, Mr. Sheehan was hired as 24 Hour Fitness's Senior Vice President of Operations and in 2005, he became its Chief Operating Officer. On June 23, 2008, Mr. Sheehan informed 24 Hour Fitness that he was resigning, effective immediately, and that he intended to accept the position of CEO with Bally. On June 24, 2008, Bally issued a press release, announcing that Mr. Sheehan would become the company's new CEO and a member of its board of directors, effective July 1, 2008. After Mr. Sheehan's departure, 24 Hour Fitness initiated a series of lawsuits against Mr. Sheehan that were withdrawn by 24 Hour Fitness or dismissed by the United Sates District Court for the Northern District of Illinois. On October 24, 2008, 24 Hour Fitness re-filed the 24 Hour Fitness Action. Bally and Mr. Sheehan filed a motion to dismiss this latest complaint on November 19, 2008. The motion to dismiss was pending on the Petition Date.

On December 3, 2008, immediately after the filing of the petitions in these Chapter 11 Cases, counsel for Bally and Mr. Sheehan in the 24 Hour Fitness Action orally notified 24 Hour Fitness's counsel of the bankruptcy filings, and on December 10, 2008, Mr. Sheehan and Bally Total Fitness filed a "Notice of Pendency of Cases Under Chapter 11 of the Federal Bankruptcy Code and of Automatic Stay" in the 24 Hour Fitness Action.

On December 23, 2008, the Debtors initiated an adversary proceeding against 24 Hour Fitness. The purpose of the adversary proceeding was to stay the 24 Hour Fitness Action during the pendency of the Chapter 11 Cases as to Mr. Sheehan. On January 28, 2009, the Debtors reached a settlement with 24 Hour Fitness whereby the 24 Hour Fitness Action would be stayed through the Effective Date and Mr. Sheehan would deposit certain electronic media with his counsel to safeguard potential evidence in the 24 Hour Fitness Action.

### 2. Great American Insurance Company

On August 22, 2006, Great American Insurance Company ("Great American"), Bally's primary provider of directors' and officers' liability insurance for the policy years 2001-2002 and 2002-2003 filed a complaint (the "Great American Action") captioned *Great American Insurance Company v. Bally Total Fitness Holding Corporation*, Case No. 06-cv-4554, in the United States District Court for the Northern District of Illinois. The complaint alleged that Bally's financial statements that were, according to Great American, "deemed" incorporated into Bally's applications for directors' and officers' liability insurance in the 2001-2002 and 2002-2003 policy years were materially false and misleading. Great American requested that the district court declare Bally's primary policies for those years void ab initio and rescinded, and to award Great American all sums that it had paid pursuant to that certain Interim Fee Advancement and Non-Waiver Agreement between the parties, which sums consisted of the $10,000,000 limit of the 2002-2003 primary policy and other amounts paid pursuant to the 2001-2002 primary policy (collectively, the "Great American Fee Reimbursement"). On June 11, 2007, Bally filed its answer and counterclaims to Great American's complaint for rescission, as well as a third-party complaint against RLI Insurance Company ("RLI") and the other excess providers of directors' and officers' liability insurance, Travelers Indemnity Company ("Travelers"), Ace American Insurance Company ("Ace") and Fireman's Fund Insurance Company ("Fireman's") (RLI, Travelers, Ace and Fireman's are collectively referred to as the "Excess Insurers"), seeking a declaration that Bally was entitled to coverage under all of the policies. In response, on or about July 26, 2007, the Excess Insurers filed answers and

counterclaims for rescission of the insurance policies against both Bally and certain of Bally's former officers and directors.  A Notice of Pendency of Cases under Chapter 11 of the Federal Bankruptcy Code and of Automatic Stay was filed on August 2, 2007 with respect to the Previous Chapter 11 Cases.  Following the effective date of the Previous Plan, the automatic stay terminated and the Great American Action continued until the Petition Date when it was stayed as to Bally, but the Illinois court held that it could continue as to the individual officers and directors.  The Debtors believe that they are owed millions of dollars from the Excess Insurers for payment of defense costs incurred for litigation relating to the restatement of certain of the Debtors' financial information.

On January 27, 2009, Great American initiated an adversary proceeding against Bally seeking a declaration that cash in the amount equal to the Great American Fee Reimbursement was not property of the Debtors' estate, and that if Great American prevailed in the Great American Action, it should receive cash from the Debtors equal to that amount without encumbrance by any bankruptcy plan.  On March 24, 2009, the Bankruptcy Court granted the Debtors' motion to dismiss the adversary proceeding.  On April 1, 2009, Great American filed a Notice of Appeal of that dismissal.  The appeal was assigned to the Honorable Shira A. Scheindlin, United States District Court for the Southern District of New York, and is currently pending.

On February 26, 2009, RLI filed in the Bankruptcy Court a Motion for Relief From the Stay to Allow Continued Prosecution of Insurance Coverage Litigation (the "RLI Stay Motion").  The RLI Stay Motion seeks to allow the continued prosecution of the Great American Action in the Northern District of Illinois.  GAIC joined in the RLI Stay Motion.  The Debtors objected to the RLI Stay Motion on March 11, 2009.  In addition, because the Illinois Court had ruled that the Excess Insurers' claims for rescission of the Debtors' policies could continue as to certain of the Debtors' former officers and directors, the Debtors filed a Motion to Enforce the Automatic Stay to prevent the continuation of the Great American Action as it related to those claims (the "Motion to Enforce the Stay").  On March 24, 2009, the Bankruptcy Court adjourned both the RLI Stay Motion and the Motion to Enforce the Stay and directed the parties to attempt to seek a mediated resolution.  On June 19, 2009, the parties commenced mediation proceedings before the magistrate judge assigned to the Great American Action.  Those mediation proceedings remain pending.

### 3.  Carrera

A class action employment-related lawsuit remains pending against the Debtors. Prior to the Petition Date, the Carrera Plaintiffs had initiated the Carrera Action[1] against the Debtors for alleged violations of state wage laws.  On April 7, 2009, the Bankruptcy Court entered a final order denying (i) the Carrera Plaintiffs' motion to allow a class proof of claim pursuant to Rules 9014 and 7023 of the Federal Rules of Bankruptcy Procedure and (ii) the

---

[1] Cesar Carrera, Kevin Lai, Danna Brown, individuals on behalf of themselves, all others similarly situated and the general public (collectively, the "Carrera Plaintiffs") in the action entitled Carrera, et. al. v. Bally Total Fitness Corporation, Los Angeles County Superior Court Case No. BC345316 and the Court of Appeal of the State of California, Second Appellate District, Case No. B208848 (the "Carrera Action").

Carrera Plaintiffs' motion for relief from the automatic stay, or in the alternative, for class certification under Rule 23 of the Federal Rules of Civil Procedure.  On April 9, 2009, the Carrera Plaintiffs filed an amended notice of appeal from the Bankruptcy Court's order denying their motions, which the Carrera Plaintiffs contend is timely.  The District Court for the Southern District of New York has scheduled oral argument on their appeal for July 21, 2009, at which time, according to the Carrera Plaintiffs, the District Court will issue a bench ruling regarding the merits of the appeal.

The Carrera Plaintiffs have asserted that the successful prosecution of their appeal will have a material adverse effect on the Debtors' ability to consummate the Plan because, according to the Carrera Plaintiffs, a successful appeal (i) will enable the Carrera Plaintiffs to file a class proof of claim upon which, if allowed, may provide for multimillion dollar Administrative Claims, Other Priority Claims and General Unsecured Claims against the Debtors' estates and the payment of such claims is not currently provided for in the Plan's distribution scheme; (ii) may grant the Carrera Plaintiffs injunctive relief to prohibit the Debtors' alleged ongoing violation of state wage laws that, according to the Carrera Plaintiffs, would substantially alter the Debtors' ordinary course business practices in the State of California, a substantial market for the Debtors' health clubs thereby materially increasing their ongoing operating expenses which are not presently accounted for in the Plan; and (iii) would prohibit the Debtors from proposing their Plan in good faith as required by Section 1129 (a)(3) of the Bankruptcy Code because of the Debtors' alleged ongoing violation of state wage laws.  The Carrera Plaintiffs also assert whether the three named Carrera Plaintiffs were employed by any of the Debtors within 180 days before the Petition Date is irrelevant since the class, if certified, will include numerous individuals with priority claims.

The Debtors do not concede, and expressly dispute, the Carrera Plaintiffs' allegations concerning the propriety and legality of their employment policies and practices.  No court of competent jurisdiction has ever found that the Carrera Plaintiffs' allegations are meritorious.  In the event that the District Court finds that the Bankruptcy Court abused its discretion in not permitting a class proof of claim to be filed, in not certifying a class or classes under Rule 23, or in not lifting the automatic stay, the Debtors are confident that the employment policies and practices attacked by the Carrera Plaintiffs will ultimately be determined to be completely lawful.  Moreover, as the three named Carrera Plaintiffs were not employed by any of the Debtors within 180 days before the Petition Date, none of their individual claims could possibly interfere with the Debtors' ability to consummate the Plan.

## H.  Assumption/Rejection of Executory Contracts

On December 19, 2008, the Debtors filed their first omnibus motion (the "First Omnibus Executory Contract Rejection Motion") seeking the rejection of certain executory contracts for services that were no longer necessary to the operation of the Debtors' business including agreements pertaining to indoor advertising services, dance instruction services, and employment of certain senior management personnel. On January 7, 2009, the Bankruptcy Court entered an order granting the First Omnibus Executory Contract Rejection Motion.  On March 10, 2009, the Debtors filed a second motion (the "Second Omnibus Executory Contract Rejection Motion"), which sought to reject certain agreements pertaining to advertising services, laundry services, employment of certain senior management personnel, information technology

29

services, and real estate management services, as well as a real estate put agreement. On March 24, 2009, the Bankruptcy Court granted the Second Omnibus Executory Contract Rejection Motion.

## I.  Post-Petition Insurance Policies

In the ordinary course of business the Debtors maintain numerous insurance policies providing coverage for, among other things, property, general liability, excess liability, workers' compensation, automobile liability, earthquake liability, commercial crime coverage, directors' and officers' liability, fiduciary liability, FEMA flood, temporary disability, Canadian employers liability, Canadian non-owned automobile liability, and Canadian automobile liability (collectively, the "Insurance Policies"). As of the Petition Date, the Debtors were party to one premium financing agreement (a "PFA"), dated August 4, 2008, with Standard Funding Corp. ("SFC") for the financing of the premiums due under certain of the Insurance Policies.

In addition, the Debtors are required to maintain numerous surety bonds. Several states require the Debtors to maintain surety bonds in connection with certain consumer protection laws applicable to operators of fitness centers (the "Consumer Protection Surety Bonds"). Certain utility providers also require surety bonds in connection with the provision of services to the Debtors (the "Utility Surety Bonds" and together with the Consumer Protection Security Bonds, the "Surety Bonds").

On December 8, 2008, the Debtors filed a motion to maintain postpetition financing of insurance (the "Insurance Motion") authorizing them to (i) continue and renew the PFA, and enter into new agreements for premium financing and (ii) pay prepetition premiums necessary to maintain the Insurance Policies and the Surety Bonds in current effect. On December 22, 2008, the Bankruptcy Court entered an order granting the Insurance Motion.

On December 15, 2008, certain of the Insurance Policies, including policies related to the Debtors' workers' compensation, automobile, general liability, and umbrella coverage insurance expired. On December 31, 2008, the Debtors filed a motion (the "Insurance Renewal Motion") seeking authority to (i) enter into replacement insurance policies (collectively, the "Renewal Insurance Program") with certain affiliates of American International Group, Inc. (collectively, "AIG") and (ii) assume certain Insurance Policies issued by AIG. The Renewal Insurance Program had a coverage period of December 15, 2008 through March 15, 2009. On January 14, 2009, the Bankruptcy Court entered an order granting the Insurance Renewal Motion (the "AIG Order"). The AIG Order provides, *inter alia*, that AIG is exempt from any bar date set in the Chapter 11 Cases for asserting administrative expense claims for the Debtors' reimbursement obligations. Upon expiration of the coverage period of the Renewal Insurance Program, the debtors entered into a new insurance program in the ordinary course of business.

On March 23, 2009, the Debtors filed a motion seeking authority to enter into a premium financing agreement (the "AFCO PFA") with AFCO Credit Corporation LLC ("AFCO") to finance the premiums due for general liability and umbrella coverage for the twelve month period commencing March 15, 2009. On April 7, 2009, the Bankruptcy Court entered an order authorizing the Debtors to enter into the AFCO PFA. Under the terms of the AFCO PFA, the Debtors paid a downpayment of $1,810,563.00 and financed approximately $3,356,437.00 in

seven (7) monthly payments of $488,807.75 each, including interest on financed amounts at an annual percentage rate of 5.801%, for payments totaling $3,421,654.25.

## J. **Plan Support Agreement**

Since the filing of these Chapter 11 Cases, the Debtors have explored every opportunity to obtain financing and seek an expeditious emergence from bankruptcy protection. After approximately six months of intense negotiations with certain of the Senior Secured Lenders and many other parties in interest, the Debtors have reached an agreement with their Senior Secured Lenders and the Creditors' Committee on the terms of (i) a confirmable plan of reorganization, and (ii) exit financing to be provided by certain of the Senior Secured Lenders (the "Exit Lenders") via the Exit Facilities.  On or about June 10, 2009, the Debtors, holders of 89.9% in principal amount of the prepetition Term Loan and the holders of 100% in principal amount of the prepetition Revolver Facility entered into a Plan Support Agreement (the "Plan Support Agreement"), pursuant to which such holders agreed, among other things, to vote for the Plan.

The overarching purpose of the Plan is to restructure the Debtors' liabilities to maximize recovery to all stakeholders and enhance the financial viability of the Reorganized Debtors.  The Plan provides for a balance sheet restructuring which swaps the secured debt outstanding under the Prepetition Term Loan for 94% of the Reorganized Debtors' equity and provides the holders of the Debtors' Unsecured Claims 3% of the Reorganized Debtors' equity. The effect of the transaction contemplated by the Plan will be to (i) cut the Debtors' debt by at least $660 million, (ii) reduce the Debtors' interest payment obligations by over $85 million annually, and (iii) facilitate a new capital infusion of approximately $30 million.

In order to ensure a smooth plan confirmation process, the Exit Lenders agreed to, among other things, the following:

- vote their Claims in support of the Plan;

- vote their Claims against any plan of reorganization or other restructuring other than the Plan;

- refrain from objecting to approval of this Disclosure Statement or confirmation of the Plan; and

- refrain from any actions inconsistent with the Plan or implementation of the Plan;

- forbear from exercising any rights or remedies under the Prepetition Credit Agreement until termination of the Plan Support Agreement; and

- not sell, transfer or assign their claims under the Prepetition Credit Agreement until termination of the Plan  Support Agreement

In return, the Debtors agreed to file and seek approval of this Disclosure Statement and the Plan and refrain from objecting to the Claims of the Exit Lenders.  The Plan

31

Support Agreement may be terminated by the Debtors and the Exit Lenders upon the occurrence of any of following events:

- The Bankruptcy Court does not enter an order granting the Commitment Letter Motion (defined below) on or prior to July 30, 2009;

- the Debtors fail to (i) obtain confirmation of the Plan by the Bankruptcy Court on or prior to September 15, 2009, or (ii) consummate the Plan on or prior to September 15, 2009;

- the Debtors (i) withdraw or revoke the Plan or (ii) file or publicly announce their intention to support any plan of reorganization other than the Plan;

- the Debtors request entry of a Confirmation Order in form and substance unacceptable to the Exit Lenders;

- the Debtors or the Exit Lenders breach any of their respective obligations, representations, warranties or covenants under the Plan Support Agreement or fail to satisfy in any respect any of the terms or conditions of the Plan Support Agreement;

- the appointment of an examiner with expanded powers or a trustee in these Chapter 11 Cases;

- these Chapter 11 Cases are converted to a case under chapter 7 of the Bankruptcy Code; or

- these Chapter 11 Cases are dismissed by order of the Bankruptcy Court.

## K.  Exit Financing

The Exit Lenders have provided the Debtors with commitments for the funding of the Exit Revolver (the "Exit Revolver Commitment Letter") and the funding of the Exit Term Loan (the "Exit Term Loan Commitment Letter," and collectively with the Exit Revolver Commitment Letter, the "Commitment Letters").  Attached to each Commitment Letter is a term sheet (collectively, the "Term Sheets") describing the relevant facility.

The Debtors believe that the Commitment Letters are integral to an efficient and expeditious resolution of these Chapter 11 Cases.  The Debtors have determined, in the exercise of their sound business judgment, that the success of the Plan depends on successfully entering into the Exit Facilities.  Thus, if the Debtors are unable to obtain approval of the Commitment Letters, the recoveries to all creditors would be greatly reduced since the unavailability of exit financing would trigger a liquidation scenario and dramatically deteriorate the value of the Debtors' estates.  Approval of the Commitment Letters is therefore (i) critical to the Debtors' ability to reorganize, (ii) in the best interests of the Debtors and their estates, and (iii) necessary to avoid irreparable harm to the Debtors, their creditors, and their assets, businesses, goodwill, reputation and employees.  On June 10, 2009, the Debtors filed a motion (the "Commitment

<u>Letter Motion</u>") seeking Bankruptcy Court approval of the Plan Support Agreement and the Commitment Letters.

## VI.  SUMMARY OF THE PLAN

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT.    ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**A.  <u>Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan</u>**

**1.  <u>Description and Treatment of Unclassified Claims</u>**

(a) <u>*Administrative Claims*</u>.    Administrative Claims are any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (i) any actual and necessary costs and expenses of preserving the Debtors' estates, (ii) any actual and necessary costs and expenses of operating the Debtors' businesses, (iii) any indebtedness or obligations assumed by the Debtors in connection with the conduct of their businesses, (iv) all compensation and reimbursement of expenses to the extent awarded by the Bankruptcy Court under sections 330, 331 or 503 of the Bankruptcy Code, (v) any fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code, and (vi) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

Each holder of an Allowed Administrative Claim as of the Effective Date shall receive from the Debtors (i) Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as practicable after  the later of (a) the Effective Date and (b) thirty days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (ii) such other treatment as the Debtors and such holder shall have agreed upon in writing; <u>provided</u>, <u>however</u>, that Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

(b) _Fee Claims_.  Fee Claims are Administrative Claims under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including reasonable expenses of the members of the Unsecured Creditors' Committee incurred as members of the Unsecured Creditors' Committee in discharge of their duties as such).

All requests for compensation or reimbursement of Fee Claims of Professionals and for persons asserting that they provided a "substantial contribution" to these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date will be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to the Unsecured Creditors' Committee, and counsel to the Exit Lenders and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, no later than 45 days after the Effective Date.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline will be forever barred from asserting such Claims against the Debtors, Reorganized Debtors or their respective properties, and such Fee Claims will be deemed discharged as of the Effective Date.  Objections to any Fee Claims must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, and the requesting party no later than seventy-five (75) days after the Effective Date.

(c) _Priority Tax Claims_.  Priority Tax Claims are any unsecured Claims that are entitled to a priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim will receive, at the sole option of the Reorganized Debtors,after consultation with the Exit Term Loan Lenders, (i) Cash in an amount equal to such Allowed Priority Tax Claim as soon as practicable after the later of (a) the Effective Date and (b) 30 days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (ii) through equal annual installment payments in cash (x) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; (y) over a period ending not later than 5 years after the Petition Date; and (z) in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan.

## 2.  **Description and Treatment of Classified Claims and Equity Interests**

(a) _Class 1 – Other Priority Claims_.  Other Priority Claims are Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims), including, without limitation, certain allowed employee compensation and benefit claims of the Debtors' employees incurred within one hundred eighty (180) days prior to the Petition Date.

Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to different treatment, in full satisfaction of and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will receive payment in an amount equal to such Allowed Other Priority Claim in full in Cash as soon as practicable after the later of (a) the Effective Date and thirty days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

KL2 2608436.2

Because the Bankruptcy Court entered an order authorizing the Debtors to pay, among other things, unpaid prepetition employee compensation and benefits, the Debtors estimate that the Allowed Claims in Class 1 that are due and payable pursuant to the Plan on or before the Effective Date will be nominal.  Class 1 is unimpaired under the Plan.  Holders of Allowed Other Priority Claims are presumed to accept the Plan and are not entitled to vote on the Plan.

(b) _Class 2 – Other Secured Claims_.  Other Secured Claims are Claims, other than the Prepetition Revolver Facility Claims, the Prepetition Term Loan Secured Claims, the Prepetition Swap Claims, and the Letter of Credit Claims, to the extent reflected in the Schedules or a proof of claim filed as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to different treatment, at the sole option of the Debtors, after consultation with the Exit Term Loan Lenders, in full satisfaction of and in exchange for each Allowed Other Secured Claim, (i) each Allowed Other Secured Claim will be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim will receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) each holder of an Allowed Other Secured Claim will receive the Collateral securing its Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim as soon as practicable, after the later of (a) the Effective Date and (b) thirty days after the date such Other Secured Claim becomes an Allowed Other Secured Claim.

Notwithstanding the foregoing, to the extent an Allowed Other Secured Claim arises on account of property taxes, such Allowed Other Secured Claim will be treated as Priority Tax Claims, and any applicable liens will remain unimpaired until such Allowed Other Secured Claim is paid in full.  Any applicable interest will be calculated in a manner consistent with Section 511 of the Bankruptcy Code.

Class 2 is unimpaired under the Plan.  Holders of Other Secured Claims are presumed to accept the Plan and are not entitled to vote on the Plan.

(c) _Class 3 – Prepetition Revolver Facility Claims_.  Prepetition Revolver Facility Claims are Claims under or evidenced by the Prepetition Revolver Facility.  In full satisfaction of and in exchange for each Allowed Prepetition Revolver Facility Claim, each holder of an Allowed Prepetition Revolver Facility Claim will receive a Pro Rata share of the Exit Revolver Facility.  Any Letter of Credit Claim shall be satisfied with the issuance of one or more

replacement letter of credit facilities as part of the Exit Revolver Facility unless cash collateralized at the sole election of the Debtors.  Class 3 is Impaired under the Plan.  Holders of Prepetition Revolver Facility Claims are entitled to vote on the Plan.

(d)  *Class 4 – Prepetition Swap Claims*.  Prepetition Swap Claims are Claims under or evidenced by the Prepetition Swap Agreements Allowed in the aggregate amount of $7,415,000.  In full satisfaction of and in exchange for the Allowed Prepetition Swap Claims, the holders of the Allowed Prepetition Swap Claims will receive the Swap Note.  Class 4 is Impaired under the Plan.  The holders of the Prepetition Swap Claims are entitled to vote on the Plan.

(e)  *Class 5– Prepetition Term Loan Secured Claims*.  Prepetition Term Loan Secured Claims are the Prepetition Term Loan Claims up to the value of the Collateral securing the Prepetition Term Loan, which Claims are expressly Allowed in an amount equal to $162,000,000 pursuant to the Plan.  In full satisfaction of and in exchange for each Allowed Prepetition Term Loan Secured Claim, each holder of a Prepetition Term Loan Secured Claim will receive a Pro Rata share of the Prepetition Term Loan Distribution.  Class 5 is Impaired under the Plan.  Holders of Allowed Prepetition Term Loan Secured Claims are entitled to vote on the Plan.

(f)  *Class 6 – Prepetition Term Loan Deficiency Claims*.  Prepetition Term Loan Deficiency Claims are the Prepetition Term Loan Claims in the amount by which the Prepetition Term Loan exceeds the value of the Collateral securing the Prepetition Term Loan, which Claims are expressly Allowed in an amount equal to $80,000,000 pursuant to the Plan; provided however, that so long as the Unsecured Creditors Committee supports, and does not object, to the Plan, the Allowed Prepetition Term Loan Deficiency Claim shall be capped at $40 million.  In full satisfaction of and in exchange for each Allowed Prepetition Term Loan Deficiency Claim, each holder of a Prepetition Term Loan Deficiency Claim will receive a Pro Rata share of the Unsecured Claims Distribution, provided, however, that in no event shall the holders of Prepetition Term Loan Deficiency Claims recover any value in excess of the Allowed amount of such Claims, provided further, that if Classes 7 and 8 vote in favor of the Plan, the Prepetition Term Loan Holders shall be deemed to waive the Prepetition Term Loan Deficiency Claim in full.  Class 6 is Impaired under the Plan.  Holders of Allowed Prepetition Term Loan Deficiency Claims are entitled to vote on the Plan.

(g)  *Class 7 – Senior Note Claims*.  Senior Note Claims are Claims of the holders of the Senior Notes and Allowed in the aggregate amount of $259,663,152.08.   In full satisfaction of and in exchange for each Allowed Senior Note Claim, each holder of an Allowed Senior Note Claim will receive a Pro Rata distribution of  the Unsecured Claims Distribution; provided, however, that in no event will the holders of Senior Note Claims recover value in excess of the Allowed amount of such Claims; provided, further, however, that if a Subordination Dispute is not timely commenced, the Subordinated Notes Plan Distribution shall be distributed to the Senior Secured Notes Indenture Trustee for the benefit of holders of Allowed Class 7 Claims, and there shall be no distributions to Class 10.  If a Subordination Dispute is timely commenced, then the Debtors shall retain the Subordinated Notes Plan Distribution until the Subordination Dispute is resolved by Final Order, and shall distribute the Subordinated Notes Plan Distribution to holders of Class 7 Claims only to the extent provided for in a Final Order entered in the Subordination Dispute.  The Subordinated Notes Indenture

36

Trustee's rights under the Subordinated Notes Indenture shall not be reduced or impaired by reason of the Debtors' retention of the Subordinated Notes Plan Distribution.  Class 7 is Impaired under the Plan.  Holders of the Allowed Senior Note Claims are entitled to vote on the Plan.

(h)  *Class 8 – General Unsecured Claims*.  General Unsecured Claims are Claims against any of the Debtors that are not Administrative Claims, Priority Tax Claims, Other Priority Claims, Fee Claims, Letter of Credit Claims, Prepetition Term Loan Secured Claims, Prepetition Revolver Facility Claims, Prepetition Swap Claims, Other Secured Claims, Senior Note Claims, Subordinated Note Claims, or Prepetition Term Loan Deficiency Claims and include, without limitation, (i) Claims of vendors or customers of the Debtors that are not Priority Claims, (ii) Claims of employees of the Debtors that are not Priority Claims, (iii) Claims arising as a result of the rejection by any of the Debtors of executory contracts, including, but not limited to, rejection of indemnification obligations under Article X.H. of the Plan, and rejection of unexpired leases pursuant to section 365 of the Bankruptcy Code, (iv) litigation Claims, (v) the Tort Claims, and (vi) the Previous Plan Claims.  In full satisfaction of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive a Pro Rata distribution of the Unsecured Claims Distribution, provided, however, that in no event shall the holders of General Unsecured Claims recover value in excess of the Allowed amount of such Claims.  Class 8 is Impaired under the Plan.  Each holder of an Allowed General Unsecured Claim is entitled to vote to vote on the Plan.

(i)  *Class 9 – Convenience Claims*.  Convenience Claims are General Unsecured Claims against any of the Debtors that otherwise would be classified in Class 8, but, with respect to each such Claim, either (i) the aggregate amount of such Claim is equal to or less than $300,000 or (ii) the aggregate amount of such Claim is reduced to $300,000 pursuant to an election by the Claim holder made on the Ballot provided for voting on the Plan by the Voting Deadline; provided, however, that where any portion(s) of a single Claim has been transferred to a transferee, (a) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (b) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.  In full satisfaction of and in exchange for each Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive a distribution in Cash equal to 1.17% of such holder's Allowed Convenience Claim (the "Convenience Claims Consideration") within the later of (i) 30 days after the Effective Date, or (ii) 30 days after the date on which such holder's claim becomes an Allowed Convenience Claim.  Class 9 is Impaired under the Plan.  Each holder of an Allowed Convenience Claim is entitled to vote on the Plan

(j)  *Class 10 – Subordinated Note Claims*.  Subordinated Note Claims are Claims of the holders of the Subordinated Notes and Allowed in the aggregate amount of $237,472,873.  In full satisfaction of and in exchange for each Allowed Subordinated Note Claim, each holder of an Allowed Subordinated Note Claim will receive a Pro Rata distribution of the Unsecured Claims Distribution; provided, however, that in no event will the holders of Subordinated Note Claims recover value in excess of the Allowed amount of such claims; provided further, however, that the treatment and distributions to be paid to the holders of the Allowed Subordinated Note Claims and Senior Note Claims will give effect to the subordination provisions of the Subordinated Notes Indenture to the extent and in the manner set forth therein

37

and section 501(a) of the Bankruptcy Code; *provided* *further*, *however*, if a Subordination Dispute is not timely commenced, the Subordinated Notes Plan Distribution shall be distributed to the Senior Secured Notes Indenture Trustee for the benefit of holders of Allowed Class 7 Claims, and there shall be no distributions to holders of Class 10 Claims.  If a Subordination Dispute is timely commenced, then the Debtors shall retain the Subordinated Notes Plan Distribution until the Subordination Dispute is resolved by Final Order, and shall distribute the Subordinated Notes Plan Distribution to holders of Class 10 Claims only to the extent provided for in a Final Order entered in the Subordination Dispute. Nothing in the Plan shall affect, limit or impair the rights that the Senior Secured Indenture Trustee and the holders of Class 7 Claims may have as holders of Senior Indebtedness (as defined in the Subordinated Notes Indenture) with respect to the Subordinated Notes Plan Distribution.  Nothing in this Plan shall affect, limit or impair the respective rights of the Senior Secured Notes Indenture Trustee and holders of Allowed Senior Notes Claims, or the Subordinated Notes Indenture Trustee and holders of Allowed Subordinated Notes Claims, in respect of the Subordinated Notes Indenture, including provisions pertaining to subordination.  Class 10 is Impaired under the Plan.  Each holder of a Allowed Subordinated Note Claim is entitled to vote on the Plan.

(k) *Class 11 –Intercompany Claims*.  Intercompany Claims are Claims held by one of the Debtors against any other Debtor, including, without limitation, (i) any account reflecting intercompany book entries by such Debtor with respect to any other Debtor, (ii) any Claim not reflected in book entries that is held by such Debtor, and (iii) any derivative Claim asserted or assertable by or on behalf of such Debtor against any other Debtor.  On the Effective Date, Intercompany Claims that are not specifically reinstated by the Debtors will be deemed eliminated in full through contribution or distribution of the Intercompany Claim, depending on the relationship of the parties, to the Debtor liable for the Claim, or as otherwise provided by the Debtors.  Class 11 is Impaired under the Plan.  Each holder of an Intercompany Claim is presumed to accept the Plan and is not entitled to vote on the Plan.

(l) *Class 12 –Equity Interests*.  An Equity Interest means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest.  The holders of Equity Interests in the Debtors will neither receive distributions nor retain any property under the Plan on account of such Equity Interests.  Class 12 is Impaired under the Plan.  Each holder of an Equity Interest in Class 12 is presumed to reject the Plan and are not entitled to vote on the Plan.

## B. Consolidation of Debtors for Distribution Purposes

Solely in connection with Distributions made under the Plan to the holders of Allowed Claims, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Bankruptcy Court provide in the Confirmation Order for the consolidation of the Debtors' Estates into a single Estate for purposes of the Plan and the Distributions hereunder. Holders of Allowed Claims in each Class will be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Intercompany Claims shall be treated as provided in Class 11 of the Plan.

KL2 2608436.2

Pursuant to the Confirmation Order (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for purposes of the Plan and Distributions made pursuant to the Plan, (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors solely for purposes of the Plan and Distributions made pursuant to the Plan, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor made pursuant to the Plan will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors.

Notwithstanding the foregoing, such consolidation will not affect (i) the legal and corporate structure of the Reorganized Debtors; (ii) guarantees that are required to be maintained after the Effective Date (a) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, (b) pursuant to the express terms of the Plan, or (c) in connection with the Exit Facilities; or (iii) each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to section 1930(a)(6) of title 28 of the United States Code (such obligations will continue until an order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case).

The Plan will serve as, and will be deemed to be, a motion for entry of an order consolidating the Estates as set forth in the Plan.  If no objection to consolidation under the Plan is timely filed and served, then the holders of Claims will be deemed to have consented to consolidation for the purpose of the Plan only and the Bankruptcy Court may approve consolidation of the Debtors' Estates in the Confirmation Order.  If such objection to the consolidation provided for in the Plan is timely filed and served, a hearing with respect to the consolidation of the Estates and the objections thereto will be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing.

KL2 2608436.2

The deemed consolidation of the Debtors for Plan purposes is appropriate and warranted under the circumstances.   Generally, the Debtors operate their businesses as a consolidated enterprise from the perspective of the Debtors, the Club Members and the creditors. In addition, certain creditors filed Claims against the wrong Debtor entities.   Similarly, some of the Debtors' creditors, although recognizing corporate distinctions, take actions that indicate that they are dealing with Bally as a consolidated enterprise.   Finally, the Debtors believe that the deemed consolidation of the consolidated Debtors for Plan purposes is in the best interests of creditors.   Permitting consolidation for Plan purposes will simplify the administration of these cases and implementation of the Plan.   Also, consolidation for Plan purposes permits the Debtors to avoid costly litigation and other expenses related to separating out assets and liabilities and preserves such assets for creditors.   For all the foregoing reasons, the Debtors believe that the deemed consolidation of the Debtors for Plan purposes is appropriate.

## C.  **Means for Implementation of the Plan**

### 1.  **Exit Facilities**

Implementation of the Plan, is dependent on, among other things, the successful closing of financing necessary to fund the Debtors' exit from their Chapter 11 Cases (the "Exit Facilities").  The Exit Facilities include (i) the Exit Revolver Facility that will be utilized to "roll" the Prepetition Revolver Facility into a post-Effective Date revolver facility, and (ii) the Exit Term Loan Facility that will be used to make distributions under the Plan, to satisfy certain Plan-related expenses, and to fund the Reorganized Debtors' working capital needs.

### 2.  **Voting of Claims**

Each holder of an Allowed Claim in an Impaired Class of Claims, not otherwise deemed to have accepted or rejected the Plan, will be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### 3.  **Nonconsensual Confirmation**

As provided in more detail in Section VII.C, because Class 12 is deemed to reject the Plan, the Debtors will seek confirmation under section 1129(b) of the Bankruptcy Code. Pursuant to section 1129(b), if less than all Impaired Classes accept the Plan, but at least one Class of Claims Impaired under the Plan has accepted the Plan (and which Class's acceptance is determined without inclusion of claims of Insiders), a chapter 11 plan of reorganization may be confirmed.   The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### 4.  **Issuance of New Bally Common Stock, New Bally Warrants, and New Subsidiary Equity Interests**

(a) *New Bally Common Stock and Shareholder Agreement*.   On the Effective Date, Reorganized Bally will issue and distribute the New Bally Common Stock and New Bally

Warrants pursuant to the terms of Article V of the Plan, and each Reorganized Subsidiary shall issue and distribute the New Subsidiary Equity Interests subject to the Restructuring Transactions. The number of shares, ownership, and terms of the New Subsidiary Equity Interests shall be the same as the number of shares, ownership, and terms of the Equity Interests in the Subsidiaries immediately prior to the Effective Date subject to the Restructuring Transactions. Each Person who receives a distribution of New Bally Common Stock under the Plan shall be deemed to have executed the Shareholder Agreement and shall be bound thereunder.

The following chart summarizes the allocation of New Bally Common Stock under the Plan:

| Distribution | Allocation of New Bally Common Stock | Distribution Recipients |
|---|---|---|
| Prepetition Term Loan Distribution | 94% | - Prepetition Term Loan Secured Claims (Class 5) |
| Unsecured Claims Distribution | 3% | - Prepetition Term Loan Deficiency Claims (Class 6)<br>- Senior Note Claims (Class 7)<br>- General Unsecured Claims (Class 8)<br>- Subordinated Note Claims (Class 10) |
| Management Incentive Plan | 3% | - Certain members of management of Reorganized Bally, as detailed in the Plan |

(b) *Section 1145 Exemption*. Pursuant to, in accordance with, and solely to the extent provided under section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Bally Common Stock, the New Bally Warrants and the New Bally Common Stock underlying the New Bally Warrants, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of the New Bally Common Stock, the New Bally Warrants and the New Bally Common Stock underlying the New Bally Warrants. The resale of the New Bally Common Stock, the New Bally Warrants and the New Bally Common Stock underlying the New Bally Warrants by creditors will be exempt from the registration requirements of the federal securities laws, except for resales by persons who may be deemed underwriters under Section 1145(b)(1) of the Bankruptcy Code. Among other persons deemed underwriters for these purposes are affiliates of Reorganized Bally, that is persons who directly or indirectly control or are controlled by Reorganized Bally or who are under direct or indirect common control with Reorganized Bally. **CREDITORS ARE URGED TO CAREFULLY READ SECTION XI OF THIS DISCLOSURE STATEMENT FOR IMPORTANT DISCLOSURES CONCERNING THE EXEMPTION OF SECURITIES ISSUED UNDER THE PLAN PURSUANT TO SECTION 1145**.

### 5. The New Bally Common Stock

All New Bally Common Stock distributed under the Plan will be issued in book-entry form, and The Depository Trust Company ("DTC") or its nominee will be the holder of record of such New Bally Common Stock, except for New Bally Common Stock issued to

affiliates of the Debtors. One or more global stock certificates representing the New Bally Common Stock will be registered with a transfer agent for the New Bally Common Stock, in the name of, and will be deposited with, DTC or its nominee. For so long as New Bally Common Stock is held through DTC, the ownership interest of each holder of New Bally Common Stock, and transfers of ownership interests, recorded on the records of the direct and indirect participants in DTC. DTC participants include securities brokers and dealers, banks, trust companies, clearing corporations and other organizations. To receive distributions of New Bally Common Stock, holders of Claims who are not affiliates of the Debtors will be required to designate a direct or indirect participant in DTC with whom such holder has an account into which the New Bally Common Stock may be deposited. If DTC is unwilling or unable to continue as a depository for the New Bally Common Stock, or Reorganized Bally otherwise decides to do so, Reorganized Bally will either exchange the New Bally Common Stock represented in book-entry form by global stock certificates for registered stock certificates or record ownership of the New Bally Common Stock through a direct registration system.

New Bally Common Stock issued to affiliates of the Debtors will be in the form of registered stock certificates and may bear a legend indicating that transfer may be restricted under federal and state securities laws. To the extent New Bally Common Stock is issued in registered form, no stockholder may sell, exchange, assign, pledge, encumber or otherwise transfer such New Bally Common Stock if such transfer would result in the New Bally Common Stock being held of record by more than 275 Persons as determined pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended, unless such transfer is expressly approved by the board of directors of Reorganized Bally. Any transfer of New Bally Common Stock in violation of these provisions will be void.

### 6. **The New Bally Warrants**

The New Bally Warrants will be issued pursuant to the terms of the New Bally Warrant Agreement.

Each New Bally Warrant will initially be exercisable for one share of New Bally Common Stock at an exercise price set forth in the New Bally Warrant Agreement. The exercise price of the New Bally Warrants and the number of shares issuable upon exercise will be subject to customary adjustment for any stock dividends, stock distributions, stock subdivisions or stock combinations. The exercise price of the New Bally Warrants and the number of shares issuable upon exercise will also be subject to customary adjustment for any extraordinary cash dividends or distributions of debt securities or other assets to all holders of New Bally Common Stock. In the event of any reclassification, capital reorganization or other change of the outstanding shares of New Bally Common Stock, or any consolidation or merger of Reorganized Bally with or into another corporation or entity (other than a consolidation or merger in which Reorganized Bally is the continuing entity) or any sale or conveyance of the property of Reorganized Bally substantially as an entirety, each New Bally Warrant will entitle the holder to purchase the kind and number of shares of stock or other securities or property receivable upon such reclassification, capital reorganization or other change, consolidation, merger, sale or conveyance by a holder of the number of shares of New Bally Common Stock that would have been purchased upon exercise of the New Bally Warrant immediately prior thereto.

In case Reorganized Bally declares a dividend or other distribution on the New Bally Common Stock that would require an adjustment in the exercise price of the New Bally Warrants; authorizes the granting to all of the holders of the New Bally Common Stock rights to subscribe for shares or warrants; effects any reclassification, reorganization, consolidation, merger or sale of substantially all of the assets of Reorganized Bally that would require adjustment to the New Bally Warrants; or effects any liquidation, dissolution or winding-up of the Debtors, Reorganized Bally will provide holders of the New Bally Warrants at least 15 business days advance notice of such action.

All New Bally Warrants distributed under the Plan will be issued in book-entry form, and DTC or its nominee will be the holder of record of such New Bally Warrants, except for New Bally Warrants issued to affiliates of the Debtors.  One or more global warrant certificates representing the New Bally Warrants will be registered with a warrant agent for the New Bally Warrants, in the name of, and will be deposited with, DTC or its nominee.  For so long as New Bally Warrants are  held through DTC, the ownership interest of each holder of New Bally Warrants, and transfers of ownership interests, will be recorded on the records of the direct and indirect participants in DTC.  To receive distributions of New Bally Warrants, holders of Claims who are not affiliates of the Debtors will be required to designate a direct or indirect participant in DTC with whom such holder has an account into which the New Bally Warrants may be deposited.  If DTC is unwilling or unable to continue as a depositary for the New Bally Warrants, or Reorganized Bally otherwise decides to do so, Reorganized Bally will exchange the New Bally Warrants represented in book entry form by global warrant certificates for registered warrant certificates or record ownership of the New Bally Warrants through a direct registration system.

So long as the New Bally Warrants are held of record by DTC or its nominee, beneficial owners of such New Bally Warrants will be required to follow such procedures as DTC or its direct or indirect participants may establish for exercising their rights in respect of the New Bally Warrants, including exercise and transfer thereof.  Also, for so long as New Bally Common Stock is held through DTC, shares of New Bally Common Stock issuable upon exercise of the New Bally Warrants will be issued in book-entry form and held through DTC.

New Bally Warrants issued to affiliates of the Debtors will be in the form of registered warrant certificates and may bear a legend indicating that transfer may be restricted under federal and state securities laws.  The New Bally Warrant Agreement will provide that, to the extent New Bally Warrants are issued in registered form, no warrant holder may sell, exchange, assign, pledge, encumber or otherwise transfer of all or any portion of a New Bally Warrant if such transfer would result in the New Bally Warrants being held of record by more than 450 Persons as determined pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended, unless such transfer is expressly approved by the board of directors of Reorganized Bally.  Any transfer of a New Bally Warrant in violation of these provisions will be void.

KL2 2608436.2

7. **Claims Monitor**

1. *Retention*.  The Debtors, in consultation with the Unsecured Creditors' Committee, will negotiate and enter into an engagement letter with the Claims Monitor prior to the Effective Date.

2. *Powers, Rights and Responsibilities*.  The powers, rights and responsibilities of the Claims Monitor shall be to: (i) consult with the Reorganized Debtors with respect to any proposed stipulation or settlement that would result in an Allowed General Unsecured Claim in excess of $1,000,000; (ii) file an objection to any proposed stipulation or settlement which would result in an Allowed General Unsecured Claim in excess of $1,000,000; and (iii) object to (and thereafter settle) any General Unsecured Claim in excess of $1,000,000 where the Claims Monitor has expressly requested in writing that the Reorganized Debtors object to a General Unsecured Claim and the Reorganized Debtors have not filed the objection requested by the Claims Monitor within 30 days of the Reorganized Debtors' receipt of such request.

3. *Funding of Claims Monitor*.  The reasonable, documented and necessary fees and expenses of the Claims Monitor (including the reasonable and necessary fees and expenses of any professionals assisting the Claims Monitor in carrying out its responsibilities as set forth above) will be funded by the Reorganized Debtors in an amount not to exceed $200,000 (which amount may be increased in the sole discretion of the Reorganized Debtors) without further order from the Bankruptcy Court.

4. *Termination of Claims Monitor*.  The Claims Monitor's engagement will terminate on the date that the last Disputed General Unsecured Claim in excess of $1,000,000 is resolved.

8. **Restructuring Transactions**

(a) *Restructuring Transactions Generally*.  On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions as provided for in Article V.H. of the Plan and may take such actions as the Debtors or Reorganized Debtors may determine to be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors, including but not limited to the restructuring transactions identified on Exhibit C to the Plan, all to the extent not inconsistent with any other terms of the Plan.  All such Restructuring Transactions will be deemed to occur on the date set under the terms of the applicable Restructuring Transaction.  The Restructuring Transactions may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.  The actions to effect these transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right,

44

liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (iv) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. Any such transactions may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors.

(b) *Continued Corporate Existence and Vesting of Assets*. Except as otherwise provided in the Plan (including with respect to the Restructuring Transactions): (i) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law; and (ii) on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest, subject to the Restructuring Transactions, in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and other interests. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Fee Claims, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

(c) *Successor Obligations*. The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations. In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

## D. **Provisions Regarding Corporate Governance of the Reorganized Debtors**

### 1. **Amendments to Certificates of Incorporation**

(a) *Bally Total Fitness Holding Corporation*. On the Effective Date, the certificate of incorporation of Bally will be amended and restated to (i) increase the authorized capital stock of New Bally, (ii) prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited, and (iii) provide for restrictions on trading New Bally Common Stock and New Bally Warrants to the

KL2 2608436.2

extent provided in Article V.E. of the Plan. The Amended and Restated Certificate of Incorporation of Reorganized Bally is attached to the Plan as <u>Exhibit E</u>, and will be filed on or immediately prior to the Effective Date with the applicable Secretaries of State and/or the applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation.

(b) *The Debtors' Subsidiaries*. On the Effective Date, or as soon thereafter as is practicable, the certificate of incorporation of each Debtor Subsidiary will be amended and restated to prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited. Under the Restructuring Transactions, the Debtors will take all necessary steps and make all necessary filings to consolidate the Subsidiaries into 7 operating subsidiaries. The Amended and Restated Certificates of Incorporation of the Reorganized Subsidiaries are attached to the Plan as <u>Exhibit E</u>, and will be filed on or immediately prior to the Effective Date with the applicable Secretaries of State and/or the applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation.

## 2. **Appointment of Officers and Directors.**

As of the Effective Date, the term of the current members of the board of directors of Bally will expire, and the initial boards of directors, including the New Board, and the officers of each of the Reorganized Debtors will be appointed in accordance with the respective new certificates of incorporation and new by-laws. The initial board of directors of Reorganized Bally will be a six-member board comprised of Michael Sheehan, and five directors designated by the Exit Term Loan Lenders (one of which will be Gene Davis). The initial boards of directors of the Reorganized Subsidiaries will have substantially the same composition and membership as such Subsidiaries had immediately prior to the Effective Date. The identities, affiliations and the amount of compensation of the initial board members of Reorganized Bally will be disclosed in Exhibit G to the Plan. Any successors to the Reorganized Debtors' initial boards will be appointed in compliance with the applicable Reorganized Debtor's bylaws, certificates of incorporation or other applicable corporate formation and governance documents. Each such director and officer will serve from and after the Effective Date pursuant to the terms of the new certificates of incorporation, new by-laws, and other constituent documents of the Reorganized Debtors.

## 3. **Powers of Officers.**

The officers of the Debtors or the Reorganized Debtors, as the case may be, will have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

## 4. **Management of Reorganized Debtors.**

The officers of the Reorganized Debtors will be substantially the same as the officers of the Debtors on the Effective Date. The Reorganized Debtors' officers will be employed and serve in accordance with the Management Contracts.

### 5. Reorganized Debtors' Management Incentive Plan.

The Management Incentive Plan shall become effective on the Effective Date. Pursuant to the Management Incentive Plan (i) 3% of the shares of the New Bally Common Stock, subject to dilution from the New Bally Warrants and the Management Options (defined below), will be reserved for issuance and distribution to management, (ii) management will be provided with options to purchase up to 8% of New Bally Common Stock, on a fully diluted basis, on the terms set forth in the Management Incentive Plan (the "Management Options"), and (iii) Reorganized Bally will distribute emergence bonuses in an aggregate amount of $1 million to management on the Effective Date. A summary of the Management Incentive Plan is attached as Exhibit H to the Plan.

### 6. Reorganized Debtors' Corporate Personnel Incentive Plan.

The Corporate Personnel Incentive Plan shall become effective on the Effective Date. Pursuant to the Corporate Personnel Incentive Plan the Reorganized Debtors will offer incentive based cash compensation to certain corporate personnel. A summary of the Corporate Personnel Incentive Plan shall be attached as Exhibit I to the Plan.

### 7. Indemnification of Directors, Officers and Employees.

Upon the Effective Date, the charter and by-laws of each Reorganized Debtor will contain provisions which (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post- emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Debtors' and the Reorganized Debtors' directors, officers, and other employees (as such employees are identified by the New Board) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized, it being expressly understood that in no event shall the Reorganized Debtors be responsible for the indemnification claims of individuals who did not serve as officers or directors of the Debtors after October 1, 2007.

## E. Effect of Confirmation of the Plan

### 1. Continued Corporate Existence

The Debtors, as Reorganized Debtors, will continue to exist after the Effective Date with all powers of a corporation or limited liability company, as the case may be, under the laws of the respective states governing their formation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith. In addition, the Reorganized Debtors may operate their businesses free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, subject only to the terms and conditions of the Plan as well as the documents and instruments executed and delivered in connection therewith, including without limitation, the Plan Exhibits. The Reorganized Debtors will be responsible for

47

filing required post-confirmation reports and paying quarterly fees due to the Office of the United States Trustee.

### 2. **Dissolution of Unsecured Creditors' Committee**

The Unsecured Creditors' Committee will continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. On the Effective Date, the Unsecured Creditors' Committee will be dissolved and its members will be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Unsecured Creditors' Committee's attorneys, financial advisors, and other agents will terminate as of the Effective Date; provided, however, such attorneys and financial advisors will be entitled to pursue their own Fee Claims and represent the Unsecured Creditors' Committee in connection with the review of and the right to be heard in connection with all Fee Claims.

### 3. **Benefit Plans**

As of and subject to the Effective Date, except as provided elsewhere in Article X and Exhibit A of the Plan, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs will survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such executory contracts or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts, or programs.

### 4. **Vesting of Property**

The property of the Debtors' estates, including, without limitation, all of the Litigation Rights, will be revested in the Reorganized Debtors on the Effective Date.

### 5. **Discharge of the Debtors**

The rights afforded pursuant to the Plan and the treatment of all Claims and Equity Interests therein will be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Reorganized Debtors or any of their respective assets or properties, arising prior to the Effective Date. Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise expressly specified in the Plan, upon the Effective Date, the Confirmation Order will act as a discharge of all debts of, Claims against, and Liens on

the Debtors, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim with respect thereto was filed, whether the Claim is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution hereunder.  Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such discharged Claim will be precluded from asserting against the Debtors, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.

## 6. **Injunction**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Persons or entities who have held, hold, or may hold Claims against the Debtors that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against or affecting a Debtor, its Estate or its Assets, with respect to any such Claim, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim, (iv) asserting any right of setoff, or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, or in connection with, or with respect to, any such Claims or Interests released or settled pursuant to the Plan.  Such injunction will extend to successors of the Debtor (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.  Such injunction will not apply in respect of Ordinary Course Administrative Claims.

## 7. **Preservation of Causes of Action**

Section 1123(b)(3) of the Bankruptcy Code provides that a debtor's plan of reorganization may provide for the debtor to retain and enforce any claim or interest on behalf of the debtor's estate for the benefit of its creditors.

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain all Litigation Rights, other than as expressly provided below.  Nothing contained in the Plan or the Confirmation Order will be deemed a waiver or relinquishment of any claim, Litigation Right, right of setoff, or other legal or equitable defense of the Debtors that is not specifically waived or relinquished by the Plan.  The Reorganized Debtors will have, retain, reserve and be entitled to assert all such claims, Litigation Rights, rights of setoff and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any claim that is not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  No Person may rely on the absence of a specific reference in the Plan

KL2 2608436.2

or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such person. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.[2]

### 8. Votes Solicited in Good Faith

The Debtors have, and upon confirmation of the Plan will be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and therefore have not been, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

### 9. Administrative Claims Incurred After the Effective Date

Administrative Claims incurred by the Debtors after the Effective Date including (without limitation) Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without application for or Bankruptcy Court approval, subject to any agreements with any Claim holders.

### 10. Releases by the Debtors

**On the Effective Date, and notwithstanding any other provisions of the Plan, the Debtors and the Reorganized Debtors, on behalf of themselves and their estates, shall be deemed to release unconditionally (i) all of their respective officers, directors, employees, partners, advisors, attorneys, financial advisors, accountants, and other professionals who served or were employed by the Debtors at any time between October 1, 2007, and the Effective Date, (ii) the Prepetition Administrative Agent, (iii) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of the Prepetition Administrative Agent, (iv) the Prepetition Term Loan Holders and the Prepetition Revolver Facility Lenders, (v) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of the Prepetition Term Loan Holders and the Prepetition Revolver**

---

[2]  The Debtors are in the process of analyzing the potential avoidance of prepetition transfers under sections 547 and 550 of the Bankruptcy Code. At this juncture, the Debtors believe that many of the transfers within the preference period were made in the ordinary course of the Debtors' business, or that the transferees would be able to assert other defenses to avoidance of their transfers. Notwithstanding the foregoing, the Debtors reserve the right to seek avoidance of any preferential transfer, unless such causes of action are otherwise expressly waived in the Plan. The Debtors intend to make efforts to consensually resolve any potential avoidance actions rather than engage in protracted litigation.

KL2 2608436.2

Facility Lenders, (vi) the Exit Revolver Lenders and the Exit Term Loan Lenders, (vii) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of the Exit Revolver Lenders and the Exit Term Loan Lenders, (viii) the members of the Unsecured Creditors' Committee, (ix) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of the Unsecured Creditors' Committee, (x) the Senior Secured Notes Indenture Trustee, (xi) the Subordinated Notes Indenture Trustee, (xii) Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, LP. (collectively "Harbinger") as the former equity owners of Bally, and (xiii) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of Harbinger (collectively the "Released Parties," and each a "Released Party") from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken solely in their respective capacities described above or any omission, agreement, transaction, event, or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, provided, however, that (a) no individual will be released from any act or omission that constitutes gross negligence or willful misconduct, (b) the Reorganized Debtors will not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such persons asserted against the Debtors, (c) the foregoing release will not apply to any obligations that remain outstanding in respect of loans or advances made to individuals by the Debtors or to any obligations under the Exit Facilities outstanding as of the Effective Date, and (d) the foregoing release applies to the Released Parties solely in their respective capacities described above.

## 11.  Releases by Holders of Claims and Equity Interests

On the Effective Date, and notwithstanding any other provisions of the Plan, (i) Persons who directly or indirectly, have held, hold, or may hold Claims or Interests who voted to accept the Plan, and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all Persons who directly or indirectly, have held, hold, or may hold Claims or Interests, will be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan, to have forever released and covenanted with the Reorganized Debtors and the Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any Released Party on account of any Claim, including but not limited to any Claim based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way related to the Debtors or their business and affairs or (z) assert against any of the Reorganized Debtors or any Released Party any claim, obligation, right, cause of action or liability that any holder of a Claim or Interest may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the

Chapter 11 Cases, or the Plan, **provided**, **however,** (i) the foregoing release will not apply to obligations arising under the Plan, (ii) the foregoing release will not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan, and (iii) nothing in the Confirmation order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties (provided that the foregoing shall in no way affect or limit the discharge or injunction granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

## 12. Exculpation and Injunction with  Respect of Released Parties

The Debtors, the Reorganized Debtors, and the other Released Parties (i) will have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission in connection with, or arising out of, the Plan, this Disclosure Statement, the negotiation of the Plan, the negotiation of the documents included in the Plan Exhibits, the pursuit of approval of this Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or this Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

## 13. Injunction with Respect of Released Parties.

Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, Claim or Equity Interest will be permitted to commence or continue any action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or prior to the Effective Date and that has been released or waived pursuant to the Plan.

KL2 2608436.2

### 14. Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

### 15. Preservation of Insurance

The Debtors' discharge and release from all Claims pursuant to the Plan will not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, its officers and current and former directors) or any other person or entity. Pursuant to the Plan, the Reorganized Debtors will obtain tail coverage under their existing directors' and officers' liability insurance policy covering their officers and current and former directors, which coverage will extend for a period of not less than 6 years after the Effective Date.

### 16. Indemnification Obligations Owed by the Debtors

Indemnification obligations owed by the Debtors to directors, officers, and employees of the Debtors (or the estates of any of the foregoing) who served or were employed by the Debtors at any time between October 1, 2007, and the Effective Date, excluding claims which have been determined by Final Order to have resulted from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

Indemnification obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and by order of the Bankruptcy Court, to the extent related to the period after the Petition Date, will be deemed to be, and will be treated as though they are, executory contracts assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

## F. Distributions under the Plan

### 1. Allowed Claims

(a) *Delivery of Distributions*. Distributions under the Plan will be made by the Reorganized Debtors to the holders of Allowed Claims in all Classes for which a Distribution is provided in the Plan at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

(b) *Distribution of Cash*. Any payment of Cash by the Reorganized Debtors pursuant to the Plan will be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

KL2 2608436.2

(c) *Unclaimed Distributions of Cash*.  Any distribution of Cash under the Plan that is unclaimed after six months after it has been delivered (or attempted to be delivered) shall, pursuant to section 347(b) of the Bankruptcy Code, become the property of the Reorganized Debtor against which such Claim was Allowed notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim will-be extinguished and forever barred.

(d) *Distributions of New Bally Common Stock and New Bally Warrants*.  On the Effective Date, the Reorganized Debtors will distribute the New Bally Common Stock from the Prepetition Term Loan Secured Claims Distribution to the holders of the Prepetition Term Loan Secured Claims.  On the Initial Distribution Date, and from time to time thereafter, the Reorganized Debtors shall distribute the New Bally Common Stock and the New Bally Warrants from the Unsecured Claims Distribution to the holders of the Senior Note Claims, the Subordinated Note Claims, the General Unsecured Claims, and the Prepetition Term Loan Deficiency Claims.  Distributions of New Bally Common Stock and New Bally Warrants made to holders of Allowed Class 7 Claims shall be delivered to the Senior Secured Notes Indenture Trustee for Pro Rata distribution to holders of Allowed Senior Note Claims in accordance with the Senior Secured Notes Indenture.  Any Subordinated Notes Plan Distribution shall be distributed to the Subordinated Notes Indenture Trustee or the Senior Notes Indenture Trustee as provided in Article III.B.10 of the Plan.

(e) *Unclaimed Distributions of New Bally Common Stock and New Bally Warrants*.  Any distribution of New Bally Common Stock and New Bally Warrants under the Plan on account of an Allowed Unsecured Claim that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) will be held in the Unsecured Claims Reserve to be distributed to the other holders of such claims and, notwithstanding any state or other escheat or similar laws to the contrary, the entitlement by the holder of such Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim will be extinguished and forever barred.

(f) *Saturdays, Sundays, or Legal Holidays*.  If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and will be deemed to have been completed as of the required date.

(g) *Fractional New Bally Common Stock and New Bally Warrants and De Minimis Distributions*.  Notwithstanding any other provision in the Plan to the contrary, no fractional shares of New Bally Common Stock and New Bally Warrants will be issued or distributed pursuant to the Plan.  Whenever any payment of a fraction of a share of New Bally Common Stock or a New Bally Warrant would otherwise be required under the Plan, the actual distribution made will reflect a rounding of such fraction to the nearest whole share (up or down), with half shares or less being rounded down and fractions in excess of a half of a share being rounded up.  If two or more holders are entitled to equal fractional entitlements and the number of holders so entitled exceeds the number of whole shares, as the case may be, that remain to be allocated, the Reorganized Debtors will allocate the remaining whole shares to such holders by random lot or such other impartial method as the Reorganized Debtors deems fair, in

54

their sole discretion. Upon the allocation of all of the whole New Bally Common Stock and New Bally Warrants authorized under the Plan, all remaining fractional portions of the entitlements will be canceled and will be of no further force and effect. The Reorganized Debtors will not be required to, but may in their sole and absolute discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

(h) *Distributions for Claims Allowed as of the Initial Distribution Date*. On the Initial Distribution Date, the Reorganized Debtors will distribute Cash, New Bally Common Stock, New Bally Warrants, or Collateral, as the case may be, to the holders of Allowed Claims as contemplated herein.

(i) *Distributions for Claims Allowed after the Initial Distribution Date*. Each holder of a Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date will receive the Distribution to which such holder of an Allowed Claim is entitled at such time that the Reorganized Debtors determine, in their discretion, to make subsequent Distributions to holders of other Claims Allowed following the Initial Distribution Date, provided that the Reorganized Debtors will make such Distributions at least annually after the Initial Distribution Date. Nothing set forth herein is intended to, nor will it, prohibit the Reorganized Debtors, in their discretion, from making a Distribution on account of any Claim at any time after such Claim becomes an Allowed Claim.

(j) *The Record Date*. As of the close of business on the Record Date, the claims register (for Claims) and transfer ledger (for Equity Interests) will be closed, and there will be no further changes in the record holders of any Claims or Equity Interests. The Reorganized Debtors will have no obligation to, but may in their sole and absolute discretion, recognize any transfer of any Claims or Equity Interests occurring after the Record Date. The Reorganized Debtors will instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the claims register (for Claims) and transfer ledgers (for Equity Interests) as of the close of business on the Record Date.

(k) *Interest on Claims*. Except as specifically provided for in the Plan, no Claims, Allowed or otherwise (including Administrative Claims, but excluding the Claims of the Prepetition Revolver Lenders), will be entitled, under any circumstances, to receive any interest on a Claim.

2. **Disputed Claims**

(a) *Objections to and Resolution of Unsecured Claims*. The Reorganized Debtors will have the right to file, settle, compromise, withdraw or litigate objections to Unsecured Claims subsequent to the Effective Date. Unless otherwise ordered by the Bankruptcy Court, objections to, or other proceedings concerning the allowance of, Unsecured Claims will be filed and served upon the holders of the Unsecured Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline. In the event any Unsecured Claim is permitted to be filed after the Claims Objection Deadline, the Reorganized Debtors will have ninety (90) days from the date of such order or agreement to object to such Claim, which deadline may be extended by the Bankruptcy Court on motion of the Reorganized Debtors without a hearing or notice to

Creditors. The Reorganized Debtors may settle any objections or proceedings without Bankruptcy Court approval or may seek Bankruptcy Court approval without notice to any Person.

(b) _Objections to and Resolution of Priority Tax Claims, Other Priority Claims, and Other Secured Claims_. The Reorganized Debtors will have the exclusive right to file, settle, compromise, withdraw or litigate objections to Priority Tax Claims, Other Priority Claims and Other Secured Claims. Unless otherwise ordered by the Bankruptcy Court, objections to, or other proceedings concerning the allowance of Priority Tax Claims, Other Priority Claims and Other Secured Claims will be filed and served upon the holders of such Claims, as soon as practicable, but in no event later than the Claims Objection Deadline. In the event any Priority Tax Claim, Other Priority Claim and Other Secured Claim is permitted to be filed after the Claims Objection Deadline, the Reorganized Debtors shall have ninety (90) days from the date of such order or agreement to object to such Claim, which deadline may be extended by the Bankruptcy Court on motion of the Reorganized Debtors without a hearing or notice to Creditors. The Reorganized Debtors may settle any objections or proceedings without Bankruptcy Court approval or may seek Bankruptcy Court approval without notice to any Person.

(c) _Objections to and Resolution of Administrative Claims and Fee Claims_. The Reorganized Debtors will have the exclusive right to file, settle, compromise, withdraw or litigate objections to Administrative Claims (other than Fee Claims). Unless otherwise ordered by the Bankruptcy Court, objections to, or other proceedings concerning the allowance of, filed Administrative Claims will be filed and served upon the holders of the Administrative Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable. The Reorganized Debtors may settle any such objections or proceedings without Bankruptcy Court approval or may seek Bankruptcy Court approval without notice to any Person. Objections to Fee Claims will be filed and served within seventy-five (75) days of the Effective Date (or such longer period as may be allowed by order of the Bankruptcy Court).

### 3. **Insured Claims**

Notwithstanding anything to the contrary in this Disclosure Statement or the Plan distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for General Unsecured Claims; _provided, however,_ that:

(a) an Allowed Insured Claim, all or a portion of which is within the applicable deductible or self-insured retention of the relevant insurance policy of the Debtors, shall be treated as an Allowed General Unsecured Claim for the amount which is within the applicable deductible or self-insured retention of the relevant insurance policy of the Debtors;

(b) an Allowed Insured Claim, a portion of which exceeds the limits of coverage available under the relevant insurance policies of the Debtors, shall be treated as an Allowed General Unsecured Claim in the amount by which such Allowed Insured Claim exceeds the limits of coverage available under such insurance policies;

KL2 2608436.2

(c)  to the extent all or a portion of an Allowed Insured Claim is to be treated as an Allowed General Unsecured Claim under subsection (a) above, such Allowed Insured Claim or portion therefore shall be deemed to be paid in full, dollar for dollar, up to the amount of the Allowed General Unsecured Claim regardless of the actual value of Distributions on General Unsecured Claims under the Plan;

(d)  with respect to any Insured Claim, the Debtors' insurers shall have no duty or obligation to pay any amount within the deductible or self-insured retention of any applicable insurance policy of the Debtors unless otherwise required to do so by the terms such policy;

(e)  in the event that any insurer pays any amount within the deductible or self-insured retention of any applicable insurance policy (whether or not obligated to do so under such policy), the Debtors will have no obligation or liability to such insurer other than a General Unsecured Claim for the amount of such payment if such General Unsecured Claim has been timely filed;

(f)  each Workers' Compensation Claim will be adjusted, settled and/or paid in the ordinary course in accordance with the terms of the applicable insurance policy of the Debtors;

(g)  nothing in Article VIII.C. of the Plan is intended to, will, or will be deemed to preclude any holder of an Allowed Insured Claim from seeking recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such holder may receive under the Plan or to preclude any insurer from contesting or asserting defenses any such action by a holder.  The Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates;

(h)  nothing in this Disclosure Statement or the Plan shall be construed as, or is, a determination as to coverage in connection with any Insured Claim under any applicable insurance policy; and

(i)  this Disclosure Statement and the Plan shall not (i) modify the coverage provided under the Debtors' insurance policies, (ii) alter in any way the obligations of the Debtors' insurers under the insurance policies, or (iii) in any way permit any holder of a Workers Compensation Claim or Insured Claim to any duplicate recovery from the insurers and any other party including, but not limited to, the Debtors or the Reorganized Debtors.

### 4.  **Tort Claims**

(i)  *Pending Tort Claims*.   Any unliquidated Tort Claim pending on the Effective Date that has not been resolved through a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date.  Upon the Effective Date, the discharge injunction will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claims in the applicable administrative or judicial tribunal(s).  For the avoidance of doubt, all Allowed Tort Claims, regardless of the forum in which they are liquidated and to the extent not covered by insurance, shall be treated as Class 8 General Unsecured Claims under the Plan, and will be limited to the recovery provided

to Class 8 claimholders as their sole source or recovery against the Debtors or Reorganized Debtors.

(ii) *Non-Pending Tort Claims*.   Any unliquidated Tort Claim for which no action is pending on the Effective Date and that has not been resolved through a Final Order of the Bankruptcy Court will be determined and liquidated at the Debtors or Reorganized Debtors' option at any administrative or judicial tribunal of appropriate jurisdiction.   The Debtors or the Reorganized Debtors may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Debtors or the Reorganized Debtors have exercised such option.   Upon a Debtor's or Reorganized Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code, or after the Effective Date, the discharge injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s).   For the avoidance of doubt, all Allowed Tort Claims, regardless of the forum in which they are liquidated and to the extent not covered by insurance, shall be treated as Class 8 General Unsecured Claims under the Plan, and will be limited to the recovery provided to Class 8 claimholders as their sole source or recovery against the Debtors or Reorganized Debtors.

(iii) *Bankruptcy Court Jurisdiction*.   At all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the United States District Court having jurisdiction over the Chapter 11 Cases) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.

(iv) *Automatic Dismissal of Tort Claim Upon Adverse Judgment*.   In the event a Tort Claim is liquidated pursuant to a judgment or order that is obtained in accordance with Article VIII.D. of the Plan and is no longer appealable or subject to review, and applicable non-bankruptcy law provides for no recovery against the applicable Debtor or Reorganized Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's or Reorganized Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim.

(v) *Reservation of Rights*.   Nothing contained in the foregoing will constitute or be deemed a waiver of any claim, Right or Cause of Action that a Debtor may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code.   All claims, demands, rights, defenses and Causes of Action that the Debtors or the Reorganized Debtors may have against any person or entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

## 5. Reserve for Disputed General Unsecured Claims

(a) *Establishment of Unsecured Claims Reserve*.   In order to effect Distributions to holders of Allowed Unsecured Claims in a timely manner, within thirty (30) days after the Effective Date, the Reorganized Debtors will file a motion for an order establishing a reserve of New Bally Common Stock and New Bally Warrants from the Unsecured Claims Distribution

with respect to unliquidated and/or Disputed Unsecured Claims for Distribution purposes (the "Unsecured Claims Reserve"). The Unsecured Claims Reserve will contain New Bally Common Stock and New Bally Warrants with sufficient to provide the distributions to which holders of Disputed Unsecured Claims would be entitled under the Plan as of such date as if the Disputed Unsecured Claims were Allowed Unsecured Claims either in the amounts of the Claims as filed or in such amounts as estimated by the Bankruptcy Court.

(b) *New Bally Common Stock and New Bally Warrants Held in Unsecured Claims Reserve*. New Bally Common Stock and New Bally Warrants held in the Unsecured Claims Reserve will be held in an account with a direct or indirect participant of DTC in the name of Reorganized Bally or its nominee, and distributed by the Disbursing Agent to the holders of Allowed Unsecured Claims in accordance with the Plan. New Bally Common Stock and New Bally Warrants held in the Unsecured Claims Reserve shall not constitute property of the Reorganized Debtors. New Bally Common Stock held in the Unsecured Claims Reserve will not be deemed outstanding, and will not have any voting rights, unless and until they are distributed in accordance with the Plan. Any New Bally Common Stock or New Bally Warrants held in the Unsecured Claims Reserve after all Unsecured Claims have been Allowed or disallowed, including, but not limited to any unclaimed Distributions forfeited in accordance herein, shall be distributed by the Distributing Agent, in a supplemental distribution, Pro Rata, to holders of Allowed Unsecured Claims, provided, however, that to the extent such Pro Rata allocation results in a distribution of less than one share of New Bally Common Stock or one New Bally Warrant to over fifty percent (50%) of holders of Allowed Unsecured Claims otherwise entitled to such distribution, the Reorganized Debtors will have no obligation to make such distribution and all then-undistributed New Bally Common Stock and New Bally Warrants shall be transferred to the Reorganized Debtors to be canceled.

(c) *Dividend and Interest Payments to the Unsecured Claims Reserve*. The Reorganized Debtors will hold in the Unsecured Claims Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the New Bally Common Stock held in the Unsecured Claims Reserve, at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of holders of Disputed Unsecured Claims whose Claims, if Allowed, are entitled to distributions under the Plan. The Reorganized Debtors will pay, or cause to be paid, out of any dividends paid on account of New Bally Common Stock or New Bally Warrants held in the Unsecured Claims Reserve, any tax imposed on the Unsecured Claims Reserve by any Governmental Unit with respect to income generated by New Bally Common Stock and New Bally Warrants held in the Unsecured Claims Reserve and any costs associated with maintaining the Unsecured Claims Reserve.

(d) *Tax Treatment of the Unsecured Claims Reserve*. As discussed in greater detail in Section XII.C.4., the Reorganized Debtors may make an election pursuant to U.S. Treasury Regulations Section 1.468B−9(c) to treat the Unsecured Claims Reserve as a "disputed ownership fund" (the "DOF"). In the event that the Reorganized Debtors makes such an election, the DOF would be treated for United States federal income tax purposes as a taxable entity separate from the holders of Unsecured Claims. The DOF, and not the holders of Unsecured Claims, would be treated as the owner of the assets in the DOF, including the New Bally Common Stock or New Bally Warrants reserved for Allowed Unsecured Claims. The

59

DOF would be responsible for the payment of any taxes (including by way of withholding) resulting from the transfer or holding of assets in the DOF.

### 6. Allocation of Consideration

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan will be treated as first, satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued, but unpaid, interest and costs, if any, and attorneys' fees, where applicable.

### 7. Cancellation and Surrender of Existing Securities and Agreements

Except for distributions to Class 7 and Class 10 described below, notwithstanding any other provision of the Plan, as a condition precedent to receiving any distribution under the Plan, each holder of a promissory note, or other instrument or security evidencing a Claim (other than the Exit Term Loan Lenders in their capacity as such) must tender such promissory note or other instrument or security to the Reorganized Debtors must execute and deliver an affidavit of loss and furnish an indemnity or bond in substance and amount reasonably satisfactory to the Reorganized Debtors.

Any holder of a Claim that fails to surrender such instrument or to provide the affidavit and indemnity or bond before six months following the date such holder's Claim becomes an Allowed Claim will be deemed to have forfeited all rights and/or Claims and may not receive or participate in any distribution under the Plan.

By reason of the Plan, the Debtors will have no continuing duties under the Senior Secured Notes Indenture or the Subordinated Notes Indenture, the Debtors' obligations under the Senior Secured Notes Indenture and the Subordinated Notes Indenture will be discharged and all claims against the Debtors thereunder will only be payable in accordance with the Plan. Notwithstanding the foregoing, if a Subordination Dispute occurs, the Senior Secured Notes Indenture and Subordinated Notes Indenture will remain in effect until such Subordination Dispute has been resolved by entry of a Final Order and the Subordinated Notes Plan Distribution have been distributed in accordance with such Final Order, including without limitation: (1) all provisions relating directly or indirectly to the Subordination Dispute and the rights of holders of Senior Indebtedness (as defined in the Subordinated Notes Indenture; (2) all rights and powers of the Indenture Trustees under each respective indenture; and (3) all protections each Indenture Trustee has under the respective Indentures, including lien rights with respect to any Plan distributions.

Upon completion of the Distributions to Classes 7 and 10 in accordance with Article III (B)(7) and (10) of the Plan, the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee shall coordinate with DTC to surrender the Senior Secured Notes and the Subordinated Notes and cancel the respective positions.

### 8. Estimation

The Reorganized Debtors may at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, such estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan, or (iii) a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors, or the Reorganized Debtors as the case may be, or the Unsecured Creditors' Committee (before the Effective Date) may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### G. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to: (i) resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article X of the Plan, any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired; (ii) to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date; (iii) to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan; (iv) to resolve disputes as to the ownership of any Claim or Equity Interest; (v) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests; (vi) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified or vacated; (vii) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (viii) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (ix) to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (x) to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan; (xi) to hear and determine any issue for which the Plan requires a Final Order of the Court; (xii) to hear and

KL2 2608436.2

determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (xiii) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date; (xiv) to hear and determine any Causes of Action preserved under the Plan; (xv) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (xvi) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided under the Plan; (xvii) to enter a final decree closing the Chapter 11 Cases; (xviii) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan; (xix) adjudicate any and all disputes arising from or relating to distributions under the Plan; and (xx) hear any other matter not inconsistent with the Bankruptcy Code.

## H.  Executory Contracts and Unexpired Leases

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection.  In the case of the Debtors' rejection of leases of real property and employment agreements, such damage claims are subject to certain caps imposed by the Bankruptcy Code.

### 1.  Assumption and Rejection of Executory Contracts and Unexpired Leases

The Plan provides that, to the extent not (i) assumed in the Chapter 11 Cases prior to the Confirmation Date, (ii) rejected in the Chapter 11 Cases prior to the Confirmation Date, or (iii) specifically rejected pursuant to the Plan, each executory contract and unexpired lease that exists between Debtor and any Person is specifically assumed by the Debtor that is a party to such executory contract or unexpired lease as of, and subject to the occurrence of, the Effective Date pursuant to the Plan.

The following executory contracts and unexpired leases are rejected:

(a) executory contacts or unexpired leases that were rejected before the Confirmation Date;

(b) employment agreements that were terminated or rejected prior to the Confirmation Date; and

(c) contracts and unexpired leases identified on Exhibit A to the Plan, which contracts and unexpired leases are deemed rejected by the applicable Debtor as of the corresponding rejection dates set forth on Exhibit A to the Plan.

### 2.  Cure

The Plan provides that except as otherwise agreed by the parties, the applicable Reorganized Debtor, on the Initial Distribution Date, will cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed by such Reorganized Debtor

KL2 2608436.2

pursuant to the Plan in accordance with section 365 of the Bankruptcy Code.  The Cure Claim for each unexpired lease and executory contract to be assumed pursuant to the Plan will be listed on Exhibit B to the Plan.  The Cure Claim to be paid in connection with the assumption of any unexpired lease and executory contract that is not specifically identified on Exhibit B to the Plan will be $0.00.  The Debtors reserve the right to amend Exhibit B to the Plan at any time prior to the Effective Date.  Any provisions or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, will be satisfied solely by payment (if any) of the Cure Claim, or by an agreed-upon waiver of the Cure Claim.

Except with respect to executory contracts and unexpired leases in which the Debtors and the applicable counterparties have stipulated in writing to the Cure Claim, all requests for payment of a Cure Claim that differ from the amounts proposed by the Debtors in Exhibit B to the Plan or in Article X.B. of the Plan, must be filed with the Bankruptcy Court and served on the Debtors on or before the Cure Claim Bar Date.  Any request for payment of Cure Claim that differs from the amounts proposed by the Debtors in Exhibit B to the Plan or in Article X.B. of the Plan and is not timely filed and served shall be disallowed automatically, forever barred and not be enforceable against any Reorganized Debtor, without the need for an objection by the Reorganized Debtors or order of the Bankruptcy Court.

The Reorganized Debtors may settle any dispute on the amount of a Cure Claim without further notice to or approval of the Bankruptcy Court.  If the Reorganized Debtors object to any request for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such Cure Claim and any related issues.  Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later to occur of (i) ten days after entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto and (ii) the Initial Distribution Date.  The Reorganized Debtors reserve the right, either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining a Cure Claim greater than that set forth on Exhibit B.

## 3. Assumption

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption.  Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.  Obligations arising under insurance policies assumed by the Debtors prior to the Effective Date will be adequately protected in accordance with any order authorizing such assumption. All objections from counterparties to executory contracts or unexpired leases to be assumed relating solely to assumption must be filed with the Court and served on the Debtors on or before the Cure Claim Bar Date.

### 4. Limited Extension of Time to Assume or Reject

In the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired. The deemed assumptions and rejections provided for in Article X of the Plan will not apply to such contract or lease.

In the event the Reorganized Debtors become aware after the Effective Date of the existence of an executory contract or unexpired lease that was not included in the Schedules on Exhibit A to the Plan, or on Exhibit B to the Plan, the right of the Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after the date on which the Debtors or the Reorganized Debtors become aware of the existence of such executory contract or unexpired lease. The deemed assumptions and rejections provided for in this Article of the Plan will not apply to any such contract or lease.

The Debtors reserve the right to amend Exhibit A to the Plan at any time prior to the Effective Date.

### 5. Rejection Damage Claims

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court in accordance with the terms of the Bar Date Order. Any Claims not filed within such time will be forever barred from assertion against the Debtors, their respective estates, or the Reorganized Debtors. All Allowed Claims arising from the rejection of executory contracts or unexpired leases will be treated as General Unsecured Claims or Convenience Claims, as appropriate under the circumstances.

### 6. Assignment

As of the effective time of an applicable Restructuring Transaction, any executory contract or unexpired lease to be held by any Debtor or Reorganized Debtor and assumed hereunder or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases, will be deemed assigned to the surviving, resulting or acquiring corporation in the applicable Restructuring Transaction, pursuant to section 365 of the Bankruptcy Code. If an objection to a proposed assumption, assumption and assignment or Cure Claim is not resolved in favor of the Debtors or the Reorganized Debtors, the applicable executory contract or unexpired lease may be designated by the Debtors or the Reorganized Debtors for rejection within five Business Days of the entry of the order of the Bankruptcy Court resolving the matter against the Debtors. Such rejection will be deemed effective as of the Effective Date.

### 7. No Change in Control

The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption or assumption and assignment of any executory contract or unexpired lease to another Reorganized Debtor is not intended to, and will not, constitute a

KL2 2608436.2

change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, executory contract or unexpired lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

### 8.  Obligations to Indemnify Directors, Officers and Employees

The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees on or after October 1, 2007, by reason of such person's prior or future service in such capacity or as a director, officer, or employee of another corporation, partnership, or other legal entity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Reorganized Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification obligation is owed for an act or event occurring before or after the Petition Date.

Any obligations of each Debtor or Reorganized Debtor to indemnify any person who ceased serving as one of its directors, officers or employees prior to October 1, 2007, by reason of such person's prior service in such a capacity or as a director, officer, or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor – to the extent such obligations are found to still exist - will terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; provided, however, that to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be deemed and treated as executory contracts that are rejected by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) must be filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date.  Any Claims not filed within such time will be forever barred from assertion against the Debtors, their respective estates, or the Reorganized Debtors.

## I.  Miscellaneous Provisions

### 1.  Payment of Statutory Fees

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code will be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date will be paid by the applicable Reorganized Debtor.

### 2.  Payment of Indenture Trustee Fees

The Reorganized Debtors will pay the reasonable and documented Indenture Trustee Fee Claims in an amount not to exceed $125,000 in Cash for each of the Senior Secured Notes

KL2 2608436.2

Indenture Trustee and the Subordinated Notes Indenture Trustee in respect of invoices submitted by the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee, in each case without the need for the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee to file an application for allowance with the Bankruptcy Court; provided, however, that to receive payment pursuant to Article XII.B. of the Plan, the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee will provide reasonable and customary detail or invoices in support of their Indenture Trustee Fee Claims to counsel to the Reorganized Debtors after the Effective Date and parties in interest will have the right to file objections to such Indenture Trustee Fee Claims based on a "reasonableness" standard within ten (10) days after receipt of supporting documentation.  Any disputed amount of the Indenture Trustee Fee Claim will be subject to the jurisdiction of, and resolution by, the Bankruptcy Court.  Upon payment of a Indenture Trustee Fee Claim in full or by resolution of the Bankruptcy Court, the Senior Secured Notes Indenture Trustee or the Subordinated Notes Indenture Trustee (as applicable) will be deemed to have released its lien and priority rights for its fees and expenses under the respective Senior Secured Notes Indenture and the Subordinated Notes Indenture solely to the extent of such Indenture Trustee Fee Claim.  Distributions under the Plan to holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims will not be reduced by the amount of the Indenture Trustee Fee Claims paid by the Debtors pursuant to Article XII.B. of the Plan, but may be reduced by charging liens and other rights that the respective indenture trustees may assert to the extent that Debtors do not pay the entire amount owed by the Debtors to the indenture trustees under their respective indentures for fees and expenses incurred by the indenture trustees after the Effective Date.

## 3. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or the Delaware General Corporation Law, the laws of the State of New York (without reference to the conflicts of laws provisions thereof) will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

## 4. Filing or Execution of Additional Documents

On or before the Effective Date, the Debtors or the Reorganized Debtors, will file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## 5. Information

For so long as Reorganized Bally is not required to publicly file financial information with the SEC, Reorganized Bally will furnish or make available to the holders of the New Bally Common Stock and the New Bally Warrants: (i) on a quarterly basis within 45 days of each quarter end, consolidated unaudited financial statements of Reorganized Bally, including the balance sheet, income statement, and statement of cash flow detailing the quarter-to-date and year-to-date results, together with the footnotes thereto; and (ii) on an annual basis within 120 days of each year end, audited consolidated financial statements of Reorganized Bally including

the balance sheet, income statement, and cash flow detailing year-to-date results, together with the footnotes thereto, in each case in reasonable detail and prepared in accordance with GAAP, except as otherwise noted therein.

### 6. **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors will comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder will be subject to any such withholding and reporting requirements.

### 7. **Exemption from Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, all transfers of property pursuant to the Plan, including (i) the issuance, transfer or exchange under the Plan of New Bally Common Stock, New Bally Warrants, and the security interests in favor of the lenders under the Exit Facilities, (ii) the making or assignment of any lease or sublease, or (iii) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan will not be subject to any stamp, conveyance, mortgage, real estate transfer, recording or other similar tax, or governmental assessment.

### 8. **Waiver of Federal Rule of Civil Procedure 62(a)**

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) will not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

## VII.  CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### A. **Conditions Precedent to Confirmation**

Pursuant to Article VII.A of the Plan, the following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied, or are waived as provided for in the Plan.

1. The Confirmation Order is reasonably acceptable in form and substance to the Debtors and the Exit Lenders, and the Unsecured Creditors' Committee.

2. The Plan is reasonably satisfactory in form and substance to the Debtors, the Exit Lenders, and the Unsecured Creditors' Committee.

3. The Plan Exhibits are reasonably satisfactory in form and substance to the Debtors and the Exit Lenders after consultation with the Unsecured Creditors' Committee.

4. Any modification of, amendment, supplement or change to the Plan that alters in any way the distributions under the Plan or the parties to whom it

shall be made available will not have been made without the consent of
the Exit Lenders and the Unsecured Creditors' Committee.

5.      The Bankruptcy Court will have approved the Disclosure Statement in
        form and substance reasonably satisfactory to the Debtors and the Exit
        Lenders, as containing adequate information with respect to the Plan
        within the meaning of section 1125 of the Bankruptcy Code.

6.      All Plan Exhibits will have been filed with the Bankruptcy Court.

7.      The Debtors will have executed all material documents relating to the Exit
        Facilities.

8.      The Debtors shall have executed the Management Contracts.

## B.  Waiver of Conditions Precedent to Confirmation

        The Debtors may waive conditions 1, 2, and 4 set forth above at any time with the
consent of the Exit Lenders and the Unsecured Creditors' Committee, which consent shall not be
unreasonably withheld, and without leave of or order of the Court and without any formal action.
The Debtors may waive conditions 3, 5, 6, 7, and 8 set forth above at any time with the consent
of the Exit Lenders,  which consent shall not be unreasonably withheld, and without leave of or
order of the Bankruptcy Court and without any formal action.

## C.  Confirmation of the Plan

        At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if
all of the requirements of section 1129 of the Bankruptcy Code are met.   Among the
requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired classes of
claims and equity interests or, if rejected by an Impaired class, that the plan "does not
discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the
"best interests" of creditors and equity interest holders that are Impaired under the Plan.

### 1.  Acceptance

        Classes 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 of the Plan are Impaired under the Plan.
Classes 1 and 2 of the Plan are unimpaired and, therefore, are conclusively presumed to have
voted to accept the Plan.  Class 11 is Impaired and pursuant to the Plan is deemed to have voted
to accept the Plan.   Class 12 is deemed to reject the Plan because they will not receive a
distribution under the Plan.  Thus, only Classes 3, 4, 5, 6, 7, 8, 9, and 10 are entitled to vote on
the Plan.  Because Class 12 is Impaired and is deemed to reject the Plan, the Debtors will seek
nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with
respect to such Classes.  In addition to the extent any Impaired Class(es) entitled to vote on the
Plan reject(s) the Plan, the Debtors may also seek the nonconsensual confirmation of the Plan
under section 1129(b) of the Bankruptcy Code with respect to such rejecting Class(es).  Finally,
the Debtors reserve their rights to amend the Plan in accordance with Article XI.E. of the Plan
with respect to any such rejecting Class(es).

KL2 2608436.2

## 2. **Standards for Confirmation**

### (a) *Requirements of section 1129(a) of the Bankruptcy Code*

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a chapter 11 plan of reorganization:

(i)  The plan complies with the applicable provisions of the Bankruptcy Code.

(ii)  The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

(iii)  The plan has been proposed in good faith and not by any means forbidden by law.

(iv)  Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(v)  The proponent of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

(vi)  The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(vii)  Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(viii)  With respect to each Impaired class of claims or interests (x) each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or (y) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(ix)  With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not Impaired under the plan (subject to the "cramdown" provisions discussed below; see "Requirements of Section 1129(b) of the Bankruptcy Code").

69

(x) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a) with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b) with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(c) with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim, regular installment payments in cash,

• of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

• over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303 of the Bankruptcy Code; and

• in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code; and

(d) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in the bullet points above.

(xi) If a class of claims is Impaired under the plan, at least one class of claims that is Impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in section 101 of the Bankruptcy Code).

(xii) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(xiii) All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(xiv) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at

the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtors believe that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code other than those pertaining to voting, which has not yet taken place.

(b) *Requirements of Section 1129(b) of the Bankruptcy Code*

If less than all Impaired Classes accept the Plan, but at least one Class of Claims Impaired under the Plan has accepted the Plan (and which class's acceptance is determined without inclusion of claims of Insiders), the Debtors may seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code sets forth the so-called "cramdown" provisions for confirmation of a plan even if it is not accepted by all Impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one Impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any Impaired class that has not accepted the plan.

(i) *Fair and Equitable*

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting Impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

(a) *Secured Creditors*.  A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (i) that each of the holders of the secured claims included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (ii) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

(b) *Unsecured Creditors*.  A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan.

(c) *Holders of Equity Interests*.  A plan is fair and equitable as to a class of equity interests that rejects the plan if the plan provides that: (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) the fixed redemption price to which such holder is entitled, or (C) the value of the interest; or (ii) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

The Debtors believe the Plan is fair and equitable as to all creditors.

(ii) *Unfair Discrimination*

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or Equity Interests.  The Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## 3. **Feasibility**

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by a liquidation or the need for further financial reorganization of the debtor.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  Based upon the Debtors' Financial Projections and the assumptions set forth therein, the Debtors believe that they will be able to make all distributions required pursuant to the Plan and to fund their operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## 4. **Best Interests Test**

With respect to each Impaired Class of Claims and Equity Interests, Confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To determine what holders of Claims and Equity Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash, if any, held by the Debtors at the time of the commencement of the liquidation case.  Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative

and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Unsecured Creditors' Committee during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed Unsecured Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and Interest holders in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Debtors' Liquidation Analysis is attached hereto as <u>Exhibit D</u>. The information set forth in <u>Exhibit D</u> provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates. The Liquidation Analysis was prepared by the Debtors with the assistance of Houlihan Lokey. As reflected in <u>Exhibit D</u>, because the estimated liquidation value of the Debtors' estates is less than the amount of the Prepetition Revolver Facility Claims, nothing would be available for distribution to holders of Allowed Administrative Claims, Priority Claims or General Unsecured Claims.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected

KL2 2608436.2

might not be realized if the Debtors were, in fact, to undergo such a liquidation.  The chapter 7 liquidation period is assumed to be a period of 6 months, allowing for, among other things, the (i) discontinuation of the Debtors' operations, (ii) sale of assets and (iii) collection of receivables.

## D.  **Conditions Precedent to Effectiveness**

### 1.  **Conditions Precedent to Effectiveness**

Pursuant to Article XI.A of the Plan, the Plan will not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XI.B of the Plan:

1.  The Confirmation Order entered by the Bankruptcy Court is in form and substance reasonably satisfactory to the Debtors, the Exit Lenders, and the Unsecured Creditors' Committee;

2.  The Confirmation Order will have become a Final Order;

3.  The final version of the Plan Exhibits and all schedules, documents, and exhibits contained therein shall have been filed in form and substance reasonably acceptable to the Exit Lenders after consultation with the Unsecured Creditors' Committee;

4.  All authorizations, consents, and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

5.  The certificate of incorporation for Bally will have been amended as provided in Article VI.A of the Plan;

6.  The New Bally Common Stock, New Bally Warrants and New Subsidiary Equity Interests to be issued pursuant to Article V.D. of the Plan shall be consistent with the Plan;

7.  The Debtors' management has been granted options to purchase New Bally Common Stock on the terms set forth in the Management Incentive Plan; and

8.  The Reorganized Debtors shall have consummated the Exit Facilities.

### 2.  **Waiver of Conditions Precedent to Effectiveness**

The Debtors may waive any of the conditions 1, 3, and 6 set forth above at any time with the consent of the Exit Lenders and the Unsecured Creditors' Committee, which consent shall not be unreasonably withheld, and without leave of or order of the Court and without any formal action.  The Debtors may waive conditions 2, 4, 5, 7, and 8 set forth above at any time with the consent of the Exit Lenders, which consent shall not be unreasonably withheld and without leave of or order of the Bankruptcy Court and without any formal action.

KL2 2608436.2

3. **Effect of Failure of Conditions**

In the event that the Effective Date does not occur on or before one hundred and twenty (120) days after the Confirmation Date, upon notification submitted by the Debtors to the Bankruptcy Court: (i) the Confirmation Order will be vacated, (ii) no distributions under the Plan will be made, (iii) the Debtors and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iv) the Debtors' obligations with respect to the Claims and Equity Interests will remain unchanged and nothing contained in the Plan will constitute or be deemed a waiver, release, or discharge of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by Bankruptcy Court order.

4. **Vacatur of Confirmation Order**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan will be null and void in all respects, and nothing contained in the Plan will (a) constitute a waiver, release, or discharge of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

5. **Modification of the Plan**

Subject to the limitations contained in the Plan, and subject to the approval of the Exit Lenders and the Unsecured Creditors' Committee, which approval shall not be unreasonably withheld: (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (ii) after entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code.

6. **Revocation, Withdrawal, or Non-Consummation**

(a) *Right to Revoke or Withdraw*. The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date; provided, however, that if such revocation or withdrawal is made without the consent of the Exit Lenders, which is not to be unreasonably withheld, the Debtors will pay the break up fee required in the Exit Facilities.

(b) *Effect of Withdrawal, Revocation, or Non-Consummation*. If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void. In such event,

KL2 2608436.2

nothing contained herein, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## VIII.  PROJECTIONS AND VALUATION

The Debtors, with the assistance of their advisors, developed a set of financial projections (as summarized below and in Exhibit C, the "Financial Projections") to generally assess the value of the Reorganized Debtors and, specifically, to determine the value of the New Bally Common Stock to be distributed under the Plan.  The Financial Projections and valuations set forth below and in Exhibit C are based on a number of significant assumptions, including, among other things, the successful reorganization of the Debtors.

THE PROJECTIONS AND VALUATIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS.  ACTUAL OPERATING RESULTS AND VALUES MAY VARY.

## A.  **Financial Projections**

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management have, through the development of the Financial Projections, analyzed the Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business subsequent to their emergence from these Chapter 11 Cases.  The Financial Projections were also prepared to assist those holders of Allowed Claims entitled to vote on the Plan in determining whether to accept or reject the Plan.

The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein and in Exhibit C, and certain relevant information set forth in the Plan.  The Financial Projections were prepared in good faith based upon assumptions believed to be reasonable.  The Financial Projections, which were prepared during February of 2009 (and have been continually updated), were based, in part, on economic, competitive, and general business conditions prevailing at the time.  Any future changes in these conditions may materially impact the Debtors' ability to achieve the Financial Projections.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND,

KL2 2608436.2

ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF NORMAL COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF NEW BALLY COMMON STOCK OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.

FINALLY, THE FINANCIAL PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE. THE REORGANIZED DEBTORS WILL BE REQUIRED TO MAKE SUCH ESTIMATIONS AS OF THE EFFECTIVE DATE. SUCH DETERMINATION WILL BE BASED UPON THE FAIR VALUES AS OF THAT DATE, WHICH COULD BE MATERIALLY GREATER OR LOWER THAN THE VALUES ASSUMED IN THE FOREGOING ESTIMATES.

1. **Scope of Financial Projections**

The Financial Projections are based on the assumption that the Effective Date will occur on or about August 31, 2009. If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted. It is also assumed that the Reorganized Debtors will conduct operations substantially similar to those businesses currently in operation.

The Financial Projections estimate the Debtors' reorganization value, the fair value of their assets, and their actual liabilities as of the Effective Date. Such determination will

be based upon the fair values as of that date, which could be materially greater or less than the value assumed in the Financial Projections. Any fresh-start reporting adjustments that may be required in accordance with Statement of Position 90-7 Financial Reporting by Entities in Reorganization under the Bankruptcy Code, including any allocation of the Debtors' reorganization value to the Debtors' assets in accordance with the procedures specified in Financial Accounting Standards Board Statement 141 will be made when the Debtors emerge from bankruptcy.

The Financial Projections include the (a) Projected Consolidated Balance Sheet of Reorganized Bally, (b) Projected Consolidated Cash Revenue Income Statement of Reorganized Bally; (c) Projected Consolidated Cash Flow Statement of Reorganized Bally; and (d) Proforma Balance Sheet of Reorganized Bally.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to, Reorganized Bally's ability to operate the Reorganized Debtors' business consistent with their projections, comply with the covenants of their financing agreements, attract and retain key executives and customers, not suffer the loss or material downtime of a major supplier, respond to adverse actions taken by the federal and state governments, as well as the accuracy of the Debtors' estimates with regards to the timing and realization of the recoveries of assets and the payments of Claims, the amount of expenses projected to recognize such recoveries and reconcile such Claims, or the realization of the proceeds from the collections of various amounts outstanding. See also Section IX ("Certain Risk Factors to be Considered").

### 2. Summary of Significant Assumptions

(a) *General*

The Financial Projections are aggregated from the projected opening balance sheet of Reorganized Bally as of the Effective Date and operating forecasts for Reorganized Bally along with assets, expenses and liabilities that exist as a result of the Plan.

The Financial Projections assume neither a change to the Debtors' current footprint of 319 clubs nor a change to the Debtors' current method of selling memberships. The Financial Projections also assume general economic conditions will improve over the term of the projections.

The Financial Projections also assume the benefits from the proposed $30 million capital injection from a term loan to be provided by the Exit Term Loan Lenders as well as the conversion of approximately $700 million of prepetition cash pay debt into equity. A material change in any of these assumptions would have a material impact on the Financial Projections.

(b) *2009 – 2011 Financial Projections – Major Assumptions*

Source of Revenues: All of the Debtors' significant revenues arise from the commercial operation of fitness centers, which are located primarily in major metropolitan markets in the United States. As of February 28, 2009, the Debtor operated fitness centers in 44

major metropolitan areas, which account for approximately 61% of the United States population. The Debtors' three principal sources of revenue are (i) membership services, (ii) sale of products, and (iii) other revenue sources, such as franchising revenue guest fees, and specialty fitness programs.

Club Costs:  Club costs include all fixed and variable expenses associated with each of the Debtors' clubs.  These expenses may include club rent, labor, insurance, utilities, repairs and maintenance, retail and other club level costs of the business.

Advertising: Marketing and Advertising expenses consist of the Debtors' national and local media and production and advertising costs to support fitness center membership growth as well as the growth of the Bally brand.  The marketing plan has been revised to include significant reductions in non-media related costs from 2008.

Total Zone Costs:  As part of its 2008 operational restructuring, the Debtors divided its club operations into 4 zones to more efficiently operate on a regional level.  Total Zone Costs consists primarily of labor costs associated with the professionals who manage sales, operations, personal training, group exercise, retail and total martial arts at the zone level.

General and Administrative: General and Administrative expenses include costs relating to the Debtors' centralized support functions, such as information technology, accounting, treasury, human resources, procurement, real estate and development and senior management.  General and administrative also includes professional services expenses such as legal, consulting and auditing.

Interest Expense: Interest expense for the Exit Revolver Facility, the Swap Note, and the Exit Term Loan Facility are based on a forecasted LIBOR rate of 1.33% held constant from 2009 to 2011.  In the case where a minimum LIBOR rate is provided for in term sheets provided by new lenders, the minimum LIBOR rate is utilized.  The interest rate on all three facilities is assumed to be LIBOR plus 6.0%.

Income Taxes: The Financial Projections are based on the assumption that the Reorganized Debtors' will not generate positive income during the Financial Projection period. Taxes paid during the projection period represent estimates of state and local taxes.

## B.  **Valuation of the Reorganized Debtors as of June 8, 2009**

In conjunction with formulating the Plan, the Debtors determined that it would be necessary to estimate the post-confirmation going concern enterprise value for the Reorganized Debtors.  The Debtors requested that Houlihan Lokey advise them with respect to the reorganization value of the Reorganized Debtors on a going concern basis.  Solely for purposes of the Plan, the range of reorganization value of Reorganized Bally is estimated to be $190.0 million to $240.0 million (with a midpoint value of $215.0 million) as of June 8, 2009.  Equity value per share at the midpoint reorganization value, assuming 10,000,000 shares outstanding, is estimated to be approximately $16.20.  Houlihan Lokey's estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

KL2 2608436.2

**THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF JUNE 8, 2009, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS CURRENTLY AVAILABLE TO HOULIHAN LOKEY.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.**

The foregoing estimate of the reorganization value of the Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Debtors' business plan, the achievement of the forecasts reflected in the Financial Projections, access to the Exit Facilities, the continuing leadership of the existing management team, general market conditions as of June 8, 2009 continuing through the assumed Effective Date of August 30, 2009, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Financial Projections, which were prepared by the Debtors' management, Houlihan Lokey assumed that such Financial Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors.  Houlihan Lokey's estimate of a range of reorganization values assumes that the Financial Projections will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow.  If the business performs at levels below those set forth in the Financial Projections, such performance may have a material impact on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF THE REORGANIZED DEBTORS, HOULIHAN LOKEY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE FINANCIAL PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO HOULIHAN LOKEY BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESS AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS THE DEBTORS' OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT HOULIHAN LOKEY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF THE DEBTORS;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE LEISURE FACILITIES AND FITNESS INDUSTRIES;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH HOULIHAN LOKEY CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND REORGANIZED BALLY'S BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY BALLY, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, HOULIHAN LOKEY DID NOT INDEPENDENTLY VERIFY THE DEBTORS' FINANCIAL PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY HOULIHAN LOKEY REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER.   SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.   SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN.

## C.  Valuation Methodology

Houlihan Lokey performed a variety of analyses and considered a variety of factors in preparing the valuation of the Reorganized Debtors.  Several generally accepted valuation techniques for estimating the Reorganized Debtors' enterprise value were used.

81

KL2 2608436.2

Houlihan Lokey primarily relied on three methodologies: comparable public company analysis, discounted cash flow analysis, and precedent transactions analysis. Houlihan Lokey made judgments as to the significance of each analysis in determining the Reorganized Debtors' indicated enterprise value range. Houlihan Lokey's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to Bally's enterprise value.

In preparing its valuation estimate, Houlihan Lokey performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Houlihan Lokey's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

## 1. Comparable Public Company Analysis

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, and cash flows. The analysis includes a financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses (in this case, companies involved in the leisure facilities industry with a focus), business risks, target market segments, location of markets, network affiliation, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining value.

In performing the comparable public company analysis, the following publicly traded companies in the leisure facilities / fitness industry were deemed generally comparable to the Debtors in some or all of the factors described above and were selected: Life Time Fitness Inc. and Town Sports International Holdings Inc. Houlihan Lokey excluded various leisure facilities / fitness companies that were deemed not comparable because of (i) size; (ii) product mix; and/or (iii) status of comparable companies.

Houlihan Lokey analyzed the current trading value for the comparable companies as a multiple of the projected latest twelve months ("LTM") 2009 and projected fiscal year 2010 earnings before interest, taxes, depreciation, and amortization ("EBITDA"). The derived multiples were applied to the Debtors' average EBITDA and EBIT for the projected twelve

months ending December 31, 2009 and fiscal year 2010 to determine the range of enterprise value.

## 2. Precedent Transactions Analysis

Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions.  An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to the Debtors.  These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors.  Houlihan Lokey specifically focused on prices paid as a multiple of EBITDA, as this is typically reflective of the cash flow derived by companies comparable to the Debtors, in determining a range of values for the Debtors.  These multiples are then applied to the Debtors EBITDA for the projected LTM period ending December 31, 2009 to determine the total enterprise value or value to a potential buyer.

Unlike the comparable public company analysis, the valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets.  Thus, this methodology generally produces higher valuations than the comparable public company analysis.  Other aspects of value that manifest itself in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results.  The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each.  Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition.  The number of recently completed transactions for which public data is available also limits this analysis.

## 3. Discounted Cash Flow Approach

The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business.  The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors.

The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Projections). Houlihan Lokey's discounted cash flow valuation is based on the business plan Projections of the Debtors' operating results. Houlihan Lokey discounted the projected cash flows using the Debtors' estimated weighted average cost of capital and calculated a terminal value of the Debtors. The terminal multiple methodology, which utilizes a projected transaction multiple to capitalize the cash flows in the final period, was considered for determining the terminal value.

This approach relies on a company's ability to project future cash flows with some degree of accuracy. Because the Financial Projections reflect significant assumptions made by the Debtors concerning anticipated results, the assumptions and judgments used in the Financial Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Houlihan Lokey cannot and does not make any representations or warranties as to the accuracy or completeness of the Financial Projections.

## IX.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.  Risks Related to the Debtors' Business and Operations

#### 1.  Ability to Maintain Sufficient Liquidity

The Debtors require substantial cash flows to fund capital spending and working capital requirements. The Reorganized Debtors' liquidity may be negatively affected by various items, including declines in membership revenues, which result in reduced levels of cash collections; changes in terms or other requirements by vendors, including the Debtors' credit card payment processor; regulatory fines; penalties, settlements or adverse results in securities actions or other litigations; future consent payments to lenders or noteholders, if required; and unexpected capital requirements. The Debtors have been required to provide additional letters of credit and cash deposits to support certain vendors, which has reduced the Debtors' available liquidity. Although the Debtors believe that the Reorganized Debtors will have adequate liquidity to pay ordinary course trade and employee obligations, there can be no assurances that the Reorganized Debtors will have sufficient liquidity to meet their debt or other obligations as and when they become due. If revenue and membership cash collection decreases, expenses increase or a default occurs under the Exit Facility or Swap Note (whether directly or as a result of a cross-default to other indebtedness) and the Reorganized Debtors do not have or cannot obtain sufficient liquidity to address any such scenario, the Reorganized Debtors would be

unable to continue operating their business.  Furthermore, pursuant to the Exit Facility, the Reorganized Debtors' depository accounts will be subject to control agreements that give the Exit Lenders the right to dominion over the Debtors' cash on deposit in control accounts if an event of default under the Exit Facility occurs and is continuing.

## 2.  Restrictive Covenants in the Exit Facilities

The operating and financial restrictions and covenants in the Exit Facilities may adversely affect the Reorganized Debtors' ability to finance future operations or capital needs or to engage in new business activities.  The Exit Facilities may restrict the Reorganized Debtors' ability to, among other things: declare dividends or redeem or repurchase capital stock; prepay, redeem or purchase debt; make loans, guarantees, acquisitions and investments; incur additional indebtedness; make capital expenditures; and engage in mergers, acquisitions or asset sales.

In addition, the Exit Facilities require the Reorganized Debtors to maintain certain financial ratios.  As a result of these financial covenants, the Reorganized Debtors will be limited in the manner in which they can conduct their business, and may be unable to engage in favorable business activities or finance future operations or capital needs.  Accordingly, these restrictions may limit the Reorganized Debtors' ability to successfully operate their business.

The Debtors cannot be certain that the Reorganized Debtors' future operating results will be sufficient to enable compliance with the covenants in the Exit Facilities or other indebtedness or to remedy any such default.  In addition, in the event of an acceleration, the Reorganized Debtors may not have or be able to obtain sufficient funds to make any accelerated payments.

## 3.  Ability to Attract New Members and Expand Operations

The profitability of the Debtors' fitness centers is dependent, in large part, on the Debtors' ability to originate and retain members.  Numerous factors have affected the Debtors' membership origination and retention at its fitness centers that could lead to a further decline in member origination and retention rates in the future, including the inability of the Reorganized Debtors to deliver quality service at a competitive cost, the presence of direct and indirect competition in the areas where the Reorganized Debtors' fitness centers are located, delayed reinvestment into aging clubs, and the public's level of interest in fitness and general economic conditions.  Additionally, these Chapter 11 Cases may cause public perception of the Bally brand to deteriorate, and lead to further membership declines.  As a result of these factors, there can be no assurance that the Reorganized Debtors' membership levels will be adequate to maintain the business or permit the expansion of its operations.

## 4.  Ability to Remain Competitive

The Debtors expect that the persisting increase in competition could continue to have an adverse effect on their business, liquidity, financial condition and results of operations.  In addition, the constraints on the Reorganized Debtors' liquidity have limited their ability to invest their operating cash flow in improvements to their fitness centers and address the aging of their facilities, which may affect their ability to compete.  Public perception of their declining liquidity, financial condition and results of operations, in particular with regard to our potential

KL2 2608436.2

failure to meet our debt obligations, may result in additional decreases in cash membership revenues (particularly those associated with longer term membership contracts) and increases in member attrition.

### 5. <u>Ability to Attract and/or Retain Quality Employees</u>

The Reorganized Debtors' success depends in significant part upon the continuing service and capabilities of our management team, including Michael Sheehan, the Debtors' Chief Executive Officer and a member of the Debtors' Board of Directors.  In particular, the successful implementation of the Reorganized Debtors' business plan, including the Operational Restructuring and Cost Reduction Plan and ability to successfully consummate the Plan, will be highly dependent upon management.  The Reorganized Debtors' ability to attract, motivate and retain key employees is restricted by provisions of the Bankruptcy Code, which limit or prevent their ability to implement a retention program or take other measures intended to motivate key employees to remain with the Debtors during the pendency of the bankruptcy.  In addition, the Debtors must obtain Bankruptcy Court approval of employment contracts and other employee compensation programs.  The loss of the services of such individuals or other key personnel could have a material adverse effect upon the implementation of the business plan, including the financial restructuring, and on the Debtors' ability to successfully reorganize and emerge from bankruptcy.

### 6. <u>Misappropriation and Infringement of Intellectual Property</u>

The Debtors attempt to protect their trademarks and trade names through a combination of trademark and copyright laws, as well as licensing agreements and third-party nondisclosure agreements.  The Reorganized Debtors' failure to obtain or maintain adequate protection of their intellectual property rights for any reason could have a material adverse effect on our business, results of operations and financial condition.

### 7. <u>Debtors' Compliance with Payment Card Industry Data Standards</u>

Similar to others in the retail industry, the Debtors are currently not fully compliant with new Payment Card Industry Data Security Standards.  The Debtors are working cooperatively with their third party assessor, payment processor and primary credit card companies to become compliant with these standards and analogous state law requirements.  The Reorganized Debtors face the possibility of fines, the possible loss of our ability to accept credit cards for the payment of memberships and/or the sale of products and services until they are fully compliant.  The inability to accept credit cards would have a material adverse impact on the Reorganized Debtors business and results of operations.

### 8. <u>Changes to Regulation of the Debtors' Business</u>

The Debtors' operations and business practices are subject to federal, state and local government regulations in the various jurisdictions where our fitness centers are located and where our nutritional products are sold, including:

- general rules and regulations of the FTC, state and local consumer protection agencies and state statutes that prescribe provisions of membership contracts and

that govern the advertising, sale, financing and collection of membership fees and dues;

- state and federal wage and labor laws;

- state and local health regulations; and

- federal regulation of health and nutritional supplements.

The Debtors are also party to several state and federal consent orders. These consent orders essentially require continued compliance with applicable laws and require the Debtors to refrain from activities not in compliance with such applicable laws. From time to time, the Debtors make minor adjustments to operating procedures to remain in compliance with applicable laws and the Debtors believe our operations are in material compliance with all applicable statutes, rules and regulations. The Reorganized Debtors' failure to comply with these statutes, rules and regulations may result in fines or penalties. Penalties may include regulatory or judicial orders enjoining or curtailing aspects of our operations. It is difficult to predict the future development of such laws or regulations, and although the Debtors are not aware of any material proposed changes, any changes in such laws could have a material adverse effect on the Reorganized Debtors' financial condition and results of operations.

### 9. Protracted Chapter 11 Cases

The Debtors' management has devoted significant time to addressing the Plan and liquidity needs and will continue to do so. However, the Debtors cannot predict whether they will receive the necessary consents to the Plan. If they do receive the requisite consents, they cannot predict when the Plan would be confirmed by the Bankruptcy Court or when they would emerge from bankruptcy. If these Chapter 11 Cases are protracted, the Debtors' ability to continue operating in bankruptcy as a going concern and to emerge from bankruptcy will depend upon management's ability to balance time and effort dealing with the reorganization and business operations at the same time in a prolonged continuation of these Chapter 11 Cases.

In addition, these Chapter 11 Cases may affect the Debtors' relationships with creditors, members, suppliers and employees. The Debtors may not be able to obtain additional financing on commercially favorable terms. While the Debtors expect to continue normal club operations, member perception of our continued viability may affect the rate of new memberships and membership renewals. Because of the public disclosure of these Chapter 11 Cases and liquidity constraints, the Debtors' ability to maintain normal credit terms with suppliers may be Impaired. Failure to maintain any of these important relationships could adversely affect the Reorganized Debtors' business, financial condition and results of operations. Also, transactions by the Debtors are generally subject to the prior approval of the Bankruptcy Court, which may limit the Debtors' ability to respond on a timely basis to certain events or take advantage of certain opportunities.

### 10. Impact of the Chapter 11 Cases on the Reorganized Debtors

Because of the risks and uncertainties associated with these Chapter 11 Cases, the ultimate impact the events that occur during these Chapter 11 Cases will have on the

Reorganized Debtors' business, financial condition and results of operations cannot be accurately predicted or quantified at this time.

These Chapter 11 Cases may adversely affect the Reorganized Debtors' ability to negotiate favorable terms from suppliers, landlords, contract or trading counterparties and others and to attract and retain customers and counterparties. The failure to obtain such favorable terms and to attract and retain customers, as well as other contract or trading counterparties could adversely affect the Reorganized Debtors' financial performance. In addition, the Reorganized Debtors' liquidity may be adversely affected by professional and other fees related to the Chapter 11 Cases.

### 11.  Discharge of Prepetition Claims

The Debtors are currently subject to claims in various legal proceedings, and may become subject to other legal proceedings in the future. Although such claims have been generally stayed while these Chapter 11 Cases are pending, the Debtors may not be successful in ultimately discharging or satisfying such claims. The ultimate outcome of each of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated presently for every case. The liability the Reorganized Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may be in excess of amounts currently accrued with respect to such matters and, as a result, these matters may potentially be material to the Reorganized Debtors' business, financial condition, and/or results of operations.

### 12.  Litigation Risks

From time to time, the Debtors have been party to various lawsuits, claims and other legal proceedings that arise in the ordinary course of business, including claims that may be asserted against the Reorganized Debtors by members, their guests or employees. There can be no assurances that the Reorganized Debtors will be able to maintain general liability and other types of insurance on acceptable terms in the future or that such insurance will provide adequate coverage against potential claims.

### 13.  Prolonged Global Recession

The current economic slowdown may have a negative effect on the Reorganized Debtors' business and financial condition and could also affect the rate of new memberships and membership renewals. Unfavorable economic conditions also could increase the Reorganized Debtors' funding and working capital costs or limit our access to the capital markets, any of which would adversely affect the Reorganized Debtors' business, financial condition, operating results or cash flows.

KL2 2608436.2

## B.  Certain Bankruptcy Law Considerations

### 1.  Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes to accept the Plan, as modified.

### 2.  Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur during the third calendar quarter of 2009, there can be no assurance as to such timing or that such conditions to the Effective Date contained in the Plan will ever occur.

## C.  Certain Risks Relating to the Equity Securities under the Plan

### 1.  Significant Holders

After the Effective Date, the Prepetition Term Loan Holders will beneficially own approximately 94% of Reorganized Bally's outstanding New Bally Common Stock.  If such holders of New Bally Common Stock were to act as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Bally Common Stock.  Further, one or more of the holders of a significant number of shares of New Bally Common Stock may determine to sell all or a large portion of their shares of New Bally Common Stock in a short period of time, which may adversely affect the market price of the New Bally Common Stock.

### 2.  Lack of Established Market for New Bally Common Stock

The New Bally Common Stock issued under the Plan will be a new issue of stock for which no trading market currently exists and will not initially be listed on any securities exchange or over-the-counter-market.  There can be no assurance that an active trading market for the New Bally Common Stock will develop.  Accordingly, no assurance can be given that a holder of New Bally Common Stock will be able to sell such securities in the future or as to the price at which any such sale may occur.  If such market were to develop, the liquidity of the market for such securities and the prices at which such securities would trade will depend upon many factors, including the number of holders, investor expectations for the Debtors, and other factors beyond the Debtor's control.  In addition, the New Bally Common Stock will be issued to pre- petition creditors of the Debtors, some of whom may prefer to liquidate their investment rather than to hold it on a long-term basis, which may create an initial imbalance in the market if and when one were to develop.

While the Plan was developed based on an assumed equity value of $16.20 per share for the New Bally Common Stock (calculated based on the Debtors' mid-point enterprise

valuation), such valuation is not an estimate of the price at which the New Bally Common Stock will trade on and after the Effective Date. The New Bally Common Stock could trade at a price higher or lower than the value ascribed to such security in this Disclosure Statement, depending on many factors, including prevailing interest rates, markets for similar securities, general economic and industry conditions, the dilutive effect of the New Bally Warrants and the Management Options, and the performance of, and investor expectations for, the Reorganized Debtors.

### 3. Lack of Publicly Available Information about the Debtors.

Prior to the Petition Date, the Debtors were not required to report financial information to the SEC, and will not be required to do so under the Plan. Accordingly, publicly available information concerning the results of operations and financial condition of the Reorganized Debtors will not be available, which may make it difficult for such holders to assess and evaluate their investment in the New Bally Common Stock.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative plan of reorganization or a plan of liquidation.

### A. Alternative Plan of Reorganization or Plan of Liquidation

If the Plan is not confirmed, the Bankruptcy Court could confirm a different plan. The Plan is, in essence, a reorganization of the Debtors' business and a different plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets. The Debtors believe that the Plan, as described herein, enables creditors and interests holders to realize the highest and best value under the circumstances. The Debtors believe that any liquidation of the Debtors' assets or alternative form of chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. The Debtors believe that their Plan provides the best recovery to their creditors which provides for a distribution of Cash, New Bally Common Stock, or New Bally Warrants as the case may be, rather than no recovery or diminished recoveries following a liquidation of their assets or distribution of other property.

### B. Liquidation Under Chapter 7

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis attached as Exhibit D to this Disclosure Statement. For the reasons above, the Debtors

believe that a liquidation under chapter 7 of the Bankruptcy Code would result in smaller distributions being made to creditors than those provided for in the Plan.

## XI.  SECURITIES LAW MATTERS

No registration statement will be filed under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws with respect to the offer and distribution under the Plan of the New Bally Common Stock and the New Bally Warrants (as defined in the Plan, the "Plan Securities").  The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the offer and distribution of the Plan Securities from federal and state securities registration requirements (including, without limitation, Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security), other than with respect to persons deemed "underwriters," as discussed below.  The Debtors believe that the Plan Securities constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and applicable state securities laws.

## A.  **Bankruptcy Code Exemptions from Registration Requirements**

### 1.  **Initial Offer and Sale of Plan Securities**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or other property.  The Debtors believe that the offer and sale of the Plan Securities under the Plan satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

The exemptions provided for in section 1145 do not apply to an entity that is deemed an "underwriter" as such term is defined in section 2(a)(11) of the Securities Act and section 1145(b) of the Bankruptcy Code.  Section 1145(b) defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":

(a)  purchases a claim against, an interest in, or a claim for administrative expense against, the debtor, with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

(b)  offers to sell securities offered under a plan for the holders of such securities ("distributors");

(c)  offers to buy securities from the holders of such securities, if the offer to buy is (a) with a view to distributing such securities and (b) made under a distribution agreement; and

91

(d) is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

## 2. **Subsequent Transfers of Plan Securities**

In general, all resales and subsequent transactions in the Plan Securities will be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to such securities.

As used in this definition, an "issuer" includes any "affiliate" of the issuer which means any person directly or indirectly controlling, controlled by or under common control with the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Under section 2(a)(12) of the Securities Act, a "dealer" is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person. Whether or not any particular person would be deemed to be an "underwriter" or a "dealer" with respect to any Plan Security or to "control," be under "common control with," or be "controlled" by, an issuer would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be an "underwriter" or a "dealer" with respect to any Plan Security or to "control," be under "common control with," or be "controlled" by, an issuer.

The staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions." The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

(a) (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

(b) the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Exchange Act; or

(c) the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades. The views of the staff of the SEC on these matters have not been sought by the Debtors and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above. Any person intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

Furthermore, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" of the debtor.

On the Effective Date, JPMorgan Chase and Anchorage (collectively, the "Principal Stockholders") will each receive the New Bally Common Stock representing approximately 50.5% and 33.7%, respectively, of the total number of issued and outstanding shares of New Bally Common Stock. Accordingly, each of the Principal Stockholders may be deemed to be a controlling person of Reorganized Bally, thus an "issuer" and thus an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code with respect to the Plan Securities. To the extent that any of the Principal Stockholders is deemed to be an "underwriter" within the meaning of section 1145(b), the offer and distribution of the Plan Securities to such Principal Stockholder would not be exempted by section 1145, and the resale and subsequent transactions in the Plan Securities by such Principal Stockholder would not be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act. Accordingly, the Principal Stockholders could resell Plan Securities only pursuant to an effective registration statement or an available exemption from registration under the Securities Act.

The Debtors believe that, pursuant to section 1145(c) of the Bankruptcy Code, the Plan Securities will not be "restricted securities" as defined in Rule 144(a)(3). In addition, affiliates of the issuer will not be deemed to be engaged in a distribution of the Plan Securities and therefore not be deemed to be "underwriters" under section 2(a)(11) of the Securities Act if they comply with the requirements of Rule 144 under the Securities Act for the resale of their Plan Securities. If a Principal Stockholder were deemed to be an underwriter within the meaning of section 1145(b)(1)(D) of the Bankruptcy Code, it might still be able to sell Plan Securities without registration pursuant to Rule 144 under the Securities Act.

Rule 144 allows a holder of securities that is an affiliate of the issuer of such securities to sell, without registration, within any three-month period a number of such securities that does not exceed the greater of one percent (1%) of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four (4) calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE PLAN SECURITIES. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

KL2 2608436.2

Plan Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states. However, the availability of such state exemptions depends on the securities laws of each state. Therefore, the Debtors recommend that holders of Claims consult with their own legal advisors regarding the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Under Section 1145(a)(4) of the Bankruptcy Code, stockbrokers effecting transactions in the Plan Securities prior to the expiration of 40 days after the Effective Date are required to deliver to the purchaser of such securities a copy of this Disclosure Statement (and supplements hereto, if any, if ordered by the Bankruptcy Court) at or before the time of delivery of such securities to such purchaser.

## XII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.  Introduction

The following discussion summarizes certain material U.S. federal income tax consequences of the Plan to the Debtors and holders of Claims. The summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. This summary does not address all aspects of federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to particular types of holders of Claims subject to special treatment under the Tax Code (for example, foreign persons, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, persons that hold Claims as part of a "straddle,", a "hedge" or a conversion transaction, persons that have a "functional currency other than the U.S. dollar, and investors in pass-through entities) and also does not discuss any aspects of state, local, or foreign taxation. In addition, a substantial amount of time may elapse between the Confirmation Date and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the Internal Revenue Service (the "Service") with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtors with respect thereto. **Accordingly, each holder of a Claim is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.**

If a partnership (including for this purpose any entity treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of a Claim, the Reorganized Bally Common Stock, New Bally Warrants, or an interest in the Exit Rollover facility, the treatment of a partner in the partnership will generally depend upon the status of the partner and the activity of the partnership. Partnerships and their partners should consult their tax advisors about the U.S. federal income tax consequences of participating in the Plan and as to ownership and disposition of the Reorganized Bally Common Stock, New Bally Warrants, or an interest in the Exit Rollover facility received under the Plan.

KL2 2608436.2

**Circular 230 Disclosure:** **This tax discussion was written to support the promotion or marketing of the Plan. To ensure compliance with requirements imposed by the Service, we are informing you that this discussion was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax-related penalties that may be imposed on the taxpayer under the Tax Code. Taxpayers should seek advice based on their particular circumstances from an independent tax advisor**.

**B. Certain Material Federal Income Tax Consequences to the Debtors.**

### 1. Cancellation of Indebtedness

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any discharged indebtedness (cancellation of debt or "COD") realized during the taxable year. COD is the amount by which the indebtedness of the Debtors discharged exceeds any consideration given in exchange therefor. COD generally equals the difference between (A) the "adjusted issue price" of the indebtedness discharged (which, in the case of the Senior Notes and Subordinated Notes, should be the principal amount and any accrued but unpaid interest at the Effective Date) and (B) the sum of (i) the amount of cash, (ii) the "issue price" of any new debt instrument, and (iii) the fair market value of any other property (such as the Reorganized Bally Common Stock and New Bally Warrants) transferred in satisfaction of such discharged indebtedness.

In general, the Tax Code provides that a debtor in a bankruptcy case is not required to recognize COD income . In lieu thereof, the debtor must reduce certain of its tax attributes – such as net operating loss ("NOL") carryforwards, tax credits, tax basis in assets and the attributes and tax basis of our subsidiaries – by the amount of the excluded COD. Certain statutory or judicial exceptions can apply to limit the amount of COD and attribute reduction (such as where the payment of the cancelled debt would have given rise to a tax deduction). In addition, to the extent the amount of COD exceeds the tax attributes available for reduction, the remaining COD is simply forgiven. Under the recently enacted American Recovery and Reinvestment Tax Act of 2009, debtors with COD in 2009 or 2010 may elect to ratably recognize the COD in income over a five year period beginning in 2014. The Debtors do not anticipate making this election because the bankruptcy exclusion described above would not be available if such an election were made and, due to the limitations on the use of NOLs under Tax Code section 382 discussed below, Reorganized Bally may not have sufficient NOLs available to offset the COD recognized in future years. As a result of the implementation of the Plan, the Debtors will have COD, and potential attribute reduction. However, because any reduction in tax attributes does not effectively occur until the first day of the taxable year following the taxable year in which the COD is incurred, the resulting COD will not impair the Debtors' ability to use their tax attributes (to the extent otherwise available) to reduce their tax liability in the year of discharge, if any, otherwise resulting from the implementation of the Plan.

### 2. Net Operating Losses

The Debtors may recognize income or gain as a result of the Restructuring Transactions. The Debtors should be able to offset any such gain with, and to the extent of, their NOL carryforwards and current year NOLs. However, as described below, for purposes of the

alternative minimum tax ("AMT"), the Debtors can only offset ninety percent (90%) of their alternative minimum taxable income ("AMTI") with NOL carryovers.

The Reorganized Debtors anticipate that they will have a significant amount of NOL carryforwards remaining following use of NOLs against (i) any gain or other income recognized in connection with the Restructuring Transactions and (ii) the reduction of NOLs as a result of COD.  The use of such NOL carryforwards will be subject to an annual limitation. Section 382 of the Tax Code provides that a corporation that undergoes an "ownership change" (as defined in section 382(g) of the Tax Code) is limited in the amount of NOL carryforwards and other tax attributes incurred prior to the ownership change that it can use each year to offset income earned following such change.  Consummation of the Plan will result in an ownership change of the Debtors for these purposes because holders of Claims will receive 100% of the New Bally Common Stock.  The annual limitation, which will be determined under section 382($l$)(6) of the Tax Code, will be equal to the product of (i) the "long term tax-exempt rate" in effect at the time of the ownership change (which rate is 4.61% for ownership changes occurring in June 2009) and (ii) the equity value of the Reorganized Debtor immediately following the ownership change.  To the extent that a corporation's section 382 limitation in a given year exceeds its taxable income for such year, such excess will increase the section 382 limitation for future taxable years.

Section 382 of the Tax Code also generally operates to limit the deduction of built-in losses recognized subsequent to the date of the ownership change.  If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of built-in income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.

Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

### 3. Alternative Minimum Tax

A corporation may incur a federal AMT liability even if its NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax.  Debtors may be liable for the AMT.  In general, the AMT is imposed on a corporation's AMTI at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax.  For purposes of computing taxable income for AMT purposes, i.e., AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's AMTI may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code, as Debtors will, and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

## C. <u>Federal Income Tax Consequences to Holders of Claims</u>

### 1. <u>In General</u>

On the exchange of its Claim for Cash, Reorganized Bally Common Stock, New Bally Warrants, interests in the Exit Rollover Facility, and/or other property, each holder of a Claim (other than holders of Claims that constitute Tax Securities (as defined below), the treatment of which is discussed in section 2 below, or that relate to services provided to a Debtor by an employee or service provider) will recognize gain or loss measured by the difference between (i) the sum of the amount of Cash and the aggregate fair market value of property received (including the fair market value of Reorganized Bally Common Stock and New Bally Warrants), or, with respect to the Exit Rollover Facility, the face amount of the Exit Rollover Facility received and (ii) such holder's tax basis in the Claim. The fair market value, as of the Effective Date, as provided in the Financial Projections, of the Reorganized Bally Common Stock and New Bally Warrants will be used by the Debtors for tax information reporting purposes.

Each holder of a Claim that relates to services provided to a Debtor by an employee or a service provider generally will recognize ordinary income equal to the sum of the amount of cash and the fair market value of the property received in exchange for its Claim.

To the extent that the Cash and/or property received by a holder of a Claim is attributable to accrued interest (instead of principal) on such Claim, the Cash and/or property received will be deemed made in payment of such interest. Conversely, a holder of a Claim will recognize a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full. The allocation for federal income tax purposes between principal and interest of amounts received in exchange for the discharge of a claim at a discount is unclear. However, the Debtors intend to treat any amount received as first allocated to principal.

Where gain or loss is recognized by a holder in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including but not limited to: (a) the nature or origin of the Claim; (b) the tax status of the holder; (c) whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held; (d) whether the Claim was acquired at a market discount (discussed below); and (e) whether and to what extent the holder had previously claimed a bad debt deduction with respect to the Claim.

A holder that purchased its Claim from a prior holder at a market discount (generally defined as the amount, if any, by which a holder's tax basis in a debt obligation immediately after its acquisition is exceeded by the adjusted issue price of the debt obligation at such time, subject to a de minimis exception) may be subject to the market discount rules of the

Tax Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

To the extent that a Claim that is a Tax Security (as defined below) that was acquired with market discount and is exchanged for Reorganized Bally Common Stock and/or New Bally Warrants, any gain recognized on the subsequent sale, exchange, redemption or other disposition of the Reorganized Bally Common Stock and/or New Bally Warrants may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claims as of the date of the exchange.  In addition, any gain recognized by a holder upon a subsequent taxable disposition of New Bally Common Stock received pursuant to the Plan in satisfaction of a Claim (or any stock or other property received for them in a later tax-free exchange) may be treated as ordinary income to the extent of any bad debt deductions (or additions to a bad debt reserve) previously claimed with respect to its Claim and any ordinary loss deduction incurred upon satisfaction of its Claim, less any income (other than interest income) recognized by the holder upon satisfaction of its Claim.

Any cash and/or property received by a holder of a Claim after the Effective Date may be subject to the imputed interest provisions of the Tax Code pursuant to which a portion of the amount received may be treated as interest.

The tax basis of property received pursuant to the Plan (other than (i) Reorganized Bally Common Stock and/or New Bally Warrants received in exchange for the principal portion of Claims that constitute Tax Securities, which is discussed in section 2 below and (ii) interests in the Exit Rollover Facility) will equal its fair market value and the holding period of such property shall begin on the date following the Effective Date.  The tax basis of interests in the Exit Rollover Facility received pursuant to the Plan will equal the face amount of the Exit Rollover Facility received.

## 2. Claims that are Tax Securities

Notwithstanding the foregoing discussion, no loss will be recognized upon the exchange, in whole or in part, of a Claim that constitutes a "security" for federal income tax purposes (a "Tax Security") for Reorganized Bally Common Stock and/or New Bally Warrants (except to the extent attributable to accrued interest, as discussed above), and (except to the extent attributable to accrued interest, as discussed above) gain will only be recognized upon such an exchange to the extent of the fair market value of the cash or property received other than Reorganized Bally Common Stock and/or New Bally Warrants.  The term "security" is not defined in the Tax Code.  While the determination whether a particular claim or debt constitutes a Tax Security depends upon an overall evaluation of the nature of the claim, in general debt instruments with a term of at least ten years qualify as securities, debt instruments with a term of less than five years do not qualify as securities, and debt instruments with a term of between five and ten years may qualify as securities.  Debtors do not plan to treat Claims based on holding the Revolving Facility, the Term Loan, and the Senior Notes as Tax Securities.  It is unclear whether

the Subordinated Notes qualify as Tax Securities. Each holder should consult its tax advisor regarding the tax status of its Claim or Claims.

The tax basis of Reorganized Bally Common Stock and/or New Bally Warrants received pursuant to the Plan in exchange for Claims that constitute Tax Securities (other than the portion if any, attributable to accrued interest) will equal the holder's tax basis in the Claims exchanged, decreased by the fair market value of any other property received in exchange for such Claims and increased by any gain recognized. The holding period for such Reorganized Bally Common Stock and/or New Bally Warrants shall include the holding period of the Claims exchanged therefore.

### 3. Sale, Exchange, or Exercise of Reorganized Bally Common Stock, Warrants, or Interests in the Exit Revolver Facility

Except as discussed below with respect to market discount above, any gain or loss recognized on a sale, exchange or other taxable disposition of Reorganized Bally Common Stock, New Bally Warrants, or interests in the Exit Revolver Facility will generally be gain or loss in an amount equal to the difference, if any, between the amount realized and the holder's adjusted tax basis in the Reorganized Bally Common Stock, New Bally Warrants, or interests in the Exit Revolver Facility, as applicable, at the time of such sale, exchange or other taxable disposition. Assuming such Reorganized Bally Common Stock, New Bally Warrants, or interests in the Exit Revolver Facility are held as capital assets, any such gain or loss will be long-term capital gain or loss if the holding period for the Reorganized Bally Common Stock, New Bally Warrants, or interests in the Exit Revolver Facility exchanged is more than one year at that time (which as noted above might include the holding period for the Subordinated Notes exchanged for New Bally Warrants if they are treated as Taxable Securities). The deductibility of capital losses is subject to limitations.

No gain or loss will be recognized on the exercise of a New Bally Warrant for New Bally Common Stock. However, in the event that the exercise price of a New Bally Warrant is adjusted for any extraordinary cash dividends or distributions of debt securities or other assets to all holders of New Bally Common Stock, such adjustment may be a taxable distribution which may be taxable as a dividend to each holder of such New Bally Warrant.

### 4. Treatment of Holders of Interests in the Exit Revolver Facility

Interest on the Exit Revolver Facility will be taxable to holders as ordinary income at the time it is paid or accrued in accordance with each holder's method of accounting for U.S. federal income tax purposes. The Debtors intend to treat the fees payable in connection with the Exit Revolver Facility as fees and not as additional amounts received by holders of Prepetition Revolver Facility Claims in exchange for Prepetition Revolver Facility Claims and/or as additional interest on the Exit Revolver Facility. However, it is possible that the Service may treat all or a portion of such fees in a different manner that may result in treatment of holders of Prepetition Revolver Facility Claims as receiving additional amounts in exchange for Prepetition Revolver Facility Claims and/or the issuance of the Exit Revolver Facility with original issue discount. Holders of Prepetition Revolver Facility Claims should consult their tax advisors.

5. **Unsecured Claims Reserve**

In the case of any holder of Unsecured Claims receiving interests in the Unsecured Claims Reserve, the following tax consequences will apply in addition to those discussed above.

As and when any Disputed Claims become disallowed after the Effective Date, a holder of a previously Allowed Unsecured Claim will become entitled to a share of the Reorganized Bally Common Stock and/or New Bally Warrants held in the Unsecured Claims Reserve. For federal income tax purposes, the receipt of such Reorganized Bally Common Stock and/or New Bally Warrants may be treated as additional consideration in satisfaction of such holder's Allowed Unsecured Claim and may be subject to the imputed interest provisions in the Tax Code as discussed above.

As and when any Disputed Claims become Allowed Claims after the Effective Date, each holder of such Claims will recognize gain or loss with respect to its Claim in an amount equal to the difference between (i) the aggregate fair market value of such holder's share of the Reorganized Bally Common Stock and/or New Bally Warrants held by the Unsecured Claims Reserve received in respect of its Claim (other than the portion attributable to accrued but unpaid interest) as of the date such Claim is an Allowed Claim and (ii) such holder's adjusted tax basis in the Claim (other than any portion of the Claim representing accrued but unpaid interest).

It is possible (but not likely) that any loss realized in satisfaction of an Allowed Unsecured Claim by a holder that received in interest in the Unsecured Claims Reserve may be deferred until all the Disputed Claims are resolved and the holder's beneficial interest in the Reorganized Bally Common Stock and/or New Bally Warrants held by the Unsecured Claims Reserve can no longer increase. It is also possible that any gain realized by such a holder may be recognized under the "installment method" of reporting. Each holder of such an Allowed Unsecured Claim is urged to consult its own tax advisor regarding the applicability of, and the ability to elect out of, the installment method.

The Reorganized Debtors will file, or cause to be filed, all appropriate tax returns with respect to the assets held in the Unsecured Claims Reserve. Specifically, the Reorganized Debtors shall either (i) treat all assets held in the Unsecured Claims Reserve as held by the Reorganized Debtors or (ii) make an election pursuant to Treasury Regulations section 1.468B−9(c) to treat the Unsecured Claims Reserve as a DOF; and report on the basis that any amounts earned by the separate trust or DOF and any taxable income of the Unsecured Claims Reserve are subject to a separate entity level tax, which shall be paid by the Reorganized Debtors out of the assets of the Unsecured Claims Reserve.

D. **Information Reporting and Backup Withholding**

All distributions to holders of Claims under the Plan are subject to any applicable tax information reporting and withholding, including employment tax withholding. Under U.S. federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if a non-exempt holder (a) fails to furnish its social

security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) fails to provide certain certifications signed under penalty of perjury.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, generally, corporations and financial institutions.

THE    FOREGOING    SUMMARY    HAS    BEEN    PROVIDED    FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES APPLICABLE TO THEM UNDER THE PLAN.

## XIII.  RECOMMENDATION AND CONCLUSION

The Debtors believe that confirmation of the Plan is in the best interests of all Creditors and Equity Interest holders and urge all creditors who receive ballots to vote in favor of the Plan.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

KL2 2608436.2

Dated: July 7, 2009

**BALLY TOTAL FITNESS HOLDING
CORPORATION**
(on its own behalf and on behalf of each affiliate
Debtor)


By:  /s/ William G. Fanelli
Name:   William G. Fanelli
Title:     Acting Chief Financial Officer

## EXHIBIT A TO THE DISCLOSURE STATEMENT

**JOINT PLAN OF REORGANIZATION OF THE DEBTORS UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BALLY TOTAL FITNESS OF | ) | |
| GREATER NEW YORK, INC., <u>et al</u>., | ) | Case No. 08-14818 (BRL) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

## AMENDED JOINT PLAN OF REORGANIZATION OF THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Kenneth H. Eckstein
P. Bradley O'Neill
Stephen D. Zide

Counsel for the Debtors and the Debtors in Possession

Dated:  July 7, 2009
        New York, New York

# TABLE OF CONTENTS

Page

ARTICLE  I. DEFINITIONS AND CONSTRUCTION OF TERMS ..........................................1
    A.      Definitions.........................................................................................1
    B.      Interpretation, Application of Definitions and Rules of Construction..................13

ARTICLE  II. ADMINISTRATIVE AND PRIORITY CLAIMS...............................................13
    A.      Administrative Claims. ....................................................................13
    B.      Fee Claims. ....................................................................................13
    C.      Priority Tax Claims..........................................................................14

ARTICLE  III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
    INTERESTS .....................................................................................................14
    A.      Class Identification and Status............................................................14
    B.      Treatment of Classified Claims and Equity Interests ...............................15

ARTICLE  IV. CONSOLIDATION OF THE DEBTORS FOR DISTRIBUTION PURPOSES .17

ARTICLE  V. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................18
    A.      Exit Facilities ...............................................................................18
    B.      Voting of Claims ...........................................................................18
    C.      Nonconsensual Confirmation.............................................................19
    D.      Issuance of New Bally Common Stock, New Bally Warrants and New Subsidiary
             Equity Interests .............................................................................19
    E.      The New Bally Common Stock ..........................................................19
    F.      The New Bally Warrants ..................................................................20
    G.      Claims Monitor .............................................................................21
    H.      Restructuring Transactions ...............................................................22

ARTICLE  VI. PROVISIONS REGARDING CORPORATE GOVERNANCE OF THE
    REORGANIZED DEBTORS................................................................................23
    A.      Amendments to Certificates of Incorporation.......................................23
    B.      Appointment of Officers and Directors ...............................................24
    C.      Powers of Officers..........................................................................24
    D.      Management of Reorganized Debtors ..................................................24
    E.      Reorganized Debtors' Management Incentive Plan ................................24
    F.      Reorganized Debtors' Corporate Personnel Incentive Plan......................25
    G.      Indemnification of Directors, Officers and Employees ...........................25

ARTICLE  VII. CONFIRMATION OF THE PLAN ............................................................25
    A.      Conditions to Confirmation ..............................................................25
    B.      Waiver of Conditions Precedent to Confirmation .................................26
    C.      Continued Corporate Existence..........................................................26
    D.      Dissolution of Unsecured Creditors' Committee....................................26
    E.      Benefit Plans ................................................................................27
    F.      Vesting of Property.........................................................................27

i

G.    Discharge of the Debtors ................................................................27
H.    Injunction ......................................................................................28
I.    Preservation of Causes of Action..................................................28
J.    Votes Solicited in Good Faith........................................................28
K.    Administrative Claims Incurred After the Effective Date ...................29
L.    Releases by the Debtors.................................................................29
M.    Releases by Holders of Claims and Equity Interests .........................30
N.    Exculpation With Respect of Released Parties....................................31
O.    Injunction With Respect of Released Parties........................................31
P.    Term of Bankruptcy Injunction or Stays .........................................31
Q.    Preservation of Insurance...............................................................31
R.    Indemnification Obligations Owed by the Debtors ...........................31

ARTICLE  VIII. DISTRIBUTIONS UNDER THE PLAN...........................................32
A.    Allowed Claims .............................................................................32
B.    Disputed Claims ...........................................................................34
C.    Insured Claims ..............................................................................35
D.    Tort Claims ..................................................................................36
E.    Reserve for Disputed General Unsecured Claims .................................37
F.    Allocation of Consideration...........................................................38
G.    Cancellation and Surrender of Existing Securities and Agreements ...................38
H.    Estimation ....................................................................................39

ARTICLE  IX. RETENTION OF JURISDICTION.....................................................39

ARTICLE  X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES...........................40
A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........40
B.    Cure...............................................................................................41
C.    Assumption ..................................................................................42
D.    Limited Extension of Time to Assume or Reject.................................42
E.    Rejection Damage Claims................................................................42
F.    Assignment ...................................................................................43
G.    No Change in Control .....................................................................43
H.    Obligations to Indemnify Directors, Officers and Employees.................43

ARTICLE  XI. EFFECTIVENESS OF THE PLAN ......................................................44
A.    Conditions Precedent to Effectiveness................................................44
B.    Waiver of Conditions Precedent to Effectiveness .................................44
C.    Effect of Failure of Conditions .........................................................45
D.    Vacatur of Confirmation Order.........................................................45
E.    Modification of the Plan .................................................................45
F.    Revocation, Withdrawal, or Non-Consummation .................................45

ARTICLE  XII. MISCELLANEOUS PROVISIONS .....................................................46
A.    Payment of Statutory Fees ..............................................................46
B.    Payment of Indenture Trustee Fees....................................................46
C.    Governing Law ...............................................................................46

D.  Filing or Execution of Additional Documents .......................................................47
E.  Information ...........................................................................................................47
F.  Withholding and Reporting Requirements .........................................................47
G.  Exemption From Transfer Taxes ........................................................47
H.  Waiver of Federal Rule of Civil Procedure 62(a) ...........................................48
I.  Plan Exhibits ........................................................................................................48
J.  Notices ..................................................................................................................48
K.  Conflicts ...............................................................................................................48

KL2 2608437.2

## TABLE OF EXHIBITS

Exhibit A            Executory Contracts and Unexpired Leases to be Rejected

Exhibit B            Executory Contracts and Unexpired Leases to be Assumed and Cure Costs

Exhibit C            Summary of Restructuring Transactions

Exhibit D            Summary of Exit Facilities

Exhibit E            Amended and Restated Certificates of Incorporation of Reorganized
                     Debtors

Exhibit F            New Bally Warrant Agreement

Exhibit G            Initial Directors of Reorganized Bally

Exhibit H            Summary of Management Incentive Plan

Exhibit I            Summary of Corporate Personnel Incentive Plan

Exhibit J            Shareholder Agreement of Reorganized Bally

i

**INTRODUCTION**

Bally Total Fitness Holding Corporation ("Bally") and its direct and indirect subsidiaries in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), propose the following joint plan of reorganization (the "Plan") under section 1121(a) of the Bankruptcy Code. The Debtors' Chapter 11 Cases are being jointly administered pursuant to an order of the Court. Claims against, and Interests in, the Debtors (other than Administrative Claims, Priority Tax Claims, and Fee Claims) are classified and treated in Article III hereof. Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, results of operations, and projections for future operations and risk factors, together with a summary and analysis of this Plan. All Claim holders entitled to vote on this Plan are encouraged to consult the Disclosure Statement and to read this Plan carefully before voting to accept or reject this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE COURT, HAVE BEEN AUTHORIZED BY THE COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

**ARTICLE I.**
**DEFINITIONS AND CONSTRUCTION OF TERMS**

A.    **Definitions**

Unless otherwise defined herein, or the context otherwise requires, the following terms shall have the respective meanings set forth below:

1.    *Administrative Claim*: means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (i) any actual and necessary costs and expenses of preserving the Debtors' estates, (ii) any actual and necessary costs and expenses of operating the Debtors' businesses, (iii) any indebtedness or obligations assumed by the Debtors in connection with the conduct of their businesses, (iv) all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, (v) any fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code, and (vi) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

2.    *Allowed*: means, with reference to any Claim, (i) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (ii) any Claim specifically allowed under the Plan, (iii) any Claim, which is not Disputed, which becomes allowed after the Claims Objection Deadline because no

KL2 2608437.2

objection was interposed against the Claim by the Claims Objection Deadline, or (iv) any Claim the amount or existence of which, if Disputed, (a) has been determined by a Final Order of a court of competent jurisdiction other than the Court, or (b) has been allowed by Final Order of the Court; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Court shall not be considered "Allowed Claims" hereunder.

3.      *Ballots:* means each of the ballot forms distributed with the Disclosure Statement to each holder of an Impaired Claim (other than to holders not entitled to vote on the Plan) upon which is to be indicated, among other things, acceptance or rejection of the Plan.

4.      *Bankruptcy Code:* means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the date hereof.

5.      *Bankruptcy Rules:* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and local rules of the Court, as the context may require.

6.      *Bar Date Order:* means the Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof, entered by the Bankruptcy Court on January 23, 2009 (Docket No. 514), as the same may be amended, modified or supplemented.

7.      *Business Day:* means any day on which commercial banks are open for business, and not authorized to close, in the City of New York, New York, except any day designated as a legal holiday by Bankruptcy Rule 9006(a).

8.      *Cash:* means legal tender of the United States of America.

9.      *Causes of Action:* means any and all claims, causes of actions, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, defenses, demands, rights, actions, debts, damages, judgments, remedies, Liens, indemnities, guaranties, suits, obligations, liabilities, accounts, offsets, recoupments, powers, privileges, licenses, and franchises of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, whether arising before, on or after the Petition Date, including through the Effective Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. "Causes of Action" shall include but are not limited to: (i) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or in equity; (ii) the right to object to Claims; (iii) all claims pursuant to sections 362, 510, 542, 543, 544 through 550, 552 or 553 of the Bankruptcy Code; (iv) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any state law fraudulent transfer claims.

10.     *Chapter 11 Cases:* means the chapter 11 cases commenced by the Debtors on December 3, 2008.

11.     *Claim:* means any claim, as such term is defined in section 101(5) of the Bankruptcy Code.

2

12.     _Claims Agent:_ means Kurtzman Carson Consultants LLC or any successor thereto.

13.     _Claims Monitor:_ means the Person designated in accordance with Article V.G. of the Plan to monitor the Reorganized Debtors' post-Effective Date settlement of Disputed General Unsecured Claims.

14.     _Claims Objection Deadline:_   means the first business day that is one hundred eighty (180) days after the Effective Date, or such other later date the Court may establish upon a motion by the Reorganized Debtors, which motion may be approved without a hearing and without notice to any party.

15.     _Class:_ means a group of Claims or Equity Interests classified under the Plan.

16.     _Collateral:_ means any property or interest in property of the Debtors' estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

17.     _Confirmation Date:_ means the date on which the Confirmation Order is entered by the Court.

18.     _Confirmation Hearing:_ means the hearing required by section 1128 of the Bankruptcy Code to consider confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

19.     _Confirmation Order:_ means the order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

20.     _Convenience Claims:_ means Claims against any of the Debtors that otherwise would be classified as General Unsecured Claims in Class 8, but, with respect to each such Claim, either (i) the aggregate amount of such Claim is equal to or less than $300,000 or (ii) the aggregate amount of such Claim is reduced to $300,000 pursuant to an election by the Claim holder made on the Ballot provided for voting on the Plan by the Voting Deadline; provided, however, that where any portion(s) of a single Claim has been transferred to a transferee, (a) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (b) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

21.     _Corporate Personnel Incentive Plan:_ means the post-Effective Date Corporate Personnel Incentive Plan referenced in Article VI.F. of this Plan, the terms of which are set forth more fully in Exhibit I to the Plan.

22.     _Court:_ means, (i) the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases; (ii) to the extent there is no reference pursuant to section 157 of title 28 of the United States Code, the United States District

Court for the Southern District of New York; and (iii) any other court having jurisdiction over the Chapter 11 Cases or proceedings arising therein.

23.    *Credit Agreement:* means that certain Credit Agreement, dated as of October 1, 2007, between Bally and Morgan Stanley Senior Funding, Inc., as Administrative Agent and Collateral Agent, Wells Fargo Foothill, LLC, as Revolving Credit Agent, and the CIT Group/Business Credit, Inc., as Revolving Syndication Agent and certain other lenders party thereto.

24.    *Cure Claim*:  means a Claim in an amount equal to all unpaid monetary obligations under an executory contract or unexpired lease assumed by a Debtor under section 365 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

25.    *Cure Claim Bar Date*:  means the deadline for filing requests for payment of a Cure Claim in amount different from the amount listed on Exhibit B to the Plan or as set forth in Article X.B. of the Plan, which shall be 10 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable executory contract or unexpired lease.

26.    *Debtor:* means, individually, any of the Debtors.

27.    *Disbursing Agent*: means an entity designated by a Debtor or Reorganized Debtor to act as a disbursing agent, which may be Reorganized Bally.

28.    *Disclosure Statement:* means the written disclosure statement that relates to this Plan, as approved by the Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time.

29.    *Disputed:* means, with reference to any Claim, (i) a Claim that is listed on a Debtor's Schedules as either disputed, contingent or unliquidated; (ii) a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted by the holder varies from the nature or amount of such Claim as it is listed on the Schedules; (iii) a Claim as to which the applicable Debtor or Reorganized Debtor, or, prior to the Confirmation Date, any other party in interest, has filed an objection and such objection has not been withdrawn or denied by a Final Order; (vi) Tort Claims, and (v) a Claim or request for payment of Administrative Claim that is required to be filed and no such Claim or request for payment of Administrative Claim is timely filed.

30.    *Distributions:* means the distribution in accordance with this Plan of (i) Cash, (ii) New Bally Common Stock, (iii) New Bally Warrants, or (iv) other forms of consideration, as the case may be.

31.    *Effective Date:* means the first Business Day on which all of the conditions specified in Article XI of the Plan have been satisfied or waived in accordance with Article XI of the Plan; provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect.

4

32.    _Equity Interest:_ means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest.

33.    _Estates:_ means the estates of the Debtors, individually or collectively, as is appropriate in the context, created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

34.    _Exit Facilities:_ means, collectively, the Exit Revolver Facility and the Exit Term Loan Facility, on substantially the terms set forth on Exhibit D.

35.    _Exit Lenders:_  means, collectively, the Exit Revolver Lenders and the Exit Term Loan Lenders.

36.    _Exit Revolver Facility:_ means that certain exit financing facility to be entered into by the Reorganized Debtors on or prior to the Effective Date, the obligations under which shall be secured by a first priority security interest in substantially all of the Reorganized Debtors' assets.

37.    _Exit Revolver Lenders:_ means the lenders, banks, financial institutions or non-Debtor entities that are or may become parties to the Exit Revolver Facility.

38.    _Exit Term Loan Facility:_ means that certain exit financing facility to be entered into by the Reorganized Debtors on or prior to the Effective Date, the obligations under which shall be secured by a first priority security interest in substantially all of the Reorganized Debtors' assets, which financing shall be utilized to make distributions under the Plan, to satisfy certain Plan-related expenses, and to fund the Reorganized Debtors' working capital needs.

39.    _Exit Term Loan Lenders:_ means the lenders, banks, financial institutions or non-Debtor entities that are or may become parties to the Exit Term Loan Facility.

40.    _Fee Claims:_ means (i) any Administrative Claim under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including reasonable expenses of the members of the Unsecured Creditors' Committee incurred as members of the Unsecured Creditors' Committee in discharge of their duties as such), and (ii) any Claim by persons asserting that they provided a "substantial contribution" to these Chapter 11 Cases pursuant to section 503(b)(3)(D) of the Bankruptcy Code for services rendered prior to the Effective Date.

41.    _Final Order:_ means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or petition for certiorari or move for a new trial, reargument or rehearing has expired, and as to which no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing that has been timely taken is pending, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed

KL2 2608437.2

has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

42.  *General Unsecured Claim:* means a Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Fee Claim, Letter of Credit Claim, Prepetition Term Loan Secured Claim, Prepetition Revolver Facility Claim, Prepetition Swap Claim, Other Secured Claim, Senior Note Claim, Subordinated Note Claim, or Prepetition Term Loan Deficiency Claim and shall include, without limitation, (i) Claims of vendors or customers of the Debtors that are not Priority Claims, (ii) Claims of employees of the Debtors that are not Priority Claims, (iii) Claims arising as a result of the rejection by any of the Debtors of executory contracts, including, but not limited to, rejection of indemnification obligations under Article X.H. hereof, and rejection of unexpired leases pursuant to section 365 of the Bankruptcy Code, (iv) litigation Claims, (v) the Tort Claims, and (vi) the Previous Plan Claims.

43.  *Governmental Unit:* has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

44.  *Impaired:* means, when used with reference to a Class of Claims or Equity Interests, Claims or Equity Interests that are impaired within the meaning of section 1124 of the Bankruptcy Code.

45.  *Indenture Trustee Fee Claim:*  means a Claim against the Debtors pursuant to the Senior Secured Notes Indenture or the Subordinated Notes Indenture relating to any compensation disbursements, fees and expenses accrued and unpaid through the Effective Date.

46.  *Initial Distribution Date:* means the Effective Date or as soon thereafter as practicable, but no later than sixty (60) days after the Effective Date.

47.  *Insider:* has the meaning set forth in section 101(31) of the Bankruptcy Code.

48.  *Insured Claim:* means any Claim or portion of a Claim (other than a Workers Compensation Claim) that is insured under the Debtors' insurance policies.

49.  *Intercompany Claims:* means any Claim held by one of the Debtors against any other Debtor, including, without limitation, (i) any account reflecting intercompany book entries by such Debtor with respect to any other Debtor, (ii) any Claim not reflected in book entries that is held by such Debtor, and (iii) any derivative Claim asserted or assertable by or on behalf of such Debtor against any other Debtor.

50.  *Letter of Credit Claims:* means any Claim under the Credit Agreement on account of a letter of credit to the extent the letter of credit has not been drawn as of the Effective Date.

51.    *Lien:* has the meaning set forth in section 101(37) of the Bankruptcy Code.

52.    *Litigation Rights:* means the Causes of Action that the Debtors or their Estates may hold against any Person (except to the extent such Causes of Action are expressly released under the Plan).

53.    *Management Contracts:*  means the employment contracts to be entered into between Reorganized Bally's management and Reorganized Bally.

54.    *Management Incentive Plan:* means the post-Effective Date Management Incentive Plan referenced in Article VI.E. of this Plan, the terms of which are set forth more fully in Exhibit H to the Plan.

55.    *New Board:* means the board of directors of Reorganized Bally to be constituted as of the Effective Date pursuant to Article VI.B. of the Plan.

56.    *New Bally Common Stock:* means the shares of common stock of Reorganized Bally, authorized pursuant to the Plan and the Amended and Restated Certificate of Incorporation of Reorganized Bally, of which 10,000,000 shares will be issued by Reorganized Bally pursuant to the Plan.

57.    *New Bally Warrants:* means the warrants, issuable pursuant to the New Bally Warrant Agreement, to purchase New Bally Common Stock, exercisable for a period of five years from the Effective Date, representing 5% of the fully diluted equity of Reorganized Bally issuable in accordance with the Plan (after taking into account the exercise of the New Bally Warrants but not including New Bally Common Stock issuable upon exercise of options under the Management Incentive Plan), of which 526,316 warrants will be issued by Reorganized Bally pursuant to the Plan..

58.    *New Bally Warrant Agreement*:  means the New Bally Warrant Agreement attached as Exhibit F to the Plan.

59.    *New Subsidiary Equity Interests:* means with respect to a particular Reorganized Debtor, the Equity Interests in such Reorganized Debtor authorized to be issued pursuant to the Plan and the Amended and Restated Certificate of Incorporation of such Subsidiary Debtor.

60.    *Ordinary Course Administrative Claims:* means Administrative Claims against the Debtors that represent liabilities (i) to sellers of goods or services on account of such sellers' provision of goods and/or services and (ii) that were incurred in the ordinary course of business by the Debtors.

61.    *Other Priority Claim:* means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims), including, without limitation, certain allowed employee compensation and benefit claims of the Debtors' employees incurred within one hundred eighty (180) days prior to the Petition Date.

KL2 2608437.2

62.    *Other Secured Claims:* means any Claim, other than the Prepetition Revolver Facility Claims, the Prepetition Term Loan Secured Claims, the Prepetition Swap Claims, and the Letter of Credit Claims, to the extent reflected in the Schedules or a proof of claim filed as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

63.    *Person:* means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity.

64.    *Petition Date:* means December 3, 2008.

65.    *Plan:* means this Plan, as it may be amended, modified, or supplemented from time to time, together with all addenda, exhibits, schedules or other attachments, if any, including the Plan Exhibits.

66.    *Plan Exhibits:* means, collectively, the documents listed on the "Table of Exhibits" included herein, which documents will be filed no later than five business days before the Confirmation Hearing, to the extent not filed earlier; *provided, however,* that Exhibits A, B, C , F, G, and J will be filed no later than five Business Days prior to the Voting Deadline.  The Plan Exhibits may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at https://ecf.nysb.uscourts.gov and http://www.kccllc.net/bally.  Holders of Claims or Equity Interests may obtain a copy of the Plan Exhibits upon written request to counsel to the Debtors.  The Debtors reserve the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Plan Exhibits after they are filed and shall promptly make such changes available online at https://ecf.nysb.uscourts.gov and http://www.kccllc.net/bally.

67.    *Prepetition Administrative Agent:* means Morgan Stanley Senior Funding, Inc., in its capacity as Administrative Agent under the Credit Agreement.

68.    *Prepetition Revolver Facility Lenders:* means Wells Fargo Foothill, LLC and CIT Group/Business Credit, Inc., as the revolver facility lenders under the Credit Agreement.

69.    *Prepetition Revolver Facility:* means the five year senior secured revolving credit facility under the Credit Agreement in an aggregate principal amount of $50,000,000.

70.    *Prepetition Revolver Facility Claims:* means the Claims under or evidenced by the Prepetition Revolver Facility.

71.    *Prepetition Swap Agreements:* means the interest expense hedging agreements, dated May 16 and 19, 2008, between Bally and Morgan Stanley Capital Services.

8

72.    *Prepetition Swap Claims*:  means the Claims under or evidenced by the Prepetition Swap Agreements allowed in the aggregate amount of $7,415,000.

73.    *Prepetition Term Loan Holders*: means the holders of the Prepetition Term Loan.

74.    *Prepetition Term Loan*: means the six-year senior secured term loan facility under the Credit Agreement in an aggregate principal amount of $242,000,000.

75.    *Prepetition Term Loan Claims*: means the Claims under or evidenced by the Prepetition Term Loan.

76.    *Prepetition Term Loan Distribution*: means 9,400,000 shares of New Bally Common Stock, representing 94% of the total amount of New Bally Common Stock, subject to dilution from the New Bally Warrants and the Management Options, to be issued in connection with the Plan, to be distributed to the holders of the Prepetition Term Loan Secured Claims pursuant to Article III of this Plan.

77.    *Prepetition Term Loan Deficiency Claims*: means the Claims in the amount by which the Prepetition Term Loan exceeds the value of the Collateral securing the Prepetition Term Loan, which Claims are expressly Allowed in an amount equal to $80,000,000 pursuant to the Plan; provided however, that so long as the Unsecured Creditors' Committee supports, and does not object, to the Plan, the Allowed Prepetition Term Loan Deficiency Claim shall be capped at $40 million.

78.    *Prepetition Term Loan Secured Claims*: means the Prepetition Term Loan Claims up to the value of the Collateral securing the Prepetition Term Loan, which Claims are expressly Allowed in an amount equal to $162,000,000 pursuant to the Plan.

79.    *Previous Chapter 11 Cases*:  means the chapter 11 cases commenced by the Debtors on July 31, 2007.

80.    *Previous Plan*:  means the plan of reorganization confirmed by the Court on October 1, 2007 in the Previous Chapter 11 Cases.

81.    *Previous Plan Claims*:  means any Claim arising out of or relating to any remaining unperformed obligations under the Previous Plan, including without limitation any obligation to make any further distribution to holders of claims or interests under the Previous Plan.  Without limiting the generality of the foregoing, Previous Plan Claims shall include (i) those Claims and/or interests classified in Class 7 of the Previous Plan, (ii) Claims of individuals who served as officers or directors of the Debtors prior to the petition date of the Previous Chapter 11 Cases, including, but not limited to, Claims classified in classes 6-B-1 and 6-B-2 of Previous Plan, and (iii) litigation Claims that were unimpaired by the Previous Plan.

82.    *Priority Tax Claim*: means any unsecured Claim that is entitled to a priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

KL2 2608437.2

83.    _Professional_: means (i) any professional employed in the Chapter 11 Cases pursuant to sections 327 or 328 of the Bankruptcy Code and (ii) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

84.    _Proof of Claim_:  A proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

85.    _Pro Rata_: means, with respect to any Claim, at any time, the proportion that the amount of a Claim in a particular Class or group of Classes bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or group of Classes, unless in each case the Plan provides otherwise.

86.    _Record Date_: means, (i) for purposes of making distributions under the Plan on account of Allowed Claims, the Confirmation Date, and (ii) for purposes of casting Ballots, the date set forth in the order approving the Disclosure Statement that accompanies this Plan.

87.    _Released Parties_: has the meaning assigned to such term in Article VII of the Plan.

88.    _Reorganized Bally_: means Bally or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

89.    _Reorganized Debtors_: means the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

90.    _Reorganized Subsidiaries_:  means the Subsidiaries, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

91.    _Restructuring Transactions_:  means, collectively, those mergers, consolidations, restructurings, dispositions, liquidations or dissolutions that the Debtors determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or otherwise to simplify the overall corporate structure of the Reorganized Debtors, as described in greater detail in Article V.H.

92.    _Scheduled_:  means, with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules.

93.    _Schedules_:  means the schedules of assets and liabilities, statements of financial affairs, and lists of holders of Claims and Equity Interests filed with the Court by each of the Debtors, including any amendments or supplements thereto.

94.    _Senior Note Claims_: means the Claims under or evidenced by the Senior Notes, Allowed in the aggregate amount of $259,663,152.08.

95.    _Senior Notes_:  means the 13% Notes due 2011 issued pursuant to the Senior Secured Notes Indenture in the principal amount of $247,337,500.

KL2 2608437.2

96.     *Senior Secured Notes Indenture*:  means that certain Indenture, dated as of October 1, 2007, between Bally and the Senior Secured Notes Indenture Trustee pursuant to which the Senior Notes were issued.

97.     *Senior Secured Notes Indenture Trustee*: means U.S. Bank National Association, as indenture trustee under the Senior Secured Notes Indenture.

98.     *Shareholder Agreement*:    means the Shareholder Agreement of Reorganized Bally, the terms of which are set forth more fully in Exhibit J to the Plan.

99.     *Subordinated Note Claims*: means the Claims of the holders of the Subordinated Notes, Allowed in the aggregate amount of $237,472,873.

100.    *Subordinated Notes*: means the 15-5/8%/14% Notes due 2013 pursuant to the Subordinated Notes Indenture in the principal amount of $231,250,000.

101.    *Subordinated Notes Indenture*: means that certain Senior Subordinated Toggle Notes Indenture, dated as of October 1, 2007, between Bally and the Subordinated Notes Indenture Trustee pursuant to which the Subordinated Notes were issued.

102.    *Subordinated Notes Indenture Trustee*: means HSBC Bank USA, National Association, as indenture trustee under the Subordinated Notes Indenture.

103.    *Subordinated Notes Plan Distribution:* means the Pro Rata share of the Unsecured Claims Distribution based upon the Allowed Subordinated Note Claims, together with all dividends and distributions accruing after the Effective Date on such portion of the Unsecured Claims Distribution.

104.    *Subordination Dispute:* means any pending motion, adversary proceeding, action or other request (together with all related proceedings and appeals) filed by the Subordinated Notes Indenture Trustee, the Senior Secured Notes Indenture Trustee, or the holders of at least 25% of the Senior Secured Notes or the Subordinated Notes, respectively, on or prior to the Subordination Dispute Deadline seeking a determination regarding entitlement to all or any portion of the Subordinated Notes Plan Distribution by reason of the subordination provisions of the Subordinated Notes Indenture or other applicable law.

105.    *Subordination Dispute Deadline:*  means five (5) days prior to the Voting Deadline.

106.    *Subsidiaries*: means Bally Total Fitness Corporation, Bally ARA Corporation, Bally Fitness Franchising, Inc., Bally Franchise RSC, Inc., Bally Franchising Holdings, Inc., Bally-Holmes Place S.L. (Spain), Bally Matrix Fitness Centre, Ltd. (Canada), Bally Real Estate I LLC, Bally REFS West Hartford, LLC, Bally Sports Clubs, Inc., Bally Total Fitness Franchising, Inc., Bally Total Fitness International, Inc., Bally Total Fitness of California, Inc., Bally Total Fitness of Colorado, Inc., Bally Total Fitness of Connecticut Coast, Inc., Bally Total Fitness of Connecticut Valley, Inc., Bally Total Fitness of Greater New York, Inc., Bally Total Fitness of Minnesota, Inc., Bally Total Fitness of Missouri, Inc., Bally Total Fitness of Philadelphia, Inc., Bally Total Fitness of Rhode Island, Inc., Bally Total Fitness of the

Mid-Atlantic, Inc., Bally Total Fitness of the Midwest, Inc., Bally Total Fitness of the Southeast, Inc., Bally Total Fitness of Toledo, Inc., Bally Total Fitness of Upstate New York, Inc., BTF Canada Corporation (Canada), BTF Cincinnati Corporation, BTF Europe Corporation, BTF Indianapolis Corporation, BTF Minneapolis Corporation, BTF/CFI, Inc., BTFCC, Inc., BTFF Corporation, CSI Bally Total Fitness Company, Ltd. (China), Greater Philly No. 1 Holding Company, Greater Philly No. 2 Holding Company, Health & Tennis Corporation of New York, Holiday Health Clubs of the East Coast, Inc., Holiday/Southeast Holding Corp., Jack LaLanne Holding Corp., Lincoln Indemnity Company (VT), New Fitness Holding Co., Inc., Nycon Holding Co., Inc., Rhode Island Holding Company, Tidelands Holiday Health Clubs, Inc., and U.S. Health, Inc.

107.    _Swap Note_:  means a note with the same maturity date and interest rate as the Exit Revolver Facility, with annual principal payments to be made from excess cash flow, and secured on a _pari passu_ basis with the Exit Revolver Facility, to be issued in accordance with Article III of the Plan on account of the Prepetition Swap Claims.

108.    _Tort Claims_:  means any Claim that has not been settled, compromised or otherwise resolved that: (i) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (ii) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment.

109.    _Unsecured Claims_:  means, collectively, the General Unsecured Claims, the Senior Note Claims, the Subordinated Note Claims, the Convenience Claims, and the Prepetition Term Loan Deficiency Claims.

110.    _Unsecured Claims Distribution_:  means (i) the New Bally Warrants and (ii) 300,000 shares of New Bally Common Stock, representing 3% of the total amount of New Bally Common Stock, subject to dilution from the New Bally Warrants and the Management Options, to be issued in accordance with Article III of the Plan on account of Allowed General Unsecured Claims, the Senior Note Claims, the Subordinated Note Claims, and the Prepetition Term Loan Deficiency Claims.

111.    _Unsecured Claims Reserve_:  has the meaning ascribed to such term in Article VIII of the Plan.

112.    _Unsecured Creditors' Committee_:  means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Debtors' Chapter 11 Cases, as constituted from time to time.

113.    _Voting Deadline_:  means the deadline for submitting Ballots to either accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code that is specified in the Disclosure Statement, the Ballots or related solicitation documents approved by the Bankruptcy Court.

114.    _Workers Compensation Claim_:  means a Claim held by a current or former employee of the Debtors for workers' compensation insurance coverage under the workers'

12

compensation laws applicable in the particular state in which the employee is or was employed by the Debtors.

### B.    Interpretation, Application of Definitions and Rules of Construction

Capitalized terms in the Plan that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. The words "herein," "hereof," and "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section or subsection in the Plan unless expressly provided otherwise. The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included. Captions and headings to articles, sections and exhibits are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan. In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Fee Claims, as described below, have not been classified and thus are excluded from the classes of Claims and Equity Interests set forth in Article III.

### A.    Administrative Claims.

Each holder of an Allowed Administrative Claim as of the Effective Date shall receive from the Debtors (i) Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (ii) such other treatment as the Debtors and such holder shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

### B.    Fee Claims.

All requests for compensation or reimbursement of Fee Claims shall be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to the Unsecured Creditors' Committee, and counsel to the Exit Lenders and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than 45 days after the Effective Date. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, Reorganized Debtors or their respective properties, and such Fee

KL2 2608437.2

Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, and the requesting party no later than 75 days after the Effective Date (unless otherwise agreed by the party requesting compensation).

### C.    **Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, after consultation with the Exit Term Loan Lenders, (i) Cash in an amount equal to such Allowed Priority Tax Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (ii) through equal annual installment payments in cash (x) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; (y) over a period ending not later than 5 years after the Petition Date; and (z) in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan.

# ARTICLE III.
# CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

All Claims and Equity Interests, except Administrative Claims, Priority Tax Claims, and Fee Claims are placed in the Classes set forth below. A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

### A.    **Class Identification and Status**

Below is a chart identifying each separate Class, a description of whether the Class is impaired and the Class's voting rights:

| **Class** | **Claim or Equity Interest** | **Status** | **Voting Rights** |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition Revolver Facility Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Swap Claims | Impaired | Entitled to Vote |
| 5 | Prepetition Term Loan Secured Claims | Impaired | Entitled to Vote |
| 6 | Prepetition Term Loan Deficiency Claims | Impaired | Entitled to Vote |
| 7 | Senior Note Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |

14

| 9  | Convenience Claims        | Impaired | Entitled to Vote  |
| 10 | Subordinated Note Claims  | Impaired | Entitled to Vote  |
| 11 | Intercompany Claims       | Impaired | Deemed to Accept  |
| 12 | Equity Interests          | Impaired | Deemed to Reject  |

## B.    Treatment of Classified Claims and Equity Interests

1.    *Class 1 - Other Priority Claims*.  Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to different treatment, in full satisfaction of and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment in an amount equal to such Allowed Other Priority Claim in full in Cash as soon as practicable after the later of (a) the Effective Date and (b) thirty days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

2.    *Class 2 - Other Secured Claims*.  Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to different treatment, at the sole option of the Debtors, after consultation with the Exit Term Loan Lenders, in full satisfaction of and in exchange for each Allowed Other Secured Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty days after the date such Other Secured Claim becomes an Allowed Other Secured Claim.

Notwithstanding the foregoing, to the extent an Allowed Other Secured Claim arises on account of property taxes, such Allowed Other Secured Claim shall be treated as a Priority Tax Claims and any applicable liens shall remain unimpaired until such Allowed Other Secured Claim is paid in full.  Any applicable interest shall be calculated in a manner consistent with Section 511 of the Bankruptcy Code.

3.    *Class 3 - Prepetition Revolver Facility Claims*.  In full satisfaction of and in exchange for each Allowed Prepetition Revolver Facility Claim, each holder of an Allowed Prepetition Revolver Facility Claim shall receive a Pro Rata share of the Exit Revolver Facility. Any Letter of Credit Claim shall be satisfied with the issuance of one or more replacement letter of credit facilities as part of the Exit Revolver Facility unless cash collateralized at the sole election of the Debtors.

15

4.    *Class 4 – Prepetition Swap Claims*.  In full satisfaction of and in exchange for the Allowed Prepetition Swap Claims, the holder(s) of the Allowed Prepetition Swap Claims shall receive the Swap Note.

5.    *Class 5 - Prepetition Term Loan Secured Claims*.  In full satisfaction of and in exchange for each Allowed Prepetition Term Loan Secured Claim, each holder of a Prepetition Term Loan Secured Claim shall receive a Pro Rata share of the Prepetition Term Loan Distribution.

6.    *Class 6 - Prepetition Term Loan Deficiency Claims*.  In full satisfaction of and in exchange for each Allowed Prepetition Term Loan Deficiency Claim, each holder of a Prepetition Term Loan Deficiency Claim shall receive a Pro Rata share of the Unsecured Claims Distribution, provided, however, that in no event shall the holders of Prepetition Term Loan Deficiency Claims recover any value in excess of the Allowed amount of such Claims, provided further, that if Classes 7 and 8 vote in favor of the Plan, the Prepetition Term Loan Holders shall be deemed to waive the Prepetition Term Loan Deficiency Claim in full.

7.    *Class 7 - Senior Note Claims*.  In full satisfaction of and in exchange for each Allowed Senior Note Claim, each holder of an Allowed Senior Note Claim shall receive a Pro Rata distribution of the Unsecured Claims Distribution; provided, however, that in no event shall the holders of Senior Note Claims recover value in excess of the Allowed amount of such Claims; provided further, however, that if a Subordination Dispute is not timely commenced, the Subordinated Notes Plan Distribution shall be distributed to the Senior Secured Notes Indenture Trustee for the benefit of holders of Allowed Class 7 Claims, and there shall be no distributions to Class 10.  If a Subordination Dispute is timely commenced, then the Debtors shall retain the Subordinated Notes Plan Distribution until the Subordination Dispute is resolved by Final Order, and shall distribute the Subordinated Notes Plan Distribution to holders of Class 7 Claims only to the extent provided for in a Final Order entered in the Subordination Dispute.  The Subordinated Notes Indenture Trustee's rights under the Subordinated Notes Indenture shall not be reduced or impaired by reason of the Debtors' retention of the Subordinated Notes Plan Distribution.

8.    *Class 8 - General Unsecured Claims*.  In full satisfaction of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive a Pro Rata distribution of the Unsecured Claims Distribution, provided, however, that in no event shall the holders of General Unsecured Claims recover value in excess of the Allowed amount of such Claims.

9.    *Class 9 - Convenience Claims*.  In full satisfaction of and in exchange for each Allowed Convenience Claim, each holder of an Allowed Convenience Claim shall receive a distribution in Cash equal to 1.17% of such holder's Allowed Convenience Claim (the "Convenience Claims Consideration") within the later of (i) 30 days after the Effective Date, or (ii) 30 days after the date on which such holder's claim becomes an Allowed Convenience Claim.

10.    *Class 10 - Subordinated Note Claims*.  In full satisfaction of and in exchange for each Allowed Subordinated Note Claim, each holder of an Allowed Subordinated Note Claim shall receive a Pro Rata distribution of the Unsecured Claims Distribution, provided,

KL2 2608437.2

however, that in no event shall the holders of Subordinated Note Claims recover value in excess of the Allowed amount of such claims; provided further, however, that the treatment and distributions to be paid to holders of Allowed Subordinated Note Claims and Senior Note Claims shall give effect to the subordination provisions of the Subordinated Notes Indenture to the extent and in the manner set forth therein and section 510(a) of the Bankruptcy Code; provided further, however, if a Subordination Dispute is not timely commenced, the Subordinated Notes Plan Distribution shall be distributed to the Senior Secured Notes Indenture Trustee for the benefit of holders of Allowed Class 7 Claims, and there shall be no distributions to holders of Class 10 Claims.  If a Subordination Dispute is timely commenced, then the Debtors shall retain the Subordinated Notes Plan Distribution until the Subordination Dispute is resolved by Final Order, and shall distribute the Subordinated Notes Plan Distribution to holders of Class 10 Claims only to the extent provided for in a Final Order entered in the Subordination Dispute. Nothing in the Plan shall affect, limit or impair the rights that the Senior Secured Indenture Trustee and the holders of Class 7 Claims may have as holders of Senior Indebtedness (as defined in the Subordinated Notes Indenture) with respect to the Subordinated Notes Plan Distribution.  Nothing in this Plan shall affect, limit or impair the respective rights of the Senior Secured Notes Indenture Trustee and holders of Allowed Senior Notes Claims, or the Subordinated Notes Indenture Trustee and holders of Allowed Subordinated Notes Claims, in respect of the Subordinated Notes Indenture, including provisions pertaining to subordination.

        11.    _Class 11 - Intercompany Claims_.  On the Effective Date, Intercompany Claims that are not specifically reinstated by the Debtors will be deemed eliminated in full through contribution or distribution of the Intercompany Claim, depending on the relationship of the parties, to the Debtor liable for the Intercompany Claim, or as otherwise provided by the Debtors.

        12.    _Class 12 - Equity Interests_.  The holders of Equity Interests in the Debtors shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests.

## ARTICLE  IV.
## CONSOLIDATION OF THE DEBTORS FOR DISTRIBUTION PURPOSES

        Solely in connection with Distributions to be made to the holders of Allowed Claims, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Confirmation Order for the consolidation of the Debtors' Estates into a single Estate for purposes of this Plan and the Distributions hereunder.  Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim.  Intercompany Claims shall be treated as provided in Class 11 of this Plan.

        Pursuant to the Confirmation Order (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for purposes of this Plan and Distributions to be made hereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors solely for purposes of this Plan and Distributions hereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be

deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor hereunder will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors.

Notwithstanding the foregoing, such consolidation shall not affect (i) the legal and corporate structure of the Reorganized Debtors; (ii) guarantees that are required to be maintained post-Effective Date (a) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, (b) pursuant to the express terms of the Plan, or (c) in connection with the Exit Facilities; or (iii) each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6) (such obligations shall continue until an order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case).

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order consolidating the Estates as set forth in this Plan. If no objection to consolidation under this Plan is timely filed and served, then the holders of Claims will be deemed to have consented to consolidation for the purpose of this Plan only and the Court may approve consolidation of the Debtors' Estates in the Confirmation Order. If such objection to the consolidation provided for in this Plan is timely filed and served, a hearing with respect to the consolidation of the Estates and the objections thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Exit Facilities

On or prior to the Confirmation Date, the Debtors shall have entered into the Exit Facilities.

1.    The Exit Revolver Facility. The Exit Revolver Facility shall be utilized to roll the Prepetition Revolver Facility into a post-Effective Date revolver facility.

2.    The Exit Term Loan Facility. The amounts borrowed under the Exit Term Loan Facility shall be used to make distributions under the Plan, to satisfy certain Plan-related expenses, and to fund the Reorganized Debtors' working capital needs.

### B.    Voting of Claims

Each holder of an Allowed Claim in an Impaired Class of Claims, not otherwise deemed to have accepted or rejected the Plan, shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with

KL2 2608437.2

respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

### C.       Nonconsensual Confirmation

If less than all Impaired Classes accept the Plan, but at least one Class of Claims impaired under the Plan has accepted the Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders), the Debtors may seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code. The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### D.       Issuance of New Bally Common Stock, New Bally Warrants and New Subsidiary Equity Interests

1.       *Issuance and Shareholder Agreement*.   On the Effective Date, Reorganized Bally shall issue and distribute the New Bally Common Stock and New Bally Warrants pursuant to the terms of this Plan, and each Reorganized Subsidiary shall issue and distribute the New Subsidiary Equity Interests subject to the Restructuring Transactions. The number of shares, ownership and terms of the New Subsidiary Equity Interests shall be the same as the number of shares, ownership and terms of the Equity Interests in the Subsidiaries immediately prior to the Effective Date subject to the Restructuring Transactions. Each Person who receives a distribution of New Bally Common Stock under the Plan shall be deemed to have executed the Shareholder Agreement and shall be bound thereunder.

2.       *Section 1145 Exemption*.   Pursuant to, in accordance with, and solely to the extent provided under section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Bally Common Stock, the New Bally Warrants and the New Bally Common Stock underlying the New Bally Warrants, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of the New Bally Common Stock, the New Bally Warrants and the New Bally Common Stock underlying the New Bally Warrants.

### E.       The New Bally Common Stock

All New Bally Common Stock distributed under the Plan will be issued in book-entry form, and The Depository Trust Company ("DTC") or its nominee will be the holder of record of such New Bally Common Stock, except for New Bally Common Stock issued to affiliates of the Debtors. One or more global stock certificates representing the New Bally Common Stock will be registered with a transfer agent for the New Bally Common Stock, in the name of, and will be deposited with, DTC or its nominee. For so long as New Bally Common Stock is held through DTC, the ownership interest of each holder of New Bally Common Stock, and transfers of ownership interests, will be recorded on the records of the direct and indirect participants in DTC. DTC participants include securities brokers and dealers, banks, trust companies, clearing corporations and other organizations. To receive distributions of New Bally

19

Common Stock, holders of Claims who are not affiliates of the Debtors will be required to designate a direct or indirect participant in DTC with whom such holder has an account into which the New Bally Common Stock may be deposited.  If DTC is unwilling or unable to continue as a depositary for the New Bally Common Stock, or Reorganized Bally otherwise decides to do so, Reorganized Bally will either exchange the New Bally Common Stock represented in book-entry form by global stock certificates for registered stock certificates or record ownership of the New Bally Common Stock through a direct registration system.

New Bally Common Stock issued to affiliates of the Debtors will be in the form of registered stock certificates and may bear a legend indicating that transfer may be restricted under federal and state securities laws.  To the extent New Bally Common Stock is issued in registered form, no stockholder may sell, exchange, assign, pledge, encumber or otherwise transfer such New Bally Common Stock if such transfer would result in the New Bally Common Stock being held of record by more than 275 Persons as determined pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended, unless such transfer is expressly approved by the board of directors of Reorganized Bally.  Any transfer of New Bally Common Stock in violation of these provisions will be void.

F.    **The New Bally Warrants**

The New Bally Warrants will be issued pursuant to the terms of the New Bally Warrant Agreement.

Each New Bally Warrant will initially be exercisable for one share of New Bally Common Stock at an exercise price set forth in the New Bally Warrant Agreement.  The exercise price of the New Bally Warrants and the number of shares issuable upon exercise will be subject to customary adjustment for any stock dividends, stock distributions, stock subdivisions or stock combinations.  The exercise price of the New Bally Warrants and the number of shares issuable upon exercise will also be subject to customary adjustment for any extraordinary cash dividends or distributions of debt securities or other assets to all holders of New Bally Common Stock.  In the event of any reclassification, capital reorganization or other change of the outstanding shares of New Bally Common Stock, or any consolidation or merger of Reorganized Bally with or into another corporation or entity (other than a consolidation or merger in which Reorganized Bally is the continuing entity) or any sale or conveyance of the property of Reorganized Bally substantially as an entirety, each New Bally Warrant will entitle the holder to purchase the kind and number of shares of stock or other securities or property receivable upon such reclassification, capital reorganization or other change, consolidation, merger, sale or conveyance by a holder of the number of shares of New Bally Common Stock that would have been purchased upon exercise of the New Bally Warrant immediately prior thereto.

In case Reorganized Bally declares a dividend or other distribution on the New Bally Common Stock that would require an adjustment in the exercise price of the New Bally Warrants; authorizes the granting to all of the holders of the New Bally Common Stock rights to subscribe for shares or warrants; effects any reclassification, reorganization, consolidation, merger or sale of substantially all of the assets of Reorganized Bally that would require adjustment to the New Bally Warrants; or effects any liquidation, dissolution or winding-up of

20

the Debtors, Reorganized Bally will provide holders of the New Bally Warrants at least 15 business days advance notice of such action,

All New Bally Warrants distributed under the Plan will be issued in book-entry form, and DTC or its nominee will be the holder of record of such New Bally Warrants, except for New Bally Warrants issued to affiliates of the Debtors. One or more global warrant certificates representing the New Bally Warrants will be registered with a warrant agent for the New Bally Warrants, in the name of, and will be deposited with, DTC or its nominee. For so long as New Bally Warrants are held through DTC, the ownership interest of each holder of New Bally Warrants, and transfers of ownership interests, will be recorded on the records of the direct and indirect participants in DTC. To receive distributions of New Bally Warrants, holders of Claims who are not affiliates of the Debtors will be required to designate a direct or indirect participant in DTC with whom such holder has an account into which the New Bally Warrants may be deposited. If DTC is unwilling or unable to continue as a depositary for the New Bally Warrants, or Reorganized Bally otherwise decides to do so, Reorganized Bally will exchange the New Bally Warrants represented in book entry form by global warrant certificates for registered warrant certificates or record ownership of the New Bally Warrants through a direct registration system.

So long as the New Bally Warrants are held of record by DTC or its nominee, beneficial owners of such New Bally Warrants will be required to follow such procedures as DTC or its direct or indirect participants may establish for exercising their rights in respect of the New Bally Warrants, including exercise and transfer thereof. Also, for so long as New Bally Common Stock is held through DTC, shares of New Bally Common Stock issuable upon exercise of the New Bally Warrants will be issued in book-entry form and held through DTC.

New Bally Warrants issued to affiliates of the Debtors will be in the form of registered warrant certificates and may bear a legend indicating that transfer may be restricted under federal and state securities laws. The New Bally Warrant Agreement will provide that, to the extent New Bally Warrants are issued in registered form, no warrant holder may sell, exchange, assign, pledge, encumber or otherwise transfer of all or any portion of a New Bally Warrant if such transfer would result in the New Bally Warrants being held of record by more than 450 Persons as determined pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended, unless such transfer is expressly approved by the board of directors of Reorganized Bally. Any transfer of a New Bally Warrant in violation of these provisions will be void.

### G.    **Claims Monitor**

1.    *Retention*.  The Debtors, in consultation with the Unsecured Creditors' Committee, will negotiate and enter into an engagement letter with the Claims Monitor prior to the Effective Date.

2.    *Powers, Rights and Responsibilities*.  The powers, rights and responsibilities of the Claims Monitor shall be to: (i) consult with the Reorganized Debtors with respect to any proposed stipulation or settlement that would result in an Allowed General Unsecured Claim in excess of $1,000,000; (ii) file an objection to any proposed stipulation or

settlement which would result in an Allowed General Unsecured Claim in excess of $1,000,000; and (iii) object to (and thereafter settle) any General Unsecured Claim in excess of $1,000,000 where the Claims Monitor has expressly requested in writing that the Reorganized Debtors object to a General Unsecured Claim and the Reorganized Debtors have not filed the objection requested by the Claims Monitor within 30 days of the Reorganized Debtors' receipt of such request.

3.    *Funding of Claims Monitor.*  The reasonable, documented and necessary fees and expenses of the Claims Monitor (including the reasonable and necessary fees and expenses of any professionals assisting the Claims Monitor in carrying out its responsibilities as set forth above) will be funded by the Reorganized Debtors in an amount not to exceed $200,000 (which amount may be increased in the sole discretion of the Reorganized Debtors) without further order from the Bankruptcy Court.

4.    *Termination of Claims Monitor*.  The Claims Monitor's engagement will terminate on the date that the last Disputed General Unsecured Claim in excess of $1,000,000 is resolved.

## H.    **Restructuring Transactions**

1.    *Restructuring Transactions Generally*.  On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors may determine to be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors, including but not limited to the restructuring transactions identified on Exhibit C, all to the extent not inconsistent with any other terms of the Plan.  All such Restructuring Transactions will be deemed to occur on the date set under the terms of the applicable Restructuring Transaction.  The Restructuring Transactions may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.  The actions to effect these transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (iv) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors.

KL2 2608437.2

2.     *Continued Corporate Existence and Vesting of Assets*.     Except as otherwise provided herein (including with respect to the Restructuring Transactions described above): (i) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law; and (ii) on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest, subject to the Restructuring Transactions, in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Fee Claims, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

3.     *Successor Obligations*.     The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations.  In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

### ARTICLE  VI.
### PROVISIONS REGARDING CORPORATE GOVERNANCE
### OF THE REORGANIZED DEBTORS

**A.**     **Amendments to Certificates of Incorporation**

1.     *Bally Total Fitness Holding Corporation*.     On the Effective Date, the certificate of incorporation of Bally shall be amended and restated to (i) increase the authorized capital stock of New Bally, (ii) prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited, and (iii) provide for restrictions on trading New Bally Common Stock and New Bally Warrants to the extent provided in Article V.E.  The Amended and Restated Certificate of Incorporation of Reorganized Bally is attached to the Plan as Exhibit E, and will be filed on or immediately prior to the Effective Date with the applicable Secretaries of State and/or the applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation.

KL2 2608437.2

2.     *The Debtors' Subsidiaries.*  On the Effective Date, or as soon thereafter as is practicable, the certificate of incorporation of each Debtor Subsidiary shall be amended and restated to prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited.  Under the Restructuring Transactions, the Debtors shall take all necessary steps and make all necessary filings to consolidate the Subsidiaries into 7 operating subsidiaries.   The Amended and Restated Certificates of Incorporation of the Reorganized Subsidiaries are attached to the Plan as Exhibit E, and will be filed with the applicable Secretaries of State and/or the applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation.

### B.     Appointment of Officers and Directors

As of the Effective Date, the term of the current members of the board of directors of Bally shall expire, and the initial boards of directors, including the New Board, and the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective new certificates of incorporation and new by-laws.  The initial board of directors of Reorganized Bally shall be a six-member board comprised of Michael Sheehan, and five directors designated by the Exit Term Loan Lenders (one of which will be Gene Davis).  The initial boards of directors of the Reorganized Subsidiaries shall have substantially the same composition and membership as such Subsidiaries had immediately prior to the Effective Date.  The identities, affiliations and the amount of compensation of the initial board members of Reorganized Bally will be disclosed in Exhibit G to the Plan.  Any successors to the Reorganized Debtors' initial boards will be appointed in compliance with the applicable Reorganized Debtor's bylaws, certificates of incorporation or other applicable corporate formation and governance documents. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the new certificates of incorporation, new by-laws, and other constituent documents of the Reorganized Debtors.

### C.     Powers of Officers

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

### D.     Management of Reorganized Debtors

The officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the Effective Date.  The Reorganized Debtors' officers shall be employed and serve the Reorganized Debtors in accordance with the Management Contracts.

### E.     Reorganized Debtors' Management Incentive Plan

The Management Incentive Plan shall become effective on the Effective Date. Pursuant to the Management Incentive Plan, (i) 3% of the shares of the New Bally Common Stock, subject to dilution from the New Bally Warrants and the Management Options, shall be reserved for issuance and distribution to management, (ii) management will be provided with options to purchase up to 8% of New Bally Common Stock, on a fully diluted basis, on the terms

KL2 2608437.2

set forth in the Management Incentive Plan (the "<u>Management Options</u>"), and (iii) Reorganized Bally will distribute emergence bonuses in an aggregate amount of $1 million to management on the Effective Date.  A summary of the Management Incentive Plan shall be attached as <u>Exhibit H</u> to the Plan.

### F.    <u>Reorganized Debtors' Corporate Personnel Incentive Plan</u>

The Corporate Personnel Incentive Plan shall become effective on the Effective Date.  Pursuant to the Corporate Personnel Incentive Plan the Reorganized Debtors will offer incentive based cash compensation to certain corporate personnel.  A summary of the Corporate Personnel Incentive Plan shall be attached as <u>Exhibit I</u> to the Plan.

### G.    <u>Indemnification of Directors, Officers and Employees</u>

Upon the Effective Date, the charter and by-laws of each Reorganized Debtor shall contain provisions which (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post- emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Debtors' and the Reorganized Debtors' directors, officers, and other employees (as such employees are identified by the New Board) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized, it being expressly understood that in no event shall the Reorganized Debtors be responsible for the indemnification claims of individuals who did not serve as officers or directors of the Debtors after October 1, 2007.

### ARTICLE VII.
### CONFIRMATION OF THE PLAN

### A.    <u>Conditions to Confirmation</u>

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived:

1.    The Confirmation Order is reasonably acceptable in form and substance to the Debtors, the Exit Lenders, and the Unsecured Creditors' Committee.

2.    The Plan is reasonably satisfactory in form and substance to the Debtors, the Exit Lenders, and the Unsecured Creditors' Committee.

3.    The Plan Exhibits are reasonably satisfactory in form and substance to the Debtors and the Exit Lenders after consultation with the Unsecured Creditors' Committee.

4.    Any modification of, amendment, supplement or change to the Plan that alters in any way the distributions under the Plan or the parties to whom it shall be made

available shall not have been made without the consent of the Exit Lenders and the Unsecured Creditors' Committee.

       5.     The Bankruptcy Court shall have approved the Disclosure Statement in form and substance reasonably satisfactory to the Debtors and the Exit Lenders, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

       6.     All Plan Exhibits shall have been filed with the Bankruptcy Court.

       7.     The Debtors shall have executed all material documents relating to the Exit Facilities.

       8.     The Debtors shall have executed the Management Contracts.

### B.    <u>Waiver of Conditions Precedent to Confirmation</u>

The Debtors may waive conditions 1, 2 and 4 set forth in Article VII.A. above at any time with the consent of the Exit Lenders and the Unsecured Creditors' Committee, which consent shall not be unreasonably withheld, and without leave of or order of the Court and without any formal action. The Debtors may waive conditions 3, 5, 6, 7 and 8 set forth in Article VII.A. above at any time with the consent of the Exit Lenders, which consent shall not be unreasonably withheld, and without leave of or order of the Court and without any formal action.

### C.    <u>Continued Corporate Existence</u>

The Debtors, as Reorganized Debtors, shall continue to exist after the Effective Date with all powers of a corporation or limited liability company, as the case may be, under the laws of the respective states governing their formation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith. In addition, the Reorganized Debtors may operate their businesses free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or the Court, subject only to the terms and conditions of the Plan as well as the documents and instruments executed and delivered in connection therewith, including without limitation, the Plan Exhibits. The Reorganized Debtors shall be responsible for filing required post-confirmation reports and paying quarterly fees due to the Office of the United States Trustee.

### D.    <u>Dissolution of Unsecured Creditors' Committee</u>

The Unsecured Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. On the Effective Date, the Unsecured Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Unsecured Creditors' Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date; <u>provided</u>, <u>however</u>, such attorneys and

financial advisors shall be entitled to pursue their own Fee Claims and represent the Unsecured Creditors' Committee in connection with the review of and the right to be heard in connection with all Fee Claims.

### E.    Benefit Plans

As of and subject to the Effective Date, except as provided in Article X and Exhibit A, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such executory contracts or plans as have previously been terminated or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts, or programs

### F.    Vesting of Property

The property of the Debtors' estates, including, without limitation, all of the Litigation Rights, shall be revested in the Reorganized Debtors on the Effective Date.

### G.    Discharge of the Debtors

The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Reorganized Debtors or any of their respective assets and properties, arising prior to the Effective Date.  Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise expressly specified in the Plan, upon the Effective Date the Confirmation Order shall act as a discharge of all debts of, Claims against, and Liens on the Debtors, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim with respect thereto was filed, whether the Claim is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution hereunder.  Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such discharged Claim shall be precluded from asserting against the Debtors, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.

H.      **Injunction**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Court, all Persons or entities who have held, hold, or may hold Claims against the Debtors that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against or affecting a Debtor, its Estate or its Assets, with respect to any such Claim, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim, (iv) asserting any right of setoff, or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Such injunction shall extend to successors of the Debtor (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.  Such injunction shall not apply in respect of Ordinary Course Administrative Claims.

I.      **Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain all Litigation Rights, other than as expressly provided below.  Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any claim, Litigation Right, right of setoff, or other legal or equitable defense of the Debtors that is not specifically waived or relinquished by this Plan.  The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Litigation Rights, rights of setoff and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any claim that is not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such person.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.

J.      **Votes Solicited in Good Faith**

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of

KL2 2608437.2

the securities offered and sold under the Plan and therefore have not been, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

### K.    Administrative Claims Incurred After the Effective Date

Administrative Claims incurred by the Debtors after the Effective Date including (without limitation) Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without application for or Court approval, subject to any agreements with any Claim holders.

### L.    Releases by the Debtors

**On the Effective Date, and notwithstanding any other provisions of the Plan, the Debtors and the Reorganized Debtors, on behalf of themselves and their estates, shall be deemed to release unconditionally (i) all of their respective officers, directors, employees, partners, advisors, attorneys, financial advisors, accountants, and other professionals who served or were employed by the Debtors at any time between October 1, 2007, and the Effective Date, (ii) the Prepetition Administrative Agent, (iii) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of the Prepetition Administrative Agent, (iv) the Prepetition Term Loan Holders and the Prepetition Revolver Facility Lenders, (v) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of the Prepetition Term Loan Holders and the Prepetition Revolver Facility Lenders, (vi) the Exit Revolver Lenders and the Exit Term Loan Lenders, (vii) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of the Exit Revolver Lenders and the Exit Term Loan Lenders, (viii) the members of the Unsecured Creditors' Committee, (ix) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of the Unsecured Creditors' Committee, (x) the Senior Secured Notes Indenture Trustee, (xi) the Subordinated Notes Indenture Trustee, (xii) Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, LP. (collectively "Harbinger") as the former equity owners of Bally, and (xiii) the officers, directors, principals, members, employees, partners, subsidiaries, affiliates, advisors, attorneys, financial advisors, accountants, and other professionals of Harbinger (collectively the "Released Parties," and each a "Released Party") from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken solely in their respective capacities described above or any omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, provided, however, that (a) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct, (b) the Reorganized Debtors shall not relinquish or waive the right to assert any of the**

29

foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such persons asserted against the Debtors, (c) the foregoing release shall not apply to any obligations that remain outstanding in respect of loans or advances made to individuals by the Debtors or to any obligations under the Exit Facilities outstanding as of the Effective Date, and (d) the foregoing release applies to the Released Parties solely in their respective capacities described above.

M.    **Releases by Holders of Claims and Equity Interests**

On the Effective Date, and notwithstanding any other provisions of the Plan, (i) Persons who directly or indirectly, have held, hold, or may hold Claims or Interests who voted to accept the Plan, and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all Persons who directly or indirectly, have held, hold, or may hold Claims or Interests, will be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan, to have forever released and covenanted with the Reorganized Debtors and the Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any Released Party on account of any Claim, including but not limited to any Claim based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way related to the Debtors or their business and affairs or (z) assert against any of the Reorganized Debtors or any Released Party any claim, obligation, right, cause of action or liability that any holder of a Claim or Interest may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, provided, however, (i) the foregoing release will not apply to obligations arising under the Plan, (ii) the foregoing release will not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan, and (iii) nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties (provided that the foregoing shall in no way affect or limit the discharge or injunction granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

KL2 2608437.2

N.    **Exculpation With Respect of Released Parties**

**The Debtors, the Reorganized Debtors, and the other Released Parties (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the negotiation of the Plan, the negotiation of the documents included in the Plan Exhibits, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.**

O.    **Injunction With Respect of Released Parties**

**Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, Claim or Equity Interest shall be permitted to commence or continue any action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or prior to the Effective Date and that has been released or waived pursuant to this Plan.**

P.    **Term of Bankruptcy Injunction or Stays**

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Q.    **Preservation of Insurance**

The Debtors' discharge and release from all Claims as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, its officers and current and former directors) or any other person or entity. The Reorganized Debtors shall obtain tail coverage under their existing directors' and officers' liability insurance policy covering their officers and current and former directors, which coverage shall extend for a period of not less than 6 years after the Effective Date.

R.    **Indemnification Obligations Owed by the Debtors**

Indemnification obligations owed by the Debtors to directors, officers, and employees of the Debtors (or the estates of any of the foregoing) who served or were employed by the Debtors at any time between October 1, 2007, and the Effective Date, excluding claims which have been determined by Final Order to have resulted from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, shall be deemed to be, and shall be

31

treated as though they are, executory contracts that are assumed pursuant to Sections 365 of the Bankruptcy Code under the Plan.

Indemnification obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and by order of the Court, to the extent that such indemnification obligations relate to the period after the Petition Date, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

## ARTICLE  VIII.
## DISTRIBUTIONS UNDER THE PLAN

### A.    Allowed Claims

1.    *Delivery of Distributions.*  Distributions under the Plan shall be made by the Reorganized Debtors to the holders of Allowed Claims in all Classes for which a Distribution is provided in this Plan at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

2.    *Distribution of Cash.*  Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

3.    *Unclaimed Distributions of Cash.*  Any distribution of Cash under the Plan that is unclaimed after six months after it has been delivered (or attempted to be delivered) shall, pursuant to section 347(b) of the Bankruptcy Code, become the property of the Reorganized Debtor against which such Claim was Allowed notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

4.    *Distributions of New Bally Common Stock and New Bally Warrants.*  On the Effective Date, the Reorganized Debtors shall distribute the New Bally Common Stock from the Prepetition Term Loan Secured Claims Distribution to the holders of the Prepetition Term Loan Secured Claims.  On the Initial Distribution Date, and from time to time thereafter, the Reorganized Debtors shall distribute the New Bally Common Stock and the New Bally Warrants from the Unsecured Claims Distribution to the holders of the Senior Note Claims, the Subordinated Note Claims, the General Unsecured Claims, and the Prepetition Term Loan Deficiency Claims.  Distributions of New Bally Common Stock and New Bally Warrants made to holders of Allowed Class 7 Claims shall be delivered to the Senior Secured Notes Indenture Trustee for Pro Rata distribution to holders of Allowed Senior Note Claims in accordance with the Senior Secured Notes Indenture.   Any Subordinated Notes Plan Distribution shall be distributed to the Subordinated Notes Indenture Trustee or the Senior Notes Indenture Trustee as provided in Article III.B.10 of the Plan.

KL2 2608437.2

5.      _Unclaimed Distributions of New Bally Common Stock and New Bally Warrants._  Any distribution of New Bally Common Stock and New Bally Warrants under the Plan on account of an Allowed Unsecured Claim that is unclaimed after six months after it has been delivered (or attempted to be delivered) shall be held in the Unsecured Claims Reserve to be distributed to the other holders of such claims and, notwithstanding any state or other escheat or similar laws to the contrary, the entitlement by the holder of such Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

6.      _Saturdays, Sundays, or Legal Holidays._  If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

7.      _Fractional New Bally Common Stock and New Bally Warrants and De Minimis Distributions._  Notwithstanding any other provision in the Plan to the contrary, no fractional shares of New Bally Common Stock or New Bally Warrants shall be issued or distributed pursuant to the Plan.  Whenever any payment of a fraction of a share of New Bally Common Stock or a New Bally Warrant would otherwise be required under the Plan, the actual distribution made shall reflect a rounding of such fraction to the nearest whole share (up or down), with half shares or less being rounded down and fractions in excess of a half of a share being rounded up.  If two or more holders are entitled to equal fractional entitlements and the number of holders so entitled exceeds the number of whole shares, as the case may be, that remain to be allocated, the Reorganized Debtors shall allocate the remaining whole shares to such holders by random lot or such other impartial method as the Reorganized Debtors deems fair, in their sole discretion.  Upon the allocation of all of the whole New Bally Common Stock and New Bally Warrants authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.  The Reorganized Debtors shall not be required to, but may in their sole and absolute discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

8.      _Distributions for Claims Allowed as of the Initial Distribution Date._  On the Initial Distribution Date, the Reorganized Debtors shall distribute Cash, New Bally Common Stock, New Bally Warrants, or Collateral, as the case may be, to the holders of Allowed Claims as contemplated herein.

9.      _Distributions for Claims Allowed after the Initial Distribution Date._  Each holder of a Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date shall receive the Distribution to which such holder of an Allowed Claim is entitled at such time that the Reorganized Debtors determine, in their discretion, to make subsequent Distributions to holders of other Claims Allowed following the Initial Distribution Date, provided that the Reorganized Debtors shall make such Distributions at least annually after the Initial Distribution Date.  Nothing set forth herein is intended to, nor shall it, prohibit the Reorganized Debtors, in their discretion, from making a Distribution on account of any Claim at any time after such Claim becomes an Allowed Claim.

KL2 2608437.2

10.     *The Record Date.*  As of the close of business on the Record Date, the claims register (for Claims) and transfer ledger (for Equity Interests) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests.  The Reorganized Debtors shall have no obligation to, but may in their sole and absolute discretion, recognize any transfer of any Claims or Equity Interests occurring after the Record Date.  The Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the claims register (for Claims) and transfer ledgers (for Equity Interests) as of the close of business on the Record Date.

11.     *Interest on Claims.*  Except as specifically provided for in the Plan, no Claims, Allowed or otherwise (including Administrative Claims, but excluding the claims of the Prepetition Revolver Lenders), shall be entitled, under any circumstances, to receive any interest on a Claim.

## B.     **Disputed Claims**

1.     *Objections to and Resolution of Unsecured Claims.*  The Reorganized Debtors shall have the right to file, settle, compromise, withdraw or litigate objections to Unsecured Claims.  Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of, Unsecured Claims shall be filed and served upon the holders of the Unsecured Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline.  In the event any Unsecured Claim is permitted to be filed after the Claims Objection Deadline, the Reorganized Debtors shall have ninety (90) days from the date of such order or agreement to object to such Claim, which deadline may be extended by the Court on motion of the Reorganized Debtors without a hearing or notice to Creditors.  The Reorganized Debtors may settle any objections or proceedings without Court approval or may seek Court approval without notice to any Person.

2.     *Objections to and Resolution of Priority Tax Claims, Other Priority Claims, and Other Secured Claims*.  The Reorganized Debtors shall have the exclusive right to file, settle, compromise, withdraw or litigate objections to Priority Tax Claims, Other Priority Claims and Other Secured Claims.  Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of Priority Tax Claims, Other Priority Claims and Other Secured Claims shall be filed and served upon the holders of such Claims, as soon as practicable, but in no event later than the Claims Objection Deadline.  In the event any Priority Tax Claim, Other Priority Claim and Other Secured Claim is permitted to be filed after the Claims Objection Deadline, the Reorganized Debtors shall have ninety (90) days from the date of such order or agreement to object to such Claim, which deadline may be extended by the Court on motion of the Reorganized Debtors without a hearing or notice to Creditors.  The Reorganized Debtors may settle any objections or proceedings without Court approval or may seek Court approval without notice to any Person.

3.     *Objections to and Resolution of Administrative Claims and Fee Claims*. The Reorganized Debtors shall have the exclusive right to file, settle, compromise, withdraw or litigate objections to Administrative Claims (other than Fee Claims).  Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of, filed

Administrative Claims shall be filed and served upon the holders of the Administrative Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable.  The Reorganized Debtors may settle any such objections or proceedings without Court approval or may seek Court approval without notice to any Person.  Objections to Fee Claims shall be filed and served within seventy-five (75) days of the Effective Date (or such longer period as may be allowed by order of the Court).

### C.     **Insured Claims**

Notwithstanding anything to the contrary in the Disclosure Statement or Plan, distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for General Unsecured Claims; *provided, however,* that

1.     an Allowed Insured Claim, all or a portion of which is within the applicable deductible or self-insured retention of the relevant insurance policy of the Debtors, shall be treated as an Allowed General Unsecured Claim for the amount which is within the applicable deductible or self-insured retention of such policy;

2.     an Allowed Insured Claim, a portion of which exceeds the limits of coverage available under the relevant insurance policies of the Debtors, shall be treated as an Allowed General Unsecured Claim in the amount by which such Allowed Insured Claim exceeds the limits of coverage available under such policies;

3.     to the extent all or a portion of an Allowed Insured Claim is to be treated as an Allowed General Unsecured Claim under subsection 1 above, such Allowed Insured Claim or portion thereof shall be deemed to be paid in full, dollar for dollar, up to the amount of the Allowed General Unsecured Claim regardless of the value of Distributions on General Unsecured Claims under the Plan;

4.     with respect to any Insured Claim, the Debtors' insurers shall have no duty or obligation to pay any amount within the deductible or self-insured retention of any applicable insurance policy of the Debtors unless otherwise required to do so by the terms of such policy;

5.     in the event that any insurer pays any amount within the deductible or self-insured retention of any applicable insurance policy (whether or not obligated to do so under such policy), the Debtors shall have no obligation or liability to such insurer other than a General Unsecured Claim for the amount of such payment if such General Unsecured Claim has been timely filed;

6.     each Workers' Compensation Claim shall be adjusted, settled and/or paid in the ordinary course in accordance with the terms of the applicable insurance policy of the Debtors;

7.     nothing in this Article VIII.C. is intended to, shall, or shall be deemed to preclude any holder of an Allowed Insured Claim from seeking recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such holder may receive under the Plan or to preclude any insurer from contesting or asserting defenses to any such action by a

holder.  The Debtors do not waive, and expressly reserve, their rights to assert that any insurance coverage is property of the Estates;

8.      nothing in the Disclosure Statement or Plan shall be construed as, or is, a determination as to coverage in connection with any Insured Claim under any applicable insurance policy; and

9.      the Disclosure Statement and Plan shall not (i) modify the coverage provided under the Debtors' insurance policies, (ii) alter in any way the obligations of the Debtors' insurers under the insurance policies, or (iii) in any way permit any holder of a Workers Compensation Claim or Insured Claim to any duplicate recovery from the insurers and any other party including, but not limited to, the Debtors or the Reorganized Debtors.

### D.    Tort Claims

1.      *Pending Tort Claims*.    Any unliquidated Tort Claim pending on the Effective Date that has not been resolved through a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date.  Upon the Effective Date, the discharge injunction will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claims in the applicable administrative or judicial tribunal(s).  For the avoidance of doubt, all Allowed Tort Claims, regardless of the forum in which they are liquidated and to the extent not covered by insurance, shall be treated as Class 8 General Unsecured Claims under the Plan and shall be limited to the recovery provided to Class 8 claimholders as their sole source of recovery against the Debtors or the Reorganized Debtors.

2.      *Non-Pending Tort Claims*.    Any unliquidated Tort Claim for which no action is pending on the Effective Date and that has not been resolved through a Final Order of the Bankruptcy Court will be determined and liquidated at the Debtors or Reorganized Debtors' option at any administrative or judicial tribunal of appropriate jurisdiction.  The Debtors or the Reorganized Debtors may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Debtors or the Reorganized Debtors have exercised such option.  Upon a Debtor's or Reorganized Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code, or after the Effective Date, the discharge injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s).  For the avoidance of doubt, all Allowed Tort Claims, regardless of the forum in which they are liquidated and to the extent not covered by insurance, shall be treated as Class 8 General Unsecured Claims under the Plan and shall be limited to the recovery provided to Class 8 claimholders as their sole source of recovery against the Debtors or the Reorganized Debtors.

3.      *Bankruptcy Court Jurisdiction*.    At all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the

United States District Court having jurisdiction over the Chapter 11 Cases) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.

4.      *Automatic Dismissal of Tort Claim Upon Adverse Judgment*.  In the event a Tort Claim is liquidated pursuant to a judgment or order that is obtained in accordance with this Article and is no longer appealable or subject to review, and applicable non-bankruptcy law provides for no recovery against the applicable Debtor or Reorganized Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's  or Reorganized Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim.

5.      *Reservation of Rights*.  Nothing contained in this Article will constitute or be deemed a waiver of any claim, right or Cause of Action that a Debtor may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code.  All claims, demands, rights, defenses and Causes of Action that the Debtors or the Reorganized Debtors may have against any person or entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

E.      **Reserve for Disputed General Unsecured Claims**

1.      *Establishment of Unsecured Claims Reserve*.  In order to effect Distributions to holders of Allowed Unsecured Claims in a timely manner, within thirty (30) days after the Effective Date, the Reorganized Debtors shall file a motion for an order establishing a reserve of New Bally Common Stock and New Bally Warrants from the Unsecured Claims Distribution with respect to unliquidated and/or Disputed Unsecured Claims for Distribution purposes (the "Unsecured Claims Reserve").  The Unsecured Claims Reserve shall contain New Bally Common Stock and New Bally Warrants sufficient to provide the distributions to which holders of Disputed Unsecured Claims would be entitled under the Plan as of such date as if the Disputed Unsecured Claims were Allowed Unsecured Claims either in the amounts of the Claims as filed or in such amounts as estimated by the Court.

2.      *New Bally Common Stock and New Bally Warrants Held in Unsecured Claims Reserve.*  New Bally Common Stock and New Bally Warrants held in the Unsecured Claims Reserve shall be held in an account with a direct or indirect participant of DTC in the name of Reorganized Bally or its nominee, and distributed by the Disbursing Agent to the holders of Allowed Unsecured Claims in accordance with the Plan.  New Bally Common Stock and New Bally Warrants held in the Unsecured Claims Reserve shall not constitute property of the Reorganized Debtors.  New Bally Common Stock held in the Unsecured Claims Reserve will not be deemed outstanding, and shall not have any voting rights, unless and until they are distributed in accordance herewith.  Any New Bally Common Stock or New Bally Warrants held in the Unsecured Claims Reserve after all Unsecured Claims have been Allowed or disallowed, including, but not limited to any unclaimed Distributions forfeited in accordance herein, shall be distributed by the Distributing Agent, in a supplemental distribution, Pro Rata, to holders of Allowed Unsecured Claims, provided, however, that to the extent such Pro Rata allocation results in a distribution of less than one share of New Bally Common Stock  or one New Bally Warrant to over fifty percent (50%) of holders of Allowed Unsecured Claims otherwise entitled

to such distribution, the Reorganized Debtors shall have no obligation to make such distribution and all then-undistributed New Bally Common Stock and New Bally Warrants shall be transferred to the Reorganized Debtors to be canceled.

        3.    _Dividend and Interest Payments to the Unsecured Claims Reserve_.  The Reorganized Debtors shall hold in the Unsecured Claims Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the New Bally Common Stock held in the Unsecured Claims Reserve, at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of holders of Disputed Unsecured Claims whose Claims, if Allowed, are entitled to distributions under the Plan.  The Reorganized Debtors shall pay, or cause to be paid, out of any dividends paid on account of New Bally Common Stock or New Bally Warrants held in the Unsecured Claims Reserve, any tax imposed on the Unsecured Claims Reserve by any Governmental Unit with respect to income generated by New Bally Common Stock and New Bally Warrants held in the Unsecured Claims Reserve and any costs associated with maintaining the Unsecured Claims Reserve.

        4.    _Tax Treatment of the Unsecured Claims Reserve_.  The Reorganized Debtors may make an election pursuant to U.S. Treasury Regulations Section 1.468B−9(c) to treat the Unsecured Claims Reserve as a "disputed ownership fund" (the "_DOF_").  In the event that the Reorganized Debtors makes such an election, the DOF would be treated for United States federal income tax purposes as a taxable entity separate from the holders of Unsecured Claims.  The DOF, and not the holders of Unsecured Claims, would be treated as the owner of the assets in the DOF, including the New Bally Common Stock or New Bally Warrants reserved for Allowed Unsecured Claims.  The DOF would be responsible for the payment of any taxes (including by way of withholding) resulting from the transfer or holding of assets in the DOF.

    **F.**    **Allocation of Consideration**

        The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan shall be treated as first, satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued, but unpaid, interest and costs, if any, and attorneys' fees, where applicable.

    **G.**    **Cancellation and Surrender of Existing Securities and Agreements**

        Except for distributions to Class 7 and Class 10 described below, notwithstanding any other provision of the Plan, as a condition precedent to receiving any distribution under the Plan, each holder of a promissory note, or other instrument or security evidencing a Claim (other than the Exit Term Loan Lenders in their capacity as such) must tender such promissory note or other instrument or security to the Reorganized Debtors or must execute and deliver an affidavit of loss and furnish an indemnity or bond in substance and amount reasonably satisfactory to the Reorganized Debtors.

        Any holder of a Claim that fails to surrender such instrument or to provide the affidavit and indemnity or bond before the later of six months following the (i) Effective Date or

(ii) the date such holder's Claim becomes an Allowed Claim shall be deemed to have forfeited all rights and/or Claims and may not receive or participate in any distribution under the Plan.

By reason of the Plan, the Debtors shall have no continuing duties under the Senior Secured Notes Indenture or the Subordinated Notes Indenture, the Debtors' obligations under the Senior Secured Notes Indenture and the Subordinated Notes Indenture shall be discharged and all claims against the Debtors thereunder shall only be payable in accordance with the Plan. Notwithstanding the foregoing, if a Subordination Dispute occurs, the Senior Secured Notes Indenture and Subordinated Notes Indenture shall remain in effect until such Subordination Dispute has been resolved by entry of a Final Order and the Subordinated Notes Plan Distribution have been distributed in accordance with such Final Order, including without limitation: (1) all provisions relating directly or indirectly to the Subordination Dispute and the rights of holders of Senior Indebtedness (as defined in the Subordinated Notes Indenture; (2) all rights and powers of the indenture trustees under each respective indenture; and (3) all protections each indenture trustee has under the respective indentures, including lien rights with respect to any Plan distributions.

Upon completion of the Distributions to Classes 7 and 10 in accordance with Article III (B)(7) and (10) of the Plan, the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee shall coordinate with DTC to surrender the Senior Secured Notes and the Subordinated Notes and cancel the respective positions.

### H.   Estimation

The Reorganized Debtors may at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan, or (iii) a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors as the case may be, or the Unsecured Creditors' Committee (before the Effective Date) may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### ARTICLE IX.
### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to: (i) resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a

KL2 2608437.2

Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article X, any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired; (ii) to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date; (iii) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (iv) to resolve disputes as to the ownership of any Claim or Equity Interest; (v) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests; (vi) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified or vacated; (vii) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (viii) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (ix) to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (x) to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan; (xi) to hear and determine any issue for which the Plan requires a Final Order of the Court; (xii) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (xiii) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date; (xiv) to hear and determine any Causes of Action preserved under the Plan; (xv) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (xvi) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided under the Plan; (xvii) to enter a final decree closing the Chapter 11 Cases; (xviii) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan; (xix) adjudicate any and all disputes arising from or relating to distributions under the Plan; and (xx) hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE X.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

To the extent not (i) assumed in the Chapter 11 Cases prior to the Confirmation Date, (ii) rejected in the Chapter 11 Cases prior to the Confirmation Date, or (iii) specifically rejected pursuant to this Plan, each executory contract and unexpired lease that exists between Debtor and any Person is specifically assumed by the Debtor that is a party to such executory

contract or unexpired lease as of, and subject to the occurrence of, the Effective Date pursuant to the Plan.

The following executory contracts and unexpired leases are rejected:

1.    executory contacts or unexpired leases that were rejected before the Confirmation Date;

2.    employment agreements that were terminated or rejected prior to the Confirmation Date; and

3.    contracts and unexpired leases identified on the attached <u>Exhibit A</u> to the Plan, which contracts and unexpired leases are deemed rejected by the applicable Debtor as of the corresponding rejection dates set forth on <u>Exhibit A</u>.

**B.    <u>Cure</u>**

Except as otherwise agreed by the parties, the applicable Reorganized Debtor, will, on the Initial Distribution Date, cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed by such Reorganized Debtor pursuant to the Plan in accordance with section 365 of the Bankruptcy Code.  The Cure Claim for each unexpired lease and executory contract to be assumed pursuant to the plan shall be listed on Exhibit B to the Plan.  The Cure Claim to be paid in connection with the assumption of any unexpired lease and executory contract that is not specifically identified on Exhibit B shall be $0.00.  The Debtors reserve the right to amend Exhibit B at any time prior to the Effective Date.  Any provisions or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by payment (if any) of the Cure Claim, or by an agreed-upon waiver of the Cure Claim.

Except with respect to executory contracts and unexpired leases in which the Debtors and the applicable counterparties have stipulated in writing to the Cure Claim, all requests for payment of a Cure Claim that differ from the amounts proposed by the Debtors in Exhibit B or in this Article X.B. of the Plan, must be filed with the Court and served on the Debtors on or before the Cure Claim Bar Date.  Any request for payment of Cure Claim that is not timely filed and served shall be disallowed automatically, forever barred and not be enforceable against any Reorganized Debtor, without the need for an objection by the Reorganized Debtors or order of the Bankruptcy Court.

The Reorganized Debtors may settle any dispute on the amount of a Cure Claim without further notice to or approval of the Bankruptcy Court.  If the Reorganized Debtors object to any request for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such Cure Claim and any related issues.  Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later to occur of (i) ten days after entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto and (ii) the Initial Distribution Date.  The Reorganized Debtors reserve the right, either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining a Cure Claim greater than that set forth on Exhibit B.

41

C.    **Assumption**

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption.  Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.  All objections from counterparties to executory contracts or unexpired leases to be assumed relating solely to assumption must be filed with the Court and served on the Debtors on or before the Cure Claim Bar Date.

Obligations arising under insurance policies assumed by the Debtors prior to the Effective Date shall be adequately protected in accordance with any order authorizing such assumption.

D.    **Limited Extension of Time to Assume or Reject**

In the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Court determining that the contract or lease is executory or unexpired.  The deemed assumptions and rejections provided for in this Article of the Plan shall not apply to such contract or lease.

In the event the Reorganized Debtors become aware after the Effective Date of the existence of an executory contract or unexpired lease that was not included in the Schedules, on Exhibit A, or on Exhibit B, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Debtors or the Reorganized Debtors become aware of the existence of such executory contract or unexpired lease.  The deemed assumptions and rejections provided for in this Article of the Plan shall not apply to any such contract or lease.

The Debtors reserve the right to amend Exhibit A at any time prior to the Effective Date.

E.    **Rejection Damage Claims**

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Court in accordance with the terms of the Bar Date Order.  Any Claims not filed within such time will be forever barred from assertion against the Debtors, their respective estates, or the Reorganized Debtors.  All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as General Unsecured Claims or Convenience Claims, as appropriate under the circumstances.

42

F.      **Assignment**

As of the effective time of an applicable Restructuring Transaction, any executory contract or unexpired lease to be held by any Debtor or Reorganized Debtor and assumed hereunder or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases, will be deemed assigned to the surviving, resulting or acquiring corporation in the applicable Restructuring Transaction, pursuant to section 365 of the Bankruptcy Code.  If an objection to a proposed assumption, assumption and assignment or Cure Claim is not resolved in favor of the Debtors or the Reorganized Debtors, the applicable executory contract or unexpired lease may be designated by the Debtors or the Reorganized Debtors for rejection within five Business Days of the entry of the order of the Bankruptcy Court resolving the matter against the Debtors.  Such rejection shall be deemed effective as of the Effective Date.

G.      **No Change in Control**

The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption or assumption and assignment of any executory contract or unexpired lease to another Reorganized Debtor is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, executory contract or unexpired lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

H.      **Obligations to Indemnify Directors, Officers and Employees**

The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees on or after October 1, 2007, by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Reorganized Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

Any obligations of each Debtor or Reorganized Debtor to indemnify any person who ceased serving as one of its directors, officers or employees prior to October 1, 2007, by reason of such person's prior service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor – to the extent such obligations are found to still exist - will terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; provided, however, that to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be

KL2 2608437.2

deemed and treated as executory contracts that are rejected by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) must be filed with the Court no later than thirty (30) days after the Effective Date.  Any Claims not filed within such time will be forever barred from assertion against the Debtors, their respective estates, or the Reorganized Debtors.

## ARTICLE XI.
## EFFECTIVENESS OF THE PLAN

### A.    Conditions Precedent to Effectiveness

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived:

1.    the Confirmation Order entered by the Court is in form and substance reasonably satisfactory to the Debtors, the Exit Lenders and the Unsecured Creditors' Committee;

2.    the Confirmation Order shall have become a Final Order;

3.    the final version of the Plan Exhibits and all schedules, documents, and exhibits contained therein shall have been filed in form and substance reasonably acceptable to the Exit Lenders after consultation with the Unsecured Creditors' Committee;

4.    all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

5.    the certificate of incorporation for Bally shall have been amended as provided in Article VI.A.;

6.    the New Bally Common Stock, New Bally Warrants and New Subsidiary Equity Interests to be issued pursuant to Article V.D. shall be consistent with the Plan;

7.    the Debtors' management has been granted options to purchase New Bally Common Stock on the terms set forth in the Management Incentive Plan; and

8.    the Reorganized Debtors shall have consummated the Exit Facilities.

### B.    Waiver of Conditions Precedent to Effectiveness

The Debtors may waive conditions 1, 3 and 6 set forth in Article XI.A. above at any time with the consent of the Exit Lenders and the Unsecured Creditors' Committee, which consent shall not be unreasonably withheld, and without leave of or order of the Court and without any formal action.  The Debtors may waive conditions 2, 4, 5, 7 and 8 set forth in Article XI.A. above at any time with the consent of the Exit Lenders, which consent shall not be unreasonably withheld, and without leave of or order of the Court and without any formal action.

KL2 2608437.2

### C.    Effect of Failure of Conditions

In the event that the Effective Date does not occur on or before one hundred and twenty (120) days after the Confirmation Date, upon notification submitted by the Debtors to the Court: (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iv) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver, release, or discharge of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by Court order.

### D.    Vacatur of Confirmation Order

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver, release or discharge of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

### E.    Modification of the Plan

Subject to the limitations contained in the Plan, and subject to the approval of the Exit Lenders and the Unsecured Creditors' Committee, which approval shall not be unreasonably withheld: (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (ii) after entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code.

### F.    Revocation, Withdrawal, or Non-Consummation

1.    *Right to Revoke or Withdraw*.  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date; provided, however, that if such revocation or withdrawal is made without the consent of the Exit Lenders, which is not to be unreasonably withheld, the Debtors shall pay the break up fee required in the Exit Facilities.

2.    *Effect of Withdrawal, Revocation, or Non-Consummation*.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan shall be

deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

<div align="center">

**ARTICLE XII.**
**MISCELLANEOUS PROVISIONS**

</div>

### A.    <u>Payment of Statutory Fees</u>

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor.

### B.    <u>Payment of Indenture Trustee Fees</u>

The Reorganized Debtors shall pay the reasonable and documented Indenture Trustee Fee Claims in an amount not to exceed 125,000 in Cash for each of the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee in respect of invoices submitted by the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee, in each case without the need for the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee to file an application for allowance with the Bankruptcy Court; <u>provided, however</u>, that to receive payment pursuant to this Article XII.B., the Senior Secured Notes Indenture Trustee and the Subordinated Notes Indenture Trustee shall provide reasonable and customary detail or invoices in support of their Indenture Trustee Fee Claims to counsel to the Reorganized Debtors after the Effective Date and parties in interest shall have the right to file objections to such Indenture Trustee Fee Claims based on a "reasonableness" standard within ten (10) days after receipt of supporting documentation.  Any disputed amount of the Indenture Trustee Fee Claim shall be subject to the jurisdiction of, and resolution by, the Bankruptcy Court.  Upon payment of a Indenture Trustee Fee Claim in full or by resolution of the Bankruptcy Court, the Senior Secured Notes Indenture Trustee or the Subordinated Notes Indenture Trustee (as applicable) will be deemed to have released its lien and priority rights for its fees and expenses under the respective Senior Secured Notes Indenture and the Subordinated Notes Indenture solely to the extent of such Indenture Trustee Fee Claim.  Distributions under the Plan to holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims will not be reduced by the amount of the Indenture Trustee Fee Claims paid by the Debtors pursuant to this Article, but may be reduced by charging liens and other rights that the respective indenture trustees may assert to the extent that Debtors do not pay the entire amount owed by the Debtors to the indenture trustees under their respective indentures for fees and expenses incurred by the indenture trustees after the Effective Date.

### C.    <u>Governing Law</u>

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or the Delaware General Corporation Law, the laws of the State of New York (without reference to the conflicts of laws provisions thereof) shall govern

KL2 2608437.2

the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

### D.    Filing or Execution of Additional Documents

On or before the Effective Date, the Debtors or the Reorganized Debtors, shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### E.    Information

For so long as Reorganized Bally is not required to publicly file financial information with the SEC, Reorganized Bally will furnish or make available to the holders of the New Bally Common Stock and the New Bally Warrants: (i) on a quarterly basis within 45 days of each quarter end, consolidated unaudited financial statements of Reorganized Bally, including the balance sheet, income statement, and statement of cash flow detailing the quarter-to-date and year-to-date results, together with the footnotes thereto; and (ii) on an annual basis within 120 days of each year end, audited consolidated financial statements of Reorganized Bally including the balance sheet, income statement, and cash flow detailing year-to-date results, together with the footnotes thereto, in each case in reasonable detail and prepared in accordance with GAAP, except as otherwise noted therein.

### F.    Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

### G.    Exemption From Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, all transfers of property pursuant hereto, including (i) the issuance, transfer or exchange under the Plan of New Bally Common Stock, New Bally Warrants and the security interests in favor of the lenders under the Exit Facilities, (ii) the making or assignment of any lease or sublease, or (iii) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan shall not be subject to any stamp, conveyance, mortgage, real estate transfer, recording or other similar tax, or governmental assessment.

KL2 2608437.2

### H.    Waiver of Federal Rule of Civil Procedure 62(a)

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

### I.    Plan Exhibits

All Plan Exhibits are incorporated into and constitute a part of the Plan as if set forth herein.

### J.    Notices

All notices, requests, and demands hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    *To the Debtors*:  Bally Total Fitness Corporation, 8700 W Bryn Mawr Ave., Third Floor, Chicago, IL 60631-3507, attention: General Counsel, Tel (773) 399-7626, Fax: (773) 399-0126, with a copy to Kramer Levin Naftalis & Frankel, 1177 Avenue of the Americas, New York, NY 10036, attention: Kenneth Eckstein, Esq., Tel: (212) 715-9100, Fax: (212) 715-8000.

2.    *To the Unsecured Creditors' Committee*: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, attention: David Botter, Esq., Tel: (212) 872-1000, Fax: (212) 872-1000.

3.    *To the Prepetition Administrative Agent*: Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, California 90071, attention: Gregory Robins, Esq., Tel: (213) 687-5270, Fax: (213) 621-5270.

4.    *To the Exit Revolver Lenders*: Buchalter Nemer, A Professional Corporation, 1000 Wilshire Blvd., Ste. 1500, Los Angeles, California 90017, attention: Pamela Kohlman Webster, Esq., Tel: (213) 891-0700, Fax: (213) 896-0400; Hahn & Hessen LLP, 488 Madison Avenue, New York, NY 10022, Attention: Rosanne Thomas Matzat, Esq.,  Tel. ( 212) 478-7410, Fax  (212) 478-7400

5.    *To the Exit Term Loan Lenders*:  Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, attention:  Irena Goldstein, Esq., Tel:  (212) 259-8000, Fax:  212-259-6333.

### K.    Conflicts

The terms of this Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in the Disclosure Statement.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

Dated: July 7, 2009

**BALLY TOTAL FITNESS HOLDING
CORPORATION**
(on its own behalf and on behalf of each affiliate
Debtor)


By:  /s/ Michael W. Sheehan
Name:   Michael W. Sheehan
Title:    Chief Executive Officer

**EXHIBIT A**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED**

**[TO BE PROVIDED]**

**EXHIBIT B**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED AND
CURE COSTS**

**[TO BE PROVIDED]**

**EXHIBIT C**
**RESTRUCTURING TRANSACTIONS**

**[TO BE PROVIDED]**

**EXHIBIT D**
**EXIT FACILITIES**

**[TO BE PROVIDED]**

**EXHIBIT E**
**AMENDED AND RESTATED CERTIFICATES OF INCORPORATION OF
REORGANIZED DEBTORS**

**[TO BE PROVIDED]**

**EXHIBIT F**
**NEW BALLY WARRANT AGREEMENT**

**[TO BE PROVIDED]**

**EXHIBIT G**
**INITIAL DIRECTORS OF REORGANIZED BALLY**

**[TO BE PROVIDED]**

**EXHIBIT H**
**SUMMARY OF MANAGEMENT INCENTIVE PLAN**

**[TO BE PROVIDED]**

**EXHIBIT I**
**SUMMARY OF CORPORATE PERSONNEL INCENTIVE PLAN**

**[TO BE PROVIDED]**

# EXHIBIT J
# SHAREHOLDER AGREEMENT

# [TO BE PROVIDED]

## **EXHIBIT B TO THE DISCLOSURE STATEMENT**

**DISCLOSURE STATEMENT APPROVAL ORDER**

**[TO BE PROVIDED]**

# EXHIBIT C TO THE DISCLOSURE STATEMENT

## FINANCIAL PROJECTIONS

**Exhibit: C**

## REORGANIZED BALLY TOTAL FITNESS
Projected Financial Information

| | FYE 2009 Projected | FYE 2010 Projected | FYE 2011 Projected |
|---|---|---|---|
| **PROJECTED CONSOLIDATED CASH REVENUE INCOME STATEMENT** | | *($ in thousands)* | |
| *REVENUES* | | | |
| Membership Revenue Collected at POS, Net | $65,130 | $64,942 | $64,802 |
| Dues/Collections | 477,340 | 483,223 | 507,656 |
| Personal Training | 102,816 | 106,330 | 106,330 |
| Ancillary Services/Other | 51,208 | 52,232 | 53,277 |
| **Total Cash Collections** | $696,494 | $706,726 | $732,065 |
| Sales Tax | (10,808) | (10,983) | (11,381) |
| Bank/ EFT Fees | (12,542) | (12,745) | (13,207) |
| **Net Cash Revenues** | $673,144 | $682,998 | $707,477 |
| EXPENSES | | | |
| Club Labor | 196,178 | 196,640 | 197,225 |
| Club Variable Costs | 127,612 | 129,453 | 132,227 |
| Club Fixed Costs | 172,119 | 170,589 | 175,019 |
| **Total Club Costs** | $495,909 | $496,682 | $504,471 |
| Advertising | 33,605 | 34,277 | 34,962 |
| Total Zone Costs | 28,792 | 25,855 | 26,057 |
| G&A | 67,046 | 65,588 | 61,531 |
| **Total Expenses** | $625,352 | $622,402 | $627,021 |
| **Pro forma Cash EBITDA, before Restructuring & Reorg. Items** | $47,792 | $60,597 | $80,456 |
| Restructuring/Reorganization Items | ($35,619) | $0 | $0 |
| **Cash EBITDA** | $12,173 | $60,597 | $80,456 |
| Depreciation & Amortization | 70,026 | 74,190 | 79,523 |
| Amortization of Deferred Financing | 64 | 191 | 191 |
| Interest Expense | 4,897 | 7,633 | 6,526 |
| **Pre-tax Income / (Loss)** | ($62,813) | ($21,418) | ($5,785) |
| Provision for Income Taxes | 2,000 | 2,000 | 2,000 |
| **Net Income / (Loss)** | ($64,813) | ($23,418) | ($7,785) |

*Note: Revenue reflected on a cash basis.*

Exhibit: C

## REORGANIZED BALLY TOTAL FITNESS
Projected Financial Information

|  | FYE 2009 Projected | FYE 2010 Projected | FYE 2011 Projected |
|---|---|---|---|
| **PROJECTED CONSOLIDATED BALANCE SHEET** | *($ in thousands)* | | |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $15,000 | $15,000 | $19,800 |
| Deferred income taxes | 29,312 | 29,312 | 29,312 |
| Prepaid expenses | 3,089 | 3,089 | 3,089 |
| Other current assets | 22,166 | 22,166 | 22,166 |
| Total current assets | $69,566 | $69,566 | $74,366 |
| Gross Fixed Assets | 301,809 | 341,809 | 396,809 |
| Less: Accumulated Depreciation and Amortization | (23,687) | (97,877) | (177,401) |
| Net Fixed Assets | $278,122 | $243,932 | $219,409 |
| Member Relationship Asset, Other Intangibles and Trademarks | 473,176 | 473,176 | 473,176 |
| Deferred financing costs, net | 511 | 319 | 128 |
| Other assets | 33,364 | 33,364 | 33,364 |
| **TOTAL ASSETS** | $854,739 | $820,357 | $800,442 |
| **LIABILITIES AND EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $15,652 | $18,733 | $18,855 |
| Income taxes payable | 2,001 | 2,001 | 2,001 |
| Accrued liabilities | 26,895 | 26,895 | 26,895 |
| Deferred revenues | 117,264 | 117,264 | 117,264 |
| Total current liabilities | $161,812 | $164,893 | $165,015 |
| Deferred rent liability | 18,682 | 18,682 | 18,682 |
| Deferred income taxes | 76,254 | 76,254 | 76,254 |
| Other liabilities | 4,000 | 4,000 | 4,000 |
| Deferred revenues | 382,538 | 382,538 | 382,538 |
| Exit Revolving Credit Facility | 22,044 | 8,203 | - |
| Exit Swap Note | 6,956 | 5,286 | 0 |
| Exit Term Loan | 30,600 | 32,400 | 34,200 |
| Revolver PIK Note | 515 | 563 | - |
| Deferred Closing Fee | 383 | - | - |
| Stockholders' equity | 150,955 | 127,537 | 119,752 |
| **TOTAL LIABILITIES & EQUITY** | $854,739 | $820,357 | $800,442 |

*Note: Does not reflect fresh start accounting adjustments.*

Exhibit: C

**REORGANIZED BALLY TOTAL FITNESS**
Projected Financial Information

| | FYE 2009 Projected | FYE 2010 Projected | FYE 2011 Projected |
|---|---|---|---|
| **PROJECTED CONSOLIDATED CASH FLOW STATEMENT** | | *($ in thousands)* | |
| **OPERATING ACTIVITIES** | | | |
| Net Income / (Loss) | ($64,813) | ($23,418) | ($7,785) |
| Depreciation & Amortization | 70,026 | 74,190 | 79,523 |
| Non-Cash Interest | 15 | 48 | 53 |
| Non-Cash Accretion of Debt | 610 | 1,830 | 1,830 |
| Amortization of Deferred Financing | (511) | 191 | 191 |
| Changes in Working Capital | | | |
| Prepaid Expenses | 13,600 | - | - |
| Other Assets | 3,650 | - | - |
| Accounts Payable | (3,536) | 3,081 | 123 |
| Accrued Liabilities | (28,255) | - | - |
| Cash Flow (Used in) / From Operations | ($9,215) | $55,923 | $73,935 |
| **INVESTING ACTIVITIES** | | | |
| Capital Expenditures | (23,000) | (40,000) | (55,000) |
| Cash Flow (Used in) Investing | ($23,000) | ($40,000) | ($55,000) |
| **FINANCING ACTIVITIES** | | | |
| Principal Payments On/Changes In: | | | |
| Revolving Credit Facility Borrowings (Repayments) | 6,454 | (13,840) | (8,203) |
| Debt not subject to compromise | (1,849) | - | - |
| Swap Term Loan | (494) | (1,699) | (5,316) |
| Exit Term Loan | 510 | - | - |
| Revolver PIK Note | | | (616) |
| Deferred Closing Fee | (191) | (383) | - |
| Cash Flow From / (Used in) Financing | $4,430 | ($15,923) | ($14,135) |
| Net Cash Flow | (27,785) | - | 4,800 |
| Beginning Cash | 42,785 | 15,000 | 15,000 |
| Ending Cash | $15,000 | $15,000 | $19,800 |

Exhibit: C

## REORGANIZED BALLY TOTAL FITNESS
Projected Financial Information

| | Aug-09 Projected | Cancellation of Debt | Revolver Refinancing | New Financing | Other Adj. | Fresh Start | Aug-09 Pro Forma |
|---|---|---|---|---|---|---|---|
| **PROFORMA BALANCE SHEET** | | | | ($ in thousands) | | | |
| **ASSETS** | | | | | | | |
| Current assets: | | | | | | | |
| Cash | $43,319 | - | - | $510 | ($28,830) (1) | - | $15,000 |
| Deferred income taxes | 29,312 | - | - | - | - | - | 29,312 |
| Prepaid expenses | 3,089 | - | - | - | - | - | 3,089 |
| Other current assets | 22,166 | - | - | - | - | - | 22,166 |
| Total current assets | 97,886 | - | - | 510 | (28,830) | - | 69,566 |
| Gross Fixed Assets | 454,976 | - | - | - | - | - | 291,268 |
| Less: Accumulated Depreciation and Amortization | (163,709) | - | - | - | - | - | - |
| Net Fixed Assets | 291,268 | - | - | - | - | - | 291,268 |
| Member relationship asset, net | 174,768 | - | - | - | - | - | 174,768 |
| Other intangible assets, net | 222,156 | - | - | - | - | (31,195) (2) | 190,961 |
| Trademarks | 125,000 | - | - | - | - | (17,552) (2) | 107,448 |
| Goodwill | 351,174 | - | - | - | - | (351,174) (2) | - |
| Deferred financing costs, net | - | - | - | - | 574 (3) | - | 574 |
| Other assets | 33,364 | - | - | - | - | - | 33,364 |
| TOTAL ASSETS | $1,295,614 | - | - | $510 | ($28,255) | ($399,921) | $867,948 |
| **LIABILITIES AND EQUITY** | | | | | | | |
| Current liabilities: | | | | | | | |
| Accounts payable | $10,983 | - | - | - | - | - | $10,983 |
| November/December Rents | | $18,000 (4) | - | - | ($18,000) (1) | - | - |
| Income taxes payable | 2,001 | - | - | - | - | - | 2,001 |
| Accrued liabilities | 50,407 (7) | - | - | - | (10,255) (1) | - | 40,151 |
| Deferred revenues | 117,264 | - | - | - | - | - | 117,264 |
| Total current liabilities | 180,654 | 18,000 | - | - | (28,255) | - | 170,399 |
| Deferred rent liability | 18,682 | - | - | - | - | - | 18,682 |
| Deferred income taxes | 76,254 | - | - | - | - | - | 76,254 |
| Other liabilities | 26,453 | - | - | - | - | ($22,453) (2) | 4,000 |
| Deferred revenues | 382,538 | - | - | - | - | - | 382,538 |
| Pre-Petition Revolving Credit Facility | 45,079 | - | ($45,079) (5) | - | - | - | - |
| Swaps | 7,085 | - | - | ($7,085) (5) | - | - | - |
| Exit Revolving Credit Facility | - | - | 45,079 (5) | (29,490) | - | - | 15,589 |
| Swap Term Loan | - | - | - | 7,440 (5) | - | - | 7,440 |
| Exit Term Loan | - | - | - | 30,000 (5) | - | - | 30,000 |
| Revolver PIK Note | - | - | 500 | - | - | - | 500 |
| Deferred Closing Fee | - | - | 574 | - | - | - | 574 |
| Total Liabilities Subject to Compromise | 870,575 | (870,575) (6) | - | - | - | - | - |
| Stockholders' equity | (311,707) | 852,575 (6) | (1,074) | (354) | - | (377,468) (2) | 161,971 |
| TOTAL LIABILITIES & EQUITY | $1,295,614 | - | - | $510 | ($28,255) | ($399,921) | $867,948 |

*Note: All fresh start accounting adjustments are illustrative only and do not purport to reflect the expected valuation of assets and liabilities upon emergence.*
*(1) Other Adjustments include the payment of cash costs associated with our exit from chapter 11, including primarily miscellaneous closing costs, which in aggregate approximate $28.3 million. A portion of November/December rent may be paid prior to August. Please note that professional fees paid to restructuring professionals are expensed in the normal course of business.*
*(2) Includes accounts written down to reflect assumed exit equity value of approximately $162.0 million. Intangible lease liability, with a book value of $22.5 million, is written off as part of the illustrative fresh-start accounting adjustments.*
*(3) Includes capitalized exit financing costs.*
*(4) Reclassification of November and December rent from Liabilities Subject to Compromise.*
*(5) Pre-petition financing and SWAP liability replaced by exit financing consisting of a $50.0 million revolver, $7.4 Swap Term Loan and $30.0 million Term Loan.*
*(6) Includes illustrative transaction adjustments associated with the cancellation of pre-petition liabilities of approximately $870.6 million.*
*(7) Professional success fees and holdbacks are expensed in August but assumed paid in October resulting in an increase of accrued liabilities for the two month period.*

## EXHIBIT D TO THE DISCLOSURE STATEMENT

## LIQUIDATION ANALYSIS

**Bally Total Fitness**

*Illustrative Liquidation Analysis*

| ($ in thousands)<br>Estimated Proceeds from Liquidation: | Balance (A) | Estimated Recovery Rate | | Estimated Liquidation Proceeds | | Note |
|---|---|---|---|---|---|---|
| | | Low | High | Low | High | |
| Customer base | $53,542 | 50.0% | 60.0% | $26,771 | $32,125 | B |
| Cash | 54,988 | 100.0% | 100.0% | 54,988 | 54,988 | C |
| Deferred income taxes | 17,801 | 0.0% | 0.0% | - | - | |
| Prepaid expenses | 16,073 | 0.0% | 0.0% | - | - | |
| Other current assets | 20,040 | 10.0% | 20.0% | 2,004 | 4,008 | D |
| Property and equipment, net | | | | | | E |
| Building & improvements | 60,559 | 1.0% | 10.0% | 606 | 6,056 | |
| Leaseholds | 108,185 | 1.0% | 10.0% | 1,082 | 10,819 | |
| Equipment & furnishings | 53,051 | 1.0% | 5.0% | 531 | 2,653 | |
| Owned Real Estate | 50,000 | 80.0% | 100.0% | 40,000 | 50,000 | F |
| Trademark | 86,376 | 2.0% | 6.0% | 1,728 | 5,183 | G |
| Member relationship asset, net | 154,057 | 0.0% | 0.0% | - | - | H |
| Other intangible assets, net | | | | | | H |
| Leasehold rights | 212,874 | 0.0% | 0.0% | - | - | |
| Other intangibles | 857 | 0.0% | 0.0% | - | - | |
| Goodwill | 257,460 | 0.0% | 0.0% | - | - | H |
| Other assets | 40,820 | 1.0% | 2.0% | 408 | 816 | I |
| **Total Estimated Proceeds** | **$1,186,682** | **10.8%** | **14.0%** | **$128,116** | **$166,647** | |

**Assumed Allocation of Proceeds:**

| Wind-down Administrative Costs | | Fee % | | Fee | | |
|---|---|---|---|---|---|---|
| Liquidation agent fee | | 2.0% | | 2,562 | 3,333 | J |
| Professional fees | | | | 4,500 | 4,500 | K |
| Wind-down operating losses | | | | 9,349 | 9,349 | L |
| **Total Assumed Admin Costs** | | | | **$16,411** | **$17,182** | |
| **Remaining Available Proceeds** | | | | **$111,705** | **$149,465** | |

| | Estimated Claims | % Recovery | | Estimated Recovery | | M |
|---|---|---|---|---|---|---|
| | | Low | High | Low | High | |
| Less: Pre-Petition Revolving Facility | 50,000 | 100.0% | 100.0% | $50,000 | $50,000 | |
| Less: Swap Debt | 7,440 | 24.9% | 40.1% | $1,849 | $2,981 | |
| Less: Pre-Petition Term Loan | 240,800 | 24.9% | 40.1% | $59,856 | $96,484 | |
| **Net Remaining Available Proceeds** | | | | **$0** | **$0** | |
| Senior Secured Notes | 247,338 | 0.0% | 0.0% | $0 | $0 | |
| Senior Subordinated Toggle Notes | 200,000 | 0.0% | 0.0% | $0 | $0 | |

**Notes**

A - All balances used herein are the un-audited net book values as of April 30, 2009 (excluding the Customer base asset). These values are assumed to be the values at the time of liquidation.

B - In calculating the Customer base asset a 2.0x multiple (representing two months of payment) was assumed on markets generating greater than $200K/month in payments from active members and no value was assumed for markets below this threshold.

C - All cash and cash equivalents held are assumed collectible.

D - Other current assets primarily consist of inventory and other prepaid expenses. Management's low recovery estimate is based on the nature of the asset and management's expected ability to recover value.

E - Property and Equipment consists of land, buildings, leasehold improvements, and equipment. Management's estimated land recovery is impaired due to the decline in the economic environment from the time of appraisal. Management believes the buildings and leasehold improvements have little liquidation value as they do not believe there would be much of a market for these health club modeled facilities. Equipment and furnishings are assumed to have little liquidation value as they are highly depreciated and little value could be obtained at auction.

F - Per Hilco estimate.

G - Trademark and tradenames are assumed to be recoverable in the range of approximately $2 million to $5 million.

H - Membership Relationship asset, Other intangible assets, and Goodwill are assumed non-recoverable. The Customer base asset, calculated separately, is theoretically included within these line items.

I - Other assets include various deposits of which management estimates low recovery due to the nature of the asset.

J - Liquidation agent fee assumed to be 2% of total estimated proceeds.

K - Professional fees during the liquidation estimated at $1.5 million for three months.

L - Wind-down costs assume three months of operating losses in order to wind down business.

M - Actual recoveries to secured and unsecured lenders may differ based on actual liquidation proceeds from unencumbered real estate assets.

<u>**EXHIBIT E TO THE DISCLOSURE STATEMENT**</u>

**CONSOLIDATED FINANCIAL STATEMENTS FOR THE DEBTORS FOR THE YEAR DECEMBER 31, 2008 AND FOR THE PERIOD OCTOBER 2, 2007 THROUGH DECEMBER 31, 2007 (SUCCESSOR COMPANY) AND FOR THE PERIOD JANUARY 1, 2007 THROUGH OCTOBER 1, 2007 (PREDECESSOR COMPANY) AND INDEPENDENT AUDITORS' REPORT THEREON**

**Two Year Annual Report by the Company**
**Pursuant to Section 7.4(a)(1) of the Indentures Dated October 1, 2007**
**Relating to the Company's 13% Senior Secured Notes Due 2011**
**and 15 5/8%/14% Senior Subordinated Toggle Notes Due 2013**

# BALLY TOTAL FITNESS HOLDING CORPORATION

## (DEBTOR-IN-POSSESION)

| Delaware | 36-3228107 |
|---|---|
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |
| 8700 West Bryn Mawr Avenue, Chicago, Illinois | 60631 |
| (Address of principal executive offices) | (Zip Code) |

Company's telephone number, including area code: (773) 380-3000

**Annual Report for the Period Ended December 31, 2008**

CONFIDENTIAL. The attached information in respect of Bally Total Fitness Holding Corporation and its affiliates (collectively "Bally" or the "Company") is highly confidential and non-public. Each person (each a "Recipient") who at any time receives any non-public information about the Company and its businesses and finances within the meaning of applicable securities laws (collectively, the "Non-Public Information"), by accepting any such Non-Public Information, shall be deemed to have acknowledged to and agreed with the Company as follows:

(A) The Recipient shall not use or communicate Non-Public Information if that use or communication would constitute a violation of applicable securities laws or regulations (including but not limited to laws or regulations prohibiting insider trading or tipping) and shall not communicate it to any other person not bound by, or which has not otherwise agreed to abide by, the terms of this clause (A), unless such information (i) is or becomes publicly available other than as a result of a disclosure known to the Recipient or is in violation of an agreement with or obligation to the Company, (ii) was within the Recipient's possession prior to it being furnished to the Recipient by or on behalf of the Company, (iii) is or becomes available to the Recipient on a non-confidential basis from a source (other than the Company) which is not known by the Recipient to be prohibited from disclosing such information to the Recipient by a legal, contractual or fiduciary obligation to the Company, (iv) is independently developed by the Recipient without the benefit of any Non-Public Information (information in clauses (i) – (iv) being "Non-Confidential Information") or (v) unless such disclosure is required by subpoena or other legal process of a tribunal, in which case the Recipient shall give the Company as much advance notice as is practicable before making disclosure so as to provide the Company with an opportunity to seek a protective order or to take other action to protect the confidentiality of the Non-Public Information.

(B) The Recipient represents and agrees that it is (i) a holder or owner of a beneficial interest in either of (a) Bally's 13% Senior Secured Notes due 2011 or (b) Bally's 15 5/8%/14% Senior Subordinated Toggle Notes due 2013 (together, the "Notes"), (ii) a prospective purchaser of the Notes and in the business of buying securities such as the Notes and (iii) is not a Person engaged in the business of operating fitness centers or any business activity reasonably related thereto (a "Competitive Business"). The Company shall have no obligation to provide any Non-Public Information to any Person engaged in a Competitive Business.

(C) The Recipient shall not disclose any Non-Public Information to any Person that engages in a Competitive Business unless such disclosure is required by subpoena or other legal process of a tribunal, in which case the Recipient shall give the Company as much advance notice as is practicable before making disclosure so as to provide the Company with an opportunity to seek a protective order or to take other action to protect the confidentiality of the Non-Public Information.

(D) Each distribution of this information in writing shall include this legend. Each recipient, by accepting delivery of this information, acknowledges the foregoing and its obligation to comply with all applicable securities laws in connection with any purchase or sale of any interest in the Notes, including applicable restrictions on trading while in possession of material non-public information.

**Bally Total Fitness Holding Corporation**
**(Debtor-in-Possession)**
**Annual Report**
**For the Period Ended December 31, 2008**

|  | **Page Number** |
|---|---|
| FORWARD-LOOKING STATEMENTS | |
| Independent Auditors' Report | 1 |
| Consolidated Balance Sheets as of December 31, 2008 (Successor Company) and December 31, 2007 (Successor Company) | 2 |
| Consolidated Statements of Operations for the year ended December 31, 2008 (Successor Company), the period October 2, 2007 through December 31, 2007 (Successor Company), and the period January 1, 2007 through October 1, 2007 (Predecessor Company) | 3 |
| Consolidated Statements of Stockholders' Equity (Deficit) and Comprehensive Income (Loss) for the year ended December 31, 2008 (Successor Company), the period October 2, 2007 through December 31, 2007 (Successor Company), and the period January 1, 2007 through October 1, 2007 (Predecessor Company) | 4 |
| Consolidated Statements of Cash Flows for the year ended December 31, 2008 (Successor Company), the period October 2, 2007 through December 31, 2007 (Successor Company), and the period January 1, 2007 through October 1, 2007 (Predecessor Company) | 5 |
| Notes to Consolidated Financial Statements | 7 |
| Selected Financial Data | 42 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 44 |
| Certification | 61 |

On December 3, 2008, the Company and substantially all of its domestic affiliates filed voluntary petitions for relief with the Bankruptcy Court, commencing the 2008 Chapter 11 Cases. The Debtors are operating their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

## FORWARD-LOOKING STATEMENTS

This annual report may contain forward-looking statements, including, without limitation, statements relating to (i) our ability to emerge from bankruptcy as a viable operating company, (ii) our plans, strategies, objectives, expectations, intentions, and adequacy of resources; (iii) our expectation that our strategies will enable us to create economic value; and (iv) the anticipated future performance of our business.

Statements that are not historical facts, including statements about our beliefs and expectations, are forward-looking statements. These statements are based on beliefs and assumptions by our management, and on information currently available to management. Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update publicly any of them in light of new information or future events. In addition, these forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.

A number of factors could cause actual results to differ materially from those contained in any forward-looking statement. These factors include, among others:

- the ability to maintain existing or obtain new sources of debt or equity financing to satisfy our cash needs and obligations;

- events that occur (or do not occur) during the pending 2008 Chapter 11 Cases;

- the success of operating initiatives, advertising and promotional efforts to attract and retain members;

- competition, including the ongoing effect of increased competition from well-financed competitors;

- the acceptance of our service and product offerings;

- changes in business strategy or plans;

- the refusal of our suppliers to provide key services and products, or any requirement by suppliers that we change the terms and conditions associated with these services and products;

- the existence of adverse publicity or litigation (including pending insurance rescission actions), the outcome thereof and the costs and expenses associated therewith;

- the changes in, or the failure to comply with, government regulations;

- the ability to attract, retain and motivate highly skilled employees, including a permanent Chief Financial Officer;

- the business abilities and judgment of personnel; and

- general economic and business conditions, including deteriorating consumer confidence and rising unemployment and foreclosures.

**Independent Auditors' Report**

Board of Directors
Bally Total Fitness Holding Corporation
Chicago, Illinois

We have audited the accompanying consolidated balance sheets of Bally Total Fitness Holding Corporation (Successor Company and Debtor-in-Possession) as of December 31, 2008 and 2007 and the related consolidated statements of operations, stockholders' (deficit) equity, and cash flows for the year ended December 31, 2008 and for the period October 2, 2007 through December 31, 2007. We have also audited the consolidated statements of operations, stockholders' deficit and cash flows of Bally Total Fitness Holding Corporation (Predecessor Company) for the period January 1, 2007 through October 1, 2007. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As described in Note 1 to the consolidated financial statements, on September 17, 2007, the Bankruptcy Court entered into an order confirming the Amended Plan of Reorganization, which became effective after the close of business on October 1, 2007. Accordingly, the consolidated balance sheet as of October 1, 2007 included in Note 3 of the consolidated financial statements has been prepared in conformity with Statement of Financial Accounting Standards No. 141 "Business Combinations" for the Successor Company as a new entity and as such reflects all assets and liabilities of the Successor Company at their estimated fair values and a new capital structure. Accordingly, financial statements after October 1, 2007 are prepared on a different basis than earlier statements and are therefore not necessarily comparable.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Bally Total Fitness Holding Corporation (Successor Company and Debtor-in-Possession) at December 31, 2008 and 2007, and the results of its operations and its cash flows for the year ended December 31, 2008 and for the period October 2, 2007 through December 31, 2007 and the results of operations and cash flows of Bally Total Fitness Holding Corporation (Predecessor Company) for the period January 1, 2007 through October 1, 2007, in conformity with accounting principles generally accepted in the United States of America.

As described in Note 1, the Company re-filed for reorganization under Chapter 11 of the United States Bankruptcy Code on December 3, 2008. The accompanying financial statements do not purport to reflect or provide for the consequences of the bankruptcy proceedings. In particular, such financial statements do not purport to show (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to prepetition liabilities, the amounts that may be allowed for claims or contingencies or the status and priority thereof; (c) as to stockholders' accounts, the effects of any changes that may be made in capitalization of the Company; or (d) as to operations, the effects of changes that may be made in its business.

The accompanying financial statements of Bally Total Fitness Holding Corporation (Successor Company and Debtor-in-Possession) have been prepared assuming that the Company will continue as a going concern. As described in Note 2 to the financial statements, as a result of the bankruptcy filing, realization of assets and the satisfaction of liabilities without substantial adjustments and or changes in the ownership are subject to uncertainty and raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As disclosed in the consolidated financial statements, effective January 1, 2007, the Predecessor Company changed its method of accounting for uncertain tax positions to conform to Financial Accounting Standard Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes."

Chicago, Illinois
April 6, 2009

**BALLY TOTAL FITNESS HOLDING COPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except par value and share data)

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and equivalents | $ 42,770 | $ 75,045 |
| Deferred income taxes | 21,068 | 30,075 |
| Prepaid expenses | 16,663 | 17,587 |
| Other current assets | 22,491 | 17,719 |
| Total current assets | 102,992 | 140,426 |
| | | |
| Long-term assets: | | |
| Property and equipment, net | 284,469 | 398,152 |
| Member relationship asset, net | 174,014 | 258,652 |
| Trademarks | 86,376 | 125,000 |
| Other intangible assets, net | 221,750 | 253,163 |
| Goodwill | 257,460 | 349,367 |
| Deferred financing costs, net | – | 15,778 |
| Other assets | 37,083 | 33,753 |
| Total long-term assets | 1,061,152 | 1,433,865 |
| Total assets | $ 1,164,144 | $ 1,574,291 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Accounts payable | $ 18,520 | $ 49,750 |
| Income taxes payable | 1,908 | 2,030 |
| Accrued expenses | 38,708 | 88,031 |
| Current maturities of long-term debt | 1,686 | 5,612 |
| Deferred revenues | 120,523 | 91,228 |
| Total current liabilities | 181,345 | 236,651 |
| | | |
| Long-term liabilities: | | |
| Deferred rent liability | 18,682 | 5,211 |
| Deferred income taxes | 52,665 | 76,318 |
| Other liabilities | 26,340 | 61,093 |
| Deferred revenues | 377,509 | 364,166 |
| Long-term debt, less current maturities | 163 | 692,337 |
| Total long-term liabilities | 475,359 | 1,199,125 |
| | | |
| Liabilities subject to compromise | 921,144 | – |
| Total liabilities | 1,577,848 | 1,435,776 |
| | | |
| Stockholders' equity (deficit): | | |
| Preferred stock, $0.01 par value; 200,000 shares authorized; none issued | – | – |
| Common stock, $0.01 par value; 450,000 shares authorized; 9,000 issued | – | – |
| Additional paid-in-capital | 233,600 | 233,600 |
| Accumulated deficit | (647,285) | (95,085) |
| Accumulated other comprehensive loss | (19) | |
| Total stockholders' equity (deficit) | (413,704) | 138,515 |
| Total liabilities and stockholders' equity (deficit) | $ 1,164,144 | $ 1,574,291 |

See accompanying notes to the consolidated financial statements.

## BALLY TOTAL FITNESS HOLDING CORPORATION
### (DEBTOR-IN-POSSESSION)
### CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except per share data)

| | Successor Company | | Predecessor Company |
|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 2 to December 31, 2007 | Period from January 1 to October 1, 2007 |
| **Net revenues:** | | | |
| Membership services | $ 580,808 | $ 131,623 | $ 654,491 |
| Retail products | 32,991 | 7,552 | 27,188 |
| Miscellaneous | 20,572 | 4,541 | 14,672 |
| | 634,371 | 143,716 | 696,351 |
| **Operating costs and expenses:** | | | |
| Membership services | 623,999 | 152,548 | 469,781 |
| Retail products | 28,343 | 7,382 | 25,367 |
| Marketing and advertising | 50,862 | 8,452 | 40,193 |
| General and administrative | 67,544 | 15,047 | 53,241 |
| Depreciation and amortization | 116,411 | 31,280 | 32,628 |
| Impairment of goodwill and intangibles | 132,337 | — | — |
| Other asset impairment charges | 39,288 | 163 | 6,635 |
| Net gain on sales of land and buildings | (49) | — | (521) |
| | 1,058,735 | 214,872 | 627,324 |
| Operating income (loss) | (424,364) | (71,156) | 69,027 |
| Interest expense (excluding certain contractual interest) | (95,438) | (24,500) | (76,316) |
| Other, net | 752 | 1,102 | 1,629 |
| | (94,686) | (23,398) | (74,687) |
| Loss from continuing operations before reorganization items and income taxes | (519,050) | (94,554) | (5,660) |
| Reorganization items, net | (46,705) | — | (57,103) |
| Income tax benefit (provision) | 13,555 | (531) | (677) |
| Loss from continuing operations | (552,200) | (95,085) | (63,440) |
| Discontinued operations: | | | |
| Income from discontinued operations | — | — | 26 |
| Gain on disposal | — | — | 21,195 |
| Income from discontinued operations | — | — | 21,221 |
| Net loss | $ (552,200) | $ (95,085) | $ (42,219) |
| **Per share data:** | | | |
| Basic income (loss) per common share: | | | |
| Loss from continuing operations | $ (61,355.56) | $ (10,565.00) | $ (1.56) |
| Income from discontinued operations | — | — | 0.52 |
| Net loss | $ (61,355.56) | $ (10,565.00) | $ (1.04) |
| Diluted income (loss) per common share: | | | |
| Loss from continuing operations | $ (61,355.56) | $ (10,565.00) | $ (1.56) |
| Income from discontinued operations | — | — | 0.52 |
| Net loss | $ (61,355.56) | $ (10,565.00) | $ (1.04) |

See accompanying notes to the consolidated financial statements.

**BALLY TOTAL FITNESS HOLDING CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(in thousands)

| | Common Stock | Additional Paid-in Capital | Accumulated Deficit | Common Stock in Treasury | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity (Deficit) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|---|
| Predecessor Company balance at December 31, 2006 | $ 420 | $ 691,631 | $ (2,072,051) | $ (11,635) | $ (8,787) | $ (1,400,422) | |
| Comprehensive loss: | | | | | | | |
| Net loss | — | — | (42,219) | — | — | (42,219) | $ (42,219) |
| Cumulative translation adjustment | — | — | — | — | 8,945 | 8,945 | 8,945 |
| Total | | | | | | | $ (33,274) |
| Stock –based compensation | — | 3,874 | — | — | — | 3,874 | |
| Predecessor Company balance at October 1, 2007 | $ 420 | $ 695,505 | $ (2,114,270) | $ (11,635) | $ 158 | $ (1,429,822) | |
| Issuance of shares in Successor | $ — | $ 233,600 | $ — | $ — | $ — | $ 233,600 | |
| Comprehensive loss: | | | | | | | |
| Net loss | — | — | (95,085) | — | — | (95,085) | $ (95,085) |
| Successor Company balance at December 31, 2007 | $ — | $ 233,600 | $ (95,085) | $ — | $ — | $ 138,515 | |
| Comprehensive loss: | | | | | | | |
| Net loss | — | — | (552,200) | — | — | (552,200) | $ (552,200) |
| Cumulative translation adjustment | — | — | — | — | (19) | (19) | (19) |
| Total | | | | | | | $ (552,219) |
| Successor Company balance at December 31, 2008 | $ — | $ 233,600 | $ (647,285) | $ — | $ (19) | $ (413,704) | |

See accompanying notes to the consolidated financial statements.

**BALLY TOTAL FITNESS HOLDING CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands)

| | Successor Company | | Predecessor Company |
|---|---|---|---|
| | **Year Ended December 31, 2008** | **Period from October 2 to December 31, 2007** | **Period from January 1 to October 1, 2007** |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (552,200) | $ (95,085) | $ (42,219) |
| Income from discontinued operations | – | – | (21,221) |
| Loss from continuing operations | (552,200) | (95,085) | (63,440) |
| Adjustments to reconcile net loss to cash provided (used) by operating activities: | | | |
| Depreciation and amortization | 122,615 | 32,754 | 47,863 |
| Deferred income taxes | (14,646) | 185 | 259 |
| Impairment charges | 171,625 | 163 | 6,635 |
| Reorganization items, net | 46,705 | – | 57,103 |
| Realized gain on sale/leaseback transactions | – | – | (521) |
| Loss on disposal of assets | 4,116 | – | 536 |
| Stock-based compensation | – | – | 1,437 |
| Other, net | – | (119) | – |
| Cash provided by discontinued operations | – | – | 1,125 |
| Change in operating assets and liabilities | 194,484 | (4,811) | (15,745) |
| Net cash provided (used) by operating activities | (27,301) | (66,913) | 35,252 |
| **Cash flows from reorganization activities:** | | | |
| Reorganization items, net | (46,705) | – | (57,103) |
| Write-off of debt issuance costs and unamortized debt discount (premium) | 21,163 | – | 13,725 |
| Loss on disposal of assets | 8,235 | – | – |
| Stock-based compensation | – | – | 2,437 |
| Increase in accrued liabilities | 15,642 | – | 3,645 |
| Cash used by reorganization activities | (1,665) | – | (37,296) |
| **Cash flows from investing activities:** | | | |
| Purchases, advances on and construction of property and equipment | (45,640) | (6,888) | (28,858) |
| Proceeds from sale of discontinued operations | – | – | 19,042 |
| Proceeds from sales of property and equipment | 4,674 | – | 232 |
| Cash acquired from Predecessor Company | – | 40,424 | – |
| Payment to Predecessor Company stockholders | – | (16,500) | – |
| Cash provided (used) by discontinued operations | – | – | (147) |
| Net cash provided (used) by investing activities | (40,966) | 17,036 | (9,731) |
| **Cash flows from financing activities:** | | | |
| Net borrowings (repayments) under credit agreement | 44,343 | – | 31,100 |
| Repayments of other long-term debt | (6,606) | (100,892) | (3,520) |
| Debt issuance and refinancing costs paid | (80) | (7,786) | (9,846) |
| Contributed capital to Successor Company | – | 233,600 | – |
| Cash used in discontinued operations | – | – | (206) |
| Net cash provided by financing activities | 37,657 | 124,922 | 17,528 |
| Increase (decrease) in cash | (32.275 ) | 75.045 | 5.753 |
| Effect of exchange rate changes on cash balance | – | – | (128) |
| Cash, beginning of period | 75,045 | – | 34,799 |
| Cash, end of period | $ 42,770 | $ 75,045 | $ 40,424 |

See accompanying notes to the consolidated financial statements.

**BALLY TOTAL FITNESS HOLDING CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS — (continued)**
(in thousands)

| | Successor Company | | Predecessor Company |
|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 2 to December 31, 2007 | Period from January 1 to October 1, 2007 |
| **Supplemental cash flows information:** | | | |
| Changes in operating assets and liabilities: | | | |
| (Increase) decrease in other current and other assets | $ (7,738) | $ (13,404) | $ 5,139 |
| Amortization of member relationship asset | 83,884 | 26,348 | – |
| Increase (decrease) in accounts payable | 31,428 | 6,660 | (9,975) |
| Increase in income taxes payable | 232 | 242 | 358 |
| Increase (decrease) in accrued expenses | 28,756 | (45,938) | 49,307 |
| Increase (decrease) in other liabilities | 13,680 | (1,113) | (242) |
| Increase (decrease) in deferred revenues | 44,242 | 22,394 | (60,332) |
| Change in operating assets and liabilities | $ 194,484 | $ (4,811) | $ (15,745) |
| | | | |
| Cash payments for interest and income taxes: | | | |
| Interest paid | $ 54,762 | $ 29,182 | $ 37,875 |
| Interest capitalized | (511) | (26) | (125) |
| Income taxes paid, net | 1,289 | – | 60 |
| | | | |
| Noncash investing and financing activities: | | | |
| Property disposal related to sales/leaseback transaction | $ – | $ – | $ 8,973 |
| Reclassification of debt and other obligations to liabilities subject to compromise | 921,144 | – | – |

See accompanying notes to the consolidated financial statements.

**BALLY TOTAL FITNESS HOLDING CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**Notes to Consolidated Financial Statements**
(All dollar amounts in thousands, except share and per share data)

## Note 1    Nature of Operations

### Description of Business

The accompanying consolidated financial statements include the accounts of Bally Total Fitness Holding Corporation (the "Company") and the subsidiaries that it controls. The Company, through its subsidiaries, is a commercial operator of 328 fitness centers at December 31, 2008 concentrated in 25 states. Additionally, as of December 31, 2008, 38 clubs were operated pursuant to franchise and joint venture agreements in the United States, Asia, Mexico, and the Caribbean. The Company operates in one industry segment, and all significant revenues arise from the commercial operation of fitness centers, primarily in major metropolitan markets in the United States. Unless otherwise specified in the text, references to the Company include the Company and its subsidiaries and refer to the Predecessor for dates and periods prior to October 1, 2007 and to the Successor thereafter.

The Company emerged from its 2007 chapter 11 proceeding under the Bankruptcy Code on October 1, 2007 (the "2007 Bankruptcy Effective Date") as more fully described in the section of this footnote entitled *"Prior reorganization proceedings and emergence under chapter 11 of the Bankruptcy Code"*. As a result, it has changed ownership from a publicly-held company prior to October 1, 2007 ("Predecessor Company" or "Predecessor") to a privately-held company after the emergence ("Successor Company" or "Successor").  Accordingly, financial results prior to October 1, 2007 relate to the Predecessor Company and results subsequent thereto pertain to the Successor Company. In conjunction with this emergence, the Company determined to adopt the purchase accounting conventions as prescribed by Statement of Financial Accounting Standards ("SFAS") No. 141, *"Business Combinations"* ("SFAS 141") to establish the opening balance sheet of Successor Company at October 1, 2007. The purchase accounting basis in the Successor Company is presented on a "push down" basis including all adjustments necessary to present the Successor Company balances after fair value adjustments. The financial information of the Predecessor Company and the Successor Company may not be directly comparable due to the change in the basis of presentation resulting from the application of purchase accounting to the October 1, 2007 Successor Company opening balance sheet and the resulting impact on operating results after that date. References in this report to the period ended October 1, 2007 relate to the Predecessor Company operations from January 1, 2007 through October 1, 2007. References to the period ended December 31, 2007 relate to the Successor Company operations from October 2, 2007 through December 31, 2007.

On December 3, 2008, the Company and substantially all of its domestic affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), commencing the 2008 Chapter 11 Cases. The Debtors are operating their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

### *Prior reorganization proceedings and emergence under chapter 11 of the Bankruptcy Code*

On June 18, 2007, the Company announced its intention to restructure its obligations and recapitalize its businesses through a prepackaged chapter 11 plan of reorganization.  On July 31, 2007, the Company and substantially all of its domestic affiliates filed voluntary petitions for relief commencing reorganization cases (the "2007 Chapter 11 Cases") under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  On September 17, 2007, the Bankruptcy Court confirmed the First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Bally Total Fitness Holding Corporation and its Affiliated Debtors (the "Amended Plan").  The Amended Plan became effective on October 1, 2007.

Effective upon the 2007 Bankruptcy Effective Date, the Company valued its assets and liabilities at fair value using purchase accounting methodology under SFAS 141 for the Successor Company. The fair value of the Successor Company's assets and liabilities differ materially from the recorded values of assets and liabilities on its consolidated balance sheets for prior periods for the Predecessor Company. In addition, the Company's financial results after the application of purchase accounting differed from historical trends. Accordingly, the values at which assets were realized and the amounts at which liabilities were liquidated differed from those recorded in the Predecessor Company financial statements. See Note 3 - Emergence from the 2007 Chapter 11 Cases and Application of Purchase Accounting for more information.

Also on the 2007 Bankruptcy Effective Date, the Company distributed the following consideration:

### *2007 Senior Notes*

The Company issued $247,337.5 of 13% Senior Secured Notes (the "2007 Senior Notes") pursuant to an indenture (the "Senior

Notes Indenture") with U.S. Bank National Association, as trustee ("U.S. Bank"). The 2007 Senior Notes were issued to holders of the Company's prepetition senior notes (the "Cancelled Senior Notes"), who exchanged the claims represented by their notes ($247,337.5 including unpaid interest) for their pro rata share of the 2007 Senior Notes and a fee equal to 2% of the principal amount of the Cancelled Senior Notes, which was included in deferred financing fees of the Successor Company.

The 2007 Senior Notes mature in July 2011. The Company has granted a second priority lien on substantially all of its assets to U.S. Bank on behalf and for the benefit of the holders of the 2007 Senior Notes. The Company's obligations under the Senior Notes Indenture are guaranteed by most of the subsidiaries which were Debtors pursuant to the Amended Plan, each of which executed a Security Agreement. Pursuant to the 2008 Chapter 11 Cases, the 2007 Senior Notes are reflected as part of Liabilities subject to compromise as of December 31, 2008.

*2007 Senior Subordinated Notes*

The Company issued $200,000 of 15-5/8%/14% Senior Subordinated Toggle Notes (the "2007 Senior Subordinated Notes") pursuant to an indenture (the "Senior Subordinated Notes Indenture") with HSBC Bank USA, National Association, as trustee. The 2007 Senior Subordinated Notes were issued to holders of the Company's prepetition Subordinated Notes (the "Cancelled Subordinated Notes"), who exchanged the claims represented by their prepetition notes ($323,041.7 including unpaid interest) for their pro rata share of (i) the 2007 Senior Subordinated Notes and (ii) a cash payment ($123,500. The 2007 Senior Subordinated Notes mature in October 2013. Pursuant to the 2008 Chapter 11 Cases, the 2007 Senior Subordinated Notes are reflected as part of Liabilities subject to compromise as of December 31, 2008.

*New Common Stock*

Pursuant to the Investment Agreement between the Company and Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, L.P. (collectively "Harbinger"), the Company issued 9,000 shares of common stock, par value $0.01 (the "New Common Stock") in exchange for $233,600 in cash. The New Common Stock issued to Harbinger was sold pursuant to an exemption provided by Section 4(2) of the Securities Act and, to the extent applicable, Regulation D promulgated thereunder.

Pursuant to the Amended Plan, all shares of the Company's common stock issued and outstanding immediately prior to the 2007 Bankruptcy Effective Date (the "Old Common Stock") were cancelled on the 2007 Bankruptcy Effective Date. As contemplated by the Amended Plan, holders of Old Common Stock received a pro rate distribution from $16,500 of investment proceeds allocated for holders of Old Common Stock and certain other equity-related claims. Approximately $13,500 has been distributed to holders of Old Common Stock. The balance of the investment proceeds are being held by the disbursing agent pending resolution of certain matters. If the pending claims are disallowed by the Bankruptcy Court, 100% of the reserved funds would be distributed to the holders of the Old Common Stock.

All other pre- and post-petition liabilities were paid in the normal course of business. On the 2007 Bankruptcy Effective Date, the Company also entered into an Exit Credit Facility. See Note 10 – Long-Term Debt.

*Governance Changes*

On the 2007 Bankruptcy Effective Date, among other things, (a) directors Charles J. Burdick, Eric Langshur and Barry Elson were deemed to have resigned from the Company's Board of Directors ("Board"); and (b) Eugene I. Davis, Bradley Dietz and Howard Kagan began serving as members of the Board together with Don R. Kornstein, who continues to serve as Chairman.

On April 4, 2008, the Company's Board adopted a resolution, effective as of March 1, 2008, (a) increasing the size of the Board to five (5) directors; (b) appointing Emanuel R. Pearlman to fill the vacancy resulting from the increase in the authorized number of directors; (c) appointing Mr. Pearlman to serve as Vice Chairman of the Board and as a member of the Board's CEO Search Committee; and (d) establishing Mr. Pearlman's compensation at $50 per month for the months of March, April and May, 2008, in recognition of Mr. Pearlman's significant full-time duties as Vice Chairman. Mr. Pearlman served until September 5, 2008 (see below).

On July 1, 2008, Michael W. Sheehan began serving as the Chief Executive Officer of the Company and was appointed as a member of the Company's Board of Directors.

Effective July 25, 2008, Don R. Kornstein resigned from the Board of Directors of the Company. Mr. Kornstein remains with the Company as an Executive Advisor, compensated at the rate of $15 annually. Mr. Kornstein's resignation created a vacancy in the office of Chairman of the Board. Also effective July 25, 2008, the Board elected Howard Kagan to serve as Chairman. On September 5, 2008, Harbinger, as the sole shareholder of the Company, adopted a resolution removing Howard Kagan, Emanuel Pearlman and Bradley Dietz from the Company's Board of Directors, effective as of the same date. Removal of these directors created three

8

vacancies on the Board of Directors, including a vacancy in the office of Chairman. Accordingly, on September 5, 2008, the remaining members of the Board of Directors adopted a resolution (a) reducing the size of the Board of Directors to three (3) directors; (b) electing Eugene I. Davis to serve as Chairman and (c) appointing Timothy J. Bernlohr to fill the one remaining vacancy on the Board. The Company's Board of Directors now consists of Eugene I. Davis, Chairman; Timothy J. Bernlohr; and Michael W. Sheehan.

Messrs. Davis and Bernlohr receive the Company's customary annual non-executive director stipend of $60, payable in quarterly installments. Mr. Sheehan does not receive a stipend or other special compensation for his service as a member of the Board of Directors. On September 7, 2008, the Board of Directors adopted a resolution setting Mr. Davis' special compensation at $30 per month, in light of the significant time commitment and services to be rendered by Mr. Davis in connection with the Company's operational and financial restructuring.

On September 7, 2008, the Board of Directors also adopted a resolution reconstituting Board committees in light of the departure and appointment of certain directors. The Audit Committee continues to be chaired by Mr. Davis and also includes Mr. Bernlohr. The Compensation/Executive Search Committee is chaired by Mr. Bernlohr and also includes Mr. Davis.

Effective October 1, 2008, Michael Feder resigned his position as Chief Operating Officer of the Company. No successor has been named to this position. Mr. Feder continues to provide limited consulting services to the Company, by virtue of his role as a Managing Director of AP Services LLC, which continues to provide consulting services to the Company.

*2008 Lender Negotiations and Commencement of 2008 Chapter 11 Cases*

On July 24, 2008, the Company delivered to the lenders under its Exit Credit Facility notice that the maximum senior secured leverage ratio (as defined under the Exit Credit Facility) was in excess of the permitted amount for the quarter ended June 30, 2008. Failure to comply with the maximum senior secured leverage ratio constituted a default under the Exit Credit Facility. This default under the Exit Credit Facility did not result in a default under the indentures governing the 2007 Senior Notes and 2007 Senior Subordinated Notes.

Effective as of August 4, 2008, the Company entered into a Temporary Limited Waiver (the "Waiver") with the Guarantors, the Lenders and Morgan Stanley Senior Funding, Inc. as Administrative Agent for the Lenders, with respect to the Exit Credit Facility dated as of October 1, 2007 (with capitalized terms used but not defined herein having the meanings assigned to them in the Exit Credit Facility) among Bally, the Lenders and the Administrative Agent, among others.

The Waiver provided, among other things, that the Agent and the Majority Lenders agreed to temporarily waive certain Specified Events of Default under the Exit Credit Facility. The Specified Events of Default include the Events of Default that occurred (i) as a result of the Company's failure to comply with the Maximum Senior Secured Leverage Ratio covenant set forth in the Exit Credit Facility with respect to the fiscal quarter ended June 30, 2008 and (ii) as a result of the Company's failure to comply with the Minimum Liquidity covenant set forth in the Exit Credit Facility with respect to the fiscal month ended July 31, 2008.

Following expiration of the Waiver, the Company, the Lenders and the Administrative Agent continued to negotiate the terms of an extended waiver that would permit the Company to continue its operational restructuring under the leadership of new Chief Executive Officer Michael Sheehan.

On September 23, 2008, the Company entered into a Temporary Waiver No. 2 and Agreement (the "Extended Waiver") with the Guarantors, the Lenders and Morgan Stanley Senior Funding, Inc. as Administrative Agent for the Lenders. Pursuant to the Extended Waiver, the Agent and the Majority Lenders agreed to temporarily waive certain Specified Events of Default under the Credit Agreement through December 31, 2008, unless terminated earlier in accordance with the terms of the Extended Waiver. The Specified Events of Default included the Events of Default that have occurred as a result of (i) the Company's failure to comply with the Maximum Senior Secured Leverage Ratio covenant set forth in the Exit Credit Facility with respect to the fiscal quarters ended June 30, 2008 and September 30, 2008; and (ii) the Company's failure to comply with the Minimum Liquidity covenant set forth in the Exit Credit Facility with respect to the fiscal months ended July 31, 2008 through November 30, 2008.

The Extended Waiver permitted the Company to make borrowings of Revolving Loans of up to $10,000, plus, at the Company's option, additional Borrowings based on a percentage of the value of certain leasehold mortgages that at the time of such additional Borrowing would be entitled in favor of the Collateral Agent.

Additionally, the Extended Waiver permitted the Company to incur up to $10,000 of additional term loans under the Credit Agreement under certain conditions and upon approval of the Majority Lenders. The lenders of such additional term loans would be entitled to recover proceeds from collateral after the revolving loan lenders, but prior to the existing term loan lenders. The Company

did not incur any of such permitted additional term loan indebtedness.

The Extended Waiver also permitted the Company to effect certain real property dispositions in the maximum aggregate amount of net proceeds of $25,000, and provided that the proceeds of these dispositions would not constitute Net Cash Proceeds for purposes of the Credit Agreement, so long as they were not used to repay junior indebtedness.

The Extended Waiver contained provisions superseding the default interest provisions of the initial Waiver.  These provisions established new percentages for the Applicable Reference Rate (greater of 4.25% and the Reference Rate in effect from time to time), Applicable Eurodollar Rate (greater of 3.25% and the Eurodollar Rate otherwise applicable to the applicable Loan for an applicable Interest Period) and Applicable Margin (with respect to Revolving Loans, 4.50% for Reference Rate Loans and 5.50% for Eurodollar Rate Loans; and with respect to Term Loans, 8.50% for Reference Rate Loans and 9.50% for Eurodollar Rate Loans). In addition, the fees payable in respect of issued and outstanding letters of credit of the Exit Credit Facility were set at 5.50%. The Extended Waiver also provided for a portion of the interest under the Credit Agreement to be added to principal.

Following execution of the Extended Waiver, the Company, the Lenders and the Administrative Agent continued to negotiate regarding the possible terms of a longer-term amendment to the Credit Agreement that would facilitate the Company's operational restructuring. However, such mitigation did not result in a timely resolution of the Company's liquidity position and, accordingly, the Company commenced the 2008 Chapter 11 Cases before the Extended Waiver expired.

Upon commencement of the 2008 Chapter 11 Cases, the Company discontinued recording interest on liabilities subject to compromise.  Contractual interest on liabilities subject to compromise not reflected in the financial statements was approximately $8.0 million; representing interest expense from the 2008 Chapter 11 Cases filing on December 3, 2008 through December 31, 2008. During 2007, the Company did not recognize contractual interest expense of $5.0 million on the Cancelled Subordinated Notes during the petition period for the 2007 Chapter 11 Cases.

*Reorganization Items*

Reorganization items, net for the year ended December 31, 2008 represent expense, income and gain or loss amounts that were incurred as a result of the 2008 Chapter 11 Cases.  Reorganization items, net for the period ended October 1, 2007 represent expense, income and gain or loss amounts that were incurred as a result of the 2007 Chapter 11 Cases. The following were the significant items within this category:

| | Year ended December 31, 2008 | | Period from January 1 to October 1,  2007 |
|---|---|---|---|
| Professional fees and administrative expense | $ | 4,010 | $ | 40,323 |
| Estimated claims and losses on rejected contracts | | 7,205 | | 818 |
| Write-off of buildings, leasehold rights and other items associated with club closings | | 6,937 | | - |
| Write-off of debt issuance costs and unamortized debt discount (premium) | | 21,163 | | 13,725 |
| Write-off of unrealized loss on interest rate swap agreement | | 7,085 | | - |
| Vendor termination penalty | | 305 | | - |
| Acceleration of stock-based compensation expense | | - | | 2,437 |
| Interest income on cash balances during bankruptcy | | - | | (200) |
| | $ | 46,705 | $ | 57,103 |

Estimated claims and losses on rejected contracts of $7,205 and $818 relate to nineteen and one rejected club leases as part of the 2008 Chapter 11 Cases and the 2007 Chapter 11 Cases, respectively. Professional fees and administrative expenses relate to legal, accounting and other professional costs directly associated with the reorganization process. The write-off of debt issuance costs in the 2007 Chapter 11 Cases relates to the Company's Cancelled Notes and prepetition credit facility that was replaced by the DIP Facility (as later described). For the year ended December 31, 2008, unamortized debt issuance costs and unamortized discounts as of the commencement of the 2008 Chapter 11 Cases were written off to Reorganization items, net as the associated debt is subject to compromise (see below).  Similarly, the unrealized loss on an interest rate swap agreement was included in Reorganization items, net and the associated liability included in Liabilities subject to compromise.  Stock-based compensation expense relates to the acceleration of expense on stock options and restricted shares which occurred as a result of the cancelation and vesting of the outstanding stock options and restricted shares, respectively, on the 2007 Bankruptcy Effective Date.

*Liabilities Subject to Compromise*

As a result of the 2008 Chapter 11 Cases, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' plan of reorganization. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed.  Although prepetition claims are generally stayed, at hearings held in December 2008, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals.

The Debtors have been paying and intend to continue to pay undisputed postpetition claims in the ordinary course of business.

American Institute of Certified Public Accountants' Statement of Position 90-7, "*Financial Reporting by Entities in Reorganization under the Bankruptcy Code*" ("SOP 90-7") requires that prepetition liabilities subject to compromise should be distinguished from both prepetition liabilities that are not subject to compromise and postpetition liabilities.  SOP 90-7 also requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.  There can be no assurance that such liabilities will be settled at the stated amounts.

Liabilities subject to compromise consist of the following:

|  | December 31, 2008 |
| --- | --- |
| Debt and capital leases | $    777,779 |
| Accounts payable and other accrued expenses | 98,823 |
| General liability and other insurance claims | 29,403 |
| Interest rate swap liability | 7,085 |
| Member bonds | 8,054 |
|  | $    921,144 |

## Note 2    Summary of Significant Accounting Policies

*Principles of Presentation and Consolidation:*  The consolidated financial statements include the accounts of the Company and its majority-owned subsidiaries and other controlled entities. All significant intercompany balances and transactions have been eliminated in consolidation.

*Bankruptcy Filing:*  On December 3, 2008, the Company and substantially all of its domestic affiliates filed voluntary petitions for relief with the Bankruptcy Court, commencing the 2008 Chapter 11 Cases. The Debtors are operating their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

SOP 90-7, which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared.  However, among other disclosures, it does require that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations. The balance sheet must distinguish prepetition liabilities subject to compromise from both prepetition liabilities that are not subject to compromise and from postpetition liabilities.  Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. The Company adopted SOP 90-7 effective upon commencement of the 2007 Chapter 11 Cases through the 2007 Bankruptcy Effective Date, and then upon commencement of the 2008 Chapter 11 Cases on December 3, 2008, and has segregated those items as outlined above for all reporting periods affected.

*Going Concern:*  The Company has prepared the consolidated financial statements on the basis that the Company will continue as a going concern. While management believes the actions described below and in Note 1 – Nature of Operations, make the going concern basis appropriate, uncertainty continues to exist. It is not possible to predict with certainty whether the actions taken will result in improvements to the financial condition of the Successor Company sufficient to allow it to continue as a going concern.

The Successor Company's ability to continue as a going concern is uncertain because the Company has incurred a substantial loss

from operations and has generated negative cash flows from operations which led to the Company's two bankruptcy filings. As such, the Company's realization of assets and discharge of liabilities are subject to significant uncertainty. If the "going concern" assumptions were not appropriate for these financial statements, then adjustments would be necessary in the carrying values of assets and liabilities, in the reported expenses and in the balance sheet classifications used.

The Company took a number of actions following its emergence from the 2007 Chapter 11 Cases to address these concerns. They included initiatives to improve membership sales, member retention and cost reductions. Among those efforts was a program to improve the clubs' appearance and attract new members, significant purchases of new equipment for the clubs and specific member retention incentives. Further, the Company has reduced corporate headcount and outsourced certain functions.

In October 2008, under new leadership, the Company implemented a plan to improve operating results. Revenue growth initiatives to accelerate cash received, increase electronic funds transfer ("EFT") usage and other measures have been put in place. The plan also included an operational restructuring of its field organization, reductions in club operating expenses by strict staffing and utility guidelines, and other cost control measures, as well as significant reductions in certain corporate costs.

While these aggregate actions have and are expected to continue to increase the Company's available cash flows, its violation of certain debt covenants which allow for its Lenders to potentially accelerate debt payments and the Company's inability to renegotiate such covenants or otherwise restructure its debt obligations has resulted in the need to commence the 2008 Chapter 11 Cases.

*Use of Estimates:* The preparation of consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP") requires management to make extensive use of certain estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Significant estimates in these consolidated financial statements include estimates of future cash flows associated with assets, expected amounts of prepetition liabilities subject to compromise, useful lives of depreciable and amortizable assets, expected member attrition, future taxable income, future cash flows resulting from retained risk arrangements and contingencies and litigation. Management bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances in making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

*Cash and equivalents:* The Company considers all highly liquid investments with maturities of three months or less when purchased to be cash equivalents. The carrying amount of cash equivalents approximates fair value due to the short maturity of those instruments.

*Property and Equipment:* Property and equipment of the Predecessor Company is stated at cost. Property and equipment of the Successor Company is recorded at the estimated fair values on the date of acquisition under the purchase method of accounting. Equipment under capital leases is stated at the present value of the minimum lease payments. Improvements are capitalized, while repair and maintenance costs are charged to operations when incurred.

Depreciation of property and equipment is calculated using the straight-line method over the estimated useful lives of the related assets. Buildings and related improvements are depreciated over 5 to 35 years and useful lives for equipment and furnishings range from 1 to 10 years. Equipment held under capital leases and leasehold improvements are amortized on the straight-line method over the shorter of the estimated useful life of the asset or the remaining lease term (12-15 years generally). Depreciation of construction in progress is not recorded until the assets are placed into service.

*Software for Internal Use:* Certain costs incurred related to software developed for internal use are accounted for in accordance with the American Institute of Certified Public Accountants Statement of Position No. 98-1 ("SOP 98-1"), *"Accounting for Costs of Computer Software Developed or Obtained for Internal Use."* In accordance with SOP 98-1, costs incurred in the planning and post-implementation stages are expensed as incurred, while costs relating to application development are capitalized. Qualifying software development costs are included as an element of property and equipment in the consolidated balance sheets. The Company amortizes such software costs over the shorter of the estimated useful life of the software or five years.

*Goodwill and Other Intangible Assets:* The Company's intangible assets are comprised principally of goodwill, member relationships, leasehold rights and trademarks all as more fully described in Note 7 - Goodwill and Other Intangible Assets. The Company has determined that its trademarks, along with its goodwill, have indefinite useful lives and are therefore not amortized. Other intangible assets have definite lives ranging up to 21 years and 40 years for member relationships and leasehold rights, respectively. Amortizable leasehold rights are amortized on a straight-line basis over the lease term. Member relationships are amortized on a declining basis in line with the expected declining undiscounted future cash flows realizable from those member relationships.

*Long-Lived Asset Impairment Assessments:* The Company accounts for its long-lived tangible assets and definite-lived intangible assets in accordance with Statement of Financial Accounting Standards No. 144, "*Accounting for the Impairment or Disposal of Long-lived Assets*" ("SFAS 144"). Under SFAS 144, the Company assesses the recoverability of these long-lived assets whenever events or changes in circumstances indicate that the Company may not be able to recover the asset's carrying amount. Primary indicators of impairment include significant declines in the operating results or an expectation that a long-lived asset may be disposed of before the end of its useful life. The Company measures the recoverability of assets to be held and used by a comparison of the carrying amount of the asset, or group of assets, to the net estimated future cash flows to be generated by that asset or asset group. The amount of impairment of such assets, if any, to be recognized is measured based on the amount by which the carrying value of the asset exceeds the estimated fair market value of the asset, which is generally determined based on projected discounted future cash flows. Tangible long-lived assets are measured at the individual fitness club level, which is the lowest level at which identifiable cash flows are largely independent of cash flows from other assets. Leasehold right assets were assessed upon emergence from bankruptcy based upon market conditions given that the fair value of these assets is generally independent of the club's future cash flows. Member relationship assets are assessed at a market level due to the significant interdependent nature of these assets across various fitness clubs. The Company classifies long-lived assets to be disposed of other than by sale as held and used until they are disposed.

The Company is required to test goodwill and indefinite-lived trademarks for impairment at least on an annual basis. The Company is also required to evaluate these intangible assets for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of an asset below its carrying amount. Certain indicators of potential impairment that could impact these intangible assets include, but are not limited to, a significant long-term adverse change in the business climate that is expected to cause a substantial decline in membership, or a significant change in the delivery of health and fitness services that results in a substantially more cost effective method of delivery than health clubs. Goodwill is assessed at the "reporting unit" level, which, for the Company has been determined to be the major metropolitan area. Impairment would exist when a) the estimated fair value of the reporting unit (generally determined based on the estimated discounted future cash flows generated from that reporting unit) is below the reporting unit's carrying value and b) that fair value, if allocated to each of the then identifiable tangible and intangible net assets of the reporting unit, would result in the excess fair value, if any, being less than the carrying value of the related goodwill. For trademarks, impairment is measured at the consolidated entity level.

The Company presents impairment charges as a separate line item within operating income (loss) from continuing operations in the Company's consolidated statements of operations, unless the impairment is associated with a discontinued operation. In that case, the Company includes the impairment charge, on a net-of-income tax basis, within the results of discontinued operations. See Note 6 – Asset Impairment Charges for a description of asset impairment charges recorded in 2008 and 2007.

*Deferred Lease Liabilities and Noncash Rental Expense:* The Company recognizes rental expense for leases with scheduled rent increases, leasehold incentives and rent concessions on the straight-line basis over the life of the lease beginning upon the commencement of the lease, or in the case of leases in operation as of the 2007 Bankruptcy Effective Date, upon the 2007 Bankruptcy Effective Date.

*Income Taxes:* Deferred income tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred income tax assets and liabilities are measured using tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred income tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date.

The Company considers future taxable income, the scheduled reversal of deferred income tax liabilities, and ongoing tax strategies in assessing the need for a valuation allowance with respect to its deferred income tax assets. The Company records a valuation allowance to reduce deferred income tax assets to a level which management believes more likely than not will be realized.

*Deferred Financing Costs:* The costs related to the issuance of debt are capitalized and amortized to interest expense over the life of the related debt instrument. The costs incurred in 2008 relate to obtaining waivers on the term loan ($80). The costs incurred in 2007 relate to obtaining the DIP and Exit Credit Facilities ($12,021) and the 2007 Senior Notes ($4,739). For the year ended December 31, 2008 and during the periods ended December 31, 2007 and October 1, 2007, the Company recognized amortization expense of $4,387, $846 and $15,109, respectively. Certain unamortized costs were written-off in the October 1, 2007 period due to the emergence from bankruptcy. Upon commencement of the 2008 Chapter 11 Cases, all unamortized deferred financing fees were written off to Reorganization items, net in accordance with SOP 90-7.

*Prepaid Expenses and Other Current Assets:* Prepaid expenses consist of prepaid rent and prepaid advertising expenses. Other current assets consist primarily of inventory and other prepaid expenses, including insurance expenses and other. Inventory consists primarily of nutritional products, apparel and other retail products and is valued at the lower of cost or market.

13

*Fair Values of Financial Instruments:* The fair value of the Company's cash equivalents, accounts receivable, postpetition accounts payable and accrued expenses that are financial instruments approximate their respective carrying amounts due to their short-term nature. Derivative instruments are carried at their estimated fair values. The Company's debt instruments and other prepetition liabilities are subject to compromise, and therefore, are valued in accordance with SOP 90-7 as of December 31, 2008.

*Revenue Recognition:* The Company's principal sources of revenue include membership services, principally health club memberships and personal training services, and the sale of nutrition products. The Company recognizes revenue in accordance with SEC Staff Accounting Bulletin No. 101, "*Revenue Recognition in Financial Statements,*" as amended by SEC Staff Accounting Bulletin No. 104, "*Revenue Recognition.*" As a general principle, revenue is recognized when the following criteria are met: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred and services have been rendered, (iii) the price to the buyer is fixed or determinable, and (iv) collectability is reasonably assured. With respect to health club memberships and personal training, the Company relies upon a signed contract between the Company and the customer as the persuasive evidence of a sales arrangement. Delivery of health club services extends throughout the term of membership. Delivery of personal training services occurs when individual personal training sessions have been rendered.

The Company receives membership fees and monthly dues from its members. Membership fees, which customers often finance, become customer obligations upon contract execution and after a "cooling off" period of three to fifteen calendar days depending on jurisdiction, while monthly dues become customer obligations on a month-to-month basis as services are provided. Membership fees and monthly dues are recognized at the later of when collected or earned. The Company does not recognize any accounts receivable for amounts contractually due under financed membership contracts (which, under the Company's policy of not recognizing revenue prior to collection, would only serve to increase the deferred revenue liability) due to the contingent nature of providing health club services in future periods and the significant collection uncertainty.

Membership fees and monthly dues collected but not earned are included in deferred revenue. The majority of members commit to a membership term of between 12 and 36 months. The majority of these contracts are 36 month contracts. Typically, contracts include a member's right to renew the membership at a discount compared to the payments made during the initial contractual term.

Under pricing policies in effect during most of 2008 and in previous years, additional members could be added to the primary joining members' contract. These additional members were added as obligatory members that committed to the same membership term as the primary member, or as non-obligatory members that could discontinue their membership at any time. Effective December 2008, the Company has changed its policies to require a separate contract for multiple member family memberships. Under the new policy, additional members may join and receive special discounted pricing to primary member pricing, joining on separate contracts. Additional members may only be added as obligatory members to obligatory primary members, or as non-obligatory to non-obligatory primary members.

Membership revenue is earned on a straight-line basis over the longer of the contractual term or the estimated membership term. Membership life is estimated at time of contract execution based on historical trends of actual attrition, and these estimates are updated quarterly to reflect actual membership attrition. The Company's estimates of membership life were up to 120 months as of December 31, 2008 and up to 360 months during 2007. The change in maximum estimated membership life near the end of 2008 was based on refreshed membership term studies completed at the time which considered the current competitive environment in which the Company's fitness centers operate and current trends of customer attrition. While this change effectively accelerates the recognition of membership services revenue, it did not have a material effect on 2008 results or financial position, primarily because even with these extended membership terms, a vast majority of our membership service revenues are recognized over the first six years or less.

As of December 31, 2008 and 2007, the weighted average membership life for members that commit to a membership term of between 12 and 36 months was 28 months and 33 months, respectively. Members with these terms that finance their initial membership fee had a weighted average membership life of 27 months and 32 months at December 31, 2008 and 2007, respectively, while those members that pay their membership fee in full at point of sale had a weighted average membership life of 43 months and 53 months at December 31, 2008 and 2007, respectively, reflecting the higher incidence of renewal of paid-in-full members. The reductions in the weighted average membership life statistics result in part from the reduction in estimated maximum term length from 360 months to 120 months effective in the third quarter 2008.

Members in their non-obligatory renewal period of membership totaled approximately 60% of total members at December 31, 2008 and 63% of total members at December 31, 2007. Renewal members can cancel their membership at any time prior to their monthly or annual due date. Membership revenue from members in renewal include monthly dues paid to maintain their membership, as well as amounts paid during the obligatory period that have been deferred as described above, to be recognized over the estimated term of membership, including renewal periods.

14

Month-to-month members may cancel their membership prior to their monthly due date with 30 days written notice. Membership revenue for these members is earned on a straight-line basis over the estimated membership life. Membership life for month-to-month members is currently estimated at between 2 and 68 months, with an average of 15 months.

Paid-in-full members who purchase nonrenewable memberships must repurchase a new membership plan to continue membership beyond the initial contractual term. Such membership fees are deferred and amortized over the contract term.

Personal training and other services are provided at most of the Company's fitness centers. Revenue related to personal training services is recognized when the four criteria of recognition described above are met. Personal training services contracts are either paid-in-full at the point of origination, or are financed and collected over periods generally through three months after an initial payment. Collections of amounts related to paid-in-full personal training services contracts are deferred and recognized as personal training services are rendered. Revenue related to personal training contracts that have been financed is recognized at the later of cash receipt, or the rendering of personal training services.

Sales of nutrition products and other fitness-related products occur primarily through the Company's in-club retail stores and are recognized upon delivery to the customer, generally at point of sale. Revenue recognized in the accompanying consolidated statement of operations as "miscellaneous" includes amounts earned as commissions in connection with a long-term licensing agreement related to the third-party sale of Bally branded fitness equipment. Such amounts are recognized prior to collection based on commission statements from the licensee. Other amounts included in miscellaneous revenue are recorded upon receipt and include franchising fees, facility rental fees, locker fees, late charges and other marketing fees pursuant to in-club promotion agreements.

The Company enters into contracts that include a combination of (i) health club services, (ii) personal training services, and (iii) nutritional products. In these multiple element arrangements, health club services are typically the last delivered service. The Company accounts for these arrangements as single units of accounting because they do not have objective and reliable evidence of the fair value of health club services. Under Emerging Issues Task Force ("EITF") *"Accounting for Revenue Arrangements with Multiple Deliverables"* ("Issue 00-21") elements qualify for separation when the services have value on a stand-alone basis, fair value of the separate elements exists and, in arrangements that include a general right of refund relative to the delivered element, performance of the undelivered element is considered probable and substantially in the Company's control. The Company does not have objective and reliable evidence of the fair value of health club services and therefore treats these arrangements as single units of accounting.

Costs related to acquiring members and delivering membership services are expensed as incurred. Advertising costs are charged to expense as incurred, or in the case of television commercial productions, upon the first airing.

As a result of the Company's emergence from bankruptcy and change in ownership effective October 1, 2007, the Company was required to reassess its accumulated deferred revenue liability as of that date in accordance with EITF No. 01-3, *"Accounting in a Business Combination for Deferred Revenue of an Acquiree"* ("EITF No. 01-3"), which required the Company to convert the liability into amounts representing the Company's estimated net cost of rendering future health club and personal training services it was legally obligated to provide under outstanding membership contracts, including expected renewal terms, as of September 30, 2007. To compute these amounts, the Company determined that the future cost—which includes a normal profit margin—of rendering such services was $14 per member per month for health club services and $56 per personal training session. These estimates were based on recent historical experience of the Predecessor Company. For those health club services members whose contract called for future monthly payments of membership fees and dues in excess of these monthly cost estimates, the Company established a member relationship intangible asset on October 1, 2007 which, when amortized over the estimated average remaining term of these contracts, will reduce cash-based revenues for these members to equate to these estimated costs. Similarly, for those health club services members whose contract called for future monthly payments of membership fees and dues less than these monthly cost estimates, the Company established a fulfillment liability on October 1, 2007 which, when amortized over the estimated average remaining term of these contracts, will increase cash-based revenues for these members to equate to these estimated costs. Any single membership contract, primarily due to the irregular payment streams inherent in renewal contracts, could have certain months when expected future payments are in excess of estimated monthly costs and certain months when expected future payments are less than estimated monthly costs. These particular contracts contributed to both the member relationship asset and the fulfillment liability accordingly. The Company's deferred personal training liability at September 30, 2007 related entirely to paid sessions as of that date and therefore the Company has recorded only a deferred revenue liability for sessions owed based on the cost of fulfilling such sessions, which was amortized over four months.

As a result of this purchase accounting treatment, the Company's regular deferred revenue balance was adjusted to zero at October 1, 2007 and started replenishing then based only on new memberships originating after that date. Accordingly, regular deferred revenue as of December 31, 2008 and December 31, 2007 was $151,119 and $54,930, respectively, and near-term future revenue recognition is less susceptible to material fluctuations due to changes in estimates of membership terms and attrition rates.

*Derivative Financial Instruments:*  The Company is a limited user of derivative financial instruments to manage risks generally associated with interest rate volatility. The Company does not hold or issue derivative financial instruments for trading purposes. Derivative financial instruments are accounted for in accordance with SFAS No. 133, *"Accounting for Derivative Instruments and Hedging Activities"* ("SFAS 133") as amended by SFAS No. 149, *"Amendment of SFAS No. 133 on Derivative Instruments and Hedging Activities"* ("SFAS 149"). This standard requires the Company to recognize all derivatives on the balance sheet at fair value. Derivatives that are not classified as qualifying hedging instruments are adjusted to fair value through earnings.

*Commitments and Contingencies — Litigation:*  The Company accounts for contingencies in accordance with SFAS No. 5, *"Accounting for Contingencies"*, which requires the Company to accrue loss contingencies when the loss is both probable and estimable. All legal costs expected to be incurred in connection with loss contingencies are expensed as incurred.

*Comprehensive Income (Loss):*  SFAS No. 130, *"Reporting Comprehensive Income"* ("SFAS 130"), establishes standards for reporting comprehensive income (loss). Comprehensive income (loss) includes net income (loss) as currently reported under GAAP, and also considers the effects of additional economic events that are not required to be reported in determining net income (loss), but rather are reported as a separate component of stockholders' deficit. The Company reported the effects of currency translation as a component of comprehensive income (loss).

*Termination liability:*  The Successor Company recorded a liability in the amount of $4,963 relating to a reduction in corporate workforce resulting from the acquisition of the Company as of October 1, 2007, in accordance with SFAS 141.  As of December 31, 2008, substantially all payments related to this workforce reduction were paid.  The Company also recorded a liability for $2,350 in October 2008 for the restructuring of its field operations.  The Company paid $668 of this obligation through the filing of the 2008 Chapter 11 Cases.  The remainder of the liability is subject to compromise.

*Insurance Proceeds:*  Insurance proceeds for reimbursement of costs incurred as a result of investigations, disputes and legal proceedings pursuant to the Company's director and officer insurance policies are recorded upon receipt and are recorded as a reduction of "General and Administrative" expenses in the Consolidated Statements of Operations.

*Asset Retirement Obligations:*  The Company recognizes asset retirement obligations in accordance with SFAS No. 143, *Accounting for Asset Retirement Obligations* ("SFAS 143"), and FASB Interpretation 47, *Accounting for Conditional Asset Retirement Obligations*, an interpretation of SFAS 143 ("FIN 47"). The Company identified conditional retirement obligations primarily related to building restoration at certain of its leased facilities. Asset retirement obligations were $829 and $794 at December 31, 2008 and 2007, respectively.

*Discontinued Operations*:  The Company accounts for discontinued operations under SFAS 144, which requires that a component of an entity that has been disposed of or is classified as held for sale after January 1, 2002 and has operations and cash flows that can be clearly distinguished from the rest of the entity be reported as discontinued operations. In the period that a component of an entity has been disposed of or classified as held for sale, the Company reclassifies the results of operations for current and prior periods into a single caption titled "discontinued operations".

*Income (Loss) Per Share:*  Income (loss) per share is computed in accordance with SFAS No. 128, *"Earnings per Share"* ("SFAS 128"). Basic income (loss) per share is computed on the basis of the weighted average number of common shares outstanding. Diluted income (loss) per share is computed on the basis of the weighted average number of common shares outstanding plus the dilutive effect of outstanding stock options, certain restricted stock, and warrants using the "treasury stock" method. The per share data presented in the Consolidated Statements of Operations are based on the following amounts:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | Year Ended December 31, 2008 | October 2, 2007 through December 31, 2008 | January 1, 2007 through October 1, 2007 |
| Numerator for basic EPS: | | | |
| Net loss | $ (552,200) | $ (95,085) | $ (42,219) |
| Denominator for basic EPS: | | | |
| Weighted average shares outstanding | 9,000 | 9,000 | 40,742,877 |
| Numerator for diluted EPS: | | | |
| Net loss | $ (552,200) | $ (95,085) | $ (42,219) |
| Denominator for diluted EPS: | | | |
| Weighted average shares outstanding | 9,000 | 9,000 | 40,742,877 |

16

Securities excluded from the computation of diluted income (loss) per share because inclusion would have had an anti-dilutive effect:

| | Successor | | Predecessor |
|---|---|---|---|
| | **December 31, 2008** | **December 31, 2007** | **October 1, 2007** |
| Anti-dilutive securities | 278 | 0 | 3,806,542 |

*Employee Share-based Compensation:*  On January 1, 2006, the Company adopted the provisions of the Statement of Financial Accounting Standards No. 123 (revised 2004), "*Share-Based Payment*" ("SFAS 123R") to record compensation expense for its employee stock options and restricted stock. SFAS No. 123R is a revision of SFAS No. 123, "*Accounting for Stock-based Compensation*," ("SFAS 123") and supersedes Accounting Principles Board Opinion No. 25, "*Accounting for Stock Issued to Employees*," ("APB 25") and its related implementation guidance. Prior to the adoption of SFAS 123R, the Company followed the intrinsic value method in accordance with APB 25, in accounting for its employee stock options. For information regarding share-based compensation, see Note 15 - Share-based Payments.

*Foreign Currency Translation:*  Foreign operations of non-U.S. subsidiaries whose functional currency was not the U.S. dollar had been translated into U.S. dollars in accordance with the principles prescribed in SFAS No. 52, "*Foreign Currency Translation*" ("SFAS 52"). All assets, liabilities, and minority interests were translated at the period end exchange rates, stockholders' equity was translated at historical rates, and revenues and expenses were translated at the average rates of exchange prevailing during the periods. Translation adjustments were included in the Accumulated other comprehensive income (loss) component of stockholders' equity (deficit). Gains and losses resulting from foreign currency transactions were reflected in net income (loss).  The Company sold essentially all of its foreign operations in June 2007.

*Impact of Recently Issued Accounting Standards:*

*Adopted Accounting Standards*

In September 2006, the Financial Accounting Standards Board (the "FASB") issued SFAS No. 157 ("SFAS 157"), *Fair Value Measurements.* In February 2008, the FASB issued FASB Staff Position No. 157-2 ("FSP 157-2"), *Effective Date of FASB Statement No. 157,* which partially defers the effective date of SFAS 157 for one year for nonfinancial assets and nonfinancial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis. FSP 157-2 does not defer recognition and disclosure requirements for financial assets and liabilities or for nonfinancial assets and nonfinancial liabilities that are remeasured at least annually. The Company expects to adopt the provisions of SFAS 157 as of January 1, 2009 for nonfinancial assets and liabilities that are subject to the deferral, which include long-lived assets and goodwill. SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value. SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition of fair value is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset, and fair value should be based on assumptions that market participants would use, including non-performance risk. SFAS 157 also establishes a fair value hierarchy to prioritize inputs used in measuring fair value. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. The Company utilized the fair value measures of SFAS 157 in accounting for its derivative financial instruments. The partial adoption of SFAS 157 did not have a significant impact on the Company's financial statements. At December 31, 2008, the Company did not have any financial assets. Upon commencement of the 2008 Chapter 11 Cases, the Company's liability associated with an interest rate swap was recorded as a Liability subject to compromise.

Effective January 1, 2008, the Company adopted SFAS No. 159, *"The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115"* ("SFAS 159"). SFAS 159 permits entities to choose to measure certain financial instruments and other eligible items at fair value when the items are not otherwise currently required to be measured at fair value. Upon adoption, the Company did not elect the fair value option for any items within the scope of SFAS 159 and, therefore, the adoption of SFAS 159 did not have an impact on the consolidated financial statements.

*Future Adoption of Accounting Standards*

In December 2007, the FASB issued SFAS No. 141 ("SFAS 141"), as revised in 2007 ("SFAS 141R"), *"Business Combinations."* SFAS 141R requires an acquiring entity to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. In addition, SFAS 141R changes the accounting for various components of a business combination, including pre-acquisition contingencies, the measurement period, in-process research and development and restructuring activities, amongst others. SFAS 141R applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. Earlier adoption is prohibited. SOP 90-7 requires the reorganization value of an entity upon emergence from bankruptcy to be allocated to the entity's assets in a manner consistent with the accounting for business combinations as specified by SFAS 141. As a result, entities emerging from bankruptcy after the effective date of SFAS 141R will apply the provisions of the new standard upon emergence. The Company is currently assessing the impact SFAS 141R may have upon its accounting for its prospective emergence from bankruptcy.

In December 2007, the FASB issued SFAS No. 160, *"Non-controlling Interests in Consolidated Financial Statements - an amendment of ARB No. 51"* ("SFAS 160"). SFAS 160 establishes accounting and reporting standards for the non-controlling interest in a subsidiary and for the deconsolidation of a subsidiary. SFAS 160 requires that non-controlling interests in subsidiaries be reported in the equity section of the controlling company's balance sheet. It also changes the manner in which the net income of the subsidiary is reported and disclosed in the controlling company's income statement. SFAS 160 is effective for fiscal years beginning after December 15, 2008. The Company has evaluated the new statement and determined that it will not have a significant impact on its financial statements.

In March 2008, the FASB issued SFAS No. 161, *"Disclosures about Derivative Instruments and Hedging Activities - an amendment of FASB Statement No. 133"* ("SFAS 161"). SFAS 161 amends and expands the disclosure requirements of Statement 133 to provide a better understanding of how and why an entity uses derivative instruments, how derivative instruments and related hedged items are accounted for, and their effect on an entity's financial position, financial performance, and cash flows. SFAS 161 is effective for fiscal years beginning after November 15, 2008. The Company will adopt SFAS 161 on January 1, 2009. The Company does not expect the adoption of SFAS 161 to have a significant impact on its financial statements other than providing the new disclosures required by SFAS 161.

18

In April 2008, the FASB issued FASB Staff Position SOP 90-7-1 ("FSP SOP 90-7-1"), *An Amendment of AICPA Statement of Position 90-7*. FSP SOP 90-7-1 resolves the conflict between the guidance requiring early adoption of new accounting standards for entities required to follow fresh-start reporting under SOP 90-7, and other authoritative accounting standards that expressly prohibit early adoption. Specifically, FSP SOP 90-7-1 requires an entity emerging from bankruptcy and applying fresh-start reporting to follow only the accounting standards in effect at the date fresh-start reporting is adopted, which include those standards eligible for early adoption if an election is made to adopt early.

In April 2008, the FASB issued FASB Staff Position No. 142-3, "*Determination of the Useful Life of Intangible Assets*" ("FSP No. 142-3"). FSP No. 142-3 amends the factors that should be considered in developing renewal or extension assumptions used to determine the useful life of a recognized intangible asset under SFAS No. 142, "*Goodwill and Other Intangible Assets*" ("SFAS 142"). The objective of FSP No. 142-3 is to improve the consistency between the useful life of a recognized intangible asset under SFAS 142 and the period of expected cash flows used to measure the fair value of the asset under SFAS 141(R), and other GAAP. FSP No. 142-3 applies to all intangible assets, whether acquired in a business combination or otherwise and shall be effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those fiscal years and applied prospectively to intangible assets acquired after the effective date. Early adoption is prohibited. The Company is currently evaluating the impact that FSP No. 142-3 will have on its consolidated financial statements.

**Note 3 Emergence from the 2007 Chapter 11 Cases and Application of Purchase Accounting**

On the 2007 Bankruptcy Effective Date, the Company recorded emergence-related adjustments (Predecessor Company) and purchase accounting adjustments (Successor Company) to its September 30, 2007 balance sheet to arrive at the Successor Company opening balance sheet on October 1, 2007. These adjustments are reflected below.

| | September 30, 2007 Predecessor | Emergence related adjustments (a) | Purchase accounting adjustments (b) | October 1, 2007 Successor |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash | $ 40,424 | $ — | $ 66,921 | $ 107,345 |
| Deferred income taxes | — | — | 30,075 | 30,075 |
| Prepaid expenses | 15,212 | — | 1,159 | 16,371 |
| Other current assets | 17,003 | (1,407) | 2,876 | 18,472 |
| Total current assets | 72,639 | (1,407) | 101,031 | 172,263 |
| | | | | |
| Property and equipment, net | 218,343 | — | 191,037 | 409,380 |
| Trademarks | 6,507 | — | 118,493 | 125,000 |
| Member relationship asset | — | — | 285,000 | 285,000 |
| Other intangible assets, net | 311 | — | 259,197 | 259,508 |
| Goodwill | 19,734 | — | 329,633 | 349,367 |
| Deferred financing costs, net | 22,282 | (13,518) | 7,786 | 16,550 |
| Other assets | 21,970 | — | (276) | 21,694 |
| | $ 361,786 | $ (14,925) | $ 1,291,901 | $ 1,638,762 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ 34,497 | $ — | $ (25) | $ 34,472 |
| Income taxes payable | 1,891 | — | (103) | 1,788 |
| Accrued liabilities | 113,286 | 28,264 | (41,254) | 100,296 |
| Current maturities of long-term debt | 4,219 | — | (93) | 4,126 |
| Deferred revenues | 258,162 | — | (182,415) | 75,747 |
| Total current liabilities | 412,055 | 28,264 | (223,890) | 216,429 |
| | | | | |
| Long-term debt, less current maturities | 497,822 | 300,943 | (112,061) | 686,704 |
| Deferred rent liability | 79,763 | — | (76,913) | 2,850 |
| Deferred income taxes | 1,785 | — | 74,348 | 76,133 |
| Other liabilities | 50,610 | — | 15,183 | 65,793 |
| Deferred revenue | 405,441 | — | (48,188) | 357,253 |
| Liabilities subject to compromise | 329,276 | (329,276) | — | — |
| Common stock, par value | 420 | — | (420) | — |
| Contributed capital | 693,068 | 2,437 | (461,905) | 233,600 |
| Accumulated deficit | (2,096,977) | (17,293) | 2,114,270 | — |
| Common stock, treasury | (11,635) | — | 11,635 | — |
| Accumulated other comprehensive income | 158 | — | (158) | — |
| Stockholders' equity (deficit) | (1,414,966) | (14,856) | 1,663,422 | 233,600 |
| | $ 361,786 | $ (14,925) | $ 1,291,901 | $ 1,638,762 |

(a)    *Emergence-related Adjustments.*  Included in this column are the following:

    a.    Reinstatement of $329,276 of pre-petition liabilities which were not compromised pursuant to the terms of the Amended Plan,

    b.   Write-off of $13,518 of deferred financing costs associated with the Cancelled Senior Notes, and

    c.   Other miscellaneous adjustments.

(b)   *Purchase Accounting Adjustments.*  Adjustments made to reflect asset values at their estimated fair value and liabilities at estimated fair value or the present value of amounts to be paid, including:

    a.   $233,600 capital contribution resulting from acquisition of the Predecessor Company by Harbinger,

    b.   Repayment of  $123,500 to the Cancelled Senior Subordinated Note holders,

    c.   Payment of $16,500 cash into an escrow pending distribution to Predecessor Company shareholders and holders of certain equity-related claims,

    d.   Elimination of the Predecessor Company's equity accounts and establishment of the opening equity of the Successor Company,

    e.   Recognition of deferred tax asset of $30,075,

    f.   Adjustments of $191,037 to increase the values of property and equipment to their estimated fair market value,

    g.   Adjustments of $118,493 to increase the value of the Successor Company's trademark to its estimated fair market value,

    h.   Recognition of the fair value of $285,000 for member relationship asset and an increase of $259,197 for leasehold rights and other intangible assets,

    i.   Payment of $7,786 of deferred financing costs related to obtaining the Exit Credit Facility and the 2007 Senior Notes,

    j.   Adjustments of $230,603 to reduce deferred revenues to the estimated fair value of the Successor Company's legal performance obligation,

    k.   Adjustment of $76,913 to reduce deferred rent liability to the estimated fair value of the Successor Company's liability,

    l.   Adjustment of deferred tax liability of $74,348,

    m.   Elimination of $12,795 and $1,304 of deferred gain on sale-leaseback transactions and landlord loans, respectively. These liabilities did not carry over to other liabilities of the Successor Company,

    n.   Adjustment of $1,669 to reduce certain other liabilities of the Successor Company to their estimated fair value,

    o.   Recognition of above market leasehold interest of $30,951,

    p.   A reduction of $12,000 to the carrying value of the 2007 Senior Subordinated Notes to the estimated fair value, and

    q.   Other miscellaneous adjustments.

In addition, goodwill of $349,367 was recorded as of October 1, 2007 to reflect the excess of the Successor Company's reorganized value over the estimated fair value of the net tangible and identifiable intangible assets and liabilities.

### Note 4   Other Current Assets

Other current assets consist of:

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
| Inventories | $ 4,649 | $ 5,242 |
| Other | 17,842 | 12,477 |
|  | $ 22,491 | $ 17,719 |

**Note 5    Property and Equipment**

Property and equipment consists of:

|  | | December 31, | | |
|---|---|---|---|---|
|  | | **2008** | | **2007** |
| Land | $ | 30,233 | $ | 35,233 |
| Buildings and improvements | | 86,567 | | 97,865 |
| Leasehold improvements | | 166,129 | | 183,177 |
| Equipment | | 111,101 | | 108,301 |
| Less: Accumulated depreciation | | (109,561 ) | | (26,424 ) |
| | $ | 284,469 | $ | 398,152 |

Depreciation of property and equipment amounted to $96,271, $26,424 and $32,526 in the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1, 2007, respectively. The Company capitalized interest of $511, $26 and $125 for the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1, 2007, respectively, related to the construction and equipping of clubs.

**Note 6    Asset Impairment Charges**

In accordance with SFAS 144, all long-lived assets are reviewed when events or changes in circumstances indicate that the carrying value of the asset may not be recoverable. The Company reviews assets at the lowest level for which there are identifiable cash flows, which is at the club level. The carrying amount of the club assets is compared to the expected undiscounted future cash flows to be generated by those assets over the estimated remaining useful life of the club. Cash flows are projected for each club based upon historical results and expectations. In cases where the expected future cash flows are less than the carrying amount of the assets, those clubs are considered impaired and the assets are written down to fair value. For purposes of estimating fair value, the Company has discounted the projected future cash flows of the impaired clubs at a weighted average cost of capital.

As a result of the Company's impairment analysis in 2008, the Company determined that certain clubs' long-lived assets, primarily leasehold improvements, were impaired.  These clubs experienced a decline in operating performance when compared to prior years' results and budgeted 2008 expectations.  Therefore, the Company recorded an impairment loss of $39,288 for the year ended December 31, 2008. The Company recorded impairment losses of $163 and $6,635 for the period ended December 31, 2007 and the period ended October 1, 2007, respectively.

**Note 7    Goodwill and Other Intangible Assets**

The Company's intangible assets are comprised principally of goodwill, member relationships, leasehold rights and certain trademarks. Goodwill represents the excess of the fair value of the Company as of the 2007 Bankruptcy Effective Date over the fair value of its net assets at that date based, in some cases, on independent valuations. Member relationships, established only in purchase accounting for the October 1, 2007 change in ownership, are described in Note 2 – Summary of Significant Accounting Policies. Leasehold rights, also established only in purchase accounting, represent the value of favorable lease terms for 225 fitness clubs and other leased premises in various markets, and was initially based on independent valuations of the market rates for those leases. Amortization of this asset over the remaining term of those leases will increase the Company's recognized expense up to the expense that would have been recorded had the lease been renewed as of the 2007 Bankruptcy Effective Date. Similarly, the balance sheet at December 31, 2008 includes a $22,050 liability representing 81 fitness club leases and other leased premises where the Company was paying higher than the appraised market rate as of the 2007 Bankruptcy Effective Date. Trademarks represent the *Bally Total Fitness* name and logo.

In accordance with SFAS 142, the Company tested goodwill and its indefinite-lived trademark for impairment as of December 31, 2008.

For the trademark, the Company utilized a royalty savings approach to determine the fair value of the trademark as of December 31, 2008.  This approach calculates the present value of the royalties saved by the Company by owning the trademark.  The fair value was determined to be $86,376 and was compared against the carrying value of the trademark of $125,000.  In 2008, revenue was below prior year and expectation for 2008 due to the decline in memberships. Therefore, the excess of the carrying value over the fair value of $38,624 was recorded as an impairment charge as of December 31, 2008.

Goodwill is assessed at the reporting unit level, which for the Company has been determined to be the major metropolitan area. Impairment would exist when a) the estimated fair value of the reporting unit (generally determined based on the estimated discounted future cash flows generated from that reporting unit) is below the reporting unit's carrying value and b) that fair value, if allocated to each of the then identifiable tangible and intangible net assets of the reporting unit, would result in the excess fair value, if any, being less than the carrying value of the related goodwill.  As of December 31, 2008, the Company determined that impairment existed at thirteen reporting units and a goodwill impairment charge of $93,713 was recorded.  The Company's operating performance in 2008 was below prior year and expectations for 2008 largely as a result of the revenue decline previously discussed.

Other intangible assets consisted of the following:

| | December 31, 2008 | | | December 31, 2007 | | |
|---|---|---|---|---|---|---|
| | Gross | Accumulated Amortization | Net | Gross | Accumulated Amortization | Net |
| Member relationship asset | $ 284,246 | $ (110,232) | $ 174,014 | $ 285,000 | $ (26,348) | $ 258,652 |
| Leasehold rights and other intangibles | 252,387 | (30,637) | 221,750 | 259,508 | (6,345) | 253,163 |
| Trademarks (non-amortizing) | 86,376 | - | 86,376 | 125,000 | - | 125,000 |
| | $ 623,009 | $ (140,869) | $ 482,140 | $ 669,508 | $ (32,693) | $ 636,815 |

Changes to intangible asset balances during 2007 and 2008 include a) purchase accounting adjustments as of the 2007 Bankruptcy Effective Date, and a purchase accounting adjustment in 2008 for $2,359, b) amortization expense of $25,171, $6,345 and $102 for the year ended December 31, 2008, the periods ended December 31, 2007 and October 1, 2007, respectively, and amortization of the member relationship asset as a reduction of revenue $83,884 and $26,348 for the year ended December 31, 2008 and the period ended December 31, 2007, respectively (see Note 11 – Deferred Revenue), c) the write-off of leasehold rights and a portion of the member relationship asset for club closings as a result of the 2008 Chapter 11 Cases recorded as Reorganization items, net of $7,670, d) the write-off of leasehold rights for clubs closed in 2008 prior to the commencement of the 2008 Chapter 11 Cases of $1,685, and e) the impairment charge of $38,624 related to Trademarks.

Estimated amortization expense for the next five years is (excluding member relationship asset):

| | |
|---|---|
| Year ending December 31, 2009 | $  18,174 |
| Year ending December 31, 2010 | 15,349 |
| Year ending December 31, 2011 | 13,448 |
| Year ending December 31, 2012 | 13,292 |
| Year ending December 31, 2013 | 13,427 |

The following table shows changes in the carrying amount of goodwill for the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1, 2007:

| | |
|---|---|
| Goodwill at January 1, 2007 | $  19,734 |
| Goodwill at October 1, 2007 | $  19,734 |
| | |
| Elimination of Predecessor Company goodwill | (19,734) |
| Establishment of Successor Company goodwill | 349,367 |
| Goodwill at December 31, 2007 | 349,367 |
| | |
| Purchase accounting adjustments | 1,806 |
| Impairment charge | (93,713) |
| Goodwill at December 31, 2008 | $  257,460 |

**Note 8    Accrued Expenses**

Accrued expenses consist of the following:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2008 | | 2007 | |
| Payroll and benefit-related liabilities | $ | 18,478 | $ | 23,191 |
| Interest |  | — |  | 17,449 |
| Advertising |  | 446 |  | 1,264 |
| Taxes other than income taxes |  | 6,609 |  | 7,594 |
| Other |  | 13,175 |  | 38,533 |
|  | $ | 38,708 | $ | 88,031 |

Upon filing the 2008 Chapter 11 Cases, a substantial portion of the Company's accounts payable and accrued expenses were reclassified to Liabilities subject to compromise (see Note 1- Nature of Operations).

**Note 9    Derivative Instruments**

The Company entered into an interest expense hedging agreement in May 2008 to swap $200,000 of the Exit Term Loan from floating rate to fixed rate until October 1, 2010. Under the Swap Agreement, the Company would pay an average fixed rate of approximately 3.85% versus floating 3 month Libor during this period and would continue to pay the applicable spread over the base rate on these loans as required in the Exit Credit Agreement or the Extended Waiver. The Swap Agreement was accounted for as a qualifying cash flow hedge of the future floating-rate interest payments in accordance with SFAS 133, whereby changes in the fair market value were reflected as adjustments to Accumulated other comprehensive income on the consolidated balance sheet. When the Company commenced the 2008 Chapter 11 Cases on December 3, 2008, an event of default occurred under the Swap Agreement and the counterparty sent the Company notice of termination thereof. The fair market value on November 30, 2008 was determined to be $7,085 based on a quotation from the financial institution that is the counterparty to the Swap Agreement. This amount has been included on the balance sheet in Liabilities subject to compromise and in the Statement of Operations as Reorganization items, net.

The Company entered into two interest rate swap agreements in 2003 which changed the fixed interest rate exposure on $200,000 of the Company's Cancelled Senior Subordinated Notes, to variable-rate based on the six-month Eurodollar rate plus 6.01%, by entering into a receive-fixed, pay-variable interest rate swap. Under the swap, the Company received fixed rate payments and made variable rate payments, thereby creating variable-rate long-term debt. These swap agreements were accounted for as qualifying interest rate hedges of the future fixed-rate interest payments in accordance with SFAS No. 133, whereby changes in the fair market value were reflected as adjustments to the fair value of the derivative instrument as reflected on the accompanying consolidated balance sheets. The change in fair value of the swaps exactly offset the change in fair value of the hedged debt, with no impact on earnings.

The fair values of the interest rate swap agreements were determined periodically by obtaining quotations from the financial institution that is the counterparty to the Company swap arrangements. The fair value represents an estimate of the net amounts that the Company would receive or pay if the agreements were transferred to another party or cancelled as of the date of the valuation. For the periods ended December 31, 2007 and October 1, 2007, approximately $275 and $2,194, respectively, related to these swaps were reported as an addition to interest expense and represent a yield adjustment of the hedged debt obligation. These swap agreements terminated October 15, 2007.

**Note 10    Long-Term Debt**

| | December 31, | |
|---|---|---|
| Nonsubordinated: | **2008** | **2007** |
| Exit term loan, due 2013 (1) | $ 240,790 | $ 242,000 |
| Exit revolving credit (1) | 44,343 | — |
| Exit credit facility payment-in-kind (1) | 2,775 | — |
| 2007 Senior Notes (1) | 247,337 | 247,337 |
| Capital lease obligations (1) | 6,500 | 7,310 |
| Other debt | 410 | 4,997 |
| Subordinated: | | |
| 2007 Senior Subordinated Notes (1) | 237,473 | 196,305 |
| Total long-term debt | 779,628 | 697,949 |
| Less:  Obligations classified as Liabilities subject to compromise | ( 777,779) | — |
| Current maturities of long-term debt not subject to compromise | ( 1,686) | (5,612 ) |
| Long-term debt, less current maturities | $     163 | $  692,337 |

    (1)  December 31, 2008 obligations were classified as Liabilities subject to compromise, and unamortized discounts of $9,691 as of the commencement of the 2008 Chapter 11 Cases on December 3, 2008 were written off to Reorganization items, net in the Statement of Operations.  See Note 1 – Nature of Operations for further discussion.

*2007 DIP Facilities*

    On June 18, 2007, the Company announced its intention to restructure its obligations and recapitalize its businesses through a prepackaged chapter 11 plan of reorganization.  On July 31, 2007, the Debtors filed their Original Plan with the Bankruptcy Court reflecting the restructuring arrangements reflected in the solicitation. On August 22, 2007, the Company entered into a superpriority debtor-in-possession credit agreement (the "2007 DIP Facility") arranged by Morgan Stanley Senior Funding, Inc., as Administrative Agent and Collateral Agent, Wells Fargo Foothill, LLC, as Revolving Credit Agent and the CIT Group/Business Credit, Inc., as Revolving Syndication Agent and certain other lenders party thereto (collectively, the "2007 DIP Lenders"), providing up to $292,000 of debtor-in-possession financing consisting of a $50,000 secured revolving credit facility with a $40,000 sublimit for letters of credit (the "2007 DIP Revolving Credit") and a $242,000 secured term loan facility (the "2007 DIP Term Loan"). The Company paid fees in the amount of $3,700 for the 2007 DIP Facility, and the 2007 DIP Term Loan was subject to original issue discount of 1.5%. These fees were capitalized as deferred financing costs of the Successor Company, and the unamortized portion was written off upon commencement of the 2008 Chapter 11 Cases. On September 17, 2007, the Bankruptcy Court confirmed the Amended Plan and the Company subsequently emerged from bankruptcy on October 1, 2007, at which time the 2007 DIP Facility converted into a senior secured exit credit facility under the Amended Plan (the "Exit Credit Facility") as described below.

    The 2007 DIP Facility contained restrictive covenants that included minimum monthly liquidity requirements, financial reporting requirements, and restrictions on use of funds; additional indebtedness; incurring liens; certain types of payments (including, without limitation, capital stock dividends and redemptions, payments on existing indebtedness and intercompany indebtedness); incurring or guaranteeing debt; investments; mergers, consolidations, asset sales and acquisitions; transactions with subsidiaries; conduct of business; sale and leaseback transactions; incurrence of judgments; and changing the Company's fiscal year; all subject to certain exceptions.

*Exit Credit Facility*

    On October 1, 2007, the 2007 DIP Facility converted into the Exit Credit Facility providing up to $292,000, consisting of up to a five-year, $50,000 senior secured revolving credit facility with a $40,000 sublimit for letters of credit (the "Exit Revolving Credit") and a six-year $242,000 senior secured term loan facility (the "Exit Term Loan"). The Exit Revolving Credit terminates on the earlier of (i) five years from closing and (ii) 30 days prior to the maturity of the first to mature of the 2007 Senior Notes or the 2007 Senior Subordinated Notes (the "Revolving Credit Maturity Date"). The Exit Term Loan maturity date (the "Term Loan Maturity Date") is the earlier of (i) six years from closing and (ii) the Revolving Credit Maturity Date. If the 2007 Senior Notes are not refinanced prior to their currently scheduled maturity date or amended to mature after October 2013, the balance outstanding on the Exit Term Loan would mature in 2011 rather than 2013.

    The Exit Term Loan is payable in quarterly installments of $605 which began on June 30, 2008 with a final installment of the balance at the Term Loan Maturity Date. The rate of interest on the borrowings under the Exit Revolving Credit is, at the Company's

option, either the reference rate (higher of the prime rate or federal funds rate plus 0.50%) plus a margin of 1.25% or a Eurodollar rate plus a margin of 2.25%. Commitment fees of 0.50% per annum are payable on the unused portion of the revolving credit facility. The rate of interest on the borrowings under the Exit Term Loan is, at the Company's option, either the reference rate plus a margin of 4.00% or a Eurodollar rate plus a margin of 5.00% per annum. A fee of 2.25% per annum is paid on outstanding letters of credit. The proceeds from the term loan and revolving credit were used to refinance the amounts outstanding under the Company's 2007 DIP Facility and used to provide additional working capital. Under the terms of the Temporary Waiver No. 2 described in Note 1, the rates of interest on the borrowings under the Exit Credit Facility have increased but interest is now stayed due to the 2008 Chapter 11 Cases.

The Exit Credit Facility is secured by substantially all the Company's real and personal property, including member obligations under installment contracts. The Company's obligations under the Exit Credit Facility are guaranteed by most of its domestic subsidiaries. The Exit Credit Facility contains restrictive covenants that include maximum quarterly senior secured leverage ratio and minimum monthly liquidity requirements, financial reporting requirements that require the Company provide audited financial statements to the lenders on or before 90 days after year end for each calendar year, and puts restrictions on use of funds; additional indebtedness; incurring liens; certain types of payments (including, without limitation, capital stock dividends and redemptions, payments on existing indebtedness and intercompany indebtedness); incurring or guaranteeing debt; investments; mergers, consolidations, asset sales and acquisitions; transactions with subsidiaries; conduct of business; sale and leaseback transactions; incurrence of judgments; and changing the Company's fiscal year; all subject to certain exceptions. Under the terms of the Exit Credit Facility, the Company may sell assets and enter into sales and leaseback transactions, subject to a pro-forma cash EBITDA threshold condition, and reinvest the proceeds within 360 days of sale. The Company may also enter into up to $100,000 aggregate amount of purchase money finance and capital lease transactions. Some of these covenants have been modified by the terms of the Temporary Waiver No. 2 discussed in Note 1.

The Company paid additional fees, which were capitalized as deferred financing costs, related to the Exit Credit Facility in the amount of $2,600. The unamortized portion of these costs was written off as a reorganization item upon the commencement of the 2008 Chapter 11 Cases.

As of December 31, 2008, there was $240,790 outstanding under the Exit Term Loan, $44,343 under the Exit Revolving Credit and $2,775 of payment-in-kind interest associated with the Exit Credit Facility, and $5,627 of letters of credit were issued. The amount available under the Exit Revolving Credit is reduced by letters of credit issued. All such outstanding amounts are reflected as part of Liabilities subject to compromise as of December 31, 2008.

*Waiver and Extended Waiver*

As described in Note 1 under 2008 Lender Negotiations and Commencement of 2008 Chapter 11 Cases, the Company violated certain financial and other covenants under the Exit Credit Facility and obtained temporary waivers and additional temporary financing during 2008.

*2007 Senior Notes and 2007 Senior Subordinated Notes*

On October 1, 2007, the Effective Date of the Amended Plan, the indebtedness under the Cancelled Senior Notes and the Cancelled Senior Subordinated Notes was discharged, in exchange for the respective consideration paid to the holders of Cancelled Senior Notes and Cancelled Senior Subordinated Notes under the Amended Plan. All related outstanding balances as of December 31, 2008 are included as liabilities subject to compromise.

On October 1, 2007, the Company issued $247,337.5 of 2007 Senior Notes pursuant to the Senior Notes Indenture with U.S. Bank. The 2007 Senior Notes were issued to holders of the Cancelled Senior Notes, who exchanged the claims represented by their Cancelled Senior Notes for their pro rata share of the 2007 Senior Notes and a fee equal to 2% of the principal amount of the Cancelled Senior Notes. This fee was capitalized as deferred financing costs of the Successor Company.

The 2007 Senior Notes mature in July 2011. The Company has granted a second priority lien on substantially all of the Company's assets to U.S. Bank on behalf and for the benefit of the holders of the 2007 Senior Notes. Obligations under the Senior Notes Indenture are guaranteed by most of the subsidiaries that were Debtors pursuant to the Amended Plan, each of which executed a Security Agreement. The 2007 Senior Notes are subject to redemption at any time at the option of the Company, in whole or in part, in accordance with the provisions of the Senior Notes Indenture.

The Company also issued $200,000 of 2007 Senior Subordinated Notes pursuant to an indenture (the "Senior Subordinated Notes Indenture") with HSBC Bank USA, National Association, as trustee. The 2007 Senior Subordinated Notes were issued to holders of the Cancelled Subordinated Notes, who exchanged the claims represented by their Cancelled Subordinated Notes for their pro rata

26

share of (i) the 2007 Senior Subordinated Notes and (ii) a cash payment of $123,500.  The 2007 Senior Subordinated Notes mature in October 2013 and are subject to redemption at any time and from time to time at the option of the Company, in whole or in part. Under the terms of the Senior Subordinated Notes Indenture, the Company is incurring interest expense at the 15-5/8% Payment-in-Kind ("PIK") rate (of $37,473 and $7,813 as of December 31, 2008 and December 31, 2007, respectively) and will continue to do so until the Company meets certain prescribed conditions that allow the Company, at its option, to pay cash interest at the lower 14% rate.

The 2007 Senior Subordinated Notes were originally recorded at their fair values as of the 2007 Bankruptcy Effective Date.  The resulting discount was being amortized on a straight-line basis over the respective terms of the debt until such remaining discounts were written off as reorganization costs as of the commencement of the 2008 Chapter 11 Cases.  The composition of the 2007 Senior Subordinated Notes as of December 31, 2008 is as follows:

|  | 2007 Senior Subordinated Notes |
|---|---|
| Fair value | $    200,000 |
| Original discount | (12,000 ) |
| Discount amortized through December 31, 2008 | 2,309 |
| Discount written off | 9,691 |
| PIK interest | 37,473 |
|  | $    237,473 |

*2006 Facility*

On October 16, 2006, the Company entered into a credit facility with a group of financial institutions led by JPMorgan Chase Bank, N.A. (the "2006 Facility"). The 2006 Facility provided for (i) a term loan facility in the amount of $205,900, (ii) a delayed-draw term loan facility in the amount of $34,100, and (iii) a revolving credit facility in the amount of $44,000. The proceeds from the 2006 Facility were used to refinance the amounts outstanding under the Company's then existing credit agreement and to fund capital expenditures and provide for additional liquidity. The termination date of the 2006 Facility was the earlier of (i) 14 days prior to the maturity of the Cancelled Subordinated Notes (due October 15, 2007), including extensions or refinancing or (ii) October 1, 2010. The term loan was payable in quarterly installments of $514.75 beginning on October 31, 2007 with a final installment of $199,723 due on October 1, 2010, or any earlier termination date related to the maturity of the Cancelled Subordinated Notes. The delayed draw term loan was payable in a single installment on the termination date. The rate of interest on the borrowings under the 2006 Facility was, at the Company's option, either the reference rate (higher of the prime rate or federal funds rate plus .50%) plus a margin of 3.25% or a Eurodollar rate plus a margin of 4.25%. Commitment fees of 0.50% and 1.00% per annum were payable on the unused portion of the revolving credit facility and the undrawn portion of the delayed draw term loan, respectively. The delayed draw term loan was available to be drawn for 18 months from October 2006 and was to be used to fund capital expenditures. A fee of 4.25% per annum and a fronting fee of 0.25% per annum are paid on outstanding letters of credit. Borrowings under the 2006 Facility were secured by substantially all of the Company's real and personal property, including member obligations under installment contracts. The 2006 Facility was refinanced by the 2007 DIP Facility on August 22, 2007.

*Senior Notes and Senior Subordinated Notes of Predecessor Company*

In July 2003, the Company issued $235,000 in aggregate principal of 10-1/2% Senior Notes due 2011 (now referred to as the "Cancelled Senior Notes") in two offerings under Rule 144A and Regulation S under the Securities Act of 1933, as amended. The Cancelled Senior Notes were jointly and severally guaranteed by substantially all of the domestic subsidiaries of the Company, on an unsecured basis. Proceeds from the note issuances were used to refinance other debt of the Company. Prior to July 2006, the Company could have redeemed up to 35% of the Cancelled Senior Notes at a redemption price of 110.5% with the proceeds from one or more equity offerings. Beginning in July 2007, the Cancelled Senior Notes could have been redeemed at the Company's option, in whole or in part, with premiums ranging from 5.25% in 2007 to zero in 2009 and thereafter. Upon a change of control, as defined in the indenture, holders could have required the Company to purchase the Cancelled Senior Notes at a price of 101%.

The 9-7/8% Series B Senior Subordinated Notes and the 9-7/8% Series D Senior Subordinated Notes (now referred to as the "Cancelled Subordinated Notes") were to mature on October 15, 2007. The Series D Notes were not subject to any sinking fund requirement but could have been redeemed at the Company's option, in whole or in part, with premiums ranging from 3.29% in December 2003 to zero as of October 2005 and thereafter. Upon a change of control, as defined in the indenture, holders could have required the Company to purchase the Cancelled Subordinated Notes at a price of 101%. The payment of the Cancelled  Subordinated Notes was subordinated to the payment in full of all senior indebtedness of the Company, as defined.

27

*Forbearance Agreements*

Due to a) untimely filing of certain financial reports starting with the Company's Form 10-K for 2006, b) untimely payment of interest starting April 16, 2007, c) certain violations of technical provisions under debt agreements and d) various cross-default provisions under certain debt agreements, the Company had received various forbearance agreements and amendments to those agreements from its lenders under the 2006 Facility, the Cancelled Senior Notes and the Cancelled Subordinated Notes under which the lenders agreed to forbear from exercising any remedies arising as a result of the defaults described above until July 31, 2007. Various consent and other fees were paid by the Company to these lenders in conjunction with these forbearance agreements.

The Company filed the 2007 Chapter 11 Cases prior to expiration of the forbearance periods on July 31, 2007. As a result, an event of default occurred under each of the 2006 Facility, Cancelled Senior Notes Indenture and Cancelled Subordinated Notes Indenture and the Company's indebtedness thereunder was immediately accelerated. On October 1, 2007, the Effective Date of the Amended Plan, the indebtedness under the Cancelled Senior Notes and the Cancelled Subordinated Notes was discharged, in exchange for the respective consideration paid to the holders of Cancelled Senior Notes and Cancelled Subordinated Notes under the Amended Plan. See Note 1 – Nature of Operations for a description of the notes included as part of that consideration.

*Capital Leases*

The Company leases certain assets under capital leases expiring in periods ranging from one to five years. Included in "Property and Equipment" at December 31, 2008 and 2007 were assets under capital leases of $546 and $5,001, respectively, net of accumulated amortization of $53 and $11, respectively.

*Other Debt Obligations*

The Company has mortgages on certain owned properties.

*Liquidity*

The Company requires operating cash flows to fund its capital spending and working capital requirements. Cash flows and liquidity may be negatively impacted by various items, including declines in membership revenues, changes in terms or other requirements by vendors, regulatory fines, penalties, settlements or adverse results in litigation and unexpected capital expenditures relating to repairs and club maintenance. The Company's liquidity (cash and unutilized revolving credit facility) declined by approximately $76,000 during 2008 to $42,800 at December 31, 2008. The decline in liquidity was primarily due to reduced membership cash collections, the funding of capital expenditures for club equipment and improvements, professional and legal fee payments related to the Company's reorganization and 2008 Chapter 11 Cases, and interest payments.

Maturities of long-term debt and future minimum payments under capital leases not subject to compromise as of December 31, 2008, are as follows:

|  | Long-Term Debt | Capital Leases | Total |
|---|---|---|---|
| 2009 | $      410 | $    1,362 | $    1,772 |
| 2010 | — | 174 | 174 |
|  | 410 | 1,536 | 1,946 |
| Less amount representing interest | — | (97 ) | (97 ) |
|  | $      410 | $    1,439 | $    1,849 |

At December 31, 2008, the Exit Credit Facility borrowings, the 2007 Senior Notes, the 2007 Senior Subordinated Notes, and certain capital leases are included in Liabilities subject to compromise on the Consolidated Balance Sheet at the allowable amount as defined by SOP 90-7.  The fair value of this debt at December 31, 2008 is de minimis.

## Note 11  Deferred Revenue

The components of membership services revenue are shown below.

|  | Successor Company | | Predecessor Company |
|---|---|---|---|
|  | Year ended December 31, 2008 | October 2 – December 31, 2007 | January 1 – October 1, 2007 |
| Membership cash receipts | $      708,919 | $      180,365 | $      594,042 |
| Change in deferral | (128,111) | (48,742) | 60,449 |
| Membership services revenue | $      580,808 | $      131,623 | $      654,491 |

Certain cash receipts from members in any period are for services that are not delivered during that same period. Such cash receipts are not immediately recognized as revenues and are rather deferred to be recognized subsequently as revenues when the related services are rendered by the Company to the member. Members may elect to finance their initial membership fees by paying an initial down payment and then making regular monthly payments. All initial payments are deferred and then recognized as revenues ratably over the related service period.  Monthly financed payments are subject to deferral and ratable recognition over the entire estimated membership term for members that maintain membership into periods subsequent to the financing period, or are recognized as received and earned for members maintaining membership for only the financing period.  Similarly, members who elect to pay their membership dues and/or fees in advance (including paying financed fees in advance of their scheduled due dates), including for personal training sessions, are initially deferred and recognized ratably over the service period.

Deferred revenue represents cash received from members but not yet earned, as well as the unamortized fair value of the legal performance obligation of the Successor Company as of the 2007 Bankruptcy Effective Date.  The summary set forth below shows changes in deferred revenue for the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1, 2007, and includes as cash additions all cash received for membership services.  Similarly, revenue recognized includes all revenue earned from membership services.

| | Successor Company | | | | |
|---|---|---|---|---|---|
| | Balance at December 31, 2007 | Cash Additions | Revenue Recognized | Other | Balance at December 31, 2008 |
| Deferral of receipts from financed members | $ 275,513 | $ 65,331 | $ (73,195) | | $ 267,649 |
| Deferral of receipts representing advance payments | 163,732 | 138,728 | (86,519) | | 215,941 |
| Deferral of receipts for personal training services | 16,149 | 102,486 | (102,604) | | 16,031 |
| Receipts collected and earned without deferral during period | — | 402,374 | (402,374) | | — |
| Adjustment for closed clubs | — | — | — | (1,589) | (1,589) |
| | $ 455,394 | $ 708,919 | $ (664,692) | $ (1,589) | $ 498,032 |
| Amortization of member relationship asset | | | 83,884 | | |
| Membership services revenue | | | $ (580,808) | | |

| | Successor Company | | | |
|---|---|---|---|---|
| | Balance at October 1, 2007 | Cash Additions | Revenue Recognized | Balance at December 31, 2007 |
| Deferral of receipts from financed members | $ 281,310 | $ 8,100 | $ (13,897) | $ 275,513 |
| Deferral of receipts representing advance payments | 132,690 | 36,772 | (5,730) | 163,732 |
| Receipts collected and earned without deferral during period | — | 112,904 | (112,904) | — |
| Deferral of receipts for personal training services | 19,000 | 22,589 | (25,440) | 16,149 |
| | $ 433,000 | $ 180,365 | $ (157,971) | $ 455,394 |
| Less: Amortization of member relationship asset | | | 26,348 | |
| Membership services revenue | | | $ (131,623) | |

| | Predecessor Company | | | |
|---|---|---|---|---|
| | Balance at December 31, 2006 | Cash Additions | Revenue Recognized | Balance at September 30, 2007 |
| Deferral of receipts from financed members | $ 489,059 | $ 146,239 | $ (196,520) | $ 438,778 |
| Deferral of receipts representing advance payments | 219,200 | 111,357 | (123,591) | 206,966 |
| Receipts collected and earned without deferral during period | — | 255,437 | (255,437) | — |
| Deferral of receipts for personal training services | 15,793 | 81,009 | (78,943) | 17,859 |
| | $ 724,052 | $ 594,042 | $ (654,491) | $ 663,603 |

Included in recognized revenues are the impacts of membership term estimate changes, whereby an estimate change that reduces expected membership term increases recorded revenues recognized in the period of such change as the related pool of deferred revenue is recognized over a shorter period of membership. The impact of the estimate changes on recorded revenue was $5.2 million, $0.0 million and $10.6 million during the year ended December 31, 2008, the period ended December 31, 2007, and the period ended October 1, 2007, respectively.

As a result of the Company's emergence from bankruptcy and change in ownership effective October 1, 2007, the Company was required to reassess its accumulated deferred revenue liability as of that date in accordance with EITF No. 01-3, "*Accounting in a Business Combination for Deferred Revenue of an Acquiree*" ("EITF No. 01-3), which required the Company to convert the liability into amounts representing the Company's estimated net cost of rendering future health club and personal training services it was legally obligated to provide under outstanding membership contracts, including expected renewal terms, as of September 30, 2007. To compute these amounts, the Company determined that the future cost—which includes a normal profit margin—of rendering such services was $14 per member per month for health club services and $56 per personal training session. These estimates were based on recent historical experience of the Predecessor Company. For those health club services members whose contract called for future monthly payments of membership fees and dues in excess of these monthly cost estimates, the Company established a $285,000 member relationship intangible asset on October 1, 2007 which, when amortized over the estimated average remaining term of these contracts, will reduce cash-based revenues for these members to equate to these estimated costs ($174,014 and $258,652 remained

unamortized at December 31, 2008 and 2007, respectively). Similarly, for those health club services members whose contract called for future monthly payments of membership fees and dues less than these monthly cost estimates, the Company established a $414,000 fulfillment liability on October 1, 2007 which, when amortized over the estimated average remaining term of these contracts, will increase cash-based revenues for these members to equate to these estimated costs ($346,913 and $395,714 remained unamortized at December 31, 2008 and 2007, respectively). Any single membership contract, primarily due to the irregular payment streams inherent in renewable contracts, could have certain months when expected future payments are in excess of estimated monthly costs and certain months when expected future payments are less than estimated monthly costs. These particular contracts contributed to both the member relationship intangible asset and the fulfillment liability accordingly.

Membership services revenue was increased during the year ended December 31, 2008, and during the period ended December 31, 2007 by amortization of the fulfillment liability of $47,298 and $18,286, respectively.  Membership services revenue was decreased during the year ended December 31, 2008, and during the period ended December 31, 2007 by amortization of the member relationship intangible asset of $83,884 and $26,348, respectively.  The following table presents the scheduled non-cash amortization of the member relationship intangible asset and fulfillment liability for the succeeding five year period:

| | Increase/(Decrease) Membership Services Revenue | | |
| Period Ending December, 31 | Member Relationship Intangible Asset | Fulfillment Obligation | Net |
|---|---|---|---|
| 2009 | $ (50,804) | $ 27,367 | $ (23,437) |
| 2010 | (25,448) | 19,230 | (6,218) |
| 2011 | (15,524) | 15,585 | 61 |
| 2012 | (13,376) | 14,181 | 805 |
| 2013 | (11,413) | 12,853 | 1,440 |
| Thereafter | (57,449) | 257,697 | 200,248 |
| | $ (174,014) | $ 346,913 | $ 172,899 |

As a result of the application of purchase accounting, the Company's regular deferred revenue balance was adjusted to zero at October 1, 2007 and started replenishing then based only on new memberships originating after that date. Accordingly, regular deferred revenue as of December 31, 2008 and December 31, 2007 was $151,119 and $54,930, respectively, and near-term future revenue recognition is less susceptible to material fluctuations due to changes in estimates of membership terms and attrition rates.

The valuation of deferred revenue pursuant to EITF No. 01-3 has resulted in a significant reduction in the level of revenue recognition in the current period and in future periods.  While the Company continues to collect contractually-determined monthly membership fees and dues at levels similar to those experienced prior to the acquisition, revenue recognition from members existing at the acquisition date has been limited to the estimated cost of rendering health club services (including a normal profit) of $14 per member month. Contractually-determined monthly membership and dues payments from the acquisition date membership base include members that are below and above these amounts.  Revenue recognition prior to the application of purchase accounting has been increased on those members that make contractual monthly payments below the $14 amount, but significantly, revenue recognition from members that make contractual monthly payments in excess of these amounts has been greatly reduced. A significant portion of the current period reduction in revenue recognition is a direct consequence of the revaluation of contractual monthly payments, primarily from the portion of members making higher initial term monthly payments, to be limited in revenue recognition to the $14 cost plus normal profit amount.  As a result, revenue recognized by the Successor Company is not comparable to revenue recognized by the Predecessor Company. Cash membership revenue, however, is a comparable measure between both the Predecessor and Successor Companies as it is unaffected by the application of purchase accounting.

## Note 12   Stockholders' Equity

*Common Stock:* The Company is authorized to issue 450,000 shares of Successor Company Common Stock, $.01 par value. Each share of Common Stock is entitled to one vote per share. On October 1, 2007, the Company issued 6,000 shares of Successor Company Common Stock to Harbinger Capital Partners Master Fund I, Ltd. and 3,000 shares of Successor Company Common Stock to Harbinger Capital Partners Special Situations Fund, L.P. At December 31, 2008, 441,000 shares of Successor Company Common Stock were available for future issuance.

*Preferred Stock:* The Company is authorized to issue 200,000 shares of Successor Company Preferred Stock, $.01 par value. At December 31, 2008, no shares of preferred stock were issued.

*Restrictions on Net Assets*:  Although the Company is obligated, as a chapter 11 debtor-in-possession, to meet substantially all of its postpetition financial obligations on a timely basis, the Company's ability to fund these obligations is contingent on continuing authority of the Bankruptcy Court that presides over the 2008 Chapter 11 Cases.  With respect to cash obligations, the Company is subject to the restrictions of the interim Cash Collateral Order, which expires on April 30, 2009.  The Cash Collateral Order incorporates a budget that projects the Company's ongoing expenses for a 13-week period; such budget contemplates the Company's ongoing business expenses as well as adequate protection payments to the Company's Lenders under the Exit Credit Facility.  With limited exceptions, the Company is restricted from expenditures that are not contemplated by the budget incorporated in the Cash Collateral Order.  Further, absent an extension of the Cash Collateral Order beyond April 30, 2009, the Company's authorization to expend cash collateral will expire.  Accordingly, the Company's cash assets are substantially restricted.

Additionally, the Bankruptcy Code and Bankruptcy Rules require the Company to obtain Bankruptcy Court authorization before entering into transactions other than those that are clearly within the ordinary course of business.  Accordingly, the Company is restricted from, among other things, incurring additional indebtedness, paying dividends or other distributions, redeeming or repurchasing capital stock, making investments, entering into transactions with affiliates, issuing stock, engaging in unrelated lines of business, creating liens to secure debt, or transferring or selling assets or merging with other entities.

As a result, substantially all of the net assets of the Company's subsidiaries were restricted at December 31, 2008 and remain restricted as of the date hereof.

During the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1, 2007, changes in common shares were as follows:

| | Common Shares |
|---|---|
| Predecessor Company issued as of December 31, 2006 | 41,286,512 |
| Forfeiture of restricted stock | (67,000 ) |
| Predecessor Company issued as of October 1, 2007 | 41,219,512 |
| | |
| Issuance of shares in Successor Company | 9,000 |
| Successor Company issued as of December 31, 2007 | 9,000 |
| Successor Company issued as of December 31, 2008 | 9,000 |

**Note 13   Income Taxes**

The income tax provision (benefit) applicable to income (loss) from continuing operations before income taxes consists of the following:

| | Successor | | Predecessor |
|---|---|---|---|
| | January 1 - December 31, 2008 | October 2 - December 31, 2007 | January 1 - October 1, 2007 |
| Deferred tax benefit before valuation allowance | $ (157,116 ) | $ (35,887 ) | $ (24,616 ) |
| Change in valuation allowance | 142,470 | 36,072 | 24,875 |
| Foreign (all current) | 5 | 1 | 25 |
| State (all current) | 1,086 | 345 | 393 |
| | $ (13,555 ) | $ 531 | $ 677 |

Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial accounting and income tax purposes and operating loss and tax credit carryforwards. Significant components of the Company's deferred income tax assets and liabilities as of December 31, 2008 and 2007, along with their classification, are as follows:

| | 2008 | | 2007 | |
| | Assets | Liabilities | Assets | Liabilities |
|---|---|---|---|---|
| Installment contract revenues | $ 183,207 | $ — | $ 146,849 | $ — |
| Accruals and reserves | 22,851 | — | 20,059 | — |
| Depreciation and capitalized costs | 67,790 | — | 30,702 | — |
| Tax loss carryforwards | 495,911 | — | 485,605 | — |
| Intangible assets | — | 181,877 | — | 250,435 |
| Other, net | 422 | — | — | 1,593 |
| | 770,181 | 181,877 | 683,215 | 252,028 |
| Valuation allowance | (619,901) | — | (477,430 ) | — |
| | $ 150,280 | $ 181,877 | $ 205,785 | $ 252,028 |
| | | | | |
| Current | $ 21,068 | $ — | $ 30,075 | $ — |
| Long-term | 129,212 | 181,877 | 175,710 | 252,028 |
| | $ 150,280 | $ 181,877 | $ 205,785 | $ 252,028 |

At December 31, 2008, the Company has estimated federal Alternative Minimum Tax ("AMT") credits and tax loss carryforwards of $5,896 and approximately $1,100,000, respectively. The AMT credits can be carried forward indefinitely, while the tax loss carryforwards expire beginning in 2011 through 2028. In addition, the Company has substantial state tax loss carryforwards that began to expire in 2005 and fully expire through 2028. On September 28, 2005 and October 1, 2007, the Company underwent ownership changes for purposes of IRC Section 382. Due to the ownership changes that occurred, the utilization of the Company's federal tax loss carryforwards is subject to an annual limitation under Section 382, which will significantly limit their use. The amount of the limitation may, under certain circumstances, be increased by built-in gains held by the Company at the time of the change that are recognized in the five-year period after the ownership change. However, the Company expects a substantial portion of the net operating loss carryforwards and credits to expire unused. In addition, upon emergence from the 2008 Chapter 11 Cases, a substantial portion of the net operating losses will likely be further reduced, generally equal to the cancellation of indebtedness.

Based upon the Company's past performance, the expiration dates of its carryforwards, and the change in ownership under IRC Section 382, the ultimate realization of all of the Company's deferred tax assets cannot be assured. Accordingly, a valuation allowance has been recorded to reduce deferred tax assets to a level which, more likely than not, will be realized.

A reconciliation of the income tax provision with amounts determined by applying the U.S. statutory tax rate to income (loss) from continuing operations before income taxes is as follows:

| | Successor | | Predecessor |
| | January 1 - December 31, 2008 | October 2 - December 31, 2007 | January 1 - October 1, 2007 |
|---|---|---|---|
| Provision (benefit) at U.S. statutory tax rate (35%) | $ (198,014) | $ (33,094) | $ (21,967) |
| Add (deduct): | | | |
| Provision for change in valuation allowance | 142,470 | 36,072 | 24,875 |
| Current state income taxes, net of related federal income tax effect | 1,086 | 224 | 255 |
| Foreign withholding taxes | 5 | 1 | 25 |
| Goodwill impairment | 31,778 | — | — |
| Other, net | 9,120 | (2,672) | (2,511) |
| Income tax provision (benefit) from continuing operations | $ (13,555) | $ 531 | $ 677 |

The Company files income tax returns in the U.S. federal jurisdiction and various states and foreign jurisdictions.

On September 15, 2008, the statute of limitation to assess tax expired for the 2004 tax year for federal tax purposes. As such, the

only currently open tax years are 2005 through 2008. The States of Illinois and Texas have audited the Company through December 31, 2005 and December 31, 2006, respectively, and did not propose any adjustments. The Company settled with New York State for the audit period through December 31, 2005.  There are no other state income tax audits in progress.

The Company adopted the provisions of FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes*, on January 1, 2007; the effect was not significant. As of December 31, 2008 and January 1, 2008, the amount of unrecognized tax benefit is $730 and $1,331. Of the ending balance, $730 of tax positions, if recognized, would affect the effective tax rate. As of December 31, 2008, the Company believes that it is reasonably possible that it will have between a zero and $730 decrease in its unrecognized tax benefits in the next twelve months related to statute of limitations or income tax examinations closing in various state jurisdictions. The Company recognizes interest and penalties accrued related to unrecognized tax benefits in the income tax provision. At the time of adoption, accrued interest amounted to $362. As of December 31, 2008 and January 1, 2008, the total amount of accrued income tax related interest and penalties was $317 and $528, respectively.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| | 2008 | | 2007 |
|---|---:|---|---:|
| Unrecognized tax benefits balance at January 1 | $ 1,331 | $ | 1,331 |
| Settlements with taxing authorities | (465) | | — |
| Decreases due to lapse of statute of limitations | (136) | | — |
| Unrecognized tax benefits balance at December 31 | $ 730 | $ | 1,331 |

### Note 14   Warrants

All warrants issued by the Predecessor Company were cancelled on the 2007 Bankruptcy Effective Date of the Amended Plan, and all such warrants issued were unexercised.  The Successor Company has not issued any warrants.

### Note 15   Share-based Payments

For the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1, 2007, the Company has recognized total share-based compensation expense of approximately $0, $0 and $3,874, respectively.

**Stock-based Compensation Plans**

As a result of the 2007 Chapter 11 Cases, all outstanding equity interests (including outstanding options and restricted shares) were cancelled effective October 1, 2007 in exchange for the consideration provided to holders of common stock pursuant to the Amended Plan.  Equity plans maintained by the Predecessor Company either expired prior to the 2007 Bankruptcy Effective Date of the Amended Plan, or were terminated pursuant to the terms of the Amended Plan. Since the 2007 Chapter 11 Cases, the Company has had no equity compensation plans.

On March 8, 2005, the Predecessor Company adopted the Inducement Award Equity Incentive Plan (the "Inducement Plan") as a means of providing equity compensation in order to induce individuals to become employed by the Company. The Inducement Plan provided for the issuance of up to 600,000 shares of the Company's Common Stock in the form of stock options and restricted shares, subject to various restrictions. Pursuant to the Inducement Plan, non-qualified stock options were generally granted with an exercise price equal to the fair market value of the Common Stock on the day prior to the date of grant. Inducement stock options had to be granted at not less than the fair market value of the Common Stock on the date of grant. Options were granted at the discretion of the Compensation Committee of the Board of Directors (the "Compensation Committee"). Option grants became exercisable generally in three equal annual installments commencing one year from the date of grant and had 10-year terms. The Inducement Plan was terminated, and all equity interests granted thereunder were cancelled, when the Company exited the 2007 Chapter 11 Cases.

Certain employment arrangements contained provisions that provided for the payment of cash to the participant of amounts which represented estimated income tax obligations related to the vesting of awards.  All such contracts were terminated as of the 2007 Bankruptcy Effective Date.

On December 19, 2006, the Predecessor Company's stockholders approved the adoption of the 2007 Omnibus Equity Compensation Plan (the "2007 Plan"), which was previously approved by the Board. The 2007 Plan provided for the issuance of a maximum of 3,000,000 shares of common stock in connection with the grant of stock options, stock units, stock awards, dividend equivalents and other stock-based awards to the Company's employees and non-employee directors. The exercise price of stock options was equal to or greater than the fair market value of the Company's common stock on the date of grant. The Compensation

Committee determined the criteria for exercisability of option grants and each grant was to have a 10-year term. The 2007 Plan was terminated, and all equity interests granted thereunder were cancelled, when the Company exited the 2007 Chapter 11 Cases.

## Stock Options

A summary of stock based compensation activity within the Predecessor Company's stock-based compensation plans for the nine months ended September 30, 2007 was as follows:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at December 31, 2006 | 3,386,426 | $ 13.34 | 5.6 | $    — |
| Granted | — | | | |
| Exercised | — | | | |
| Forfeited | (69,496) | 4.03 | | |
| Canceled | (246,089) | 9.84 | | |
| Outstanding at September 30, 2007 | 3,070,841 | 13.49 | 4.9 | — |
| Exercisable at October 1, 2007 | 2,704,198 | $ 14.58 | 4.5 | $    — |

On the Effective Date of the Amended Plan, all outstanding stock options were canceled. The Predecessor Company recognized $549 of expense classified as Reorganization items, net on the Statement of Operations, related to these cancellations.

## Restricted Stock

The Predecessor Company also granted restricted stock awards to certain employees. Restricted stock awards were valued at the closing market value of the Company's common stock on the day prior to the grant, and the total value of the award was recognized as expense ratably over the vesting period (usually 4 years) of the employees receiving the grants. The Company did not grant restricted stock awards in 2007.

A summary of restricted stock activity for the nine months ended September 30, 2007 is as follows:

| | Number of Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 31, 2006 | 568,250 | $    6.90 |
| Granted | — | — |
| Vested | (60,000) | 7.01 |
| Forfeited | (67,000) | 6.72 |
| Outstanding at September 30, 2007 | 441,250 | $    6.92 |
| Outstanding at October 1, 2007 | 441,250 | |

On the 2007 Bankruptcy Effective Date of the Amended Plan, all non-vested restricted stock vested as a result of a change in control of the Company. The Predecessor Company recognized $1,888 of expense classified as Reorganization items, net on the Statement of Operations, related to these shares. Such restricted shares were then canceled, together with all then-issued common stock in the Company, in exchange for the consideration provided to holders of common stock pursuant to the Amended Plan.

In October 2008, the Company entered into an employment agreement with one of its key corporate executives. The executive was granted 278 shares of restricted common stock of the Successor Company to vest ratably over a 4-year period. The value of the award was not material.

## Note 16   Defined Contribution Plan

The Company sponsors a defined contribution plan, which provides retirement benefits for certain full-time employees. Eligible employees elect to participate by contributing a percentage of their pre-tax earnings to the plan. Employee contributions to the plan, up to certain limits, are matched in various percentages by the Company. The Company's matching contribution expense related to the plan totaled $654, $172 and $675 for the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1,

2007, respectively.

## Note 17    Discontinued Operations

On April 24, 2007, the Company's subsidiaries, Bally Matrix Fitness Centre Ltd., an Ontario, Canada corporation, and BTF Canada Corporation, an Ontario, Canada corporation, entered into Asset Purchase Agreements to sell the Company's Canadian operations for cash consideration of $19,042. These transactions closed on June 1, 2007, resulting in the sale of substantially all of the Company's Canadian operations. In accordance with the reporting requirements of SFAS No. 144, the Company has reclassified amounts from the statement of operations to discontinued operations for all periods presented.

The financial results for the Canadian operations, included in discontinued operations, in the Consolidated Statements of Operations for the Predecessor Company are as follows:

|  | Period ended October 1, 2007 |
| --- | --- |
| Revenue | $    13,890 |
| Income from discontinued operations before income taxes | $    26 |
| Income tax provision | — |
| Income from discontinued operations | 26 |
| Gain on disposal of discontinued operations | 21,195 |
| Income from discontinued operations | $    21,221 |

## Note 18    Related Party Transactions

The Company has regular transactions in the normal course of business for fitness equipment and services with two companies that have employed relatives of John Wildman, Senior Vice President Sales. The Company paid $7,083, $621 and $10,140 to those companies, during the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1, 2007, respectively, for providing such goods and services.

In June 2007 and October 2007, respectively, the Board of Directors named Michael A. Feder to serve as Chief Operating Officer of the Company and Harvey Rubinson to serve as Senior Vice President and Interim Chief Financial Officer of the Company. Effective October 1, 2008, Mr. Feder resigned his position as Chief Operating Officer.  Mr. Feder continues to provide certain consulting services to the Company, at the request of the Chief Financial Officer and/or the Chief Executive Officer.  Mr. Feder and Mr. Rubinson are both associated with AP Services LLC, a provider of restructuring and related management services to financially-distressed companies. The Company also uses the services of other AP Services personnel to manage and assist with certain other projects relating to the Company's financial and operational restructuring.  The Company paid AP Services LLC an aggregate of $5,530, $1,329 and $573 for the year ended December 31, 2008 and the periods ended December 31, 2007 and October 1, 2007, respectively.

In 2006, the Board of Directors named Ronald G. Eidell as Senior Vice President and Chief Financial Officer and principal financial officer of the Company and Michael L. Goldberg as Vice President, Corporate Controller. Mr. Eidell and Mr. Goldberg were also partners of Tatum LLC, a financial and accounting services provider. The Company also utilized the services of several partners and associates of Tatum LLC, to manage and assist in certain projects related to accelerating the accounting close process and remediation of material internal control weaknesses. On August 15, 2007, the Company terminated the agreements between the Company and Tatum LLC pursuant to which Mr. Eidell served as the Company's Senior Vice President and Chief Financial Officer and to which Mr. Goldberg served as Vice President, Corporate Controller. The Company paid Tatum LLC an aggregate of $529 during the period ended October 1, 2007.

## Note 19    Commitments and Contingencies

*Operating leases:* The Company leases various fitness center facilities, office facilities, and equipment under operating leases expiring in periods ranging from one to 25 years, excluding optional renewal periods. Certain leases contain contingent rental provisions generally related to cost-of-living criteria or revenues of the respective fitness centers. In 2007, the Company renegotiated the terms of certain of these leases. One such lease had been settled (terminated) for a settlement of $818 and recorded in the financial statements as a liability at December 31, 2007, and reclassified to Liabilities subject to compromise at December 31, 2008. Rent expense under operating leases was $139,199, $35,225 and $94,106 for the year ended December 31, 2008 and the periods ended

December 31, 2007 and October 1, 2007, respectively.

Minimum future rent payments under long-term noncancellable operating leases in effect as of December 31, 2008, exclusive of taxes, insurance, other expenses payable directly by the Company and contingent rent, are $127,456, $120,191, $112,397, $101,325 and $85,792 for 2009 through 2013, respectively, and $351,211 thereafter.

*Capital Leases:* Under the terms of an agreement with the landlord, the Company is obligated to purchase at the landlord's option the leased premises at the Greenwood, Indiana location for a predetermined amount of $5,099 at any time during a ten-year period ending July 2009. During the fourth quarter of 2008, the landlord initiated the exercise of the option. Due to the commencement of the 2008 Chapter 11 Cases on December 3, 2008, no further action has been taken and the Company has included this liability as a Liability subject to compromise at December 31, 2008.

**Litigation:**

*Securities and Exchange Commission Investigation*

In April 2004, the Division of Enforcement of the SEC commenced an investigation in connection with the Company's restatement of the Company's financial statements for 2002 and 2003 and selected financial data for 2000 and 2001. The Company fully cooperated with the SEC during the course of the SEC's investigation. On February 29, 2008, the Company and the SEC announced that they had reached a settlement concerning the SEC's investigation relating to the restatement. As part of the settlement, the Company, without admitting or denying the SEC's allegations, consented to a final judgment requiring future compliance with Federal securities laws and regulations. The settlement did not require the Company to pay a monetary penalty.

*Department of Justice Investigation*

In February 2005, the United States Justice Department commenced a criminal investigation in connection with the Company's restatement. The investigation was conducted by the United States Attorney for the Northern District of Illinois. In early 2008, the Company was informed that the criminal investigation had been closed, without any action against the Company.

*Putative Securities Class Actions*

Between May and July 2004, ten putative securities class actions, now consolidated and designated *In re Bally Total Fitness Securities Litigation* were filed in the United States District Court for the Northern District of Illinois against the Company and certain of its former and current officers and directors. Each of these substantially similar lawsuits alleged that the defendants violated Sections 10(b) and/or 20(a) of the Exchange Act, as well as the associated Rule 10b-5, in connection with the Company's proposed restatement.

On March 15, 2005, the Court appointed a lead plaintiff and on May 23, 2005 the Court appointed lead plaintiff's counsel. By stipulation of the parties, the consolidated lawsuit was stayed pending restatement of the Company's financial statements in November 2005. On December 30, 2005, plaintiffs filed an amended consolidated complaint, asserting claims on behalf of a putative class of persons who purchased Bally stock between August 3, 1999 and April 28, 2004, and adding the Company's former outside audit firm, Ernst & Young LLP as an additional defendant. On July 12, 2006, the Court granted defendants' motions to dismiss the amended consolidated complaint and dismissed the complaint in its entirety, without prejudice to plaintiffs filing an amended complaint on or before August 14, 2006. An amended complaint was filed on August 14, 2006. Defendants filed motions to dismiss the amended complaint on September 28, 2006. On February 20, 2007, the Court issued a Memorandum Opinion and Order dismissing claims against all defendants with prejudice. Plaintiffs filed a Notice of Appeal on March 23, 2007. On April 18, 2007, the Court granted Plaintiff's unopposed Motion to Suspend Briefing, suspending briefing pending a ruling by the United States Supreme Court regarding the Seventh Circuit's standard for pleading scienter in *Makor Issues & Rights v. Tellabs* and directing the parties to file position statements within 14 days of the issuance of the Supreme Court's decision. The Supreme Court's decision was issued on June 21, 2007. The parties filed position statements with the United States Court of Appeals for the Seventh Circuit on July 5, 2007. On August 6, 2007, following commencement of the 2007 Chapter 11 Cases, the Court entered an order staying the appeal. This stay expired on October 1, 2007, the 2007 Bankruptcy Effective Date of the Amended Plan.

In October 2007, the plaintiff filed proofs of claim with the Bankruptcy Court, asserting claims against the Company's chapter 11 estate. The Company filed an objection to these claims. On January 29, 2008, the Bankruptcy Court entered a Consent Order Under Section 502 of the Bankruptcy Code and Fed. R. Bankr. P. 3007 Granting Reorganized Debtors' Objection to Proofs of Claim Numbers 299 and 310 Filed By Lead Plaintiff Cosmos Investment Co., LLC Against Bally Total Fitness Corporation (the "Cosmos Order"). The Cosmos Order disallowed any and all claims of the plaintiff against the Company and expressly barred the plaintiff from asserting any other or further claims against the Company. The Cosmos Order did not bar the plaintiff's claims against individual co-

defendants. Two of these defendants, Lee Hillman and John Dwyer, filed claims with the Bankruptcy Court in both the 2007 Chapter 11 Cases and the 2008 Chapter 11 Cases, alleging, among other things, that the Company is obligated to indemnify them in this litigation. It is not yet possible to determine the ultimate outcome of these indemnification claims.

*Individual Securities Action in Illinois*

On March 15, 2006, a lawsuit captioned *Levine v. Bally Total Fitness Holding Corporation, et al.*, Case No. 06 C 1437 was filed in the United States District Court for the Northern District of Illinois against the Company, certain of its former officers and directors, and its former outside audit firm, Ernst & Young, LLP. Plaintiff's complaint alleged violations of Sections 10(b), 18 and 20(a) of the Exchange Act, SEC Rule 10b-5, and the Illinois Consumer Fraud and Deceptive Practices Act, as well common law fraud in connection with the Company's restatement. The Court found this action related to the consolidated securities class action discussed above, and transferred it to the judge before whom the class action cases were pending. After defendants filed motions to dismiss the complaint and after the Court granted motions to dismiss the class action cases, plaintiff moved for leave to amend its complaint. On July 19, 2006, the Court denied plaintiff's motion and ordered completion of briefings on defendant's motions to dismiss on statute of limitations issues. On September 29, 2006, the Court granted defendant's motion to dismiss plaintiff's Section 18 claim as untimely, denied the motion as to Sections 10(b) and 20(a), dismissed Ernst & Young, LLP as a defendant and granted plaintiff leave to amend his complaint. An amended complaint was filed on November 3, 2006. The Company filed a motion to dismiss the amended complaint on January 5, 2007. On April 2, 2007, the Court granted the Company's motion and dismissed the case with prejudice. Plaintiff did not file a timely Notice of Appeal of this dismissal, but instead filed a new action in the Circuit Court of Cook County, Illinois, Case No. 07 L 4280, asserting only claims for common law fraud and under the Illinois Consumer Fraud and Deceptive Practices Act. A Notice of Pendency of Cases under Chapter 11 of the Federal Bankruptcy Code and of Automatic Stay was filed on August 2, 2007.

In October 2007, the plaintiff filed proofs of claim with the Bankruptcy Court, asserting claims against the Company's chapter 11 estate. The Company filed an objection to these claims. On February 4, 2008, the Bankruptcy Court entered a Stipulation and Agreed Order Approving Settlement Between the Reorganized Debtors and Douglas Levine With Respect to Proofs of Claim Numbers 275 and 289 (the "Levine Stipulation"). The Levine Stipulation provided for a distribution of $50 to the plaintiff, in full satisfaction of any and all claims asserted by the plaintiff against the Company in the *Levine* lawsuit. The *Levine* lawsuit remains pending against individual co-defendants. Two of these defendants, Lee Hillman and John Dwyer, have filed claims with the Bankruptcy Court Court in both the 2007 Chapter 11 Cases and the 2008 Chapter 11 Cases, alleging, among other things, that the Company is obligated to indemnify them in the *Levine* litigation. It is not yet possible to determine the ultimate outcome of these indemnification claims.

*Insurance Lawsuits*

On August 22, 2006, the Company's primary directors and officers insurance provider for the policy years 2001-2002 and 2002-2003 filed a complaint captioned *Great American Insurance Company v. Bally Total Fitness Holding Corporation*, Case No. 06 C 4554 in the United States District Court for the Northern District of Illinois. The complaint alleged that financial information included in the Company's applications for directors and officers liability insurance in the 2001-2002 and 2002-2003 policy years was materially false and misleading. Plaintiff requested the Court to declare the Company's primary policies for those years void *ab initio* and rescinded, and to award plaintiff all sums that plaintiff has paid pursuant to an Interim Funding and Non-Waiver Agreement between the parties, which consists of the $10,000 limit of the 2002-2003 primary policy and additional amounts paid pursuant to the 2001-2002 primary policy. The Company filed a motion to dismiss or stay the proceedings on October 12, 2006. On April 26, 2007, the Court denied Defendant's motion. On June 8, 2007, plaintiff filed a motion for summary judgment, which motion remains pending. On June 11, 2007, the Company filed its answer and counterclaims to Great American's complaint for rescission, as well as a third-party complaint against RLI Insurance Company and the other excess insurance providers. Third party responses and answers were filed by the insurance carriers on or about July 26, 2007. A Notice of Pendency of Cases under Chapter 11 of the Federal Bankruptcy Code and of Automatic Stay was filed on August 2, 2007.

Following the 2007 Bankruptcy Effective Date of the Amended Plan on October 1, 2007, the automatic stay was lifted, permitting the litigation to proceed. Upon commencement of the 2008 Chapter 11 Cases, this matter was dismissed then reinstated to permit the action to proceed with regard to parties other than the Company. The Company is seeking to stay the reinstated action. Additionally, certain parties to this litigation have filed proofs of claim and sought other relief from the Bankruptcy Court. It is not yet possible to determine the ultimate outcome of the insurance litigation, or the amount of any claims that might be allowed against the Company in the 2008 Chapter 11 Cases on account of this litigation.

*Other*

On December 3, 2008, the Company and substantially all of its domestic affiliates filed voluntary petitions for relief with the Bankruptcy Court, commencing the 2008 Chapter 11 Cases. The Debtors are operating their businesses as debtors-in-possession under

the jurisdiction of the Bankruptcy Court and in accordance with applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. Absent a further order of the Bankruptcy Court, the automatic stay rendered operative by Section 362 of the Bankruptcy Code currently operates as a stay of certain litigation that was commenced against the Company prior to commencement of the 2008 Chapter 11 Cases.

The Company is also involved in various other claims and lawsuits incidental to its business, including claims arising from accidents at its fitness centers. In the opinion of management, the Company is adequately insured against such claims and lawsuits, and any ultimate liability arising out of such claims and lawsuits should not have a material adverse effect on the financial condition or results of operations of the Company. In addition, from time to time, customer complaints are investigated by various governmental bodies. In the opinion of management, none of these other complaints or investigations currently pending should have a material adverse effect on the Company's financial condition or results of operations.

In addition, the Company is, and has been in the past, named as defendants in a number of purported class action lawsuits based on (a) alleged violations of state and local consumer protection laws and regulations governing the sale, financing and collection of membership fees; and (b) alleged violations of state and federal employment laws and regulations. To date, the Company has successfully defended or settled such lawsuits without a material adverse effect on its financial condition or results of operations. However, the Company cannot assure that it will be able to successfully defend or settle all pending or future purported class action claims, and the failure to do so may have a material adverse effect on its financial condition or results of operations.

## Note 20   Guarantees

In connection with the Company's January 2006 sale of its "Crunch Fitness" business along with certain additional health clubs located in San Francisco, California, the Company and/or certain of its subsidiaries remain liable for the obligations on certain leases transferred to the purchaser in the amount of $45,371 as of December 31, 2008.

The amount of foregoing liabilities will reduce over time as obligations are paid by the purchaser under these leases. However, certain of the leases possess renewal options which, if exercised by purchaser, will again increase the amount of liability of the Company and/or certain of its subsidiaries under such lease existing as of the date of such exercise by purchaser, but for no more than the obligations for a 5 year period under any such lease.

The Company's exposure for these retained liabilities is mitigated by two letters of credit naming the Company as beneficiary, aggregating $3,077 and having a term equal to the longer of April 20, 2009 or the time the purchaser has a Debt to EBITDA Ratio of less than 3 to 1. If replacement letters of credit are not issued prior to April 20, 2009, the Company has the right to draw on the existing letters of credit. The Company has recorded a liability on its balance sheet for the estimated fair value of these potential obligations of $600.

## Note 21   Sale/Leaseback Transaction

The Company entered into a sale/leaseback transaction in 2006 involving four owned properties. This transaction involved the sale of land, buildings, and related building improvements and the subsequent leaseback of the same property over a period of twenty years. The transaction generated $8,919 of proceeds and resulted in deferred gains of $6,117 that were to be amortized in proportion to the related gross rental charged to expense over the respective lease term based upon operating lease classification according to SFAS No. 13, *"Accounting for Leases."*

However, this transaction did not qualify for sale/leaseback treatment as of December 31, 2006, and therefore the transaction was recorded as a financing according to SFAS No. 98, *"Accounting for Leases".* During the first quarter of 2007, upon amending the transaction, the Company recorded the sale and subsequently records rent expense for this facility.

Upon the application of purchase accounting, the deferred gains related to the above transaction were eliminated and did not carryover to the Successor Company.

## Note 22   Subsequent Events

Since December 31, 2008, the Company is operating its business as a debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. The Company continues to be engaged in negotiations with its secured lenders and other key creditor constituencies, in an attempt to negotiate the terms of a chapter 11 plan of reorganization, including exit financing. There can be no assurance that the Company will be able to negotiate a consensual chapter 11 plan or that the Bankruptcy Court will enter an order confirming a chapter 11 plan that the Company (or another party) might propose.

**Note 23    Quarterly Financial Data (Unaudited)**

Quarterly financial data for the years ended December 31, 2008 and 2007 is as follows (in millions, except per share data):

| | Successor Company | | | |
| | Fiscal 2008 | | | |
| | Mar 31 | Jun 30 | Sep 30 | Dec 31 |
|---|---|---|---|---|
| Net revenues | $ 157.9 | $ 161.2 | $ 160.4 | $ 154.9 |
| Operating expenses | 237.9 | 235.8 | 232.8 | 352.3 |
| Operating loss | (80.0 ) | (74.6 ) | (72.4 ) | (197.4) |
| Loss from continuing operations | (104.3 ) | (98.9 ) | (99.5 ) | (249.5) |
| Net loss | (104.3 ) | (98.9 ) | (99.5 ) | (249.5) |
| Basic loss per common share: | | | | |
| Loss from continuing operations | (11,589.56) | (10,991.33) | (11,054.22) | (27,720.44) |
| Net loss | (11,589.56) | (10,991.33) | (11,054.22) | (27,720.44) |
| Diluted loss per common share: | | | | |
| Loss from continuing operations | (11,589.56) | (10,991.33) | (11,054.22) | (27,720.44) |
| Net loss | (11,589.56) | (10,991.33) | (11,054.22) | (27,720.44) |

| | Predecessor Company | | | Successor |
| | Fiscal 2007 | | | |
| | Mar 31 | Jun 30 | Oct 1 | Dec 31 |
|---|---|---|---|---|
| Net revenues | $ 233.4 | $ 235.5 | $ 227.5 | $ 143.7 |
| Operating expenses | 223.2 | 207.6 | 196.5 | 214.9 |
| Operating income (loss) | 10.2 | 27.9 | 31.0 | (71.2) |
| Loss from continuing operations | (14.9 ) | (13.4 ) | (35.1 ) | (95.1) |
| Net income (loss) | (14.9 ) | 7.8 | (35.1 ) | (95.1) |
| | | | | |
| Basic income (loss) per common share: | | | | |
| Loss from continuing operations | (0.37 ) | (0.33 ) | (0.86 ) | (10,565.00) |
| Net income (loss) | (0.37 ) | 0.19 | (0.86 ) | (10,565.00) |
| Diluted income (loss) per common share: | | | | |
| Loss from continuing operations | (0.37 ) | (0.33 ) | (0.86 ) | (10,565.00) |
| Net income (loss) | (0.37 ) | 0.19 | (0.86 ) | (10,565.00) |

Membership revenue beginning in the fourth quarter 2007 (Successor Company) was impacted by the reduction in the basis of deferred revenue due to the valuation at fair value under purchase accounting as of October 1, 2007, and the creation of the intangible member relationship asset, the amortization of which is recorded as a reduction in membership revenue recognition. Also, in the fourth quarter of 2008, the Company recorded $171.6 million of asset impairment charges.

**CERTIFICATION**

I, Harvey Rubinson, certify that:

1.  I have reviewed this Annual Report of Bally Total Fitness Holding Corporation;

2.  This Annual Report was prepared in accordance with generally accepted accounting principles.


Date: April 6, 2009                                        /s/ Harvey Rubinson
                                                            Harvey Rubinson
                                                           Interim Chief Financial Officer

~~Independent Auditors' Report~~

Board of Directors
Bally Total Fitness Holding Corporation
Chicago, Illinois

We have audited the accompanying consolidated balance sheets of Bally Total Fitness Holding Corporation (Successor Company and Debtor-in-Possession) as of December 31, 2008 and 2007 and the related consolidated statements of operations, stockholders' (deficit) equity, and cash flows for the year ended December 31, 2008 and for the period October 2, 2007 through December 31, 2007. We have also audited the consolidated statements of operations, stockholders' deficit and cash flows of Bally Total Fitness Holding Corporation (Predecessor Company) for the period January 1, 2007 through October 1, 2007. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As described in Note 1 to the consolidated financial statements, on September 17, 2007, the Bankruptcy Court entered into an order confirming the Amended Plan of Reorganization, which became effective after the close of business on October 1, 2007. Accordingly, the consolidated balance sheet as of October 1, 2007 included in Note 3 of the consolidated financial statements has been prepared in conformity with Statement of Financial Accounting Standards No. 141 "Business Combinations" for the Successor Company as a new entity and as such reflects all assets and liabilities of the Successor Company at their estimated fair values and a new capital structure. Accordingly, financial statements after October 1, 2007 are prepared on a different basis than earlier statements and are therefore not necessarily comparable.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Bally Total Fitness Holding Corporation (Successor Company and Debtor-in-Possession) at December 31, 2008 and 2007, and the results of its operations and its cash flows for the year ended December 31, 2008 and for the period October 2, 2007 through December 31, 2007 and the results of operations and cash

flows of Bally Total Fitness Holding Corporation (Predecessor Company) for the period ~~January 1, 2007 through October 1, 2007, in conformity with accounting principles~~ generally accepted in the United States of America.

As described in Note 1, the Company re-filed for reorganization under Chapter 11 of the United States Bankruptcy Code on December 3, 2008. The accompanying financial statements do not purport to reflect or provide for the consequences of the bankruptcy proceedings. In particular, such financial statements do not purport to show (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to prepetition liabilities, the amounts that may be allowed for claims or contingencies or the status and priority thereof; (c) as to stockholders' accounts, the effects of any changes that may be made in capitalization of the Company; or (d) as to operations, the effects of changes that may be made in its business.

The accompanying financial statements of Bally Total Fitness Holding Corporation (Debtor-in-Possession) have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, as a result of the bankruptcy filing, realization of assets and the satisfaction of liabilities without substantial adjustments and or changes in the ownership are subject to uncertainty and raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As disclosed in the consolidated financial statements, effective January 1, 2007, the Predecessor Company changed its method of accounting for uncertain tax positions to conform to Financial Accounting Standard Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes."

*BDO Seidman, LLP*

Chicago, Illinois
April 6, 2009

<u>**EXHIBIT F TO THE DISCLOSURE STATEMENT**</u>

**THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE**

# Bally Total Fitness Holding Corporation -- Corporate and Capital Structure

**As of 12/3/2008**

**$292mm Senior Credit Facility**

- Credit Agreement dated 10/1/2007
- Borrower: Bally Total Fitness Holding Corporation
- Term Loan Amount: $242mm
- Revolving Loan Amount: $50mm
- Guarantors: Certain subsidiaries
- Collateral: Secured by substantially all of the Company's personal property and certain real property

**13% Senior Secured Notes**

- Indenture dated 10/1/2007
- Maturity: 7/15/2011
- Issuer: Bally Total Fitness Holding Corporation
- Amount: $247,337,500
- Trustee: U.S. Bank National Association
- Guarantors: Certain subsidiaries
- Collateral: Secured by a second lien on all of the Company's personal property and certain real property

**15-5/8%/14% Senior Subordinated Toggle Notes**

- Indenture dated 10/1/2007
- Maturity: 10/1/2013
- Issuer: Bally Total Fitness Holding Corporation
- Amount: $200mm
- Trustee: HSBC Bank USA, National Association
- Guarantors: None
- Collateral: None

**LEGEND**

Debtor

Non-debtor

Ownership Details

Guarantor under Senior Credit Facility and 13% Senior Secured Indenture

Non-Guarantors

*Non-affiliate of Bally Total Fitness Holding Corporation

